FILED
CLERK, U.S. DISTRICT COURT

March 29, 2019

CENTRAL DISTRICT OF CALIFORNIA
BY: ___JG___ DEPUTY

Charis Feeney-Orchard
9 Wirrilda Way,
Forestville, NSW, 2087
Australia
Email: charisfeeney77@gmail.com
Phone : +61 (0) 404870918

Friday March 29th, 2019

REF : 2:19–cv–00893 GW (SKx)

ATTN: Judge George H. Wu

Hearing: April 29, 2019
Time: 8:30 a.m.
Courtroom: 9D

### Request for a motion to dismiss

To the Honourable Judge George H. Wu,

Under Rule 12 of the Federal Rules of Criminal Procedure I hereby request for a motion to dismiss this case.

As the defendant on the above-mentioned court case, I formally request a motion to dismiss for the following reasons:

1. I was not served properly by the defendant (attachment a)

2. The signed Screenplay Option Purchase Agreement between the Plaintiff and Myself, which is the basis of this dispute, clearly states that all matters of dispute must be resolved by Arbitration using the rules of the International Film and Television Alliance (attachment b, item 19, clause g). Therefore, there is no jurisdiction for this matter to be resolved in the Federal Court of the United States as, in accordance with the contract in place, it should be resolved using a single arbitrator from the IFTA.

3. I paid the option for the screenplay (attachment c) and had the right to undertake principle photography before the payment of the writer's fee, as the fee was to be based on the final budget of the film.

4. When I went to pay the writer's fee, the dispute over the amount of payment arose due to a misunderstanding and misinterpretation of the writer's fee, where I believed the amount in question referred to the budget and not the writers fees (see attachment b, item 5: purchase price). I would be astonished to find if there was ever a payment of such a high writers fee in existence for a first-time producer screenplay, hence my shock and disbelief at finding that Ms. Boyle expected $125,000 for her first and only screenplay.

5. As I am not motivated by money and want the film to be available to the public, not only for myself but for all involved in its production, the dispute was promptly settled by an 'assignment of payment' agreement that was negotiated by the former Attorney of the Plaintiff in August 2016, over two years ago, and signed and accepted by Myself and the sales agent, Adler and Associates (See attachment d) where I accepted to allow the fee of $125,000 to be paid out of the receipts of the film, as per the sales agreement. If there was any issue why has it taken this long for the plaintiff to react and why wasn't there any attempt to seek out a resolution independent of a Federal Court?

6. I am a resident of Australia, not the United States and a single mother who is not affluent and earns a normal wage, therefore, I cannot defend myself properly in this case, which I feel is wasteful of Federal Court resources and stems from malicious intent.

Due to the above-mentioned reasons, I humbly request that Your Honour make a motion to dismiss the case and direct the Plaintiff towards Arbitration at the IFTA.

Signature of Charis Feeney-Orchard:

*[signature: Charis Feeney-Orchard]*

Name, email and signature of Witness:

Jason Hae    Jason.Hae@gmail.com

*[signature]*

*Motion to Dismiss*
*Attachment A*

**From:** Charis Orchard
**To:** Charis Feeney
**Subject:** Fwd: Lawsuit filed by Kimberly Boyle
**Date:** Tuesday, 19 March 2019 2:05:40 PM
**Attachments:** Waiver of Service of Summons.pdf
Assignment to Judge Wu.pdf
Complaint Filed.pdf
Notice of Assignment to ADR.pdf
Notice of Interested Parties.pdf
Report on the Filing of a Copyright Filed.pdf
Standing Judges Order.pdf
Summons Issued.pdf

Sent from my iPhone

Begin forwarded message:

> **From:** "Larry Zerner" <Larry@Zernerlaw.com>
> **Date:** 6 March 2019 at 6:12:09 am AEDT
> **To:** <charisorchard@gmail.com>
> **Cc:** <Zernerlaw@gmail.com>
> **Subject: Lawsuit filed by Kimberly Boyle**
> **Reply-To:** <Larry@ZernerLaw.com>

Dear Ms. Orchard,

I am the attorney for Kimberly Boyle. On February 7, 2019, I filed a copyright infringement lawsuit on Ms. Boyle's behalf against you, Adler & Associates Entertainment, LLC, Amazon.com, and Dreamscape Media.

The lawsuit arises out of the movie *Perfect Piece,* which you produced without ever securing rights in Ms. Boyle's screenplay. There was an attempt in 2016 to resolve this issue by you and Adler agreeing to pay Ms. Boyle $125,000 from the proceeds of the movie. However, as Adler never signed onto this deal, no agreement was reached. Ms. Boyle had me file the lawsuit after seeing that the movie was showing on Amazon Prime and was for sale on DVD.

Ms. Boyle is seeking payment of the $125,000 that you owe her under the terms of your option agreement.

I have enclosed copies of the pleadings filed in this case as well as a Waiver of Service of Summons form. If you sign and return the

form, you will have 90 days to respond to the lawsuit. On the other hand, if you don't sign, and I have to hire a process server in Sydney to serve you, you will only have 21 days to respond to the complaint and you will be responsible for all of the costs of service.

Please let me know by the end of the week whether you will sign the waiver form.

Thank you for your prompt attention to this matter.

Larry Zerner

---

ZERNERLAW

Copyright, Trademark, and Entertainment Law

1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Tel (310) 773-3623
Fax (310 634-1256
Url www.ZernerLaw.com

The information contained in this email and its attachments is confidential and may be the subject of legal, professional or other privilege. It is intended only for the named addressees and may not be disclosed to anyone else without consent from ZernerLaw. If you are not the named addressee you must not use, disclose, distribute, copy, print or rely on the contents of this email and should destroy it immediately. Whilst ZernerLaw takes care to protect its systems from electronic virus attack or other harmful element, the firm gives no warranty that this email message (including any attachments to it) is free of any virus or other harmful matter and accepts no responsibility for any loss or damage resulting from the recipient receiving, opening or using it. If you need further information, please contact the originator of this message on (310) 773-3623.

Charis Feeney-Orchard
Purchaser/Director
8 Haven Green
Ealing, London, W5 2UU
United Kingdom
Email: charisorchard@gmail.com
Tel: +44 7455 309583

Kim Boyle
C/o Jay S. Kenoff, ESQ.
Kenoff & Machtinger, LLP
1801 Century Park East,
Suite 1520
Los Angeles, California 90067
United States of America
Email: Jay@km-entertainmentlaw.com
Tel: +1 (310) 552 0808

SCREENPLAY OPTION PURCHASE AGREEMENT

This Option Purchase Agreement made on 12 May 2014 by and between Kim Boyle, (hereinafter referred to as the "Transferor") and Charis Feeney-Orchard (hereinafter referred to as "Purchaser").

WHEREAS, the Transferor is the sole and exclusive owner throughout the world of all rights in and to the screenplay for a feature-length motion picture (the "Picture") presently-entitled: "Casanova Lost and Found" (formerly known as "This Albert DiGrazia") that was also written by the Transferor which work has been filed in the Office of the Writers Guild of America West, Los Angeles, California, USA, under Registration Number 818942 (a copy of which is attached as Appendix A to this Agreement), this work including all adaptations and/or versions, the titles, characters, plots, themes and story line is collectively referred to as the "Property"; and

WHEREAS, Purchaser wants to acquire certain rights of the Transferor in consideration for the purchase price provided herein and in reliance upon the Transferor's representations and warranties;

NOW, THEREFORE, the parties agree as follows:

1. RIGHTS: Upon exercise of the Option (as described below) and payment of the Purchase Price (as described herein), the Transferor will irrevocably transfer, sell, grant, convey and assign to the Purchaser, and the Purchaser's successors, licensees and assigns exclusively and forever, except for the reserved rights described below, all motion picture rights (including all silent, sound dialogue and musical motion picture rights), all television motion picture and other television rights, together with limited radio broadcasting rights and 7,500 word publication rights for advertisement, publicity and exploitation purposes, and certain incidental and allied rights, throughout the world, in and to the Property and in and to any intellectual property including the copyright thereof and all renewals and extensions of copyright. Included among the rights granted to Purchaser hereunder (without in any way limiting the grant of rights hereinabove made) are the following sole and exclusive rights throughout the world in perpetuity:

(a) To make, produce, adapt and copyright (or otherwise protect) one or more motion picture adaptations or versions (the initial one of which shall be the Picture), whether fixed on film, tape, disc, wire, audio-visual cartridge, cassette or through any other technical process whether now known or hereafter devised, based in whole or in part on the Property, of every size, gauge, colour, dimension or type, including, but not limited to, musical motion pictures and remakes of and sequels (or prequels) to any motion picture produced hereunder and motion pictures in series or serial form, and for such purposes to record and reproduce and license others to record and reproduce, in synchronization with such motion pictures, spoken words taken from or based upon the text or theme of the Property and any and all kinds of music, musical accompaniments and/or lyrics to be performed or sung by the performers in any such motion picture and any and all other kinds of sound and sound effects.



1

(b) To make, produce, distribute, sell, license, assign, transfer, exhibit, perform, rent, lease and generally deal in and with any of the foregoing:

(i) by all means or technical processes whatsoever, whether now known or hereafter devised including, by way of example only, film, tape, disc, wire, audio-visual cartridge, cassette or television (including commercially sponsored, sustaining and subscription or pay-per-view television, or any derivative thereof); and

(ii) in any place whatsoever, including, by way of example only and without limitation to, homes, theatres and elsewhere, and whether or not a fee is charged, directly or indirectly, for viewing any such motion picture.

(c) To broadcast, transmit or reproduce the Property or any adaptation or version thereof (including, by way of example only and without limitations to, any motion picture produced hereunder and/or any script or other material based on or utilizing the Property or any of the characters, themes or plots thereof), by means of television or any process analogous thereto whether now known or hereafter devised (including commercially sponsored, sustaining and subscription or pay-per-view television), through the use of motion pictures produced on films or by means of magnetic tape, wire, disc, audio-visual cartridge or any other device now known or hereafter devised and including such television productions presented in series or serial form, and the exclusive right generally to exercise for television purposes all the rights granted to Purchaser hereunder for motion picture purposes.

(d) Without limiting any other rights granted Purchaser, to broadcast and/or transmit by television or radio or any process analogous thereto whether now known or hereafter devised, all or any part of the Property or any adaptation or version thereof, including any motion picture or any other version or versions thereof, and announcements pertaining to said motion picture or other version or versions, for the purpose of advertising, publicizing or exploiting such motion picture or other version or versions, which broadcasts or transmissions may be accomplished through the use of living actors performing simultaneously with such broadcast or transmission or by any other method or means including the use of motion pictures (including trailers) reproduced on film or by means of magnetic tape or wire or through the use of other recordings or transcriptions.

(e) To publish, copyright and protect or cause to be published, copyrighted and protected in the name of Purchaser or its nominee in any and all languages throughout the world, in any form or media, synopses, novelizations, serializations, dramatizations, abridged and/or revised versions of the Property, not exceeding 75,000 words each, adapted from the Property or from any motion picture and/or other version of the Property for the purpose of advertising, publicizing and/or exploiting any such motion picture and/or other version.

(f) For the foregoing purposes to use all or any part of the Property and any of the characters, plots, themes and/or ideas contained therein, and the title of the Property and any title or subtitle of any component of the Property, and to use said titles or subtitles for any motion picture or other version of adaptation whether or not the same is based on or adapted from the Property and/or as the title of any musical composition contained in any such motion picture or other version or adaptation.

(g) To use and exploit commercial or merchandise licenses, tie-ups, promotions and recordings of any sort and nature arising out of or connected with the Property and/or its motion picture or other versions and/or the title or titles thereof and/or the characters thereof and/or their names or characteristics.



All rights, licenses, privileges and property herein granted to Purchaser

shall be cumulative and Purchaser may exercise or use any or all said rights, licenses, privileges or property simultaneously with or in connection with or separately and apart from the exercise of any other of said rights, licenses, privileges and property; provided that Purchaser's initial production hereunder is the Picture. If the Transferor hereafter makes or publishes or permits to be made or published any revision, adaptation, sequel, prequel, translation or dramatization or other versions of the Property, then Purchaser shall have and the Transferor hereby grants to Purchaser, subject to the terms and conditions, including without limitation, the payment provisions set forth hereinbelow, all of the same rights therein as are herein granted Purchaser. The terms "Picture" and "Pictures" as used herein shall be deemed to mean or include any present or future kind of motion picture production based upon the Property, with or without sound recorded and reproduced synchronously therewith, whether the same is produced on film or by any other method or means now or hereafter used for the production, exhibition and/or transmission of any kind of motion picture productions.

2. RIGHTS RESERVED: The following limited rights are reserved for the Transferor's continued and future use and disposition:

(a) Publication Rights: The right to publish and distribute printed versions of the Property owned or controlled by the Transferor in written book form, whether hardcover or soft-cover, and in magazine or other similar periodicals (which may be published as a continuing series of instalments), subject to Purchaser's rights as provided for in Clause 1 above.

(b) Stage Rights: The right to perform the Property or adaptations thereof on the spoken stage with actors appearing in person in the immediate presence of the audience, provided no broadcast, telecast, recording, photography or other reproduction of such performance is made. The Transferor agrees not to exercise, or permit any other person to exercise, said stage rights earlier than five (5) years after the first general release or telecast, if earlier, of the first Picture produced hereunder, or seven (7) years after the date of exercise of the purchaser's option to acquire the property, whichever is earlier.

(c) Radio Rights: The right to broadcast the Property by sound (as distinguished from visually) by radio, subject however to Purchaser's right at all times to: (i) exercise its radio rights provided in Clause 1 above for advertising and exploitation purposes by living actors or otherwise, by the use of excerpts from or condensations of the Property or any Picture produced hereunder; and (ii) in any event to broadcast any Picture produced hereunder by radio. The Transferor agrees not to exercise, or permit any other person to exercise, the Transferor's radio rights earlier than five (5) years after the Purchaser first publishes the Property.

(d) Author-Written Sequel: A literary property (story, novel, or drama), whether written by the Transferor or by a successor in interest of the Transferor, using one or more of the characters appearing in the Property, participating in substantially different events from those found in the Property, and whose plot is substantially different from that of the Property. The Transferor shall have the right to exercise publication rights (i.e., in book or magazine form) at any time. The Transferor agrees not to exercise, or permit any other person to exercise, any other rights (including but not limited to motion picture or allied rights) of any kind in or to any author-written sequel earlier than five (5) years after the Purchaser first publishes the Property, provided that such restriction on the Transferor's exercise of said author-written sequel rights shall be extended to any period during which there is in effect, in any particular country or territory, a network television broadcasting agreement for a television motion picture, (i) based upon the Property, or (ii) based upon any Picture produced in the exercise of rights assigned herein, or (iii) using a character or characters of the Property.



3

(e) Inasmuch as the characters of the Property are included in the exclusive grant of motion picture rights to Purchaser, no sequel or prequel rights or television series rights may be granted to such other person or company, but such characters from the Property which are contained in the author-written sequel may be used in a motion picture and remakes thereof whose plot is based substantially on the plot of the respective author-written sequel.

It is expressly agreed that the Transferor's reserved rights under this subclause relate only to material written or authorized by the Transferor and not to any revision, adaptation, sequel, prequel, translation or dramatization written or authorized by Purchaser, even though the same may contain characters or other elements contained in the Property.

3. RIGHT TO MAKE CHANGES: the Transferor agrees that Purchaser shall have the unlimited right to vary, change, alter, modify, add to and/or delete from the Property, and to rearrange and/or transpose the Property and change the sequence thereof and the characters and descriptions of the characters contained in the Property, and to use a portion or portions of the Property or the characters, plots, or theme thereof in conjunction with any other literary, dramatic or other material of any kind. The Transferor hereby waives the benefits of any provisions of law known as the "droit moral" or any similar law in any country of the world and agrees not to permit or prosecute any action or lawsuit on the ground that any Picture or other version of the Property produced or exhibited by Purchaser, its assignees or licensees, in any way constitutes an infringement of any of the Transferor's droit moral or is in any way a defamation or mutilation of the Property or any part thereof or contains unauthorized variations, alterations, modifications, changes or translations.

4. DURATION AND EXTENT OF RIGHTS GRANTED: Upon exercise of the Option and payment of the Purchase Price, Purchaser shall enjoy, solely and exclusively, all the rights, licenses, privileges and property granted hereunder throughout the world, in perpetuity, as long as any rights in the Property are recognized in law or equity, except insofar as such period of perpetuity may be shortened due to any now existing or future copyright by the Transferor of the Property and/or any adaptations thereof, in which case Purchaser shall enjoy its sole and exclusive rights, licenses, privileges and property hereunder to the fullest extent permissible under and for the full duration of such copyright or copyrights, whether common law or statutory, and any and all renewals and/or extensions thereof, and shall thereafter enjoy all such rights, licenses, privileges and property non-exclusively in perpetuity throughout the world. The rights granted herein are in addition to and shall not be construed in derogation of any rights that Purchaser may have as a member of the public or pursuant to any other agreement. All rights, licenses, privileges and property granted herein to Purchaser are irrevocable and not subject to rescission, restraint or injunction under any circumstances. Notwithstanding the foregoing, if Purchaser exercises the Option and fails to produce the Picture within seven (7) years of the date of this Agreement or five (5) of the date of exerercise of the Option, all rights shall revert to Transferor with a lien in favour of Purchaser for Purchaser's actual out-of-pocket expenses incurred in connection with the acquisition of the Property, payable upon commencement of production of the Picture by a third party.

5. CONSIDERATION: The following terms shall apply to this Agreement:

Option: In consideration of the option payment specified below, Purchaser shall have an option (the "Option") to acquire the Rights described hereinabove on the terms and conditions specified in this Agreement.

Term: The initial option term shall be 12 months from the date of Transferor's execution of this Agreement; renewable for an additional period of 12 months upon written notice to Transferor and payment of the

option extension payment prior to the expiration of the initial option period.

Option Payments: Purchaser shall pay Transferor the sum of $500 upon execution of this Agreement for the initial period, with such payment applicable to the Purchase Price and $1,000 for the option extension payment, payment to accompany the written option extension notice; such payment shall not be applicable to the Purchase Price.

Option Exercise: The Option may be exercised by written notice accompanied by payment of the Purchase Price (or, if sooner, upon commencement of principal photography, in which event payment of the Purchase Price shall be made to Transferor within 5 business days thereafter).

Purchase Price: The amount of the Purchase Price shall equal 3% of the final budget of the Picture (with exclusions for contingency, actual bond fees, finance charges and purchase price for screenplay), floor of $125,000, cap of $250,000. If the final budget has not been determined at the time of exercise of the Option, then the minimum amount shall be paid at that time, and the balance shall be paid within 30 days of commencement of principal photography of the Picture.

Box Office Bonus: Transferor will be paid $50,000 at $20 million U.S. theatrical box office as reported in Daily Variety or similar if Daily Variety not available with payment within 30 days of such determination.

Contingent Compensation: For sole writing credit, Transferor will receive 5% of contingent Net Proceeds (or Net Profits, as applicable) defined, accounting for and paid according to the same definition applicable to the Purchaser (or, if none, then on a favored nations basis with any other receipient of a participation in the revenues of the Picture); reducible to 2½% for shared writing credit by percentage paid to another credited writer.

Further Writing: Transferor shall have the first opportunity to prepare one rewrite and one polish of the Property, fees at applicable WGA minimums + 10%, payable one-half upon start of writing and one-half upon delivery of each work.

Passive Payments for Sequels/Remakes/Spinoffs: These apply for payments to the Transferor for the particular form of work, if Transferor is not the writer and being compensated for writing the particular work. Below amounts reduced by one half if Transferor shares writing credit on the initial Picture.
(a)   Theatrical Sequels: ½ of the Purchase Price and ½ of contingent compensation percentage.
(b)   Theatrical Remakes: 1/3rd of Purchase Price and 1/3rd of contingent percentage.
(c)   Mini-series/MFT: $15,000 per hour for the first two hours, cap at $90K; proration for partial hours.
(d)   Episodic: $5,000/90 min; $3,500/hour; $2,500/half hour.
(e)   Spin-offs: one-half of applicable episodic amount for a generic spin-off, one-fourth of applicable episodic amount for a planted spin-off.

Re-runs: 20% of applicable episodic payment per re-run for first 5 re-runs.

Credit: Per WGA standards, as if applicable, and as otherwise set forth below.



Premiere: Invite for Kim + 1 to premiere with travel and accommodations provided.

6. REPRESENTATIONS AND WARRANTIES:

(a) Sole Proprietor:  the Transferor represents and warrants to Purchaser

5

that the Transferor is the sole and exclusive proprietor, throughout the universe, of that certain original literary material written by the Transferor entitled "Casanova Lost and Found."

(b) Facts: the Transferor represents and warrants to Purchaser as follows:

(i) The Transferor is the sole author and creator of the Property.

(ii) The Property is unpublished and was registered for copyright in the name of "Casanova Lost and Found" written by Kim Boyle which work has been filed in the Office of the Writers Guild of America West, Los Angeles, California, USA, under Registration Number 818924.

(iii) No motion picture or dramatic version of the Property, or any part thereof, has been manufactured, produced, presented or authorized; no radio or television development, presentation, or program based on the Property, or any part thereof, has been manufactured, produced, presented, broadcast or authorized; and no written or oral agreements or commitments whatsoever with respect to the Property, or with respect to any rights therein, have been made or entered into by o on behalf of the Transferor.

(iv) None of the rights herein granted and assigned to Purchaser have been granted and/or assigned to any person, firm or corporation other than Purchaser herein upon exercise of the Option.

(c) No Infringement or Violation of Third Party Rights: the Transferor represents and warrants to Purchaser that the Transferor has not adapted the Property from any other literary, dramatic or other material of any kind, nature or description, nor, except for material which is in the public domain, has the Transferor copied or used in the Property the characters, themes, plot, scenes, sequence or story of any other literary, dramatic or other material; that, according to the standard applicable under Article 28 of the WGA Basic Agreement, (i) the Property does not infringe upon any common law or statutory rights in any other literary, dramatic or other material; (ii) no material contained in the Property is libelous or violative of the right of privacy of any person; (iii) the full utilization of any and all rights in and to the Property granted by the Transferor pursuant to this Agreement will not violate the rights of any person, firm or corporation; and (iv) the Property is not in the public domain in any country in the world where copyright protection is available.

(d) No Impairment of Rights: the Transferor represents and warrants to Purchaser that the Transferor is the exclusive proprietor, throughout the universe, of all rights in and to the Property granted herein to Purchaser; that the Transferor has not assigned, licensed or in any manner encumbered, diminished or impaired any such rights; that the Transferor has not committed or omitted to perform any act by which such rights could or will be encumbered, diminished or impaired; and that there is no outstanding claim or litigation pending against or involving the title, ownership and/or copyright in the Property, or in any part thereof, or in any rights granted herein to Purchaser. The Transferor further represents and warrants that no attempt shall be made hereafter by the Transferor to challenge, encumber, diminish or impair any of the rights granted herein and that all appropriate protection of such rights will continue to be maintained by the Transferor.

7. INDEMNIFICATION:



(a) The Transferor agrees to indemnify Purchaser against all judgments, liability, damages, penalties, losses, costs, and expense (including reasonable attorneys' fees) which may be suffered or assumed by or obtained against Purchaser by reason of any breach or failure of any warranty or agreement herein made by the Transferor.

(b) Purchaser agrees to indemnify Transferor against all judgments,

liability, damages, penalties, losses, costs, and expense (including reasonable attorneys' fees and costs) which may be suffered or assumed by or obtained against Transferor by reason of any matter or things arising out of the development, production, distribution and exploitation of the Picture, the breach or failure of any warranty or agreement herein made by Purchaser and any material added to the Property by Purchaser, except to the extent that the foregoing covered by the Trnasferor's foregoing indemnity.

(c) Upon exercise of the Option and payment of the Purchase Price, All rights, licenses and privileges herein granted to Purchaser are irrevocable and not subject to rescission, restraint or injunction under any circumstances.

8. PROTECTION OF RIGHTS GRANTED: the Transferor hereby grants to Purchaser the free and unrestricted right, but at Purchaser's own cost and expense, to institute in the name and on behalf of the Transferor, or the Transferor and Purchaser jointly, any and all suits and proceedings at law or in equity, to enjoin and restrain any infringements of the rights herein granted, and hereby assigns and sets over to Purchaser any and all causes of action relative to or based upon any such infringement, as well as any and all recoveries obtained thereon. The Transferor will not compromise, settle or in any manner interfere with such litigation if brought; and Purchaser agrees to indemnify and hold the Transferor harmless from any costs, expenses, or damages which the Transferor may suffer as a result of any such suit or proceeding.

9. COPYRIGHT: Regarding the copyright (and/or any other intellectual property right) in and to the Property, the Transferor agrees that:

(a) The Transferor will prevent the Property and any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof whether published or unpublished and whether copyrighted or uncopyrighted, from vesting in the public domain, and will take or cause to be taken any and all steps and proceedings required for copyright or similar protection in any and all countries in which the same may be published or offered for sale, insofar as such countries now or hereafter provide for copyright or similar protection. Any contract or agreement entered into by the Transferor authorizing or permitting the publication of the Property or any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof in any country will contain appropriate provisions requiring such publisher to comply with all the provisions of this clause.

(b) Without limiting the generality of the foregoing, if the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof is published in the United States or in any other country in which registration is required for copyright or similar protection in accordance with the laws and regulations of such country, and the Transferor further agrees to affix or cause to be affixed to each copy of the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof which is published or offered for sale such notice or notices as may be required for copyright or similar protection in any country in which such publication or sale occurs.

(c) Intentionally omitted.



(d) If the Property, or any arrangement, revision, translation, novelization, dramatization or new version thereof, shall ever enter the public domain, then nothing contained in this agreement shall impair any rights or privileges that the Purchaser might be entitled to as a member of the public.

(e) Upon exercise of the Option and payment of the Purchase Price, all

rights granted or agreed to be granted to Purchaser under this Agreement shall be irrevocably vested in Purchaser and shall not be subject to rescission by the Transferor or any other party for any cause, nor shall said rights be subject to termination or reversion by operation of law or otherwise, except to the extent, if any, that the provisions of any copyright law or similar law relating to the right to terminate grants of, or recapture rights in, literary property may apply. If, pursuant to any such copyright law or similar law, the Transferor or any successor or any other legally designated party (all herein referred to as "the terminating party") becomes entitled to exercise any right to reversion, recapture or termination (the "termination right") with respect to all or any part of the rights granted or to be granted under this Agreement, and if the terminating party exercises said termination right with respect to all or part of said rights (the "recaptured rights"), then from and after the date on which the terminating party has the right to transfer to a third party all or part of the recaptured rights, Purchaser shall have the first right to purchase and acquire the recaptured rights from the terminating party.

If the terminating party is prepared to accept a bona fide offer from a third party with respect to all or part of the recaptured rights, then in each such instance the terminating party shall notify Purchaser of such offer which the terminating party is prepared to accept and the name of the third party who made the offer to the terminating party, and the terminating party shall offer Purchaser the right to enter into an agreement with the terminating party with respect to the recaptured rights on the aforesaid terms and conditions. Purchaser shall have 30 days from the date of its receipt of such written offer within which to notify the terminating party of its acceptance of such offer (provided, however, the Purchaser shall not be required to meet any terms or conditions which cannot be as easily met by one person as another, including, without limitation, the employment of a specified person, etc.) If Purchaser shall acquire from the terminating party all or part of the recaptured rights, then the terminating party agrees to enter into appropriate written agreements with Purchaser covering said acquisition. If Purchaser shall elect not to purchase the recaptured rights from the terminating party, then the terminating party may dispose of said recaptured rights, but only to the aforesaid third party and only upon the terms and conditions specified in the aforesaid written notice given by the terminating party to Purchaser, it being understood and agreed that the terminating party may not dispose of said recaptured rights either to: (a) any other proposed transferee; or (b) upon terms and conditions which are more favorable to any transferee than the terms and conditions previously offered to Purchaser hereunder, without again offering to enter into an agreement with Purchaser on: (i) the terms offered to such other transferee; or (ii) such more favorable terms and conditions offered to said proposed transferee, whichever of (a) or (b) shall apply. Any such required offer made to Purchaser by the terminating party shall be governed by the procedure set forth in the preceding four sentences of this Paragraph. The unenforceability of any portion of this Paragraph shall not invalidate or affect the remaining portions of this Paragraph of this Agreement.

10. CREDIT OBLIGATIONS: Purchaser shall have the right to publish, advertise, announce and use in any manner or medium, the name, approved biography and approved photographs or approved likenesses of the Transferor in connection with any exercise by Purchaser of its rights hereunder, provided such use shall not constitute an endorsement of any product or service. 

The Transferor shall be accorded the following credit on a single card on screen in the main titles of the Picture and in the billing block portion of paid ads (subject to customary exceptions and exclusions), and in size of type (as to height, width, thickness and boldness) equal to the largest size of type of any other main title credit and otherwise subject to the credit requirements of the WGA Basic Agreement:

WRITTEN BY Kim Boyle

8

Additionally, if Purchaser shall exploit any other rights in and to the Property, then Purchaser agrees to give appropriate source material credit to the Property, to the extent that such source material credits are customarily given in connection with the exploitation of such rights.

Purchaser will notify third parties in writing of the foregoing credit requirements. No casual or inadvertent failure to comply with any of the provisions of this clause shall be deemed a breach of this agreement by the Purchaser. The Transferor hereby expressly acknowledges that in the event of a failure or omission constituting a breach of the provisions of this paragraph, the damage (if any) caused the Transferor thereby is not irreparable or sufficient to entitle the Transferor to injunctive or other equitable relief. Consequently, the Transferor's rights and remedies in the event of such breach shall be limited to the right to recover damages in an action at law; provided however, upon written notice by Transferor of a failure or omission regarding the foregoing credit requirements, Purchaser will make good faith efforts to promptly implement a cure.

11. RIGHT OF FIRST NEGOTIATION: Purchaser shall have a right of first negotiation on all Reserved Rights. The term "Right of First Negotiation" means that if the Transferor desires to dispose of or exercise a particular right reserved to the Transferor herein ("Reserved Right"), whether directly or indirectly, then the Transferor shall notify Purchaser in writing and immediately negotiate with Purchaser regarding such Reserved Right. If, after the expiration of thirty (30) days following the receipt of such notice, no agreement has been reached, then the Transferor may negotiate with third parties regarding such Reserved Right subject to Clause 12.

12. RIGHT OF LAST REFUSAL: The Purchaser shall have a right of last refusal on all Reserved Rights. The term "Right of Last Refusal" means that if Purchaser and the Transferor fail to reach an agreement pursuant to Purchaser's right of first negotiation, and the Transferor makes and/or receives any bona fide offer to transfer, sell, grant, convey, assign, license, and/or lease any Reserved Right or any interest therein ("Third Party Offer"), the Transferor shall notify Purchaser of such terms (the existence of which shall be fully disclosed) and Purchaser shall have the exclusive option for thirty (30) days to execute such proposed transaction upon the same terms and conditions as set forth in such notice. Purchaser's Right of Last Refusal shall continue in full force and effect, upon all of the terms and conditions of this paragraph, so long as the Transferor retains any rights, title or interests in or to the particular Reserved Right. Purchaser's Right of Last Refusal shall inure to the benefit of Purchaser, its successors and assigns, and shall bind the Transferor and the Transferor's heirs, successors and assigns.

13. NO OBLIGATION TO PRODUCE: Nothing herein shall be construed to obligate Purchaser to produce, distribute, release, perform or exhibit any motion picture, television, theatrical or other production based upon, adapted from or suggested by the Property, in whole or in part, or otherwise to exercise, exploit or make any use of any rights, licenses, privileges or property granted herein to Purchaser.

14. ASSIGNMENT: Purchaser may assign and transfer this agreement or all or any part of its rights hereunder to any studio, major production company, network, or similarly financially-capable person, firm or corporation without limitation, and this agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, representatives and assigns forever. Any other assignment and transfer of this Agreement shall require Transferor's written consent, not to be unreasonable withheld. 

15. NO PUBLICITY: The Transferor will not, without Purchaser's prior written consent, not to be unreasonably withheld, in each instance, issue or authorize the issuance or publication of any news story or publicity

9

(except non-derogatory remarks incidental to an interview of Transferor) relating to (i) this Agreement, (ii) the subject matter or terms hereof, or to any use by Purchaser, its successors, licensees and assigns, and (iii) any of the rights granted Purchaser hereunder.

16. AGENT COMMISSIONS: Purchaser shall not be liable for any compensation or fee to any agent of the Transferor in connection with this Agreement.

17. ADDITIONAL DOCUMENTATION: The Transferor agrees to execute and procure any other and further instruments necessary to transfer, convey, assign, protect, enforce, and copyright all rights in the Property granted herein by the Transferor to Purchaser in any country throughout the world. If it shall be necessary under the laws of any country that copyright registration be acquired in the name of the Transferor, Purchaser is hereby authorized by the Transferor to apply for said copyright registration thereof; and, in such event, the Transferor shall and does hereby assign and transfer the same unto Purchaser, subject to the rights in the Property reserved hereunder by the Transferor. The Transferor further agrees, upon request, to duly execute, acknowledge, procure and deliver to Purchaser such short form assignments as may be requested by Purchaser for the purpose of copyright recordation in any country, or otherwise. If the Transferor shall fail to so execute and deliver, or cause to be executed and delivered, the assignments or other instruments herein referred to, Purchaser is hereby irrevocably granted the power coupled with an interest to execute such assignments and instruments in the name of the Transferor and as the Transferor's attorney-in-fact. Purchaser agrees to cover any and all expense involved in obtaining compliance with the foregoing provisions of this paragraph.

18. NOTICES: All notices to Purchaser under this agreement shall be sent by registered mail, postage prepaid, or by email (with a copy by regular mail) addressed to the Purchaser at:

Charis Feeney-Orchard
8 Haven Green
Ealing, London, W5 2UU
United Kingdom

And to:
charisorchard@gmail.com

All notices to the Transferor under this agreement shall be sent by registered mail, postage prepaid, or by email (with a copy by regular mail) to:

Kim Boyle
C/o- Jay S. Kenoff, ESQ.
Kenoff & Machtinger, LLP
1801 Century Park East, Suite 1520
Los Angeles, California 90067
United States of America

And to:
jay@km-entertainmentlaw.com

All payments to Transferor hereunder shall be made to Transferor c/o Jay S. Kenoff, Esq., at the address set forth above.



19. MISCELLANEOUS:

(a) Relationship: This agreement between the parties does not constitute a joint venture or partnership of any kind.

(b) Cumulative Rights and Remedies: All rights, remedies, licenses, undertakings, obligations, covenants, privileges and other property granted

herein shall be cumulative, and Purchaser may exercise or use any of them separately or in conjunction with any one or more of the others.

(c) Waiver: A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

(d) Severability: If any provision of this agreement as applied to either party or any circumstances shall be adjudged by a court to be void and unenforceable, such shall in no way affect any other provision of this agreement, the application of such provision in any other circumstance, or the validity or enforceability of this agreement.

(e) Governing Law: This agreement shall be construed in accordance with the laws of the State of California.

(f) Entire Understanding: This agreement contains the entire understanding of the parties relating to the subject matter, and this agreement cannot be changed except by written agreement executed by both parties.

(g) Arbitration: Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration using the rules and procedures of the International Film and Television Alliance using a single arbitrator. The parties agree that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable attorneys' fees and expenses. The arbitration will be held in Los Angeles and any award shall be final, binding and non-appealable.

(h) Electronic or Fax Execution; Counterparts: This Agreement may be executed by original, facsimile or electronic signatures and in counterparts, each of which will be deemed an original but all of which together will constitute a single instrument. Any signed copy of this Agreement delivered electronically or by facsimile transmission will for all purposes be treated as if it had been delivered containing an original signature of the party whose signature appears in the electronic or facsimile version and will be binding upon that party in the same manner as though an original signed copy had been delivered.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and year first above written.

---------------------------------  
Charis Feeney-Orchard    Date

*Kim Boyle  11-4-14*  
---------------------------------  
Kim Boyle              Date

---------------------------------  
Witness  
(please sign and print name)

*Dina Swann*  
---------------------------------  
Witness Dina Swann  
(please sign and print name)

> NOTARY PUBLIC  
> STATE OF ARIZONA  
> Maricopa County  
> DINA SWANN  
> My Commission Expires 07/28/15

11

3/29/2019     Gmail - Proof of transfer

*Motion to dismiss Attachment C*

 **Gmail**     Charis Orchard <charisorchard@gmail.com>

## Proof of transfer

**Charis Orchard** <charisorchard@gmail.com>     Fri, Dec 19, 2014 at 11:32 PM
To: Jay Kenoff <jay@km-entertainmentlaw.com>, k boyle <kb2fo@yahoo.com>

Hi,

Attached is the proof of transfer for the option on the script. Could Kim please send 3 original signed copies to me at the address below:

Charis Orchard
Flat 4
56 Queens Gardens
W2 3AF
London
United Kingdom

This is rather urgent so I can get the BFI certification process complete.
Thank you very much.

Wish you both a very Merry Christmas!

Kind regards,
Charis

07455309583
www.charisorchard.com
imdb.com/name/nm2450532

LOVE ADDICT TRAILER:
http://bit.ly/1u0usVP
Love Addict received the award for
Best Comedy Film 2014
at the LA Comedy Awards on the 13th Nov

---------- Forwarded message ----------
From: **Charis Orchard** <charisorchard@gmail.com>
Date: Fri, Dec 19, 2014 at 1:30 PM
Subject:
To: Ms Me <charisorchard@gmail.com>

Envoyé de mon iPhone

 **FullSizeRender.jpg**
97K

**Foreign payment confirmation at 19 December 2014 11:03 AM**

| | |
|---|---|
| Country | UNITED STATES OF AMERICA |
| From account | SELECT ACCOUNT 60-02-08 60945583 |
| Payment amount | 500.00 USD |
| Exchange rate (Indicative only) | 1.00 GBP = 1.5299 USD |
| FX Deal Number | |
| Payment date | 19 Dec 2014 |
| Payment credit date (estimated arrival date) | 23 Dec 2014 Relay - 3-5 business days |
| Statement reference | |
| Charge | 10.00 GBP (Paid by customer) |
| Agent bank fee | Any fee claimed by our agents will be debited separa[tely] |

**Payment totals**

| | |
|---|---|
| Indicative total cost to you | 336.82 GBP |
| Indicative total amount credited to beneficiary | 500.00 USD |

**Beneficiary summary**

National Westminster Bank Plc  Registered in England No 929027  Registered Office: 135 Bishopsgate, London EC2M 3UR

*Motion to Dismiss Attachment D*

## ASSIGNMENT OF PAYMENT RIGHTS

This agreement (the "Agreement") is made as of 04 May, 2018, between **Charis Orchard**, an individual located at 9 Wirrilda Way, Forestville, NSW, 2087, Australia (the "Producer") and Adler & Associates Entertainment, Inc., a California corporation whose principal offices are located at 3500 West Olive Avenue, Suite 300, Burbank, CA 91505, United States of America ("Adler & Associates Entertainment").

### RECITALS

A. Producer is the copyright owner of the motion picture **Perfect Piece**, which was formerly known under the titles of **This Albert DiGrazia, Casanova Lost & Found** and **Inner Peace** ("the Picture").

B. The Picture was based upon an original screenplay written by **Kim Boyle** (the "Screenwriter").

C. Adler & Associates Entertainment and Producer are both parties to a written agreement whereby Producer has granted Adler & Associates Entertainment the exclusive right to sell, distribute, license, exhibit and otherwise exploit the Picture throughout the world for a period of ten (10) years (the "Sales Agreement").

D. Under the terms of the Sales Agreement, Adler & Associates Entertainment shall be entitled to collect a one-time administration fee of four thousand five hundred dollars ($4500) and a one-time audit fee of three thousand five hundred dollars ($3500) from the monies received from the sale and distribution of the Picture and any and all ancillary products. Following the collection of these fees, Adler & Associates Entertainment shall also be entitled to reimburse itself for all "out of pocket" distribution expenses, the total of which shall not exceed sixty-five thousand dollars ($65,000) without the prior approval of the Producer.

E. Following the reimbursement of the administration fee, the audit fee and all "out of pocket" distribution expenses, Adler & Associates Entertainment shall be entitled to retain a sales commission of thirty-five percent (35%) of all monies received from the sale and distribution of the Picture, with the remaining sixty-five percent (65%) to be paid to the Producer (the "Producer's Share").

### AGREEMENT

Adler & Associates Entertainment and Producer hereby agree to following:

A. In accordance with section seventeen (17), sub-paragraph 'a' of the Sales Agreement, Producer hereby assigns the right to receive payments under the Sales Agreement to Screenwriter, pursuant to the following terms:

1. In accordance with the accounting schedule defined in section ten (10) of the Sales Agreement, Screenwriter shall hereby be paid one hundred percent (100%) of the Producer's Share until the amount paid to Screenwriter equals one hundred and twenty-five thousand United States dollars ($125,000).

PRODUCER INITIALS: *[initials]*

### ASSIGNMENT OF PAYMENT RIGHTS

2. Producer hereby authorizes Adler & Associates Entertainment to provide Screenwriter and Screenwriter's attorney with copies of all financial statements and reports issued by Adler & Associates Entertainment with regards to the Picture. This permission shall terminate once the amount paid to Screenwriter equals one hundred and twenty-five thousand United States dollars ($125,000).
3. All monies owed to Screenwriter shall be paid by wire transfer into an account as directed by Screenwriter or Screenwriter's attorney.
4. Following the final and full payment of all monies owed to Screenwriter under this Agreement, Adler & Associates Entertainment shall pay all remaining monies owed as part of the Producer's Share to Producer in accordance with the terms of the Sales Agreement.

### ADDITIONAL TERMS

A. This Agreement shall be governed by the laws of the State of California.
B. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.
C. Both parties represent and warrant to the other: that it has full right, power and authority to enter into and perform under this Agreement, and that it is under no obligation, contractual or otherwise, which might in any way interfere with its full and complete performance of this Agreement.

**AGREED TO AND ACCEPTED**

ADLER & ASSOCIATES ENTERTAINMENT

By: _Jeremy J Lunt_ (Signature)     Date: 6 June, 2018

Name: _Jeremy J. Lunt_

PRODUCER

By: _Charis Feeney-Orchard_ (Signature)     Date: 04 May 2018

Name: _Charis Feeney-Orchard_

Page 2 of 2

"Casanova Lost & Found" aka "Perfect Piece"

Adler & Associates Entertainment, Inc., representatives sign to confirm their full knowledge of this agreement. Kim Boyle will provide them with a copy of the Screenplay Option Purchase Agreement dated May 12, 2014 at the written request of Adler & Associates Entertainment, Inc.

| | | | |
|---|---|---|---|
| _[signature]_ 8/19/16 | | _[signature]_ 8/19/16 | |
| Mark Belasco | Date | Jeremy Lunt | Date |

| | |
|---|---|
| Sales Representative | Sales Representative |
| Title | Title |
| Adler & Associates Entertainment, Inc. | Adler & Associates Entertainment, Inc. |

Date:  27th March 2019

To:

Ms. Marie Adler
Adler & Associates Entertainment,
3500 West Olive Ave. Ste 300 Burbank, CA 91505
Telephone: (310) 684-3545
Email: info@adlersproductions.com

Re:   Kimberly Boyle v. Adler & Associates Entertainment, LLC et al Civil Action No. 2:19-CV-893 (C.D. Ca, filed February 6, 2019)

Dear Ms. Marie Adler,

I am writing this letter to confirm that I, Charis Feeney, indemnify and hold Alder and Associates harmless with respect to the claims made in the above-named lawsuit, pursuant to my obligations under Section 13 of the Agreement made between our parties.

Sincerely,

*[signature: Feeney-Orchard]*

Charis Feeney-Orchard
Director and Producer of 'Perfect Piece'