Amy B. Lawrence, Esq. - Bar # 115874
LAWRENCE & ASSOCIATES
Attorneys at Law
2550 N. Hollywood Way, Suite 202
Burbank, CA 91505
Telephone: (818) 843-6442
Facsimile: (818) 566-7875
Email: ablawrence@lawandassoc.com

Attorneys for Defendant
ADLER & ASSOCIATES ENTERTAINMENT, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY BOYLE<br><br>Plaintiff,<br><br>vs.<br><br>ADLER & ASSOCIATES ENTERTAINMENT, LLC, a California LLC; AMAZON.COM, INC., a Delaware corp.; DREAMSCAPE MEDIA, LLC, an Ohio LLC; and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. 2:19CV00893-GW(SKx)<br><br>**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S MOTION TO COMPEL ARBITRATION AND TO DISMISS AND/OR STAY THE LITIGATION**<br><br>*[Filed Concurrently with Motion to Compel Arbitration and to Dismiss and/or Stay the Litigation; Declaration of Charis Feeney-Orchard; Declaration of Jeremy J. Lunt; and [Proposed] Order]*<br><br>Date: June 20, 2019<br>Time: 8:30 a.m.<br>Courtroom: 9D<br><br>Trial Date: None set<br><br>Judge: Hon. George H. Wu |

---

**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF
MOTION TO COMPEL ARBITRATION**

1    I, Amy B. Lawrence, hereby declare as follows.

2    1.    I am the counsel of record for Defendant Adler & Associates

3    Entertainment, LLC ("Adler"). I am over 18 years of age and have personal

4    knowledge of the facts set forth herein.

5    2.    On or about April 11, 2019, Director/Producer Charis Feeney-

6    Orchard filed an arbitration claim against Plaintiff Kimberly Boyle with the

7    IFTA. A true and correct copy of said arbitration claim is attached as Exhibit A.

8    3.    On or about April 25, 2019, Adler filed an arbitration claim against

9    Director/Producer with the IFTA. A true and correct copy of said arbitration

10   claim is attached as Exhibit B.

11   4.    On May 3 and May 10, 2019, I met and conferred with counsel for

12   Kimberly Boyle pursuant to L.R. 7-3. At the meet and confer conference,

13   arbitration of this dispute and the grounds therefore were discussed by both

14   Parties, although Boyle has not agreed to submit this case against Adler to

15   arbitration.

16   I declare under penalty of perjury under the laws of the United States of

17   America that the foregoing is true and correct.

18

19   Dated: _May 22_, 2019

20

21

22

23                                        Amy B. Lawrence

24

25

26

27

28

                                          2

**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF**
**MOTION TO COMPEL ARBITRATION**

EXHIBIT "A"

## NOTICE OF ARBITRATION

11ᵗʰ April 2019

**Attention: Kimberly Boyle and her Attorney's Jay Kenoff and Larry Zerner**

**Via email and/or postal mail**

**Re: Notice of Arbitration**

In accordance with the requirements of Rule 2 of the Independent Film & Television Alliance Rules for International Arbitration ("Rules"), Claimant hereby notifies Respondent and the Independent Film & Television Alliance ("IFTA") of the following:

Pursuant to Rule 2.4.1., demand is hereby made that the dispute between **Charis Feeney-Orchard** and **Kimberly Boyle** be referred to arbitration.

Pursuant to Rules 2.4.2. and 2.4.3., the names, addresses, telephone, and fax numbers, if available, of the parties to this dispute and the names, addresses, telephone and fax numbers, email addresses and, if available, of the respective legal counsel are as follows:

Claimant
**Charis Feeney-Orchard**
Producer and Director of 'Perfect Piece'
9 Wirrilda Way
Forestville, NSW, 2087, Australia
Email: charisorchard@gmail.com
Phone: +61 (0)404870918

Respondent
**Kimberly Boyle,**
Screenwriter of the film, 'Perfect Piece'
Email: kb2fo@yahoo.com

Claimant's Counsel
**Claimant is representing herself**

Respondent's counsel
**Larry Zerner and Jay Kernoff**

Larry Zerner
1801 Century Park East
Suite 2400
Los Angeles, CA 90067
Tel: (310) 773-3623
Larry@zernerlaw.com

Jay S. Kenoff
Attorney At Law
312 S. Beverly Dr. #6344
Beverly Hills, CA 90212
USA
Phone: (310) 552-0808
jay@km-entertainmentlaw.com

Pursuant to Rule 2.4.4., a copy of the arbitration clause contained in the attached contract, Paragraph 19 (g) on page 11, is referenced as follows:

**Paragraph 19 (g)** **Arbitration:** Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration using the rules and procedures of the International Film and Television Alliance using a single arbitrator. The parties agree that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable attorneys' fees and expenses. The arbitration will be held in Los Angeles and any award shall be final, binding and non-appealable.

Pursuant to Rule 2.4.5., a copy of the relevant contract(s) is attached hereto.

Pursuant to Rule 2.4.6., **Charis Feeney-Orchard** sets forth a statement of the nature of the dispute and the amount involved, if any, as follows:

I hereby request that the arbitrator instate that the Writer's Fees for the rights to the screenplay be set at the

amount that I had understood and believed that I was going to pay, the amount of $3750 (Three Thousand Seven Hundred and Fifty United States Dollars), or otherwise 3% of the final Budget of $125,000, with a share of 5% of the net profit.

I believe that this is a fair, justifiable and industry-acceptable amount to be paid for the rights to the screenplay, which was viewed as being of a mediocre writing standard and which had sat on the shelf and remained un-optioned for a period of 5 years between when I first read the screenplay and when I considered using it for my university graduation assignment in 2014.

I feel that Kimberly Boyle and her Attorneys have acted on bad faith, have deliberately set out to commit fraud and extortion by wording the payment clause in such a confusing and vague way that it could be construed in the way I had, or in such a way that Kimberly Boyle would be able to demand the sum of $125,000.00 from me, post completion of the film, in exchange for the rights.

I believe that Kimberly Boyle and her Attorneys have seen me as a vulnerable university student and intentionally set up a trap so that I would be tricked into paying the amount of $125,000 for the rights to the script. Who has ever, in the history of cinema, received such as sum for their first-time produced screenplay that sat on a shelf for 5 years and has been reviewed by experts as a mediocre standard of writing? No one, except Kimberly Boyle and her Attorneys.

The value and worth of the screenplay that Kimberly Boyle wrote is not $125,000, it is not even close to the Writer's Guild recommended amount of $40,000 for a first-time produced screenplay. As such, I strongly believe that I am being extorted and deliberately conned Kimberly Boyle and her Attorneys through the way that Kimberly Boyle's attorney wrote 'Clause 5. Consideration - Purchase Price' in the Screenplay option agreement. I strong believe that this is a deliberate act of bad faith by Kimberly Boyle and her Attorneys, the justification for this is described in detail in the following document entitled 'Annex A - Background Story and Evidence'.

Pursuant to Rule 2.4.7., the relief or remedy sought by Charis Feeney-Orchard is as follows:
It is requested that the Arbitrator instate the amount of $3750.00 or the amount of 3% of a minimum budget of $125,000 plus 5% share of the net profit as the correct and legally binding payment of fees owed for the purchase of the rights to the screenplay entitled, 'Casanova Lost and Found', now a film entitled, 'Perfect Piece'.

Page **3** of **7**

The foregoing is not intended nor shall it be construed as a complete recitation of the facts and events concerning the above-referenced matter, nor shall it be construed as a waiver of any rights, remedies or claims, legal or equitable, which **Charis Feeney-Orchard** may have.

Sincerely,                                                                                                        Notarized by:

Charis Feeney-Orchard

cc: IFTA Arbitral Agent

EXECUTED before me at Sydney, NSW, Australia
this 15th day of April 2019.

MICHAELANGELO K. TWEMLOW
Public Notary ID No. 1660

Michaelangelo K Twemlow
Notary Public
Level 1, 299 Elizabeth Street
Sydney NSW 2000
Australia
Tel: +61 401 915 692
michael@solicitor.sydney
W: www.solicitor.sydney

**Annex A - Background Story and Evidence**

As a young director and producer, I was connected via email to Kimberly Boyle via, 'Inktip Pro', which was a website that connected writers with producers. I requested the screenplay and read it. I thought it was fun and liked the fact it had a female lead role. *Attachment A – First email correspondence between Kim Boyle and I regarding the screenplay.*

Five years later, I was a Student at the University of Western London and the Met Film School, completing my master's degree London when I was trying to find a script for my thesis graduation project. I remembered Kim's script and reached out to her again. The script was still available and had not been optioned within the period of 6 years. *Attachment B – Email correspondence in 2014 between Kim Boyle and I regarding the option.*

Professional analyses of the script at the time found it to be of mediocre quality, heavily flawed story arcs and very talky and predictable. Even so, I felt that I could undertake a rewrite to correct many weaknesses in the story and make it affordable for me to shoot as a student. I was always honest and transparent with Kimberly and her Attorney Jay Kenoff that at that I was a university student on a tight, minimalist student budget and that the film would be made as a graduation project using other students. *Attachment C – Emails confirming my student and financial status to Kim and her Attorney during the option negotiation.*

I refused to pay the high option fee that Kim requested and after repeatedly explaining to Kim and her lawyer that I was a financially challenged master's degree student, I received a contract and believed in good faith Kim and her attorney understood my circumstances. That is why when I read the payment terms, although they were slightly confusing I 100% believed that the minimum floor of $125,000 referred to the budget and not Kim's writer's fee. I conferred with a lawyer at the time who also interpreted the payment clause in the same way that I had, and several other people have since, confirmed that my interpretation was correct. *Attachment D – Email from an Attorney friend, who was also a producer, that interpreted the payment clause as I had.* It seemed completely outrageous and bizarre to interpret the payment clause as the actual fee being $125,000 as the situation was such that I was a student and Kim was a never producer writer of a very basic script.

Due to my university assessment due dates I had significant time pressure on me at the time of negotiating with Kimberly and her Attorney, as well as financial pressures, and the writers contract stated that the amount of the writers fees would be based on the final budget so I pressed forward with producing and directing the film to meet my assessment criteria and due date for the university. *Attachment E – documents from the university.*

I was able to finance the film due to the fact I was a student, with the assistance of three private equity investors, two of whom were friends and the third and majority investor was my brother. I literally worked on the film every waking hour for a period of 12 Weeks for no income and invested my own time and money. I could have alternatively been working as an office worker during the same time and earning 1500 GBP a week but instead I chose to follow my passion and get a master's degree in film making. Shortly after I gained my master's degree, I was able to afford Kimberly's writer's fee and I reached out to her Attorney to organise the payment, with total conviction that I was completely just, honourable and honest in paying the fee of $3750 or 3% of a minimum budget of $125,000, which is how I had interpreted the payment clause. *Attachment F – Email to Jay Kenoff, Kim's attorney to make the payment of her writer's fee.*

Case 2:19-cv-00893-JWH-SK   Document 25-1   Filed 05/22/19   Page 8 of 131   Page ID #:134

I was completely astounded and shocked when Jay turned around and requested a fee of $125,000 for Kimberly, who had never had a screen play produced, but albeit had worked previously in the film industry as a computer-generated special effects technician on many big budget films. *Attachment G– my response to Jay's request for a writer's fee payment of $125,000.* I explained that even the Writer Guild of America recommends a payment of $40,000 as a fair amount for first time produced writers. *Attachment H – Writer's guild documentation regarding normal fees for the writer of a first-time produced screenplay at the time of the production.*

When the initial demand for payment of $125,000 occurred, I felt completely taken advantage of by Kimberly Boyle and Jay Kenoff. I felt that they had deliberately mislead me and acted in bad faith. I felt that they were scammers, fraudsters and completely removed from the reality of independent film making, especially young producers such as myself, who are at the front line of trying to break into the Hollywood industry.

I believe that Kimberly and Jay Kenoff deliberately and knowingly scammed me or attempted to extorted money from me because not only had I worked hard and given Kimberly her only credit as a feature film screen writer, after her script had sat on a shelf for 5 years but also because of the fact that Kimberly's 'Writer' credit on 'Perfect Piece' remains today as her only 'Writer' Credit on her IMDB profile (some 10 years on from when I first met her). This clearly demonstrates that Kimberly's writing ability is not on the level of a $125,000.00 screenplay and that this is a deliberate attempt to extort and fraud an innocent and well-intentioned young director-producer. Any person of sound mind and rational with even a small insight into the film industry would understand that Writers of Kimberly status and experience do not command $125,000 for a first-time produced screenplay. Therefore, demanding $125,000.00 is a blatant scam, an act of bad faith, and an act that deliberately and strategically disrespects and aims to injure and insult the work of myself and the 50 or so other young people who invested their time and energy into making the film.

On top of this, the fact is that Kimberly's original screenplay, 'Casanova Lost and Found' was the weakest part of the production from the get-go. The film is only viable to be sold to the wider public because I, as the producer and director, engaged and persuaded GreenPeace, a globally recognisable organisation, to let us use their name and likeness, their logo and global head office, to be a main part of the story. This was not in the original script. As well, the fact that it was set in London at Christmas time, another 'viable sale' aspect of the film, was not in the original script. The fact that I found a lead cast of amazingly talented actors who worked voluntarily made it a viable to be appreciated by audiences. None of this has to do with the mediocre script that I spend weeks re-writing that Kimberly Boyle is now demanding $125,000.00 in extortionate fees for. *Attachment I – Kimberly Boyle's current profile Internet Movie Database* (the industry standard for professional validation of credit) that shows only 'Perfect Piece' as her only, single credit as a writer).

I feel betrayed and scammed for myself and all the cast and crew, the editors, colour grader, VFX technicians, sound editors, the composer, the musicians and the sales agent who had all given their valuable time, energy and talents to making the movie a reality – many of whom have relied on this 'credit' to further build their careers in the film industry. *Attachment J – list of contributors to the film.*

When Kimberly and her attorney first demanded the extortionate fees, I spent some time reflecting on the situation and decided that the life of the film was worth more than to begin a legal battle for the correct fees and so initially, instead of engaging in arbitration earlier, I offered to Kimberly to take the extortionate sum of $125,000 through the revenue of the film over the duration of the sales agreement. Kimberly's Attorney was in favour of this resolution and drafted a settlement to allow the film to be sold and the revenues up to the amount of $125,000 to go to Kimberly. We all followed their demands and believed the issue was resolved. *Attachment K – The settlement agreement drafting by Kimberly's Attorney Jay Kenoff and Attachment L – emails from Jay Kenoff about the settlement.*

However, instead of signing the agreed settlement, Kimberly went into radio silence. No reply to any emails. No communication for almost 3 years. Until now when the film's Sales Agent, Adler and Associates, notified me of a demand for highly expensive and complicated Federal Court proceeding when there is a clause in the Writer's agreement specifying that any matter of dispute must be settled by arbitration, as per industry standards. *Attachment M – the original Screenplay Purchase Agreement signed by Kimberly Boyle.* This Federal Court action is another clear example of the intention to extort money for the script, which would never be considered by any normal, sound person of reasonable intelligence to be worth the amount of $125,000 United States Dollars. If further evidence of this argument is needed, I would be happy to pay for 2 or 3 professional script analyses of the original screenplay to prove that its quality was well below industry standard. There is simply no logic or sense at all in what Kimberly Boyle and her Attorneys are continuing to demand, therefore, I have undertaken Arbitration in order to resolve this dispute once and for all.

My questions remain the same as when Kimberly and her Attorney first demanded $125, 000 for the payment of her very first, and only, produced screenplay;

1. Why was this amount not made clear to me during the negotiation of the contract when Kimberly and her Attorney both knew I was a struggling university student?
2. How can a woman who works in Hollywood not understand, or expect to be paid a normal amount, in line with industry standards for a first-time produced writer?
3. How could any artist deliberately try to derail and diminish the work of all the other artists and talents that came together to make this film?
4. How could a writer not appreciate that their only produced screenplay is now screening on Amazon and on other platforms all over the world thanks to the work of the dedicated sales agent?
5. How could someone who has been offered a fair and amicable resolution in an agreement drafted by her own attorney, then go silent for three years and then suddenly go to court with a new lawyer?
6. Do the behaviour and actions listed above demonstrate acts of bad faith, and attempts at extortion and fraud by Kimberly Boyle and her Attorneys?

Signed on the 11ᵗʰ April, 2019 in Sydney, Australia.

Signature of Charis Feeney-Orchard

Signature of Notary

Michaelangelo K Twemlow
Notary Public
Level 1, 299 Elizabeth Street
Sydney NSW 2000
Australia
Tel: +61 401 915 692
michael@solicitor.sydney
W: www.solicitor.sydney

**Annex B – List of Attachments**

Attachment A – First email correspondence between Kim Boyle and I regarding the screenplay.

Attachment B – Email correspondence in 2014 between Kim Boyle and I regarding the option.

Attachment C – Emails confirming my student and financial status to Kim and her Attorney during the option negotiation.

Attachment D – Email from an Attorney friend, who was also a producer, that interpreted the payment clause as I had.

Attachment E – Documents from the university assessment of 'Perfect Piece'.

Attachment F – Email to Jay Kenoff, Kim's attorney to make the payment of her writer's fee.

Attachment G– my response to Jay's request for a writer's fee payment of $125,000.

Attachment H – Writer's guild documentation regarding normal fees for the writer of a first-time produced screenplay at the time of the production.

Attachment I – Kimberly Boyle's current profile Internet Movie Database.

Attachment J – list of contributors to the film.

Attachment K – The settlement agreement drafting by Kimberly's Attorney Jay Kenoff

Attachment L – Emails from Jay Kenoff about the settlement.

Attachment M – The original Screenplay Purchase Agreement signed by Kimberly Boyle

Signed on the 11th April, 2019 in Sydney, Australia.

Signature of Charis Feeney-Orchard                      Signature of Notary

EXECUTED before me at Sydney, NSW, Australia
this  17th  day of  April  2019

MICHAELANGELO K. TWEMLOW
Public Notary ID No. 1660

Michaelangelo K Twemlow
Notary Public
Level 1, 299 Elizabeth Street
Sydney NSW 2000
Australia
Tel: +61 401 915 692
michael@solicitor.sydney
W: www.solicitor.sydney

*Notice of Arbitration*
*Annex A & B*
*Attachment A.*

From: k boyle <kb2fo@yahoo.com>
Subject: **Script_Casanova Lost & Found**
Date: January 6, 2009 6:38:14 AM GMT+10:00
To: charisorchard@mac.com
Reply-To: kb2fo@yahoo.com
1 Attachment, 220 KB   Save

Dear Charis,

Thank you for your enthusiastic response.  Per your request, attached please find the script for "Casanova Lost & Found."  It would be fantastic to set it in Paris.  I look forward to hearing from you once you've had a chance to read it.

Sincerely,

Kim Boyle

··· On Mon, 1/5/09, charisorchard@hotmail.com <charisorchard@hotmail.com> wrote:

From: charisorchard@hotmail.com <charisorchard@hotmail.com>
Subject: Re: Casanova Lost & Found
To: kb2fo@yahoo.com
Date: Monday, January 5, 2009, 6:22 AM
Dear Kim,

Charis Orchard of Vivre Films sarl has sent you a message.
To see it, please go to:

http://www.inktippro.com/invites/new_entry.php?title=query&iq_id=111992&ic=cp6jerbp&pid=13993&comm_id=55406

Best,
Jerrol LeBaron
InkTipPro.com

Casanova Lo....pdf (220 KB)

 **Gmail**

**Charis Orchard <charisorchard@gmail.com>**

*Notice of Arbitration*
*Annex A + B*
*Attachment B ~~~~*

## Purchase agreement for Casanova Lost and Found

**Charis Orchard** <charisorchard@gmail.com>
To: jay@km-entertainmentlaw.com, k boyle <kb2fo@yahoo.com>
Bcc: charis orchard <charisorchard@gmail.com>

Wed, Apr 9, 2014 at 8:58 PM

*( 14 pages)*

Dear Mr Jay Kernoff,

I am contacting in regards to the script 'Casanova Lost and Found' by Kim Boyle.
I would like to purchase this property from Kim, and have attached a purchase agreement, as per my offer to Kim. If you would like to make any changes to the agreement, please do let me know.
Otherwise, with your approval, I ask that Ms. Boyle sign and date three original copies of the agreement and send them to me with her bank account details and a copy of her identification.

Best regards,
Charis Orchard

📎 **PURCHASE AGREEMENT Casanova Lost and Found-2.doc**
67K

Charis Feeney-Orchard
9 Haven Green
Ealing, London, W5 2UU
United Kingdom
Email: charisorchard@gmail.com
Tel: +44 7455 309583

Kim Boyle
C/o- Jay S. Kenoff, ESQ.
Kenoff & Machtinger, LLP
1801 Century Park East, Suite 1520
Los Angeles, California 90067
United States of America
Email: jay@km-entertainmentlaw.com
Tel: +1 (310) 522 0808

## PURCHASE AGREEMENT

This Purchase Agreement made on 07 April 2014 by and between Kim Boyle, (hereinafter referred to as the "Transferor") and Charis Feeney-Orchard (hereinafter referred to as "Purchaser").

WHEREAS, the Transferor wrote and is the sole and exclusive owner throughout the world of all rights in and to the work entitled: "Casanova Lost and Found" (attached hereto as Appendix 1 to this Agreement) which has been filed in the Office of the Writers Guild of America West, Los Angeles, California, USA, under Copyright Registration Number 818942 (a copy of which is attached as Appendix 2 to this Agreement), this work including all adaptations and/or versions, the titles, characters, plots, themes and story line is collectively referred to as the "Property"; and

WHEREAS, Purchaser wants to acquire all of the rights of the Transferor in and to the Property in consideration for the purchase price provided herein and in reliance upon the Transferor's representations and warranties;

NOW, THEREFORE, the parties agree as follows:

1. RIGHTS GRANTED: the Transferor hereby irrevocably transfers, sells, grants, conveys and assigns to the Purchaser, and the Purchaser's successors, licensees and assigns exclusively and forever, all of the Transferor's rights in and to the Property throughout the world in perpetuity.

As a result of these rights transferred, the Transferor agrees and acknowledges that the Purchaser may undertake, which such undertaking may include but shall not be limited to, the following:

(a) To make, produce, adapt and copyright (or otherwise protect) one or more motion picture adaptations or versions, whether fixed on film, tape, disc, wire, audio-visual cartridge, cassette or through any other technical process whether now known or hereafter devised, based in whole or in part on the Property, of every size, gauge, colour, dimension or type, including, but not limited to, musical motion pictures and remakes of and sequels (or prequels) to any motion picture produced hereunder and motion pictures in series or serial form, and for such purposes to record and reproduce and license others to record and reproduce, in synchronization with such motion pictures, spoken words taken from or based upon the text or theme of the Property and any and all kinds of music, musical accompaniments and/or lyrics to be performed or sung by the performers in any such motion picture and any and all other kinds of sound and sound effects.

(b) To make, produce, distribute, sell, license, assign, transfer, exhibit, perform, rent, lease and generally deal in and with any of the foregoing:

(i) by all means or technical processes whatsoever, whether now known or hereafter devised including, by way of example only, film, tape, disc, wire, audio-visual cartridge, cassette or television (including commercially sponsored, sustaining and subscription or pay-per-view television, or any derivative thereof); and

(ii) in any place whatsoever, including, by way of example only and without limitation to, homes, theatres and elsewhere, and whether or not a fee is charged, directly or indirectly, for viewing any such motion picture.

(c) To broadcast, transmit or reproduce the Property or any adaptation or version thereof (including, by way of example only and without limitations to, any motion picture produced hereunder and/or any script or other material based on or utilizing the Property or any of the characters, themes or plots thereof), by means of television or any process analogous thereto whether now known or hereafter devised (including commercially sponsored, sustaining and subscription or pay-per-view television), through the use of motion pictures produced on films or by means of magnetic tape, wire, disc, audio-visual cartridge or any other device now known or hereafter devised and including such television productions presented in series or serial form, and the exclusive right generally to exercise for television purposes all the rights granted to Purchaser hereunder for motion picture purposes.

(d) Without limiting any other rights granted Purchaser, to broadcast and/or transmit by television or radio or any process analogous thereto whether now known or hereafter devised, all or any part of the Property or any adaptation or version thereof, including any motion picture or any other version or versions thereof, and announcements pertaining to said motion picture or other version or versions, for the purpose of advertising, publicizing or exploiting such motion picture or other

version or versions, which broadcasts or transmissions may be accomplished through the use of living actors performing simultaneously with such broadcast or transmission or by any other method or means including the use of motion pictures (including trailers) reproduced on film or by means of magnetic tape or wire or through the use of other recordings or transcriptions.

(e) To publish, copyright and protect or cause to be published, copyrighted and protected in the name of Purchaser or its nominee in any and all languages throughout the world, in any form or media, synopses, novelizations, serializations, dramatizations, abridged and/or revised versions of the Property, not exceeding 75,000 words each, adapted from the Property or from any motion picture and/or other version of the Property for the purpose of advertising, publicizing and/or exploiting any such motion picture and/or other version.

(f) For the foregoing purposes to use all or any part of the Property and any of the characters, plots, themes and/or ideas contained therein, and the title of the Property and any title or subtitle of any component of the Property, and to use said titles or subtitles for any motion picture or other version of adaptation whether or not the same is based on or adapted from the Property and/or as the title of any musical composition contained in any such motion picture or other version or adaptation.

(g) To use and exploit commercial or merchandise licenses, tie-ups, promotions and recordings of any sort and nature arising out of or connected with the Property and/or its motion picture or other versions and/or the title or titles thereof and/or the characters thereof and/or their names or characteristics.

All rights, licenses, privileges and property herein granted to Purchaser shall be cumulative and Purchaser may exercise or use any or all said rights, licenses, privileges or property simultaneously with or in connection with or separately and apart from the exercise of any other of said rights, licenses, privileges and property. If the Transferor hereafter makes or publishes or permits to be made or published any revision, adaptation, sequel, prequel, translation or dramatization or other versions of the Property, then Purchaser shall have and the Transferor hereby grants to Purchaser without payment therefor all of the same rights therein as are herein granted Purchaser. The terms "Picture" and "Pictures" as used herein shall be deemed to mean or include any kind of motion picture production based upon the Property, with or without sound recorded and reproduced synchronously therewith, whether the same is produced on film or by any other method or means now or hereafter used for the production, exhibition and/or transmission of any kind of motion picture productions.

2. NO RIGHTS RESERVED:  The Transferor does not reserve any rights in or to the Property.

3. RIGHT TO MAKE CHANGES:  The Transferor agrees that Purchaser shall have the unlimited right to vary, change, alter, modify, add to and/or delete from the Property, and to rearrange and/or transpose the Property and change the sequence thereof and the characters and descriptions of the characters contained in the Property, and to use a portion or portions of the Property or the characters, plots, or theme thereof in conjunction with any other literary, dramatic or other material of any kind.  The Transferor hereby waives the benefits of any provisions of law known as the "droit moral" or any similar law in any country of the world and agrees not to permit or prosecute any action or lawsuit on the ground that any Picture or other version of the Property produced or exhibited by Purchaser, its assignees or licensees, in any way constitutes an infringement of any of the Transferor's droit moral or is in any way a defamation or mutilation of the Property or any part thereof or contains unauthorized variations, alterations, modifications, changes or translations.

4. DURATION AND EXTENT OF RIGHTS GRANTED:  Purchaser shall enjoy, solely and exclusively, all the rights licenses, privileges and property granted hereunder throughout the world, in perpetuity, as long as any rights in the Property are recognized in law or equity, except insofar as such period of perpetuity may be shortened due to any now existing or future copyright by the Transferor of the Property and/or any adaptations thereof, in which case Purchaser shall enjoy its sole and exclusive rights, licenses, privileges and property hereunder to the fullest extent permissible under and for the full duration of such copyright or copyrights, whether common law or statutory, and any and all renewals and/or extensions thereof, and shall thereafter enjoy all such rights, licenses, privileges and property non-exclusively in perpetuity throughout the world.  The rights granted herein are in addition to and shall not be construed in derogation of any rights which Purchaser may have as a member of the public or pursuant to any other agreement.  All rights, licenses, privileges and property granted herein to Purchaser are irrevocable and not subject to rescission, restraint or injunction under any circumstances.

5. CONSIDERATION:  As consideration for all rights granted and assigned to Purchaser and for owner's representations and warranties, Purchaser agrees to pay to the Transferor, and the Transferor agrees to accept Five Hundred United States Dollars (500 $US) upon the execution of this Agreement, plus fifteen percent (15.0%) of the net domestic box-office profit earned by the Purchaser.

6. REPRESENTATIONS AND WARRANTIES:

(a) Sole Proprietor:  the Transferor represents and warrants to Purchaser that the Transferor is the sole and exclusive proprietor, throughout the universe, of that certain original literary material written by the Transferor entitled "Casanova Lost and Found."

(b) The Transferor represents and warrants to Purchaser as follows:

(i) The Transferor is the sole author and creator of the Property.

(ii) The Property is unpublished and was registered for copyright in the name of "Casanova Lost and Found" written by Kim Boyle which work has been filed in the Office of the Writers Guild of America West, Los Angeles, California, USA, under Copyright Registration Number 818924.

(iii) No motion picture or dramatic version of the Property, or any part thereof, has been manufactured, produced, presented or authorized; no radio or television development, presentation, or program based on the Property, or any part thereof, has been manufactured, produced, presented, broadcast or authorized; and no written or oral agreements or commitments whatsoever with respect to the Property, or with respect to any rights therein, have been made or entered into by or on behalf of the Transferor.

(iv) None of the rights herein granted and assigned to Purchaser have been granted and/or assigned to any person, firm or corporation other than Purchaser.

(c) No Infringement or Violation of Third Party Rights: the Transferor represents and warrants to Purchaser that the Transferor has not adapted the Property from any other literary, dramatic or other material of any kind, nature or description, nor, except for material which is in the public domain, has the Transferor copied or used in the Property the characters, themes, plot, scenes, sequence or story of any other literary, dramatic or other material; that the Property does not infringe upon any common law or statutory rights in any other literary, dramatic or other material; that no material contained in the Property is libelous or violative of the right of privacy of any person; that the full utilization of any and all rights in and to the Property granted by the Transferor pursuant to this Agreement will not violate the rights of any person, firm or corporation; and that the Property is not in the public domain in any country in the world where copyright protection is available.

(d) No Impairment of Rights: the Transferor represents and warrants that the Transferor is the exclusive proprietor, throughout the universe, of all rights in and to the Property granted herein to Purchaser; that the Transferor has not assigned, licensed or in any manner encumbered, diminished or impaired any such rights; that the Transferor has not committed or omitted to perform any act by which such rights could or will be encumbered, diminished or impaired; and that there is no outstanding claim or litigation pending against or involving the title, ownership and/or copyright in the Property, or in any part thereof, or in any rights granted herein to Purchaser. The Transferor further represents and warrants that no attempt shall be made hereafter to challenge, encumber, diminish or impair any of the rights granted herein and that all appropriate protection of such rights will continue to be maintained by the Transferor.

7. INDEMNIFICATION:

(a) The Transferor agrees to indemnify Purchaser against all judgments, liability, damages, penalties, losses, costs, and expense (including reasonable attorneys' fees) which may be suffered or assumed by or obtained against Purchaser by reason of any breach or failure of any warranty or agreement herein made by the Transferor.

(b) Purchaser shall not be liable to the Transferor for damages of any kind in connection with any Picture it may produce, distribute or exhibit, or for damages for any breach of this agreement (except failure to pay the money consideration herein specified) occurring or accruing before Purchaser has had reasonable notice and opportunity to adjust or correct such matters.

(c) All rights, licenses and privileges herein granted to Purchaser are irrevocable and not subject to rescission, restraint or injunction under any circumstances.

8. PROTECTION OF RIGHTS GRANTED: the Transferor hereby grants to Purchaser the free and unrestricted right, but at Purchaser's own cost and expense, to institute in the name and on behalf of the Transferor, or the Transferor and Purchaser jointly, any and all suits and proceedings at law or in equity, to enjoin and restrain any infringements of the rights herein granted, and hereby assigns and sets over to Purchaser any and all causes of action relative to or based upon any such infringement, as well as any and all recoveries obtained thereon. The Transferor will not compromise, settle or in any manner interfere with such litigation if brought; and Purchaser agrees to indemnify and hold the Transferor harmless from any costs, expenses, or damages which the Transferor may suffer as a result of any such suit or proceeding.

9. COPYRIGHT: Regarding the copyright (and/or any other intellectual property right) in and to the Property, the Transferor agrees that:

(a) The Transferor will prevent the Property and any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof whether published or unpublished and whether copyrighted or uncopyrighted, from vesting in the public domain, and will take or cause to be taken any and all steps and proceedings required for copyright or similar protection in any and all countries in which the same may be published or offered for sale, insofar as such countries now or hereafter provide for copyright or similar protection. Any contract or agreement entered into by the Transferor authorizing or permitting the publication of the Property or any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof in any country will contain appropriate provisions requiring such publisher to comply with all the provisions of this clause.

(b) Without limiting the generality of the foregoing, if the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof is published in the United States or in any other country in which registration is required for copyright or similar protection in accordance with the laws and regulations of such country, and the Transferor further agrees to affix or cause to be affixed to each copy of the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof which is published or offered for sale such notice or notices as may be required for copyright or similar protection in any country in which such publication or sale occurs.

(c) At least six (6) months prior to the expiration of any copyright required by this provision for the protection of the Property, the Transferor will renew (or cause to be renewed) such copyright, as permitted by applicable law, and any and all rights granted Purchaser hereunder shall be deemed granted to Purchaser throughout the full period of such renewed copyright, without the payment of any additional consideration, it being agreed that the consideration payable to the Transferor under this agreement shall be deemed to include full consideration for the grant of such rights to Purchaser throughout the period of such renewed copyright.

(d) If the Property, or any arrangement, revision, translation, novelization, dramatization or new version thereof, shall ever enter the public domain, then nothing contained in this agreement shall impair any rights or privileges that the Purchaser might be entitled to as a member of the public; thus, the Purchaser may exercise any and all such rights and privileges as though this agreement were not in existence. The rights granted herein by the Transferor to Purchaser, and the representations, warranties, undertakings and agreements made hereunder by the Transferor shall endure in perpetuity and shall be in addition to any rights, licenses, privileges or property of Purchaser referred to in this subclause (d).

(e) All rights granted or agreed to be granted to Purchaser under this Agreement shall be irrevocably vested in Purchaser and shall not be subject to rescission by the Transferor or any other party for any cause, nor shall said rights be subject to termination or reversion by operation of law or otherwise, except to the extent, if any, that the provisions of any copyright law or similar law relating to the right to terminate grants of, or recapture rights in, literary property may apply. If, pursuant to any such copyright law or similar law, the Transferor or any successor or any other legally designated party (all herein referred to as "the terminating party") becomes entitled to exercise any right to reversion, recapture or termination (the "termination right") with respect to all or any part of the rights granted or to be granted under this Agreement, and if the terminating party exercises said termination right with respect to all or part of said rights (the "recaptured rights"), then from and after the date on which the terminating party has the right to transfer to a third party all or part of the recaptured rights, Purchaser shall have the first right to purchase and acquire the recaptured rights from the terminating party. If the terminating party is prepared to accept a bona fide offer from a third party with respect to all or part of the recaptured rights, then in each such instance the terminating party shall notify Purchaser of such offer which the terminating party is prepared to accept and the name of the third party who made the offer to the terminating party, and the terminating party shall offer Purchaser the right to enter into an agreement with the terminating party with respect to the recaptured rights on the aforesaid terms and conditions. Purchaser shall have 30 days from the date of its receipt of such written offer within which to notify the terminating party of its acceptance of such offer (provided, however, the Purchaser shall not be required to meet any terms or conditions which cannot be as easily met by one person as another, including, without limitation, the employment of a specified person, etc.) If Purchaser shall acquire from the terminating party all or part of the recaptured rights, then the terminating party agrees to enter into appropriate written agreements with Purchaser covering said acquisition. If Purchaser shall elect not to purchase the recaptured rights from the terminating party, then the terminating party may dispose of said recaptured rights, but only to the aforesaid third party and only upon the terms and conditions specified in the aforesaid written notice given by the terminating party to Purchaser, it being understood and agreed that the terminating party may not dispose of said recaptured rights either to: (a) any other proposed transferee; or (b) upon terms and conditions which are more favorable to any transferee than the terms and conditions previously offered to Purchaser hereunder, without again offering to enter into an agreement with Purchaser on: (i) the terms offered to such other transferee; or (ii) such more favorable terms and conditions offered to said proposed transferee, whichever of (a) or (b) shall apply. Any such required offer made to Purchaser by the terminating party shall be governed by the procedure set forth in the preceding four sentences of this Paragraph. The unenforceability of any portion of this Paragraph shall not invalidate or affect the remaining portions of this Paragraph of this Agreement.

10. CREDIT OBLIGATIONS: Purchaser shall have the right to publish, advertise, announce and use in any manner or medium, the name, biography and photographs or likenesses of the Transferor in connection with any exercise by Purchaser of its rights hereunder, provided such use shall not constitute an endorsement of any product or service.

The Transferor shall be accorded the following credit on a single card on screen and in paid ads controlled by Purchaser and in which any other writer is accorded credit, and in size of type (as to height, width, thickness and boldness) equal to the largest size of type in which any other writer is accorded credit:

WRITTEN BY Kim Boyle

Additionally, if Purchaser shall exploit any other rights in and to the Property, then Purchaser agrees to give appropriate source material credit to the Property, to the extent that such source material credits are customarily given in connection with the exploitation of such rights.

No casual or inadvertent failure to comply with any of the provisions of this clause shall be deemed a breach of this

agreement by the Purchaser. The Transferor hereby expressly acknowledges that in the event of a failure or omission constituting a breach of the provisions of this paragraph, the damage (if any) caused the Transferor thereby is not irreparable or sufficient to entitle the Transferor to injunctive or other equitable relief. Consequently, the Transferor's rights and remedies in the event of such breach shall be limited to the right to recover damages in an action at law.

11. NO OBLIGATION TO USE: Nothing herein shall be construed to obligate Purchaser to use, produce, distribute, release, perform or exhibit any work or production based upon, adapted from or suggested by the Property, in whole or in part, or otherwise to exercise, exploit or make any use of any rights, licenses, privileges or property granted herein to Purchaser.

12. ASSIGNMENT: Purchaser may assign and transfer this agreement or all or any part of its rights hereunder to any person, firm or corporation without limitation, and this agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, representatives and assigns forever.

13. NO PUBLICITY: The Transferor will not, without Purchaser's prior written consent in each instance, issue or authorize the issuance or publication of any news story or publicity relating to (i) this Agreement, (ii) the subject matter or terms hereof, or to any use by Purchaser, its successors, licensees and assigns, and (iii) any of the rights granted Purchaser hereunder.

14. AGENT COMMISSIONS: Purchaser shall not be liable for any compensation or fee to any agent of the Transferor in connection with this Agreement.

15. ADDITIONAL DOCUMENTATION: The Transferor agrees to execute and procure any other and further instruments necessary to transfer, convey, assign, protect, enforce, and copyright all rights in the Property granted herein by the Transferor to Purchaser in any country throughout the world. If it shall be necessary under the laws of any country that copyright registration be acquired in the name of the Transferor, Purchaser is hereby authorized by the Transferor to apply for said copyright registration thereof; and, in such event, the Transferor shall and does hereby assign and transfer the same unto Purchaser, subject to the rights in the Property reserved hereunder by the Transferor. The Transferor further agrees, upon request, to duly execute, acknowledge, procure and deliver to Purchaser such short form assignments as may be requested by Purchaser for the purpose of copyright recordation in any country, or otherwise. If the Transferor shall fail to so execute and deliver, or cause to be executed and delivered, the assignments or other instruments herein referred to, Purchaser is hereby irrevocably granted the power coupled with an interest to execute such assignments and instruments in the name of the Transferor and as the Transferor's attorney-in-fact.

16. NOTICES: All notices to Purchaser under this agreement shall be sent by overnight courier to the Purchaser at:

Charis Feeney-Orchard
8 Haven Green
Ealing, London, W5 2UU
United Kingdom

And to:
charisorchard@gmail.com

All notices to the Transferor under this agreement shall be sent by electronic message or overnight courier to:

Kim Boyle
C/o- Jay S. Kenoff, ESQ.
Kenoff & Machtinger, LLP
1801 Century Park East, Suite 1520
Los Angeles, California 90067
United States of America

And to:
jay@km-entertainmentlaw.com

17. MISCELLANEOUS:

(a) Relationship: This agreement between the parties does not constitute a joint venture or partnership of any kind.

(b) Cumulative Rights and Remedies: All rights, remedies, licenses, undertakings, obligations, covenants, privileges and other property granted herein shall be cumulative, and Purchaser may exercise or use any of them separately or in conjunction with any one or more of the others.

(c) Waiver: A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

(d) Severability:  If any provision of this agreement as applied to either party or any circumstances shall be adjudged by a court to be void and unenforceable, such shall in no way affect any other provision of this agreement, the application of such provision in any other circumstance, or the validity or enforceability of this agreement.

(e) Governing Law:  This agreement shall be construed in accordance with the laws of the State of California.

(f) Entire Understanding:  This agreement contains the entire understanding of the parties relating to the subject matter, and this agreement cannot be changed except by written agreement executed by both parties.

(g) Arbitration: This Agreement shall be interpreted in accordance with the laws of the United States of America, applicable to agreements executed and to be wholly performed therein.  Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration.  The parties agree hereto that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable attorneys' fees and expenses. The arbitration will be held in Orange Country and any award shall be final, binding and non-appealable.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and year first above written.

---

-------------------------------
Charis Feeney-Orchard

-------------------------------
Kim Boyle

-------------------------------
Witness
(please sign and print name)

-------------------------------
Witness
(please sign and print name)

 **Gmail**                                                      **Charis Orchard <charisorchard@gmail.com>**

---

## Purchase agreement for Casanova Lost and Found

Jay Kenoff <jay@km-entertainmentlaw.com>                          Tue, Apr 15, 2014 at 9:02 AM
To: Charis Orchard <charisorchard@gmail.com>, k boyle <kb2fo@yahoo.com>

Dear Ms. Orchard – Thank you for forwarding the proposed Purchase Agreement.  My client is looking for a somewhat different deal structure and terms for her screenplay.  In order to see if we can move this forward quickly, I am attaching a term sheet for your consideration.  Please get back to me with your thoughts.

Best regards,

-----------------------------------------------------------
JAY S. KENOFF, ESQ.
Kenoff & Machtinger, LLP
Attorneys at Law
1801 Century Park East, Suite 1520
Los Angeles, California 90067
jay@km-entertainmentlaw.com
Tel. (310) 552-0808
Fax (310) 277-0653


CONFIDENTIALITY NOTE:  The information contained in this email transmission is legally privileged and confidential information intended only for the use of the individual or entity named above.  If the reader of this transmission is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this transmission is strictly prohibited.  If you have received this transmission in error, please immediately notify us by email, telephone or fax and delete the original transmission.  Thank you.


Pursuant to recently enacted Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (a) avoiding tax related penalties under the Internal Revenue Code of (b) prompting, marketing or recommending to another party any tax-related matters addressed herein.


[Quoted text hidden]

📄 **Boyle K option deal terms 4-13-14.doc**
   38K

"Casanova Lost and Found" by Kim Boyle

Proposed Option/Purchase Terms
For Theatrical Feature Motion Picture
as first picture

Date: 4/13/14

<u>Term</u>: Initial option term 12 months; renewable for an additional period of 12 months.

<u>Option Payments</u>: $500 for initial period, upon signing of Option Agreement; payment applicable to purchase price; $1,000 for renewal period, payment to accompany extension notice; not applicable to Purchase Price.

<u>Option Exercise</u>: Written notice accompanied by payment of purchase price (or, if sooner, commencement of principal photography, payment within 5 business days).

<u>Purchase Price</u>: 3% of final budget (with exclusions for contingency, actual bond fees, finance charges and purchase price for screenplay), floor of $125,000, cap of $250,000.

<u>Box Office Bonus</u>: $50,000 at $20 million U.S. theatrical as reported in Daily Variety.

<u>Contingent Compensation</u>: For sole writing credit, 5% of contingent Net Proceeds (or Net Profits, as applicable) defined, accounting for and paid according to the same definition applicable to the Producer; reducible to 2½% for shared writing credit by percentage paid to another credited writer.

<u>Further Writing</u>: First opportunity for one rewrite and one polish, fees at applicable WGA minimums + 10%.

<u>Passive Payments for Sequels/Remakes/Spinoffs</u>: These apply if Kim is not the writer. Below amounts reduced by one half if Kim shares writing credit on the initial motion picture.
(a)   Theatrical Sequels: ½ of purchase price and ½ of contingent compensation percentage.
(b)   Theatrical Remakes: 1/3rd of purchase price and 1/3rd of contingent percentage.

(c)  Mini-series/MFT: $15,000 per hour for the first two hours, cap at $90K; proration for partial hours.
(d)  Episodic:  $5,000/90 min; $3,500/hour; $2,500/half hour.
(e)  Spin-offs: one-half generic, one-fourth planted.

Re-runs:  20% per re-run for first 5 re-runs.

Credit: Per WGA standards, as if the applicable.

Premiere:  Invite for Kim + 1 to premiere with travel and accommodations provided.

 Gmail

Charis Orchard <charisorchard@gmail.com>

## Purchase agreement for Casanova Lost and Found

**Charis Orchard <charisorchard@gmail.com>**                                   Tue, Apr 15, 2014 at 4:11 PM
To: Jay Kenoff <jay@km-entertainmentlaw.com>
Cc: k boyle <kb2fo@yahoo.com>

Dear Jay and Kim,

As I explained to Kim, I am a masters student at the Met Film School and this is (possibly) going to be my graduation project. I am not from a well-off background nor in a position of such today.

I read the script in 2006, so seven years ago, and since then it has not been picked up. I think it has enough potential in the UK to become a somewhat successful film, but in the USA, thanks to Veronica Mars, I am sure that it's going to sit on the shelf for another seven years, if not permanently.

Therefore, I will offer to make only one change to my initial contract, that is:

Instead of offering 500 USD and a net profit share of 15 percent, I will offer actual company shares of 15 percent. Meaning that Kim would have 15 percent ownership of the screenplay, the UK company and all further projects produced by the company related to the screenplay. I intend to offer shares in the company to the 3 lead characters, the DOP and my attorney as well.

I will need the purchase agreement to be able to create the company, as I need to be 100% sure that the rights to the screenplay will belong to me. I will then ceed the screenplay to the company. Unfortunately is all I can offer today, so it's really up to Kim to make it work if she wants to.

Also, if I would like to be able to set up the company asap and make a promo trailer for the cannes film festival in the coming weeks so I would very much appreciate it if Kim could make a decision in the best possible time frame, thank you.

Best regards,
Charis
[Quoted text hidden]

3/11/2019                                    Gmail - Purchase agreement for Casanova Lost and Found

 Gmail                                    **Charis Orchard <charisorchard@gmail.com>**

## Purchase agreement for Casanova Lost and Found

**Charis Orchard <charisorchard@gmail.com>**                          Tue, Apr 15, 2014 at 7:05 PM
To: Jay Kenoff <jay@km-entertainmentlaw.com>
Cc: k boyle <kb2fo@yahoo.com>

   Alternatively, I could create the company today, and sell the shares to Kim in exchange for the script. I think this option
   is probably the best, as it would be clearer from the beginning that the company owns the script and Kim owns shares
   in the company.

   Please confirm you agree to this as soon as possible, as I would like to set up the company asap to shoot the promo
   trailer at the end of the month.

   Thank you very much.
   [Quoted text hidden]

3/11/2019                                                  Gmail - Revised purchase agreement

 Gmail                                    **Charis Orchard <charisorchard@gmail.com>**

---

## Revised purchase agreement

**Charis Orchard <charisorchard@gmail.com>**                         Mon, May 12, 2014 at 6:02 AM
To: Jay Kenoff <jay@km-entertainmentlaw.com>, k boyle <kb2fo@yahoo.com>

Dear Kim and Jay,

Apologies for the delay in getting back to you. I have now included your proposed terms in the revised agreement. I
have attached attached both the revised agreement and your original term sheet so you can verify.

If you agree to the contract as it stands, I will sign four copies and send them to Jay. Kim can then countersign them
and when I receive three original copies back I will transfer the option amount of 500 USD.

I aim to go into production in November so you should receive the rest of the purchase fee by then.

Thank you very much and looking forward to hearing back from you.

Best regards,
Charis

**2 attachments**

📄 **PURCHASE AGREEMENT REVISED Casanova.doc**
   81K

📄 **Boyle K option deal terms 4-13-14.doc**
   38K

M Gmail                                        **Charis Orchard <charisorchard@gmail.com>**

## Electronic signature

**Charis Orchard <charisorchard@gmail.com>**                    Tue, Jun 3, 2014 at 1:34 AM
To: Jay Kenoff <jay@km-entertainmentlaw.com>, k boyle <kb2fo@yahoo.com>

Dear Jay and Kim,

Sorry to put pressure on you but I have an appointment with my course supervisor on Thursday and I need to tell her that I have definitely got the script for my grad project sorted so I would greatly appreciate you getting me the signed version of the contract via scan/email in the next couple of days. Thank you very much.

Regards,
Charis

charisorchard.com
chachacreative.com

'The screen is a magic medium. It has such power that it can retain interest as it conveys emotions and moods that no other art form can hope to tackle' - Stanley Kubrick

M Gmail

*Notice of Arbitration*

**Charis Orchard <charisorchard@gmail.com>**

*Annex A + B*

*Attachment C*

## grad film

**Charis Orchard** <charisorchard@gmail.com>                    *(21 pages)*    Tue, Apr 15, 2014 at 10:45 PM
To: k boyle <kb2fo@yahoo.com>
Cc: Jay Kenoff <jay@km-entertainmentlaw.com>

Hi Kim,

I just wanted to ask you directly to make a decision regarding the project asap.

I can only offer you shares in the company, plus a deferred payment of 3k when we sell the distribution rights. The company must own all rights to the script.

I need to know this week if you want to go ahead, this is because my masters program involves steps that lead up to the production.

I need to do the promo trailer in 2 weeks and book the equipment from the school and the actors, locations, ect.

I have a lot of work to get done and deadlines to be met in order to be able to make the film by the end of the year, therefore, if you are not serious about letting me use the script for my grad project, please tell me asap, thank you.

Charis

 Gmail

**Charis Orchard <charisorchard@gmail.com>**

---

## "Casanova" - Option Puchase Agreement
---

**Charis Orchard <charisorchard@gmail.com>**                          Tue, Sep 2, 2014 at 1:05 AM
To: Jay Kenoff <jay@km-entertainmentlaw.com>, k boyle <kb2fo@yahoo.com>

Dear Jay and Kim,

I am touching base with you to see if you would be interested in signing the contract with me for a reduced rate? My intention is to produce the film for a micro sum of just 100k. So if you can reduce the fees by a third I can get the project up and running again and have it filmed before the end of the year.

Please let me know your response within a week, thank you very much.

Regards,
Charis

charisorchard.com
chachacreative.com

'The screen is a magic medium. It has such power that it can retain interest as it conveys emotions and moods that no other art form can hope to tackle' - Stanley Kubrick
[Quoted text hidden]

 Gmail

**Charis Orchard <charisorchard@gmail.com>**

## "Casanova" - Option Puchase Agreement

**k boyle** <kb2fo@yahoo.com>                                                              Wed, Sep 3, 2014 at 5:39 AM
To: Charis Orchard <charisorchard@gmail.com>
Cc: Jay Kenoff <jay@km-entertainmentlaw.com>

Hi Charis,

For clarification, when you say "reduce the fees by a third," are you asking to reduce the purchase price from $125,000 to $41,700:

Purchase Price: The amount of the Purchase Price shall equal 3% of the final budget of the Picture (with exclusions for contingency, actual bond fees, finance charges and purchase price for screenplay), floor of $41,700, cap of $250,000. If the final budget has not been determined at the time of exercise of the Option, then the minimum amount shall be paid at that time, and the balance shall be paid within 30 days of commencement of principal photography of the Picture.

I would then want to increase the bonus after the box office reaches $20 million from $50,000 to $133,300:

Box Office Bonus: Transferor will be paid $133,300 at $20 million U.S. theatrical box office as reported in Daily Variety or similar if Daily Variety not available with payment within 30 days of such determination.

If this is what you meant and the bonus adjustment is agreeable, let us know. We'll revise those two paragraphs of the contract and can move forward to sign.

Best,

Kim

--------------------------------------------
On Mon, 9/1/14, Charis Orchard <charisorchard@gmail.com> wrote:

  Subject: Re: "Casanova" - Option Puchase Agreement
  To: "k boyle" <kb2fo@yahoo.com>
  Cc: "Jay Kenoff" <jay@km-entertainmentlaw.com>
  Date: Monday, September 1, 2014, 11:31 AM
  [Quoted text hidden]

 Gmail

Charis Orchard <charisorchard@gmail.com>

## "Casanova" - Option Puchase Agreement

**k boyle** <kb2fo@yahoo.com>                                      Fri, Sep 5, 2014 at 2:19 AM
To: Charis Orchard <charisorchard@gmail.com>
Cc: Jay Kenoff <jay@km-entertainmentlaw.com>

Hi Charis,

Thank you for the clarification.  I'm sorry but it's not an acceptable offer.  I'm looking for a different deal structure and terms for this screenplay.

Best regards,

Kim

_____

On Thu, 9/4/14, Charis Orchard <charisorchard@gmail.com> wrote:

Subject: Re: "Casanova" - Option Puchase Agreement
To: "k boyle" <kb2fo@yahoo.com>
Cc: "Jay Kenoff" <jay@km-entertainmentlaw.com>
Date: Thursday, September 4, 2014, 6:34 AM

(6 Pages long)

Hi
Kim,
Thanks for your
email. To be totally transparent the floor for the budget
will be exactly 55k USD. If we made the film on this much
then your fee would be 1650 USD upfront payment with an
option of 500 USD due upon signature. Please confirm if this
is an acceptable offer for you.

Regards, Charis
charisorchard.com

chachacreative.com


'The screen is a magic medium. It has such
power that it can retain interest as it conveys emotions and
moods that no other art form can hope to tackle' - Stanley
Kubrick


On Tue, Sep 2, 2014 at 9:39
PM, k boyle <kb2fo@yahoo.com>
wrote:

Hi Charis,


For clarification, when you say "reduce the fees by a
third," are you asking to reduce the purchase price
from $125,000 to $41,700:

1

3/11/2019                                        Gmail - "Casanova" - Option Puchase Agreement

Purchase Price: The amount of the Purchase Price shall equal 3% of the

final budget of the Picture (with exclusions for contingency, actual bond

fees, finance charges and purchase price for screenplay), floor of $41,700,

cap of $250,000. If the final budget has not been determined at the time of

exercise of the Option, then the minimum amount shall be paid at that time,

and the balance shall be paid within 30 days of commencement of principal

photography of the Picture.

I would then want to increase the bonus after the box office reaches $20 million from $50,000 to $133,300:

Box Office Bonus: Transferor will be paid $133,300 at $20 million U.S.

theatrical box office as reported in Daily Variety or similar if Daily

Variety not available with payment within 30 days of such determination.

If this is what you meant and the bonus adjustment is agreeable, let us know.  We'll revise those two paragraphs of the contract and can move forward to sign.

Best,

Kim

–––––––––––––––––––––––––––––––––––

On Mon, 9/1/14, Charis Orchard <charisorchard@gmail.com> wrote:

  Subject: Re: "Casanova" - Option Puchase Agreement

  To: "k boyle" <kb2fo@yahoo.com>

  Cc: "Jay Kenoff" <jay@km-entertainmentlaw.com>

  Date: Monday, September 1, 2014, 11:31 AM

2

Thanks Kim !


Envoyé de mon iPhone


> Le 1 sept. 2014 à 20:11, k boyle <kb2fo@yahoo.com>
a

écrit :

>

> Hi

Charis,

>

> Got your

email.  Today is a holiday in the U.S.  I will contact Jay

and we'll get back to you in the next couple of days.

>

> Best,

>

> Kim

>

>

>

>

-------------------------------------

> On Mon, 9/1/14, Charis Orchard <charisorchard@gmail.com>

wrote:

>

> Subject:

Re: "Casanova" - Option Puchase Agreement

> To: "Jay Kenoff" <jay@km-entertainmentlaw.com>,

"k boyle" <kb2fo@yahoo.com>

> Date: Monday, September 1, 2014, 8:05

AM

>

3

> and Kim,

> I am

touching

> base with you to see if you

would be interested in signing

> the

contract with me for a reduced rate? My intention is to

> produce the film for a micro sum of just

100k. So if you can

> reduce the fees by

a third I can get the project up and

>

running again and have it filmed before the end of the

> year.

>

> Please let me know your

> response within a week, thank you very

> much.

> Regards,

Charis

>

>

charisorchard.com

> chachacreative.com

>

>

>

>

> 'The screen is a magic medium. It has

such

> power that it can retain interest

as it conveys emotions and

> moods that

4.

> Kubrick

>

>

>

>

> On Thu, May 22, 2014

at

> 10:50 PM, Jay Kenoff <jay@km-entertainmentlaw.com>

> wrote:

>

> Hi Charis - Attached please find a

redlined revision of the

> proposed

option/purchase agreement.  In some places,

> I've inserted notes regarding the

revisions which I hope

> you will find

helpful.  We look forward to receiving your

> response.

>

>

>

>

> Best regards,

>

>

----------------------------------------------------

>

> JAY S. KENOFF,

ESQ.

>

> Kenoff &

Machtinger, LLP

>

5.

Gmail - "Casanova" - Option Puchase Agreement

Attorneys at Law

>

>

1801 Century Park East, Suite 1520

>

> Los Angeles, California 90067

>

> jay@km-entertainmentlaw.com

>

> Tel. (310)

552-0808

>

> Fax

(310) 277-0653

>

>


>

> CONFIDENTIALITY

NOTE:  The information contained in this

> email transmission is legally privileged

and confidential

> information intended

only for the use of the individual or

>

entity named above.  If the reader of this transmission

is

> not the intended recipient, you are

hereby notified that any

> use,

dissemination, distribution or copying of this

> transmission is strictly prohibited.  If

you have received

*b*

error, please immediately notify us by

>

email, telephone or fax and delete the original

> transmission.  Thank you.

>

>

>

>

> Pursuant to recently enacted Treasury

Department

> Regulations, we are now

required to advise you that, unless

>

otherwise expressly indicated, any federal tax advice

> contained in this communication, including

attachments and

> enclosures, is not

intended or written to be used, and may

>

not be used, for the purpose of (a) avoiding tax related

> penalties under the Internal Revenue Code

of (b) prompting,

> marketing or

recommending to another party any tax-related

> matters addressed herein.

>

>

>

>

7.

3/11/2019                                  Gmail - "Casanova" - Option Puchase Agreement

 Gmail                              **Charis Orchard <charisorchard@gmail.com>**

## "Casanova" - Option Puchase Agreement

**Charis Orchard <charisorchard@gmail.com>**                    Thu, Sep 4, 2014 at 11:34 PM
To: k boyle <kb2fo@yahoo.com>
Cc: Jay Kenoff <jay@km-entertainmentlaw.com>

Hi Kim,

Thanks for your email. To be totally transparent the floor for the budget will be exactly 55k USD. If we made the film on this much then your fee would be 1650 USD upfront payment with an option of 500 USD due upon signature. Please confirm if this is an acceptable offer for you.

Regards,
Charis

charisorchard.com
chachacreative.com

'The screen is a magic medium. It has such power that it can retain interest as it conveys emotions and moods that no other art form can hope to tackle' - Stanley Kubrick
[Quoted text hidden]

3/11/2019                                     Gmail - "Casanova" - Option Puchase Agreement

 Gmail                                    **Charis Orchard <charisorchard@gmail.com>**

_____

## "Casanova" - Option Puchase Agreement

**k boyle <kb2fo@yahoo.com>**                                Fri, Sep 5, 2014 at 3:37 PM
To: Charis Orchard <charisorchard@gmail.com>
Cc: Jay Kenoff <jay@km-entertainmentlaw.com>

> Charis,
>
> 1. Yes.
> 2. Yes.
>
> I agree.
>
> Best regards,
>
> Kim
>
> _____
>
> On Thu, 9/4/14, Charis Orchard <charisorchard@gmail.com> wrote:
>
> Subject: Re: "Casanova" - Option Puchase Agreement
> To: "k boyle" <kb2fo@yahoo.com>
> Cc: "Jay Kenoff" <jay@km-entertainmentlaw.com>
> Date: Thursday, September 4, 2014, 10:00 PM
>
> Hi
> Kim,
> I understand. What
> about:
> 1. If I raise
> more funds then I come back to you and we sign the original
> agreement we were about to sign in June? 2. If
> you option it to someone else in the mean time you let me
> know so I stop talking to talent/investors about the
> project?
> Can you
> agree on the above?
> Regards, Charis
> charisorchard.com
> chachacreative.com
>
>
> 'The screen is a magic medium. It has such
> power that it can retain interest as it conveys emotions and
> moods that no other art form can hope to tackle' - Stanley
> Kubrick
>
>
> On Thu, Sep 4, 2014 at 6:19
> [Quoted text hidden]

3/11/2019                                                    Gmail - Option Payment

 Gmail                                Charis Orchard <charisorchard@gmail.com>

## Option Payment

Jay Kenoff <jay@km-entertainmentlaw.com>                           Wed, Dec 3, 2014 at 1:38 PM
To: Charis Orchard <charisorchard@gmail.com>
Cc: k boyle <kb2fo@yahoo.com>

Hi Charis – We have the fully-signed agreement, but it appears that the option payment has yet to be made.  Please take care of that right away.  Thank you.

Best,

------------------------------------------------------
JAY S. KENOFF, ESQ.
Kenoff & Machtinger, LLP
Attorneys at Law
1801 Century Park East, Suite 1520
Los Angeles, California 90067
jay@km-entertainmentlaw.com
Tel. (310) 552-0808                                        (7 pages long)
Fax (310) 277-0653

CONFIDENTIALITY NOTE:  The information contained in this email transmission is legally privileged and confidential information intended only for the use of the individual or entity named above.  If the reader of this transmission is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this transmission is strictly prohibited.  If you have received this transmission in error, please immediately notify us by email, telephone or fax and delete the original transmission.  Thank you.

Pursuant to recently enacted Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (a) avoiding tax related penalties under the Internal Revenue Code of (b) prompting, marketing or recommending to another party any tax-related matters addressed herein.

**From:** Charis Orchard
**Sent:** Monday, November 03, 2014 2:22 PM
**To:** Jay Kenoff
**Cc:** k boyle
**Subject:** Re: Electronic signature

Dear Jay and Kim,

Hope that this email finds you both well.

I would like to move forward with the option and purchase of the screenplay and have attached the signed agreement that was agreed to earlier this year.

Please could you counter sign it and send it back to me in the coming week? I hope to move forward with the production for a shoot in January.

Best regards,
Charis

+44 7455 309583
charisorchard.com

On Mon, Jun 9, 2014 at 9:13 AM, Charis Orchard <charisorchard@gmail.com> wrote:
Thanks Jay. I am really sorry to have had to put a stop on it. I will let you know as soon as I have a clear vision on the situation.

Regards,
Charis

charisorchard.com
chachacreative.com

'The screen is a magic medium. It has such power that it can retain interest as it conveys emotions and moods that no other art form can hope to tackle' - Stanley Kubrick

On Fri, Jun 6, 2014 at 5:21 AM, Jay Kenoff <jay@km-entertainmentlaw.com> wrote:
Hi Charis — Sorry to hear that you're unable to proceed at this time.  Hopefully, it's something that can be rectified quickly so that you can proceed again.  Please keep us posted.

Best regards,

---------------------------------------------------------

JAY S. KENOFF, ESQ.
Kenoff & Machtinger, LLP
Attorneys at Law
1801 Century Park East, Suite 1520
Los Angeles, California 90067
jay@km-entertainmentlaw.com
Tel. (310) 552-0808
Fax (310) 277-0653

CONFIDENTIALITY NOTE:  The information contained in this email transmission is legally privileged and confidential information intended only for the use of the individual or entity named above.  If the reader of this transmission is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this transmission is strictly prohibited.  If you have received this transmission in error, please immediately notify us by email, telephone or fax and delete the original transmission.  Thank you.

Pursuant to recently enacted Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (a) avoiding tax related penalties under the Internal Revenue Code of (b) prompting, marketing or recommending to another party any tax-related matters addressed herein.

**To:** k boyle
**Cc:** Jay Kenoff
**Subject:** Re: Electronic signature

Dear Jay and Kim,

Something unforeseen and personal has come up today and I have decided to put this project on hold. I apologize. No need to send the signature today. I will give you a update in the next couple of weeks if I can go ahead with the project or not. I am sure my course supervisor will understand when I update her tomorrow. Sorry and thanks for your patience.

Best regards,
Charis

Regards,
Charis

charisorchard.com
chachacreative.com

'The screen is a magic medium. It has such power that it can retain interest as it conveys emotions and moods that no other art form can hope to tackle' - Stanley Kubrick


On Wed, Jun 4, 2014 at 5:24 PM, k boyle <kb2fo@yahoo.com> wrote:
Yes, I will send it today.

Best,

Kim

_____

On Wed, 6/4/14, Charis Orchard <charisorchard@gmail.com> wrote:

Subject: Re: Electronic signature
To: "Jay Kenoff" <jay@km-entertainmentlaw.com>
Cc: "k boyle" <kb2fo@yahoo.com>
Date: Wednesday, June 4, 2014, 1:41 AM

Thank you Jay and Kim. Just
in Time. Kim, would it be possible for you to send me
the scan with your signature in time for my meeting
Thursday?I will do mine later today or tomorrow
morning at the latest.


Regards, Charis
charisorchard.com

chachacreative.com


'The screen is a magic medium. It has such
power that it can retain interest as it conveys emotions and
moods that no other art form can hope to tackle' - Stanley
Kubrick


On Wed, Jun 4, 2014 at
2:35 AM, Jay Kenoff <jay@km-entertainmentlaw.com>
wrote:

Hi Charis and Kim – I've removed the redlines and comments from the
enclosed Option Purchase Agreement which should be ready for signatures.
Please sign and date before a witness, as indicated, and scan and email to each
of us.  Kim, please attach the Exhibit "A".  I've also included wire
instructions for the option payment.

Please note that I have specified in Par. 5 that the 12 month option term
runs from the date of Transferor's execution of this Agreement.

Please let me know if you have any questions.

Thank you.

Best regards,


--------------------------------------------------
JAY
S. KENOFF, ESQ.
Kenoff & Machtinger, LLP
Attorneys at Law
1801
Century Park East, Suite 1520
Los Angeles, California 90067
jay@km-entertainmentlaw.com
Tel. (310)
552-0808
Fax (310) 277-0653

CONFIDENTIALITY
NOTE:  The information contained in this email transmission is legally
privileged and confidential information intended only for the use of the
individual or entity named above.  If the reader of this transmission is
not the intended recipient, you are hereby notified that any use, dissemination,
distribution or copying of this transmission is strictly prohibited.  If
you have received this transmission in error, please immediately notify us by
email, telephone or fax and delete the original transmission.  Thank
you.

Pursuant to recently
enacted Treasury Department Regulations, we are now required to advise you that,
unless otherwise expressly indicated, any federal tax advice contained in this
communication, including attachments and enclosures, is not intended or written
to be used, and may not be used, for the purpose of (a) avoiding tax related
penalties under the Internal Revenue Code of (b) prompting, marketing or

herein.

From: Charis
Orchard
Sent: Tuesday, June 03, 2014 2:44 PM
To: Jay
Kenoff
Cc: k
boyle
Subject: Re: Electronic
signature

Hi Jay,
Thanks for your email. All is well and I agree that we
can execute the
agreement now.
Looking forward to receiving Kim's Signature.

Best,
Charis


Regards,
Charis


charisorchard.com

chachacreative.com


'The
screen is a magic medium. It has such power that it can
retain interest as it
conveys emotions and moods that no other art form can hope
to tackle' - Stanley
Kubrick


On Mon, Jun 2, 2014 at
11:36 PM, Jay Kenoff <jay@km-entertainmentlaw.com>
wrote:


    Hi Charis – I've added the electronic and
counterpart signature provision
    (at the end), but Kim and I also wanted to ensure that you
had checked over
    the (hopefully) final adjustments to the agreement, since
there were a few
    differences from your prior version (and I had also
provided comments to
    explain the reasons for some of the changes).  If

send the final version
    to you and Kim for execution.  Since we have counterpart execution, each
    of you can sign electronically and send to the other.
The payment to Kim
    should go to me, and I'll provide bank information for the wire.  I noted
    that you requested a copy of Kim's DL, but I don't know why there is a need
    for that.

    Please let me know if you have any questions.

    Best regards,

    _____

JAY
    S. KENOFF, ESQ.
Kenoff & Machtinger, LLP
Attorneys at Law
1801
    Century Park East, Suite 1520
Los Angeles, California 90067
jay@km-entertainmentlaw.com
Tel. (310)
    552-0808
Fax (310) 277-0653

CONFIDENTIALITY
    NOTE:  The information contained in this email transmission is legally
    privileged and confidential information intended only for the use of the
    individual or entity named above.  If the reader of this transmission is
    not the intended recipient, you are hereby notified that any use,
    dissemination, distribution or copying of this transmission is strictly
    prohibited.  If you have received this transmission in error, please
    immediately notify us by email, telephone or fax and delete the original
    transmission.  Thank you.

    Pursuant to
    recently enacted Treasury Department Regulations, we are now required to
    advise you that, unless otherwise expressly indicated, any federal tax advice
    contained in this communication, including attachments and enclosures, is not
    intended or written to be used, and may not be used, for the purpose of (a)
    avoiding tax related penalties under the Internal Revenue Code of (b)
    prompting, marketing or recommending to another party any tax-related matters
    addressed herein.

    From: Charis Orchard
    Sent: Monday, June 02, 2014 8:34 AM

Subject: Electronic signature

Dear Jay and Kim,

Sorry to put pressure on you but I have an appointment with my course
supervisor on Thursday and I need to tell her that I have definitely got the
script for my grad project sorted so I would greatly appreciate you getting me
the signed version of the contract via scan/email in the next couple of days.
Thank you very much.

Regards,
Charis

charisorchard.com

chachacreative.com

'The screen is a magic medium. It has such power that it can
retain interest as it conveys emotions and moods that no other art form can
hope to tackle' - Stanley Kubrick

 Gmail                              **Charis Orchard <charisorchard@gmail.com>**

## Proof of transfer

**Charis Orchard <charisorchard@gmail.com>**                          Fri, Dec 19, 2014 at 11:32 PM
To: Jay Kenoff <jay@km-entertainmentlaw.com>, k boyle <kb2fo@yahoo.com>

Hi,

Attached is the proof of transfer for the option on the script. Could Kim please send 3 original signed copies to me at
the address below:

Charis Orchard
Flat 4
56 Queens Gardens
W2 3AF
London
United Kingdom

This is rather urgent so I can get the BFI certification process complete.
Thank you very much.

Wish you both a very Merry Christmas!

Kind regards,
Charis

07455309583
www.charisorchard.com
imdb.com/name/nm2450532

LOVE ADDICT TRAILER:
http://bit.ly/1u0usVP
Love Addict received the award for
Best Comedy Film 2014
at the LA Comedy Awards on the 13th Nov

---------- Forwarded message ----------
From: **Charis Orchard** <charisorchard@gmail.com>
Date: Fri, Dec 19, 2014 at 1:30 PM
Subject:
To: Ms Me <charisorchard@gmail.com>

Envoyé de mon iPhone



**FullSizeRender.jpg**
97K

4/11/2019                                    Gmail - Purchase agreement for Casanova Lost and Found

 Gmail

Charis Orchard <charisorchard@gmail.com>

## Purchase agreement for Casanova Lost and Found
12 messages

*Notice of Arbitration*
*Annex A* and *Attachment D - 5 pages*
*(see page 4/5)*

**Charis Orchard** <charisorchard@gmail.com>                                    Apr 9, 2014 at 8:58 PM
To: jay@km-entertainmentlaw.com, k boyle <kb2fo@yahoo.com>
Bcc: charis orchard <charisorchard@gmail.com>

Dear Mr Jay Kernoff,

I am contacting in regards to the script 'Casanova Lost and Found' by Kim Boyle.
I would like to purchase this property from Kim, and have attached a purchase agreement, as per my offer to Kim. If you
would like to make any changes to the agreement, please do let me know.
Otherwise, with your approval, I ask that Ms. Boyle sign and date three original copies of the agreement and send them to
me with her bank account details and a copy of her identification.

Best regards,
Charis Orchard

📎 **PURCHASE AGREEMENT Casanova Lost and Found-2.doc**
67K

**Jay Kenoff** <jay@km-entertainmentlaw.com>                                    Tue, Apr 15, 2014 at 9:02 AM
To: Charis Orchard <charisorchard@gmail.com>, k boyle <kb2fo@yahoo.com>

Dear Ms. Orchard – Thank you for forwarding the proposed Purchase Agreement.  My client is
looking for a somewhat different deal structure and terms for her screenplay.  In order to see if we
can move this forward quickly, I am attaching a term sheet for your consideration.  Please get back
to me with your thoughts.

Best regards,

-----------------------------------------------------------
JAY S. KENOFF, ESQ.
Kenoff & Machtinger, LLP
Attorneys at Law
1801 Century Park East, Suite 1520
Los Angeles, California 90067
jay@km-entertainmentlaw.com
Tel. (310) 552-0808
Fax (310) 277-0653

CONFIDENTIALITY NOTE:  The information contained in this email transmission is legally privileged and confidential
information intended only for the use of the individual or entity named above.  If the reader of this transmission is not
the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this transmission
is strictly prohibited.  If you have received this transmission in error, please immediately notify us by email, telephone or
fax and delete the original transmission.  Thank you.

Pursuant to recently enacted Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (a) avoiding tax related penalties under the Internal Revenue Code of (b) prompting, marketing or recommending to another party any tax-related matters addressed herein.

[Quoted text hidden]

📄 **Boyle K option deal terms 4-13-14.doc**
38K

---

**Charis Orchard** <charisorchard@gmail.com>                                    Tue, Apr 15, 2014 at 4:11 PM
To: Jay Kenoff <jay@km-entertainmentlaw.com>
Cc: k boyle <kb2fo@yahoo.com>

Dear Jay and Kim,

As I explained to Kim, I am a masters student at the Met Film School and this is (possibly) going to be my graduation project. I am not from a well-off background nor in a position of such today.

I read the script in 2006, so seven years ago, and since then it has not been picked up. I think it has enough potential in the UK to become a somewhat successful film, but in the USA, thanks to Veronica Mars, I am sure that it's going to sit on the shelf for another seven years, if not permanently.

Therefore, I will offer to make only one change to my initial contract, that is:

Instead of offering 500 USD and a net profit share of 15 percent, I will offer actual company shares of 15 percent. Meaning that Kim would have 15 percent ownership of the screenplay, the UK company and all further projects produced by the company related to the screenplay. I intend to offer shares in the company to the 3 lead characters, the DOP and my attorney as well.

I will need the purchase agreement to be able to create the company, as I need to be 100% sure that the rights to the screenplay will belong to me. I will then ceed the screenplay to the company. Unfortunately is all I can offer today, so it's really up to Kim to make it work if she wants to.

Also, if I would like to be able to set up the company asap and make a promo trailer for the cannes film festival in the coming weeks so I would very much appreciate it if Kim could make a decision in the best possible time frame, thank you.

Best regards,
Charis
[Quoted text hidden]

---

**Charis Orchard** <charisorchard@gmail.com>                                    Tue, Apr 15, 2014 at 4:16 PM
To: Jay Kenoff <jay@km-entertainmentlaw.com>
Cc: k boyle <kb2fo@yahoo.com>

I forgot to mention that I have already offered the lead role to Madeleine Dunbar, who has accepted to play Christine Mitchell. http://www.imdb.com/name/nm2685330/

Madeleine is fantastic and I am very excited about working with her. She apparently came very close to getting a lead role in the game of thrones. Her father is also a famous actor, Adrian Dunbar and he will probably play a role in the film: http://www.imdb.com/name/nm0001160/?ref_=nmmd_md_nm

You can google Madeleine to see what she looks like and watch her in a short film here:
http://www.2dayslater.co.uk/films/match.html
[Quoted text hidden]

---

**Charis Orchard** <charisorchard@gmail.com>                                    Tue, Apr 15, 2014 at 7:05 PM

To: Jay Kenoff <jay@km-entertainmentlaw.com>
Cc: k boyle <kb2fo@yahoo.com>

Alternatively, I could create the company today, and sell the shares to Kim in exchange for the script. I think this option is probably best, as it would be clearer from the beginning that the company owns the script and Kim owns shares in the company.

Please confirm you agree to this as soon as possible, as I would like to set up the company asap to shoot the promo trailer at the end of the month.

Thank you very much.
[Quoted text hidden]

---

**Charis Orchard** <charisorchard@gmail.com>                                    Tue, Apr 15, 2014 at 8:46 PM
To: Jay Kenoff <jay@km-entertainmentlaw.com>
Cc: k boyle <kb2fo@yahoo.com>

I could also offer a small fee of 3000 USD to be paid upon the sale of the distribution rights of the film.

The budget of the film will be very modest because I am a student, I will be using mostly volunteers for the cast and crew and the lighting, camera (a red one) and machinery will be supplied by the school. Therefore, the budget will mostly be locations costs, set design and catering, music rights and marketing costs. I will also be using students who are doing a masters post-production for the editing and post. However, Just so you know the school does not take any part of the ownership of the project.

Therefore, your fee demands are really not in line with the film I intend to make.

I am aiming to make a film that generates a lot of recognition for everyone involved. My aim is to make something that makes the most of the resources available to me as a masters student that will be highly acclaimed and receive international distribution.

In any case I need to know by this **Thursday, 17th of April** if Kim will accept my offer or not, thank you.

Best regards,
Charis


[Quoted text hidden]

---

**Charis Orchard** <charisorchard@gmail.com>                                    Wed, Apr 16, 2014 at 7:44 PM
To: Adam Omar Shanti <adam.shanti@seashoreproductions.com>
Cc: Elie Haddad <haddadmaster@gmail.com>

Dear Adam,

Here is the terms that I received from the solicitor re. miss chaotic, currently entitled casanova lost and found.

I have also attached the original contract I sent him, which you had looked at.

I would like to try and make it work and think that if we included Elie's fees and your fees the budget could probably be 125k USD.

The problem for me is paying her fee to secure ownership of the project. I know you said you would not give a cent until you received a complete budget from me. I am working on this and will get it to you in due course once it clear if we can sort out purchasing the rights for the screenplay.

If you don't think this is a project you and Elie want to be involved in then please let me know and I will not involve you further, thanks.

Best,
Charis
[Quoted text hidden]

4/11/2019                                        Gmail - Purchase agreement for Casanova Lost and Found

**2 attachments**

📄 **Boyle K option deal terms 4-13-14.doc**
38K

📄 **PURCHASE AGREEMENT Casanova Lost and Found-2.doc**
67K

---

**Adam Omar Shanti** <adam.shanti@seashoreproductions.com>                    Wed, Apr 16, 2014 at 9:05 PM
To: Charis Orchard <charisorchard@gmail.com>
Cc: Elie Haddad <haddadmaster@gmail.com>

Thanks for this.

To make this clear:  they are offering to sell 100% rights in the screenplay for $3,750 PLUS between 2.5%-5% net (which, to put that into perspective, on a $1M gross will be approximately $10k).  I am not going to address sequels, re-writes, or B.O. performance bonus since I think they are unlikely.

If you two want this film for $3,750 ($500 payable now; the  balance upon completion), then let me know and I will get it done.  However, I am not totally in love with this film (which needs some Shantanization), think that you both have a lot on your plates, and if you reeeeeally insist then I would prefer to squeeze them much more (maybe $1,500 upfront and 2.5% net -- and then we can just bankrupt SSP).

Thanks.


Adam Omar Shanti
Seashore Productions, LLC
JOR: 962 (0)79.77.00139
UAE: 971 (0)50.373.1239
USA: 001 646.845.9613
adam.shanti@seashoreproductions.com



Seashore Productions

This message and its attachments may contain confidential information. If an addressing or transmission error has caused misdirection of this message and if you are not the intended recipient you are hereby notified that any disclosure, use, copying, distribution or taking any action in reliance on the information of this message and its attachments is strictly prohibited. If you have received this communication in error, please notify the sender immediately by responding to this message and then delete the message and its attachments from your system. All contents, images and drawings which have been sent within this message are only for information purposes and Seashore Productions, LLC reserves all the rights to change or renew when it is considered necessary. Seashore Productions, LLC shall not be liable for any errors or omissions or any viruses in the context of this message.

Please consider the environment before printing this message.
[Quoted text hidden]

---

**Charis Orchard** <charisorchard@gmail.com>                                  Wed, Apr 16, 2014 at 9:54 PM
To: Adam Omar Shanti <adam.shanti@seashoreproductions.com>
Cc: Elie Haddad <haddadmaster@gmail.com>

I want to do it and think it can be made very inexpensively thanks to the fact it is my masters grad project.

I just got the contacts from film london for a lot of the locations I would need (I will forward you the email so you can see). I think it's worth moving forward with the writer's attorney. by the time Adam has negotiated the contract, I will have a realistic budget to give you guys, so you can decide if you want to come onboard and in this case, we can quickly move forward to close with writer.

4/11/2019                                    Gmail - Purchase agreement for Casanova Lost and Found

I have already started casting for the promo trailer and have 2 rugby players and a dozen very attractive actresses who are all aware its no pay / volunteer basis. I intend to do the entire cast apart from the lead actors on this basis, I hope you are ok with that? When it's a student film, it's acceptable.

The only thing is, I am not sure how to introduce Adam to the writer's attorney? I would like to introduce you as my friend is offering to help, rather the my attorney. Is this ok?

Please confirm and I will do the introduction via email. Thanks.

[Quoted text hidden]

---

**Adam Omar Shanti** <adam.shanti@seashoreproductions.com>                    Wed, Apr 16, 2014 at 9:58 PM
To: Charis Orchard <charisorchard@gmail.com>
Cc: Elie Haddad <haddadmaster@gmail.com>

Charis, I cannot speak for Elie, but I do not want to be a part of this until you prepare me a realistic budget.
[Quoted text hidden]

---

**Charis Orchard** <charisorchard@gmail.com>                                  Wed, Apr 16, 2014 at 11:23 PM
To: Adam Omar Shanti <adam.shanti@seashoreproductions.com>
Cc: Elie Haddad <haddadmaster@gmail.com>

Sure, I am working on it. Will get it to you asap. Thanks.
[Quoted text hidden]

---

**Charis Orchard** <charisorchard@gmail.com>                                  Fri, Mar 1, 2019 at 4:20 PM
To: jeremy-lunt@adlersproductions.com


Sent from my iPhone

Begin forwarded message:

> **From:** "Jay Kenoff" <jay@km-entertainmentlaw.com>
> **Date:** 15 April 2014 at 9:02:04 am AEST
> **To:** "Charis Orchard" <charisorchard@gmail.com>, "k boyle" <kb2fo@yahoo.com>
> [Quoted text hidden]

[Quoted text hidden]

---

📄 **Boyle K option deal terms 4-13-14.doc**
38K

*Notice of Arbitration*
*Annex A & B*
*Attachment E*
*½*
*(1 out of 2 docs)*

**CharisFeeney-Orchard_MAF02_RPM1405_3a**

**Master's Project Portfolio and Supporting Documentation**

Table of Contents

1.     Essay on directional framework
2.     Characters list
3.     Shooting schedule
4.     Budget
5.     Post production plan
6.     Marketing and distribution

1

1. Essay on Directional Framework

This masters project portfolio endeavors to describe in detail the directional framework for my graduation project, 'Casanova Christmas', a romantic comedy about two mismatched people that end up together due to unexpected circumstances at Christmas time. The primary concerns of a director are a) to understand and support the actor's process and b) to develop a strategy for camera work that consists of a cohesive and achievable list of shot that can be engineered during the shoot and then succinctly cut together in the edit to create the film. As such, this portfolio presents it's main area of research as being working with the actors and the camera and poses the question of what are some valuable references and critical tools a director should utilize in order to create a successful independent feature film?  In directing the actors performance one of most useful reference I will draw from is the work of Sanford Meisner, one of history's greatest acting coaches. For the shot list and camera techniques, I will apply the technical provisions specified by Steven D. Katz for covering a scene using the camera angles and movement that are available to me in a low budget production, with the primary focus on conveying the story to the audience.

'Casanova Christmas' is a story about a young private detective named Christine Mitchell, who is hired to uncover why a guy named Albert severed his relationship with a group of women he was dating that, unbeknown to him, are all friends. In order to get to know Albert, Christine poses as an interior decorator and repaints his apartment on behalf of the landlord. During the course of the renovation, Christine discovers that Albert is going through a midlife crisis and has had to face the truth about himself, in particular his attitude towards women. Albert's efforts to change his life cause Christine to face the truth about her own relationship and they inadvertently fall for each other during the course of the film. The moral of the story is that honesty is the most valuable and rewarding attribute of a relationship that people can achieve together.

The story lends itself to a low-budget production as the context portrays a dynamic set of inter-relations between characters who are at different times compassionate, compelling, comedic and heroic in the sense that they establish a deep connection with each other and are forced to be honest with each other and thus portray an example of love. To attain an honest portrayal of the relations between the characters in the film, I will engage in playing games with the actors that achieve freedom of creative expression, those prescribed by Sanford Meisner[1]

Sanford Meisner created many innovative techniques for directing actors. Meisner prescribed that actors should let their performance come from the moment. Much of his technique was based on repeated and controlled improvisation, or not acting on the text and assumptions but rather searching for the honest emotional ground from which a character's true motivation might grow. Meisner describes his interpretation of improvisation as the following; 'There is a basic way to do an improvisation based on a repeat exercise which finally came

---

[1] Sanford Meisner - Theatre's Best Kept Secret (Documentary), 1984.

down to not doing anything unless one had to do it. So that in the work when something happens it happens because it has to happen not because someone wants to make it happen because a director wants to make it happen or an actor thinks they want to manipulate so its set up so it has to occur. This makes an actor have it's own world, and helps to know their world that is a cocoon around the actor where they feel safe.'[2]

Therefore, part of my strategy for working with the actors is improvisation to create correlation through indirect and comparable exploration of possible experiences of the character to generate the performance of actors. Much of this process involves free association and stream of consciousness work on behalf of the actors. As a director, I can encourage actors to become comfortable in each others presence and then support them in understanding the story in general and then the context of each scene, its background circumstance and underlying structure. I would help construct a framework for this by breaking the scene into emotional plot points and beats that determine the way the actors might behave or react and how the story is conveyed to the audience.

Sydney Pollack summarises this process as developed by Meisner, 'What Sandy did was to examine the fact that dialogue is the last thing that happens at any time between two people. It's all about behaviour and attitude. You say something to me but beforehand, you mean a certain thing to me because of whatever relationship we have had. You say something. I hear it. Depending on the state I am in when I come into the room, it means something to me. It produces an emotional reaction in me the last thing that happens is that I respond with dialogue in some way.'[3]

Hence, my aim with the actors is to implement my own style of direction as an extension of the Meisner technique where I establish a context for a state of play that is entirely random and drawn from the actors own imaginative construction of their background story and where their emotional compass can be used as a basis for the relationship and story as it unfolds in the scene. As a director it's critical to pose questions to the actors such as, what brought them to this moment? Where to they want to go now? What is their intention and what are their feelings in regards to themselves, the other person in the scene and their state of mind and life as a whole?

An powerful concept fostered by Sanford Meisner is the idea of a 'spine' for a character's own story or in other words, his governing intention of the moment. According to Sydney Pollack, 'There is a spine that you have got to find and then you will find the moment. Don't worry about the moment, worry what is the intention of the speech? The intention of the speech is "I'll tell you something about the world. I'll tell you how sad and tragic it is." What Sandy so clearly is that the basic thing about character is how you do what you do. it's not so much what you but how you do it and what you being to see is that there are 1000s of ways of doing the

---

[2] Sanford Meisner - Theatre's Best Kept Secret (Documentary), 1984.
[3] Sanford Meisner - Theatre's Best Kept Secret (Documentary), 1984.

text and what is required is a point of view. A real sense of who you are and what you are doing."[4]

Hence the aim of acting is to enable the actors to create a reality by allowing their instincts to play truthfully through their inhabiting the life of the character and feeling their emotions and state of being as it were themselves. Acting is about reproducing truthful behaviour in imaginary circumstances and directing is the way that this can be broken into moments and attitudes that are recorded by the camera and brought to life on a screen. The use of the imagination as a director is critical not only in supporting the work of actors but also in developing a cohesive strategy for implementation of all creative and technical ingredients of a feature film, in particularly the camera work and cinematography.

The camera shot, movement and angles a director selects for to construct a scene must take into consideration the nuance of time and space as well as guide the audience in determining where the status is, what the drama is about and in particular what is the comedy in the scene? To do this the camera should follow the main characters and capture the beats of their emotional state of play.  My work in directing the camera is then to create a sense of emotion and objective via the camera to give a perspective to the audience that relates status, drama and comedy in each scene. To do this I have to examine the staging of each scene and how it will play out then place the camera in the best position to frame the characters and create the story.

In his book, 'Cinematic Motion', Steven D. Katz lists different examples of staging the scene and explain how camera should follow the motion of the actors to convey important information to the audience. Katz list the major technical considerations for a director as being, 'point of view, dramatic emphasis, the dramatic circle of action, master and sequence shots and multiple setups and coverage.'[5] Each of these different aspects of camera work fall into the area of staging and involve choreographing the scenes with the actors and camera movement.

Katz explains, 'There are two overall approaches to staging that are common classic movie technique, zone and man-on-man. Zone systems staging structure the shots according to recognizably distinct locations in the scene. In man-on-man stagings the scene is structured around the movement of a subject which in turn determines the spatial organisation of the scene. Both Man-on-man and zone staging share an underlying technique - they direct the viewer's attention within the frame. This is accomplished by emphasizing particular story elements, transferring attention from one subject to another, determined by the content of the scene. Specifically, a director has 4 basic techniques at his command: static and moving camera shots and static and moving subjects.' (Katz, 2004. pg. 38-40).

---

[4] Sanford Meisner - Theatre's Best Kept Secret (Documentary), 1984.
[5] Katz, S. (2004). Cinematic motion. Studio City, CA: Michael Wiese Productions.

4

In line with Katz's specifications, I intend to these four techniques to construct the camera work for the film and will endeavour that each shot in the scene effectively conveys to the audience the story as played out by the actors within the stage and framework of the motion picture. As a director, I am acutely aware that the content of the frame is defining story experience for the audience. It is the responsibility of the director to ensure that the story is conveyed cohesively so the audience is able to engage with the actors and become emotionally involved in their story.

The shots and framing must therefore ensure that there is no ambiguity in the story or the motivations of the actors in their emotional play with each other within the imagined reality that the film creates for the audience. As well, the director must ensure that the film shoot is able to achieve the required footage within the specified amount of time. Conscious of this equation of time and performance and technical staging and camera set-ups, my goal is to cover each scene with a moving master shot and then individual shots of the characters conversing and a middle shot with both or all characters that can balance out master and single shots. The determining factor of what shots I use will be the staging of the actors and how to convey the story to the actors using the most economic framing.

Therefore, the two most important factors for me as director are combining the work of the actors and the work of the camera to create a story that the audience that effectively portrays the emotional states and essential information so that the audience can themselves become deeply involved in the state of play they are watching, witnessing and living vicariously through. To be able to do this is to offer the audiences an opportunity to be entertained, inspired, educated and emotionally involved in a story that is not about them, but about people and circumstances that they can perhaps relate to on a deeper level of human experience and circumstance.

This relates back to the essential nature of the actors work and critical need for a director to support their character's development, emotional presence in the moment, the complex inter-relations they go through on screen and their journey in the film as conveyed via the camera angles and shots that a director chooses. A directors' contribution to a film is at a fundamental level her work with the actors and cinematographer on set but on a higher level what the audience experiences and what that film represents through the story it tells. Together, these thing are indicative of the need for a director to be coherent and willing to engage on all levels at the most honest sense of what storytelling is.

References

Brown, S. and Vaughan, C. (2009). Play. New York: Avery.

Katz, S. (2004). Cinematic motion. Studio City, CA: Michael Wiese Productions.

Weston, J. (2003). The film director's intuition. Studio City, CA: Michael Wiese Productions.

Wilkinson, C. (2005). The working director. Studio City, CA: M. Wiese Productions.

Documentary

Sanford Meisner - Theatre's Best Kept Secret (Documentary). (1984). [film] New York: Sydney Pollack, The Playhouse Repertory Company.

6

## 2. Character List

| | |
|---|---|
| 1 CHRISTINE | Witty, fun and quite pretty looking but in a smart way. Mid to late 20s. Cool and casual but is always thinking ahead of the game. |
| 2 ALBERT | Business executive for a top investment consulting firm. very good looking, used to having women throw themselves at him. |
| 3 CARL | Wise, old and witty. An experienced private investigator whose seen it all. |
| 4 ANGELA | Late 20s, successful business executive |
| 5 MIKE | Late 20s, ordinary guy, no real ambition in life. Sells used cars in his family's used car shop. |
| 6 TONY | Late 20s or Early 30s Ordinary guy, could be an accountant or real estate agent. Plays rugby and likes to have a beer with his mates. |
| 7 MUM | Albert's mother, in her 50s. Is a house wife but is actually a very smart old lady who is a dotting mother. |
| 8 SOPHIE | Late 20's blonde, fun, likes to enjoy the moment. |
| 9 ROB | Late 20s, could be a lawyer or banking exec. Is sensible and good looking. |
| 10 MR. MITCHELL | Christine's dad, is tough but kind. Own's his own hardware store. Used to be a painter and redecorater. |
| 11 DAD | Albert's father, in his early 60s, is a retired business man. Going through a late-life crisis, cheats on his wife. |
| 12 SHARON | Very smart but also sexy lawyer around 30. Is average looking but high maintainence. |
| 13 STACIE | Black, smart and very pretty. Easy going and sincere. Could work as a something creative, like an advertising account manager. |
| 14 DONNA | Early 30s, pretty, tall. very ambitious and driven. Is the editor of a trashy gossip magazine. |
| 15 OFFICER | Late 20s, average looking. Is a childhood friend of Christines. Had a crush on her in high school. |
| 16 VICTORIA | Model in her late 20s. Very insecure. Comes from a wealthy family. Always gotten what she wanted. |
| 17 ENGINEER | Late 40s, short, indian or mexican looking. Is funny, looks like he likes a good laugh. |
| 18 TAMARA | Late 20s, slightly wieght challenged, fun and sincere. She could be a teacher or art therapist for children. |
| 20 STANLEY | Late 20s, Ordinary guy, slightly nerdy. Could be a manager in an electronics store. |
| 21 EMILIA | Assistant in the office where Albert used to work, Early 20s. Smart/geeky. Features in one scene with speaking lines. |
| 24 ROBIN | Assistant in the office where Albert used to work, Early 20s. Smart/geeky. Features in one scene with speaking lines. |

7

## Foreign payment confirmation at 19 December 2014 11:08 AM

**NatWest**

| | |
|---|---|
| Country | UNITED STATES OF AMERICA |
| From account | SELECT ACCOUNT 60-02-08 60943583 |
| Payment amount | 500.00 USD |
| Exchange rate (indicative only) | 1.00 GBP = 1.5299 USD |
| FX Deal Number | |
| Payment date | 19 Dec 2014 |
| Payment credit date (estimated arrival date) | 23 Dec 2014 Relay : 3-5 business days |
| Settlement reference | |
| Charge | 10.00 GBP (Paid by customer) |
| Agent bank fee | Any fee claimed by our agents will be debited separately |
| Payment totals | |
| Indicative total cost to you | 336.82 GBP |
| Indicative total amount credited to beneficiary | 500.00 USD |
| Beneficiary summary | |
| Beneficiary name | |
| Beneficiary address line 1 | |

National Westminster Bank Plc. Registered in England No. 929027. Registered Office, 135 Bishopsgate, London EC2M 3UR

Print of
Page 2 of

NWB 1390 D/2003)

*Payment of Option*

| 25 WAITRESS #2 | Plain looking waitress who is busy at work. Asks the girls and guys what they would like to drink in one very funny scene. |
|---|---|

### 3. Shooting Schedule

**SHOOTING SCHEDULE CASANOVA CHRISTMAS 05 DECEMBER 2014**

| SCENE | DAY | 8THS | I/E | SET | LOCATION |
|---|---|---|---|---|---|
| | | | | Thursday, December 18, 2014 | |
| Day 1 | | | | | |
| 39 | DAY | 2 0/8 | INT | MITCHELL'S PAINT | |
| 82 | MORNING | 1 4/8 | INT | ANOTHER RESTAURANT | Cafe Christine and Angela |
| 45 | EVENING | 2 1/8 | INT | FANCY CITY CAFE | Cafe with the girls |
| 17 | DAY | 1 4/8 | INT | FOUNTAIN IN HYDE PARK | Hyde Park Fountain |
| 1 | DAY | 0 1/8 | EXT | LONDON AT CHRISTMAS | London Markets |
| 32 | DAY | 0 7/8 | INT | MAINTENANCE OFFICE OF ALBERT'S BUILDING | Maintenance Man's Office |
| End of Day 1 - SHOOTING | | 8 1/8 pages | | | |
| | | | | Saturday, December 20, 2014 | |
| Day 2 | | | | | |
| 15 | DAY | 0 1/8 | EXT | GOTHIC CATHEDRAL | Cathedral |
| 16 | DAY | 5 2/8 | INT | GOTHIC CATHEDRAL | Cathedral |
| 92 | DAY | 0 1/8 | INT | GOTHIC CATHEDRAL | Cathedral |
| End of Day 2 - SHOOTING | | 5 4/8 pages | | | |
| | | | | Sunday, December 21, 2014 | |
| Day 3 | | | | | |
| 2 | DAY | 1 0/8 | INT | CHRISTINE'S OFFICE | Christine and Carls Office |
| 28 | DAY | 0 1/8 | INT | CHRISTINE'S OFFICE HALLWAY/EXT. | Christine and Carls Office |
| 29 | DAY | 1 3/8 | INT | CARL'S OFFICE | Christine and Carls Office |
| 33 | DAY | 1 4/8 | INT | CHRISTINE'S OFFICE | Christine and Carls Office |
| 42 | DAY | 1 1/8 | INT | CHRISTINE'S OFFICE | Christine and Carls Office |
| 56 | AFTERNOON | 0 1/8 | INT | CHRISTINE'S OFFICE RECEPTION AREA | Christine and Carls Office |
| End of Day 3 - SHOOTING | | 5 2/8 pages | | Sunday, December 21, 2014 | |

8

| | | | | | |
|---|---|---|---|---|---|
| Day 4 | | | | Monday, December 22, 2014 | |
| 57 | AFTERNOON | 1 7/8 | INT | CARL'S OFFICE | Christine and Carls Office |
| 75 | MORNING | 1 3/8 | INT | CARL'S OFFICE | Christine and Carls Office |
| 78 | EVENING | 0 3/8 | INT | HALLWAY TO CHRISTINE'S OFFICE | Christine and Carls Office |
| 79 | EVENING | 2 2/8 | INT | CHRISTINE'S OFFICE | Christine and Carls Office |
| 83 | MORNING | 0 3/8 | INT | CARL'S OFFICE | Christine and Carls Office |
| End of Day 4 - SHOOTING | | 6 2/8 pages | | | |
| Day 5 | | | | Tuesday, December 23, 2014 | |
| 13 | DAY | 1 3/8 | INT | ALBERT'S OFFICE | Albert's office |
| 31 | AFTERNOON | 1 3/8 | INT | PLUSH EXECUTIVE OFFICE | Angela's Office |
| 61 | DAY | 0 7/8 | INT | ANGELA'S OFFICE | Angela's Office |
| 26 | NIGHT | 1 4/8 | INT | BAR/ RESTAURANT | Bar for the girls night out |
| 58 | EVENING | 0 1/8 | EXT | HIP NEIGHBORHOOD BAR | Bar for the girls night out |
| End of Day 5 - SHOOTING | | 5 2/8 pages | | | |
| Day 6 | | | | Wednesday, December 24, 2014 | |
| 11 | NIGHT | 0 1/8 | INT | ALBERT'S LIVING ROOM | Albert's apartment |
| 12 | NIGHT | 0 1/8 | INT | ALBERT'S BEDROOM | Albert's apartment |
| 14 | DAY | 0 2/8 | INT | ALBERT'S LIVING ROOM | Albert's apartment |
| 20 | DAY | 0 6/8 | INT | ALBERT'S APARTMENT BUILDING HALLWAY | Albert's apartment |
| 21 | DAY | 0 6/8 | INT | ALBERT'S APARTMENT BUILDING STAIRWELL | Albert's apartment |
| 23 | DAY | 0 1/8 | INT | ALBERT'S APARTMENT DOOR | Albert's apartment |
| 24 | DAY | 0 1/8 | INT | ALBERT'S LIVING ROOM | Albert's apartment |
| 25 | DAY | 0 1/8 | INT | ALBERT'S BEDROOM | Albert's apartment |
| 36 | DAY | 0 6/8 | INT | ALBERT'S BEDROOM | Albert's apartment |
| 37 | DAY | 0 5/8 | INT | ALBERT'S LIVING ROOM | |

9

| | | | | | |
|---|---|---|---|---|---|
| 30 | DAY | 0 7/8 | INT | HALLWAY TO ALBERT'S APARTMENT | Albert's Building |
| 34 | DAY | 0 2/8 | INT | ALBERT'S HALLWAY | Albert's Building |
| 63 | DAY | 0 1/8 | EXT | ALBERT'S APARTMENT BUILDING | Albert's Building |
| End of Day 6 - SHOOTING | | 5 0/8 pages | | | |
| End of Day - NONWORKING | | | | Wednesday, December 24, 2014 | |
| End of Day - NONWORKING | | | | Thursday, December 25, 2014 | |
| End of Day - NONWORKING | | | | Friday, December 26, 2014 | |
| Day 7 | | | | Saturday, December 27, 2014 | |
| 41 | DAY | 1 0/8 | INT | ALBERT'S LIVING ROOM | Albert's apartment |
| 43 | DAY | 1 5/8 | INT | ALBERT'S LIVING ROOM | Albert's apartment |
| 46 | MORNING | 1 7/8 | INT | ALBERT'S KITCHEN | Albert's apartment |
| 52 | MORNING | 0 2/8 | INT | ALBERT'S KITCHEN | Albert's apartment |
| 53 | MORNING | 0 2/8 | INT | OUTSIDE ALBERT'S BEDROOM | Albert's apartment |
| 35 | DAY | 1 2/8 | INT | ALBERT'S LIVING ROOM | Albert's apartment |
| End of Day 7 - SHOOTING | | 6 2/8 pages | | | |
| Day 8 | | | | Sunday, December 28, 2014 | |
| 54 | MORNING | 1 4/8 | INT | ALBERT'S KITCHEN | Albert's apartment |
| 55 | AFTERNOON | 0 2/8 | INT | ALBERT'S LIVING ROOM | |
| 62 | MORNING | 1 4/8 | INT | ALBERT'S HALLWAY | Albert's apartment |
| 69 | DAY | 0 2/8 | INT | ALBERT'S HALLWAY | Albert's apartment |
| 70 | DAY | 1 4/8 | INT | ALBERT'S LIVING ROOM | Albert's apartment |
| 71 | DAY | 0 2/8 | INT | ALBERT'S APARTMENT HALLWAY | Albert's apartment |
| End of Day 8 - SHOOTING | | 5 2/8 pages | | | |
| Day 9 | | | | Monday, December 29, 2014 | |
| 76 | MORNING | 0 3/8 | INT | ALBERT'S LIVING ROOM | Albert's apartment |
| 77 | MORNING | 2 1/8 | INT | ALBERT'S KITCHEN | Albert's apartment |
| 84 | MORNING | 2 5/8 | INT | ALBERT'S BATHROOM | Albert's apartment |
| 87 | EVENING | 0 4/8 | INT | ALBERT'S BEDROOM | Albert's apartment |

| | | | | | |
|---|---|---|---|---|---|
| 19 | DAY | 0 2/8 | INT | ALBERT'S APARTMENT BUILDING HALLWAY | Albert's Building |
| 22 | DAY | 0 3/8 | INT | ALBERT'S BUILDING HALLWAY AT ELEVATORS | Albert's Building |
| End of Day 9 - SHOOTING | | 6 2/8 pages | | | |
| Day 10 | | | | Tuesday, December 30, 2014 | |
| 27 | NIGHT | 1 0/8 | INT | CHRISTINE'S LIVING ROOM | Christine's apartment |
| 40 | DAY | 1 6/8 | INT | CHRISTINE'S LIVING ROOM | Christine's apartment |
| 47 | NIGHT | 0 2/8 | INT | CHRISTINE'S LIVING ROOM | Christine's apartment |
| 48 | NIGHT | 0 1/8 | INT | CHRISTINE'S BATHROOM | Christine's apartment |
| 49 | NIGHT | 0 2/8 | INT | CHRISTINE'S KITCHEN | Christine's apartment |
| 50 | NIGHT | 0 1/8 | INT | CHRISTINE'S BATHROOM | Christine's apartment |
| 51 | NIGHT | 1 0/8 | INT | CHRISTINE'S LIVING ROOM | Christine's apartment |
| End of Day 10 - SHOOTING | | 4 4/8 pages | | | |
| Day 11 | | | | Wednesday, December 31, 2014 | |
| 18 | NIGHT | 2 0/8 | INT | CHRISTINE'S APARTMENT | Christine's apartment |
| 80 | NIGHT | 0 7/8 | INT | CHRISTINE'S BEDROOM | Christine's apartment |
| 85 | EVENING | 1 0/8 | INT | CHRISTINE'S LIVING ROOM | Christine's apartment |
| 86 | EVENING | 0 6/8 | INT | CHRISTINE'S BATHROOM | Christine's apartment |
| 88 | NIGHT | 0 6/8 | INT | CHRISTINE'S LIVING ROOM | Christine's apartment |
| 81 | EVENING | 0 7/8 | INT | EXPENSIVE RESTAURANT | Restaurant Christine and Mike |
| End of Day 11 - SHOOTING | | 6 2/8 pages | | | |
| End of Day - NONWORKING | | | | Thursday, January 1, 2015 | |
| Day 12 | | | | Friday, January 2, 2015 | |
| 74 | DAY | 4 5/8 | INT | ALBERT'S CHILDHOOD HOME | Albert's parent's house |

11

| Scene | Time | Pages | INT/EXT | Location | Notes |
|---|---|---|---|---|---|
| 93 | AFTERNOON | 0 2/8 | INT | ALBERT'S CHILDHOOD HOME | Albert's parent's house |
| 73 | DAY | 0 1/8 | EXT | ALBERT'S CHILDHOOD HOME | |
| End of Day 12 - SHOOTING | | 5 0/8 pages | | | |
| | | | | Saturday, January 3, 2015 | |
| Day 13 | | | | | |
| 59 | EVENING | 6 4/8 | INT | NEIGHBORHOOD BAR | Bar for the girls night out |
| End of Day 13 - SHOOTING | | 6 4/8 pages | | | |
| Day 14 | | | | Sunday, January 4, 2015 | |
| 72 | DAY | 0 1/8 | EXT | SUBURBAN NEIGHBORHOOD | Street Albert's Parent's house |
| 64 | DAY | 0 1/8 | EXT | CITY STREET | Street near Albert's building |
| 65 | DAY | 0 2/8 | EXT | INTERSECTION | Street near Albert's building |
| 66 | DAY | 0 1/8 | EXT | OPPOSITE CORNER OF THE INTERSECTION | Street near Albert's building |
| 67 | DAY | 2 3/8 | EXT | CITY STREET | Street near Albert's building |
| 68 | DAY | 0 1/8 | EXT | CITY STREET | Street near Albert's building |
| 44 | AFTERNOON | 1 2/8 | EXT | CHRISTMAS SHOPPING IN THE CITY | Christmas Shopping |
| End of Day 14 - SHOOTING | | 4 3/8 pages | | | |
| Day 15 | | | | Monday, January 5, 2015 | |
| 60 | NIGHT | 1 7/8 | INT | INDIAN RESTAURANT | Restaurant - Christine and Albert |
| 8 | DAY | 1 4/8 | EXT | FOOTBALL FIELD | Football Field |
| 38 | DAY | 0 1/8 | EXT | MITCHELL PAINTING & WALLCOVERING | Hardware and paint store |
| End of Day 15 - SHOOTING | | 3 4/8 pages | | | |
| Day 16 | | | | Tuesday, January 6, 2015 | |
| 89 | NIGHT | 4 5/8 | INT | SWANK HOTEL LOUNGE | Hotel Lobby |
| 90 | NIGHT | 0 1/8 | INT | LOBBY SWANK HOTEL | Hotel Lobby |

| | | | | | |
|---|---|---|---|---|---|
| 91 | NIGHT | 1 7/8 | INT | SWANK HOTEL FRONT DESK | Hotel Lobby |
| End of Day 16 - SHOOTING | | 6 5/8 pages | | | |

| | | | | Wednesday, January 7, 2015 | |
|---|---|---|---|---|---|
| Day 17 | | | | | |
| 9 | MORNING | 0 6/8 | INT | DONNA'S BEDROOM | Donna's apartment |
| 3 | DAY | 0 7/8 | INT | ANGELA'S LIVING ROOM | Angela's appartment |
| 4 | NIGHT | 0 1/8 | INT | FANCY RESTAURANT | Restaurant - Angela and Albert |
| 5 | NIGHT | 0 4/8 | INT | VICTORIA'S BEDROOM | Victoria's apartment |
| 6 | NIGHT | 1 2/8 | INT | ALBERT'S KITCHEN | Albert's apartment |
| 7 | NIGHT | 0 5/8 | INT | ALBERT'S LIVING ROOM | Albert's apartment |
| 10 | NIGHT | 0 1/8 | INT | ALBERT'S BEDROOM | Albert's apartment |
| End of Day 17 - SHOOTING | | 4 2/8 pages | | | |

13

4.  Budget

| BUDGET CASANOVA CHRISTMAS DECEMBER 2014 | | |
|---|---|---|
| SCRIPT RIGHTS | Screenwriter / Screenplay | 2,000 |
| MANAGEMENT | Production office | 1,000 |
| | Accounting Fees | 2,000 |
| | Insurance | 500 |
| | Hard drives | 750 |
| CAST | Actors will be paid 100 p/d | 9,000 |
| ART / SET / PROPS | The paint for decorating I have sponsorship for. | 1,000 |
| EQUIPMENT | Camera and lighting rental - total kit | 4,500 |
| | Expendables (tapes, gels, diffusion) | 250 |
| CREW | DOP | 1,800 |
| | 1st Ass. Focus Puller | 1,800 |
| | 2nd Ass. Camera | 1,800 |
| | Gaffer | 1,800 |
| | Best Boy | 1,800 |
| | Sound Mixer (including equipment) | 1,800 |
| | Production Assistant / DIT | 1,560 |
| | Production Designer | 1,560 |
| WARDROBE / HAIR & MAKE-UP | Costume Designer | 1,560 |
| | Costumes | 1,000 |
| | Hair & Make-up Artist | 1,560 |
| LOCATIONS | ARTHUR'S APARTMENT / BUILDING | free |
| | ARTHUR AND ANGELA'S OFFICE | 350 |
| | CHRISTINE AND CARLS OFFICE | 350 |
| | CHRISTINE'S APARTMENT | free |
| | DONNA AND VICTORIAS BEDROOMS | 600 |
| | CATHEDRAL | free |
| | FOOTBALL FIELD | free |
| | 5 RESTAURANTS | free |
| | ALBERTS CHILDHOOD HOME | free |
| | MITCHELL'S PAINT SHOP | free |
| | SWANK HOTEL | 500 |
| | SHOPPING/STREET SCENES | 0 |

14

| | | |
|---|---|---:|
| TRANSPORTATION | Mini Van Hire 5 weeks | 700 |
| | Petrol | 400 |
| | Parking costs | 400 |
| PR / Marketing | | 500 |
| FOOD / CATERING | crew and actors for 10£ / day including crafty | 2,500 |
| POST-PRODUCTION | Post Production | 10,000 |
| | Sound Editor | 2,000 |
| | Music Rights | Will have to find songs for free |
| | Composer | 2,500 |
| **TOTAL** | | **59,840** |

5. Post Production Plan

The post house 'Clear Cut' in Shepherds Bush have given me a deal for 10 000 for the entire post production, including delivery of the final film on digibeta cassette.

6. Marketing and Distribution

As the film is a Christmas themed the film will be marketed and distributed for a release in late November 2015. The aim is to secure a limited theatrical release in all Europe and all other English speaking territories with a simultaneous release on the internet via pay per view platforms such as Netflix, Itune, Amazon and Google Play.

15

*Notice of Arbitration*
*Annex A + B*
*Attachment E 2/2*

**CharisFeeney-Orchard_MAF02_MGRAD1411_2**

In this this essay, I will review and analyse my recent experience in making the micro-budget film, 'Perfect Piece' with the objective to gain a greater understanding of the conventions of the romantic comedy genre and how to successfully amalgamate these convention into a motion picture. As a screenplay, 'Perfect Piece' is rooted in the genre of romantic comedy but as a commercial project, I felt that it needed a spark of originality that would capture the attention of a general audience. The story concerns the antics of the private investigator, Christine Mitchell who attempts to explain the mysterious disappearance of Albert DiGrazia. I was attracted to this script because of the strong central female character and because of its universal themes of love and fulfilment that pose the central question of, 'Will this pair end up as a couple?' (Grindon, 2011, Pg. 1). In the course of her apparently mundane professional activities, Christine will unexpectedly find love.  The process of directing the film posed many challenges that I was able to deal with by referring to established practices in the different areas of the project. For my work with the actors I turned to Judith Weston as well as other coaches. When working with the camera team and crew I found myself referring to other films or the staging systems prescribed by Steven D. Katz. Central to every issues in the process of directing the film was my desire to achieve a feature length project that is both engrossing to the audience and yet which never falls below industry standards for the genre of romantic comedy.

As a film's director, the development of the film is the foundation and intention for the themes to be represented in the text, subtext and context. The theme of my film is how relationships are mis-matched and unexpected love can eventuate. To present this theme in a well construed and compelling story that is told in a way that invokes an emotional investment from the audience takes a intensive level of work. I constantly questioned myself, Why do I want to create this film? Why do I like this character? What is interesting about the story? And kept refining my answers or changing my perspective until totally satisfied with my own reasoning and that the end results of my endeavors would be valuable to the audience. Getting the story structure and plot points right from the start is very important in ensuring a film's level of success. I compared the structure of my romantic comedy to Christopher Vogler's formula in 'The writer's Journey'[1]. Christine's journey as the hero can be represented in the following terms:

1. The ordinary world- Albert as a casanova, Christine in her office at work.
2. Call to adventure- Christine is hired to find Albert.
3. Refusal to the call – Christine wants to make her relationship with Mike better.
4. Meeting with the mentor- Christine consults Carl for advice.
5. Crossing the threshold – Christine realizes Mike is not the one and that she is attracted to Albert.
6. Tests, Allies, Enemies – Christine shares her adventure with her best friend Sophie, she has to become successful as a Greenpeace fundraiser to get to know Albert and causes Sharon to become an enemy.
7. The inmost cave – Christine understands that Albert is attracted to her and her feelings are mutual.
8. Ordeal – Breaking up with Mike while believing that she will not be with Albert either.

---

[1] Page 212 of Vogler's 'The Writer's Journey' depicts the character arc in relation to Joseph Campbell's 'The Hero's Journey'.

9. Reward – Solving the mystery, closing the case and encouraging Albert to break-up with Angela properly and finally, confessing her true feelings and having them reciprocated.

While I was developing the script, I was fortunate to be able to work for Greenpeace and when I learnt how focused Greenpeace was on generating publicity I saw it as an opportunity to depict the change in Albert due to his personal crisis and to bring the lead characters together in a way that would lend itself to forming a bond and falling in love. Once I had incorporated the Greenpeace aspect into the film I felt strongly it had the depth of story to be satisfying for the audience and so I shared it with various parties to get their feedback. Script consultant Erin Cramer, reminded me that romcoms are about the audience investing in two characters who want to find love with whom they can identify with and that the story must be a journey where by the end they will be wiser and will have found love via a path to love that is difficult due to internal and external obstacles.  Erin advised that the drama is whether or not Christine will let herself fall in love with Albert, the confusion created by different expectations of love.

This confusion is an essential element of a romantic comedy, which Professor Tamar Jeffers McDonald defines as, 'a film which has it's central narrative motor as a quest for love, which portrays the quest in a light-hearted way and almost always to a successful conclusion.' (Jeffers McDonald, 2007, Pg. 15) The fact that romantic comedies are character driven vehicles and that comedy comes from the dialogue between different characters and their relationships as well as context was the basis of my work with the actors. I met with each of the cast individually and together we prepared for their roles by exploring in depth the background story for each character, the context and subtexts for their relationships in the film as well as their decisions and actions in the film and the implications of these on the story as a whole.  This work examined many conventions of romantic comedies, including the conflicts between characters, the plot of the story,

In my work with the actors, I referred to the practices of Stánislavsky and Meisner, who are my preferred acting coaches for their contrasting methods as well as the ideas of Judith Weston. In working through the scenes with the actors, we established how each of the areas of conflict are present in the film's story in various different contexts and subtexts. According to Leger Grindon, 'The three major fields of conflict are those between parents and children, those between courting men and women and those internal to each of us.' (Grindon, 2011, Pg. 8). I encouraged the actors to identify their internal and external sources of conflict and also to use these areas of conflict in the story as a source to constantly improve on and create humour. The most instrumental technique for this was by using improvisation techniques and encouraging spontaneity and to deepen and solidifying the relationships. In particular in the scene with Albert and Angela in the restaurant the actor Tim and I spent some time thinking about a way to give this scene more depth and construct the relationship and the opposing wants of the two characters that exposed an internal conflict in both Albert and Angela.  I also motivated the actors by giving them other things to do then what was in the script so that when they had to perform their lines they were already in a flow and could express themselves freely. A good example of this was the scenes with Carl in his office where I asked him to play a game of solitaire at his desk while the camera team was setting up the shot.  Also the Christmas day scene with Christine and Mr Mitchell, where I asked the actors to both hum a Christmas tune together to recall real Christmas emotions.

As a director I was aware of the need to keep freshness and spontaneous in the relationships and the subtext in the story. This idea of finding humour and valuing fun was tied to the style of the camera work that I used. Wherever possible I consciously presented the story in two shots so that the dynamics of the relationship could be most apparent and real for the audience.Not only with the camera work but with every creative elements of the film including production design, costumes and hair and makeup I

remained focused on the distinctive conventions of romantic comedy that I described to my heads of departments as being, 'Colourful, warm and richly textured, up-lifting and fun, sexy yet romantic.' As a director, I selected several successful romantic comedy to use as references for the work of the creative departments. The most useful reference I used was 'Bridget Jones's Diary' because it was also about unexpected love set in London around Christmas time with a female protagonist who didn't really know what love was supposed to be and was unsatisfied with the romance in her life.

Referencing Bridget Jones's Diary was a great exercise in understanding the dynamics of the camera and the story. In particular I noticed that Bridget Jones's Diary used a lot of mechanical moving camera shots such as numerous jib shots that moved forward with the character while the jib lifted the camera from above. There was no way I could compete with such production costs but by studying the body of shots in Bridget Jones and a list of other romantic comedies I clearly understood the need for a wide variety of scale and movement in my repertoire of shots. Due to the restriction of my budget I decided to work with a young cinematographer who had his own steadicam although this did turn out to be a small contingency for the film as he was not with the level of experience I had hoped for in order to create truly outstanding camera work for the film. It turned out that his inherent ability to measure shot composition was lacking as were his skills in stabilizing the steady cam. These two issues came up on a constant basis when we were on set and I found working with him to ensure the shots were balanced, matching and favorably presented took up the most amount of time and work during the principal photography stage of the production.

With the cinematographer I discussed my intention to create the film and what style of shots I wanted to use. The cinematographer and I mapped out the shots for each scene as well as possible lighting scenarios based on the locations. I referenced the ideas presented by Steven D. Katz in his works, 'Cinematic Motion' and 'Shot by Shot'. On the set once the actors had rehearsed the shot list was adjusted to cover their performance in the most interesting or economical (if we were behind schedule) way possible. My preferred style of shot was a long lense two shot and I always favoured this over a single on the lead characters. However, I also understood that when the performance is very dramatic close ups are a key tool to establish the emotion and drama involved. When there was a lot of heavy dialogue I preferred using movement and 2 shots or 3 shots to keep the drama going and create an interesting pace for the story. As there was a lot of repetition in the interior scenes of the office and the apartment that I compensated with wide, moving exterior scenes.

Being a director means being a leader which is not easy especially when you have to compromise your creative vision for lack of time or to concede the input of other which could potentially be a contingency for the film. Two examples of this such as the idea of having a nose ring that the lead actor came up with which I now regret agreeing to or the amount of close-ups that were routine procedure for the cinematographer but ultimately wasted resources as when it came to post and we did not use any of the footage. By far, the hardest element of directing during the production phase is balancing out the creativity of others against your own vision while maintaining a coherent grasp over the processes. Thanks to my experience in directing this film I am acutely aware that preparing a very clear list of shot that are actually needed for the construction of the scene according to your own vision and the conventions of the genre is a best pathway to avoid wasting time, resources and managing talent on set. It can therefore be very useful to refer back to the standard industry processes such as the work of Katz or Weston or reference films as well as upholding solidarity and a sense of teamwork. By doing this regularly I was successful in reaching targeted schedule and budget while staying firmly within the conventions of the romantic comedy genre.

In the post production I continued to develop the story based on genre of the film by referring to the style of other romantic comedies and relaying my own perception of the film. I especially focused on capitalising on the humour and the personal and inter relational conflicts. Thankfully the post production team really matched my expectations for a high level of professional expertise and talent and I am confident the errors that were made during the photography stage will be rectified in post. Due to the experience I had during principal photography I am now very conscious to be better prepared in future with my shot list and a clear plan for the principal photography that will avoid wasting time and money in post. I will also avoid problems in the shoot by putting as much effort as necessary into finding the right crew and right actors before commencement of the shoot.

Of course it's always preferable to have more budget and time but these factors are always a constraint even with higher budgets and more time to complete the film. Therefore, it is critical to have the most talented and professional cast and crew, which was not the case in the production as I discovered the cinematographer and sound recordist were less skilled and professional then I assumed at the start. Another aspect that I should have improved upon was to be able to delegate all tasks that are not of primary importance to the actual directing of the film to the production management team instead of having to deal with them myself, although again, I felt that the production team were not skilled or reliable enough. This understanding of the value in finding or building a solid support structure in your physical team is just as important as understanding the foundation and structure of the theoretical angle of what goes into making a successful romantic comedy feature film.

In conclusion, thanks to gaining a better understanding of the processes involved in directing a romantic comedy film, including refining the script, working with the actors to strengthen the conflicts and relationships and managing the talents and expectations of the crew, I feel that the project has been a successful experience and that the film stands on its own merit. As is was important for me to make a movie that young people, particularly young women, could enjoy and relate to I hope that the audience enjoys and appreciates the film. If so, I will have achieved my goal of gaining an understanding of romantic comedy genre to become more proficient and to continue making films for women to enjoy and to help men see and appreciate that love doesn't revolve around picking up women for the sake of it but by respecting a woman because she is special, unique and offers challenges with the best intention.

**Biography**

Brearley, M. (1985). The Art of Captaincy. 2nd ed. London: Hodder and Stoughton Ltd.

Brown, S. and Vaughan, C. (2009). Play. New York: Avery.

Caldarone, M. and Lloyd-Williams, M. (2004). Actions. Brooklyn Heights, NY: Drama Publishers.

Campbell, J., Cousineau, P. and Brown, S. (1990). The hero's journey. San Francisco: Harper & Row.

Grindon, Leger. The Hollywood Romantic Comedy. Malden, MA: Wiley-Blackwell, 2011. Print.

Katz, S. (2004). Film directing. Studio City, Calif.: Michael Wiese.

Katz, S. (1991). Film directing shot by shot. Studio City, CA: Michael Wiese Productions in conjunction with Focal Press.

McDonald, Tamar Jeffers. Romantic Comedy. London: Wallflower, 2007. Print.

Stanislavsky, K. (1948). An actor prepares. New York: Theatre Arts Books.

Vogler, C. (2007). The writer's journey. Studio City, CA: Michael Wiese Productions.

Weston, J. (2003). The film director's intuition. Studio City, CA: Michael Wiese Productions.

Weston, J. (1996). Directing actors. Studio City, CA: M. Wiese Productions.

**DVDs**

Amélie. (2001). [DVD] Jean-Pierre Jeunet.

Bridget Jones's Diary. (2001). [DVD] Sharon Maguire.

Great Directors. (2009). [DVD] Angela Ismailos.

 **Gmail**

**Charis Orchard <charisorchard@gmail.com>**

## "Casanova" - Option Agreement - Purchase Price Payment

**charisorchard@gmail.com <charisorchard@gmail.com>**                    Thu, Aug 20, 2015 at 5:12 PM
To: Jay Kenoff <jay@km-entertainmentlaw.com>
Cc: kim boyle <kb2fo@yahoo.com>

Dear Jay and Kim,
Thanks for touching base. I ended up self financing the film with a few friends and we made it on a very low budget so
the fee would be the minimum specified in the agreement. Could you please confirm the amount. I believe it will be
around 1000 usd? The good news is that we have Greenpeace as a feature of the film as I was working for
Greenpeace when I was trying to get the film made and they agreed to allow me to use their name and likeness.
This is good because it is a strong commercial element and we should be able to make a nice return.
Best,
Charis

Sent from my iPhone
[Quoted text hidden]

&lt;WIRE INSTRUCTIONS CLIENT TRUST 7-13-15.doc&gt;

Notice of Arbitration
Annex A & B
Attachment F

 Gmail

**Charis Orchard <charisorchard@gmail.com>**

## "Casanova" - Option Agreement - Purchase Price Payment

**charisorchard@gmail.com** <charisorchard@gmail.com>                    Sat, Aug 22, 2015 at 11:25 AM
To: Jay Kenoff <jay@km-entertainmentlaw.com>

I would never have agreed to this. My lawyer said it was 3% of a minimum budget of 125 000, which is 3750. This is what I believe was the minimum payment. Is there a way to find an amicable solution? There is no way I can afford more than the minimum payment of 3750.

Sent from my iPhone
[Quoted text hidden]

*Notice of Arbitration
Annex A & B
Attachment G(1)*

 Gmail                                    **Charis Orchard <charisorchard@gmail.com>**

## "Casanova" - Option Agreement - Purchase Price Payment

**Jay Kenoff** <jay@km-entertainmentlaw.com>                     Sat, Aug 22, 2015 at 9:00 AM
To: charisorchard@gmail.com
Cc: kim boyle <kb2fo@yahoo.com>

Hi Charis – Thank you for your response.   You should probably take another look at the
agreement.  It calls for a minimum payment of $125,000 against 3% of the budget with a cap of
$250,000.   When you refer to a $1,000 payment, that was for an extension of the option, which
does not apply in this situation.  And, as I believe I may have mentioned previously, payment of
the purchase price to acquire the rights for the underlying material -- in this instance, Kim's
script -- is an essential component of producing a motion picture.

Best,

------------------------------------------------

JAY S. KENOFF, ESQ.
Kenoff & Machtinger, LLP
Attorneys at Law
1801 Century Park East, Suite 1520
Los Angeles, California 90067
jay@km-entertainmentlaw.com
Tel. (310) 552-0808
Fax (310) 277-0653

*Notice of Arbitration*
*Annex A & b*
*Attachment G(2)*

CONFIDENTIALITY NOTE:  The information contained in this email transmission is legally privileged and
confidential information intended only for the use of the individual or entity named above.  If the reader of this
transmission is not the intended recipient, you are hereby notified that any use, dissemination, distribution or
copying of this transmission is strictly prohibited.  If you have received this transmission in error, please
immediately notify us by email, telephone or fax and delete the original transmission.  Thank you.

Pursuant to recently enacted Treasury Department Regulations, we are now required to advise you that, unless
otherwise expressly indicated, any federal tax advice contained in this communication, including attachments and
enclosures, is not intended or written to be used, and may not be used, for the purpose of (a) avoiding tax related
penalties under the Internal Revenue Code of (b) prompting, marketing or recommending to another party any tax-
related matters addressed herein.

**From:** charisorchard@gmail.com
**Sent:** Thursday, August 20, 2015 12:12 AM
**To:** Jay Kenoff
**Cc:** kim boyle
[Quoted text hidden]

[Quoted text hidden]

 Gmail

**Charis Orchard <charisorchard@gmail.com>**

## "Casanova" - Option Agreement - Purchase Price Payment

**charisorchard@gmail.com <charisorchard@gmail.com>**                    Sat, Aug 22, 2015 at 2:37 PM
To: k boyle <kb2fo@yahoo.com>
Cc: Jay Kenoff <jay@km-entertainmentlaw.com>

Dear Kim,

The fee that I agreed to pay you is 3% of a minimum budget of 125k.
This is 3750 plus net participation. If you agree to this then that would be great and the film will be able to be sold commercially and everyone who worked on it will be able to profit. I believe Jay is confused as his fee demand is more then double the writers guild rate for an indie, micro budget film. I hope you can be reasonable and see the benefit of accepting the original fee that I signed the agreement for so that the film can be sold and we can avoid legal battle, as I will definitely not be paying 125k and the film will be a failure if you allow Jay to make this mistake.

Best,
Charis

Sent from my iPhone

Begin forwarded message:

[Quoted text hidden]

*Notice of Arbitration*
*Annex A + B*

*Attachment G (3)*

Notice of Arbitration, Annex A+B, Attachment Item 14

## WGA 2014 THEATRICAL AND TELEVISION BASIC AGREEMENT
### THEATRICAL COMPENSATION (ARTICLE 13.A.1.a.)+

| | | First Period Effective 5/2/14 – 5/1/15 | |
|---|---|---|---|
| | | LOW | HIGH |
| A. | Original Screenplay, Including Treatment | $67,804 | $127,295 |
| | Installments: | | |
| | Delivery of Original Treatment | 30,721 | 50,874 |
| | Delivery of First Draft Screenplay | 26,700 | 50,874 |
| | Delivery of Final Draft Screenplay | 10,383 | 25,547 |
| B. | Non-Original Screenplay, Including Treatment | 59,331 | 110,337 |
| | Installments: | | |
| | Delivery of Treatment | 22,248 | 33,916 |
| | Delivery of First Draft Screenplay | 26,700 | 50,874 |
| | Delivery of Final Draft Screenplay | 10,383 | 25,547 |
| C. | Original Screenplay, Excluding Treatment or Sale/Purchase of Original Screenplay | 45,556 | 93,257 |
| | Installments for Employment: | | |
| | Delivery of First Draft Screenplay | 35,183 | 67,833 |
| | Delivery of Final Draft Screenplay | 10,373 | 25,424 |
| D. | Non-Original Screenplay, Excluding Treatment or Sale/Purchase of Non-Original Screenplay | 37,073 | 76,298 |
| | Installments for Employment: | | |
| | Delivery of First Draft Screenplay | 26,700 | 50,874 |
| | Delivery of Final Draft Screenplay | 10,373 | 25,424 |
| E. | Additional Compensation for Story included in Screenplay | 8,483 | 16,959 |
| F. | Story or Treatment | 22,248 | 33,916 |
| G. | Original Story or Treatment | 30,721 | 50,874 |
| H. | First Draft Screenplay, with or without Option for Final Draft Screenplay (non-original) | | |
| | First Draft Screenplay | 26,700 | 50,874 |
| | Final Draft Screenplay | 17,795 | 33,916 |
| I. | Rewrite of Screenplay | 22,248 | 33,916 |
| J. | Polish of Screenplay | 11,132 | 16,959 |

+The MBA provides for a discount with respect to employment on a flat deal basis of a writer who has not been previously employed under a Guild MBA in television, theatrical films or dramatic radio, subject to an adjustment to full minimum if a photoplay is produced and the writer receives any writing credit.  For details, contact the Guild Contracts Department.

*Notice of Arbitration*
*Annex A + B*
*Attachment 1* 

Find Movies, TV shows, Celebrities and more...          All
Movies, TV     Celebs, Events     News &         Watchlist     Sign In
& Showtimes    & Photos           Community

# Kim Boyle (I)

Visual Effects | Production Manager | Writer

+ Add or change photo on IMDbPro »

Contribute to IMDb. Add a bio, trivia, and more.
Update information for Kim Boyle »

SEE RANK

## Quick Links

Biography                Filmography (by Job)
Awards                   Trailers and Videos
Photo Gallery

**Explore More**

## Zachary Levi Predicts Who Will End Up on the Iron Throne

## Known For



Antitrust
Visual Effects
(2001)


Pirates of the Caribbean:...
Visual Effects
(2003)


Terminator 3: Rise of th...
Visual Effects
(2003)


Valkyrie
Visual Effects
(2008)





Find out what Shazam! star Zachary Levi is watching and how he thinks "Game of Thrones" will end.

What is Zachary watching? »

## Filmography                    ⌃ Hide all | Show by...        Edit

Jump to: Visual effects | Production manager | Writer | Special effects

| Visual effects (14 credits) | Hide ⌃ |
|---|---|
| Valkyrie (visual effects producer: Frantic Fils) | 2008 |
| Life (TV Series) (visual effects producer - 1 episode)<br>- Pilot: Merit Badge (2007) ... (visual effects producer) | 2007 |
| Heroes (TV Series) (visual effects producer - 15 episodes, 2006 - 2007) (visual effects supervisor - 1 episode, 2006)<br>- Chapter Seventeen 'Company Man' (2007) ... (visual effects producer)<br>- Chapter Sixteen 'Unexpected' (2007) ... (visual effects producer)<br>- Chapter Fourteen 'Distractions' (2007) ... (visual effects producer)<br>- Chapter Thirteen 'The Fix' (2007) ... (visual effects producer)<br>- Chapter Twelve 'Godsend' (2007) ... (visual effects producer)<br>-Show all 16 episodes | |
| Crossing Jordan (TV Series) (visual effects supervisor - 4 episodes)<br>- Don't Leave Me This Way (2006) ... (visual effects supervisor)<br>- Mace vs. Scalpel (2006) ... (visual effects supervisor)<br>- Mysterious Ways (2006) ... (visual effects supervisor)<br>- Thin Ice (2006) ... (visual effects supervisor) | 2006 |
| Night Stalker (TV Series) (visual effects producer - 1 episode)<br>- Timeless (2006) ... (visual effects producer: EntityFX - uncredited) | 2006 |
| The Bourne Supremacy (visual effects producer: CIS Hollywood) | 2004 |
| Mean Girls (visual effects producer: CIS Hollywood) | 2004 |
| The Haunted Mansion (visual effects producer: CIS Hollywood) | 2003 |
| Scary Movie 3 (digital effects producer: Composite Image Systems) | 2003 |
| Spy Kids 3-D: Game Over (visual effects producer: CIS Hollywood) | 2003 |
| Terminator 3: Rise of the Machines (visual effects producer: CIS Hollywood) | 2003 |
| Pirates of the Caribbean: The Curse of the Black Pearl (visual effects producer: CIS Hollywood) | 2003 |

**Share** this page:

## Around The Web   Powered by ZergNet


Actors We Lost In 2019


Ginny From 'Harry Potter' Is 28 Now and Absolutely Gorgeous


Actors Who Were Replaced and No One Noticed

Don't Ever Watch These Movies With Your Parents

## Do you have a demo reel?

Add it to your IMDbPage

| | |
|---|---|
| Superfire (TV Movie) (visual effects producer: Foundation Imaging) | 2002 |
| Antitrust (line producer: MetroLight Studios) | 2001 |
| **Production manager** (2 credits) | Hide ▲ |
| Dinosaur (assistant production manager) | 2000 |
| Dangerous Minds (production supervisor) | 1995 |
| **Writer** (1 credit) | Hide ▲ |
| Perfect Piece (writer) | 2016 |
| **Special effects** (1 credit) | Hide ▲ |
| My Name Is Modesty: A Modesty Blaise Adventure (special effects producer) | 2004 |

 

Find out more at IMDb Pro »

## How Much Have You Seen?

How much of Kim Boyle's work have you seen?

### User Polls

 **One Handed Characters**

**Best 21st Century Sequel of a 20th Century Original**

 **Disney Theme Parks and Movies**

**Best of "Woman Warrior" Pictures**

**The one and only...**

**Unauthorized Remakes, Adaptations, Sequels and Cash-Ins**

See more polls ⌄

## Contribute to This Page

Getting Started | Contributor Zona »

| Edit page |

## Rent or Buy Popular Movies With Prime Video

    

Explore popular movies available to rent or buy on Prime Video.

Visit Prime Video to explore more titles »

Recently Viewed

Clear your history

## IMDb Everywhere

Find showtimes, watch trailers, browse photos, track your Watchlist and rate your favorite movies and TV shows on your phone or tablet!

IMDb Mobile site                                        »

an amazon company

### Follow IMDb on

Home
Top Rated Movies
Box Office
TV
Coming Soon
Site Index
Search
In Theaters

Contact Us
Register
News

Press Room
Advertising
Jobs

IMDbPro
Box Office Mojo

Conditions of Use
Privacy Policy
Interest-Based Ads

Copyright © 1990-2019 IMDb.com, Inc.

| Amazon Affiliates | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Prime Video Unlimited Streaming of Movies & TV | Amazon UK Buy Movies on DVD & Blu-ray | Amazon Germany Buy Movies on DVD & Blu-ray | Amazon Italy Buy Movies on DVD & Blu-ray | Amazon France Buy Movies on DVD & Blu-ray | Amazon India Buy Movie and TV Show DVDs | DPReview Digital Photography | Audible Download Audio Books |

Notice of Arbitration
Annex A + B
Attachment J.

Cast in Order of Appearance

Tim Fellingham
Aimee Nazroo
Scott Michael Wagstaff
Pip Phillips
Natasha James
Terence Anderson
Andrew David
Jenny Runacre

Producer and Director Charis Orchard
Cinematographer Buster Blackledge
Focus Puller James Westlake
Gaffer Åsmund Berge Jenssen
Best Boy Jonathan Poole
Sound Engineer Robert Justin Brown
Sound Designer Timo Salio
Editor Sophia Rodrigues
1ST AD and VFX Coordinator Marzena Milowska
Colour Grader James Westlake
Casting Director Shakyra Dowling
Hair and Make-up Designer Addy Frame
Costume Designer Esther Franklin
Production Designer Nicolina Ianollo
Production Assistant Devon Barber
Production Assistant Eilidh Bennett
Production Assistant Kiran Selvakumaran
Production Assistant Linus Scheithauer
Production Assistant Ingrid Ferrer
Marketing and PR Producer Bryony Disbury
Composer Ioannis Kourtis
2nd Unit Steadycam Dan Starborg
2nd Unit Director of Photography James Westlake

Special Thanks to:

Steve and Jon at Shoot Blue
John Forsyth at Panalux
James at The Postfactory

Westminster Film Office
Royal Parks

Formans Restaurant and Art Gallery
Sophie's Bar
Souk Medina Restaurant
The Mitre Bar in Lancaster Gate
Ealing Hardware and Timbers
The Castle Bar in Ealing
Hodgson Huxley House

Lance Forman
Juliet Matthews
Julie Hardy
Beverlie Mason
Phyllis Richardson
Christine Bella
Robert Bierman

The Met Film School

*Notice of Arbitration
Annex A + B
Attachment K*

"Casanova Lost & Found" aka "Perfect Piece"

Charis Feeney-Orchard
Purchaser/Director
8 Haven Green
Ealing, London, W5 2UU
United Kingdom
Email: charisorchard@gmail.com
Tel: +44 7455 309583

Kim Boyle
C/o Jay S. Kenoff, ESQ.
Kenoff & Machtinger, LLP
1801 Century Park East,
Suite 1520
Los Angeles, California 90067
United States of America
Email:Jay@km-
entertainmentlaw.com
Tel: +1 (310) 552 0808

**"Casanova Lost & Found" aka "Perfect Piece"**

1.  Charis Feeney-Orchard instructs Adler & Associates Entertainment, Inc., their employees, agents, and representatives, and shall instruct in writing any distributors, sub-licensees, agents or representatives of the Film (collectively, "Distributors") to remit payments to Kim Boyle's attorneys' Client's Trust Checking Account in accordance with Exhibit "A" attached hereto until the Purchase Price of One Hundred Twenty-Five Thousand Dollars ($125,000.00) for the screenplay "Casanova Lost & Found" aka "Perfect Piece" has been paid in full, per the Screenplay Option Purchase Agreement dated May 12, 2014.

2.  When the Screenplay Purchase Price is paid in full the rights transfer to Charis Feeney-Orchard per the terms of the Screenplay Option Purchase Agreement dated May 12, 2014.

3.  Charis Feeney-Orchard instructs Adler & Associates Entertainment, Inc., their employees, agents, and representatives, and shall instruct in writing any distributors, sub-licensees, agents or representatives of the Film (collectively, "Distributors") to copy Kim Boyle and Jay Kenoff on

1 of 5

"Casanova Lost & Found" aka "Perfect Piece"

all agreements, licenses, and contracts pertaining to "Perfect Piece" aka "Casanova Lost & Found" via email, Kim Boyle kb2fo@yahoo.com , Jay Kenoff jay@km-entertainmentlaw.com.

4.  Charis Feeney-Orchard instructs Adler & Associates Entertainment, Inc., their  employees, agents, and representatives, and shall instruct in writing any distributors, sub-licensees, agents or representatives of the Film (collectively, "Distributors") to copy Kim Boyle and Jay Kenoff on all accountings related to "Perfect Piece" aka "Casanova Lost & Found" concurrent with the remit of payments to or for Kim Boyle and concurrent with the remit of payments to or for Charis Feeney-Orchard via email, Kim Boyle kb2fo@yahoo.com , Jay Kenoff jay@km-entertainmentlaw.com.

5.  If the Screenplay Purchase Price of One Hundred Twenty-Five Thousand Dollars ($125,000.00) is not paid in full by March 31, 2018, Kim Boyle and Jay Kenoff will keep all money paid to date and the rights will remain with Kim Boyle to resell the screenplay if she chooses.

6.  This agreement in no way replaces or voids all or any part of the Screenplay Option Purchase Agreement dated May 12, 2014.  All terms and conditions of the Screenplay Option Purchase Agreement are in full effect.


_Charis Feeney-Orchard_ ------------------------------------------------

Charis Feeney-Orchard        Date          Kim Boyle              Date

04/04/19

EXECUTED before me at Sydney, NSW, Australia
this 4th day of April 2019

MICHAELANGELO K. TWEMLOW
Public Notary ID No. 1660

Michaelangelo K Twemlow
Notary Public
Level 1, 299 Elizabeth Street
Sydney NSW 2000
Australia
Tel: +61 401 915 692
michael@solicitor.sydney
W: www.solicitor.sydney

2 of 5

3/11/2019                                                                    Gmail - Perfect piece

# M Gmail

Charis Orchard <charisorchard@gmail.com>

*Notice of Arbitration*
*Annex A + B*
*Attachment   L*

## Perfect piece

**Charis Feeney-Orchard** <charisorchard@gmail.com>                    Tue, Apr 12, 2016 at 9:00 AM
To: Jay Kenoff <jay@km-entertainmentlaw.com>
Cc: k boyle <kb2fo@yahoo.com>, "william@actionablebooks.com" <william@actionablebooks.com>, Jeremy Lunt
<jeremy-lunt@adlersproductions.com>

Dear Jay,

Great news! Thank you for cooperating so we can come to a win win situation.

I understand the position of Kim and your but from my vantage point:

a) Kim's script sat on the shelf for a decade and at least now she has a completed film credit to her name (and
hopefully can go on to get more screenplays produced.)

b) 125k for a first time writers fee is over 3x what the writers guild recommends and somewhat extortionate when you
consider the reality of the business and the fact I was upfront that I was making my grad project for film school.

I personally don't expect to make any money but I feel that it would not be justified to let Kim walk away with an
extortionate fee while the investor loses money.

I suggest that the first 40k revenue is split 50:50 with Kay and the investor so that the investor can recuperate his 20k.

After this the proceeds go to Kay until she has recovered the other 105k.

After this the production company gets what is left for the rest of the sales agreement term of 10 years.

I have copied the sales agent and investor so they are clear on the deal.

If you agree we can get it in a simple, clear one page agreement and the sales agent can be in control of the
distribution of revenue.

Please let me know if you are willing to accept this? Thank you.

Best regards,
Charis

Sent from my iPhone

[Quoted text hidden]

 Gmail

Charis Orchard <charisorchard@gmail.com>

## Perfect piece

**Charis Feeney-Orchard** <charisorchard@gmail.com>                    Thu, Apr 7, 2016 at 11:59 AM
To: Jay Kenoff <jay@km-entertainmentlaw.com>
Cc: k boyle <kb2fo@yahoo.com>, Charis Feeney-Orchard <charisorchard@gmail.com>

Hi again Jay,

I tried to call you several times.
The deal I want to propose is that I pay Kay through the sale of the film.
I have a sales agent ready to represent the film at Cannes and a deal with them already.
I am happy to tell them with you on copy that Kay is entitled to all sales revenue once the films investor has recouped his money, which was only 11,000 GBP.
After this 11,000 is recouped by the investor then Kay can have the next 125000 USD.
After this any other profits can go the the film company to pay the people who worked on the film.
This is literally the only way that Kay will be able to get the fees she is expecting as I am not going to pay them myself.
Let me know if Kay is willing to move forward with this and I will put you in touch with the sales agent so we can coordinate it with them.

Best,
Charis

Sent from my iPhone

M Gmail                                              **Charis Orchard <charisorchard@gmail.com>**

## Perfect piece

**Jay Kenoff <jay@km-entertainmentlaw.com>**                         Tue, Apr 12, 2016 at 8:32 AM
To: Charis Feeney-Orchard <charisorchard@gmail.com>
Cc: k boyle <kb2fo@yahoo.com>

Dear Charis - I did receive your telephone messages, but, unfortunately, I've been unavailable at the times you
mentioned you would call. Nevertheless, I believe I sufficiently understood the thrust of your proposal to enable to
discuss with my client.

My client's viewpoint is that you never paid for the literary property and took it without compensation to produce your
film.
Now, you are proposing to arrange for the sale of the movie and are further proposing to have proceeds used to pay
for the literary property AFTER paying back investors who contributed to produce the film.  While my client is
pragmatic and willing to discuss a resolution, the order of priorities needs to be set straight.  And, the first priority is the
payment to Kim for
acquisition of the literary property.  Kim is willing to agree to accepting distribution of the film if proceeds are first
applied to payment of the literary purchase price, and then payment to investors.  If you think about it, you have the
obligation to pay Kim for her property that you took - unlike the writer who is supposed to be paid for the acquisition of
the rights in her literary property, the investors in a film do not have a realistic expectation of receiving any money from
distribution of a film.

This email is sent to you with a full reservation of rights and remedies for my client.

Sincerely,

------------------------------------------------
JAY S. KENOFF, ESQ.
Kenoff & Machtinger, LLP
Attorneys at Law
1801 Century Park East, Suite 1520
Los Angeles, California 90067
jay@km-entertainmentlaw.com
Tel. (310) 552-0808
Fax (310) 277-0653

CONFIDENTIALITY NOTE:  The information contained in this email transmission is legally privileged and confidential
information intended only for the use of the individual or entity named above.  If the reader of this transmission is not
the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this transmission
is strictly prohibited.  If you have received this transmission in error, please immediately notify us by email, telephone
or fax and delete the original transmission.  Thank you.

Pursuant to recently enacted Treasury Department Regulations, we are now required to advise you that, unless
otherwise expressly indicated, any federal tax advice contained in this communication, including attachments and
enclosures, is not intended or written to be used, and may not be used, for the purpose of (a) avoiding tax related
penalties under the Internal Revenue Code of (b) prompting, marketing or recommending to another party any tax-
related matters addressed herein.

-----Original Message----- From: Charis Feeney-Orchard
Sent: Monday, April 11, 2016 1:05 AM
To: Jay Kenoff
Cc: k boyle
Subject: Re: Perfect piece
[Quoted text hidden]

3/11/2019                                          Gmail - Urgent: Payment Agreement proposal

 Gmail                                    Charis Orchard <charisorchard@gmail.com>

## Urgent: Payment Agreement proposal

**Charis Orchard** <charisorchard@gmail.com>                         Wed, Apr 13, 2016 at 9:43 AM
To: Jay Kenoff <jay@km-entertainmentlaw.com>, k boyle <kb2fo@yahoo.com>
Cc: Jeremy Lunt <jeremy-lunt@adlersproductions.com>, William Feeney <william@actionablebooks.com>

Dear Jay, Kay,

Please see the attached one page agreement and let me know if you are happy to sign? It would be wonderful to sign
this within the next day or so for the Sales agent to be able to proceed for their Cannes M&A campaign. Thank you
very much.

Sincerely,
Charis

www.chachacreative.com
uk.linkedin.com/pub/charis-orchard/83/817/8ba
imdb.com/name/nm2450532/

The contents of this email are confidential to the intended recipient and may not be disclosed. Although it is believed that this email and any attachments are virus free, it is the responsibility of the recipient to confirm this.

**Agreement for the payment of the Screenwriter fees for the feature film 'Perfect Piece'.docx**
6K

 Gmail                                    Charis Orchard <charisorchard@gmail.com>

## Agreement for Casanova

**Charis Orchard** <charisorchard@gmail.com>                              Fri, Aug 19, 2016 at 8:07 AM
To: k boyle <kb2fo@yahoo.com>
Cc: Jeremy Lunt <jeremy-lunt@adlersproductions.com>, Mark Belasco <mark-belasco@adlersproductions.com>, Jay
Kenoff <jay@km-entertainmentlaw.com>

Hi All,

Apologies for the delay!!

Please find attached the contract signed by myself. Over to Jeremy to sign now. Also Jeremy ->I did not recieve yet
the new list of post-houses to do the quality control report. Please can you send this to me asap? I would love to get it
done next week if possible.

Thank you!

Sincerely,
Charis

Tel: 0457 955 152
uk.linkedin.com/pub/charis-orchard/83/817/8ba
imdb.com/name/nm2450532/

The contents of this email are confidential to the intended recipient and may not be disclosed. Although it is believed that this email and any
attachments are virus free, it is the responsibility of the recipient to confirm this.
[Quoted text hidden]

📄 **Contract Boyle Signed.pdf**
    81K

*Notice of Arbitration*
*Annex A + B*
*Attachment M*

Charis Feeney-Orchard
Purchaser/Director
8 Haven Green
Ealing, London, W5 2UU
United Kingdom
Email: charisorchard@gmail.com
Tel: +44 7455 309583

Kim Boyle
C/o Jay S. Kenoff, ESQ.
Kenoff & Machtinger, LLP
1801 Century Park East,
Suite 1520
Los Angeles, California 90067
United States of America
Email:Jay@km-
entertainmentlaw.com
Tel: +1 (310) 552 0808

### SCREENPLAY OPTION PURCHASE AGREEMENT

This Option Purchase Agreement made on 12 May 2014 by and between Kim Boyle, (hereinafter referred to as the "Transferor") and Charis Feeney-Orchard (hereinafter referred to as "Purchaser").

WHEREAS, the Transferor is the sole and exclusive owner throughout the world of all rights in and to the screenplay for a feature-length motion picture (the "Picture") presently-entitled: "Casanova Lost and Found" (formerly known as "This Albert DiGrazia") that was also written by the Transferor which work has been filed in the Office of the Writers Guild of America West, Los Angeles, California, USA, under Registration Number 818942 (a copy of which is attached as Appendix A to this Agreement), this work including all adaptations and/or versions, the titles, characters, plots, themes and story line is collectively referred to as the "Property"; and

WHEREAS, Purchaser wants to acquire certain rights of the Transferor in consideration for the purchase price provided herein and in reliance upon the Transferor's representations and warranties;

NOW, THEREFORE, the parties agree as follows:

1. RIGHTS: Upon exercise of the Option (as described below) and payment of the Purchase Price (as described herein), the Transferor will irrevocably transfer, sell, grant, convey and assign to the Purchaser, and the Purchaser's successors, licensees and assigns exclusively and forever, except for the reserved rights described below, all motion picture rights (including all silent, sound dialogue and musical motion picture rights), all television motion picture and other television rights, together with limited radio broadcasting rights and 7,500 word publication rights for advertisement, publicity and exploitation purposes, and certain incidental and allied rights, throughout the world, in and to the Property and in and to any intellectual property including the copyright thereof and all renewals and extensions of copyright. Included among the rights granted to Purchaser hereunder (without in any way limiting the grant of rights hereinabove made) are the following sole and exclusive rights throughout the world in perpetuity:

(a) To make, produce, adapt and copyright (or otherwise protect) one or more motion picture adaptations or versions (the initial one of which shall be the Picture), whether fixed on film, tape, disc, wire, audio-visual cartridge, cassette or through any other technical process whether now known or hereafter devised, made in whole or in part on the Property, of every size, gauge, colour, dimension or type, including, but not limited to, musical motion pictures and remakes of and sequels (or prequels) to any motion picture produced hereunder and motion pictures in series or serial form, and for such purposes to record and reproduce and license others to record and reproduce, in synchronization with such motion pictures, spoken words taken from or based upon the text or theme of the Property and any and all kinds of music, musical accompaniments and/or lyrics to be performed or sung by the performers in any such motion picture and any and all other kinds of sound and sound effects.



1

(b) To make, produce, distribute, sell, license, assign, transfer, exhibit, perform, rent, lease and generally deal in and with any of the foregoing:

(i) by all means or technical processes whatsoever, whether now known or hereafter devised including, by way of example only, film, tape, disc, wire, audio-visual cartridge, cassette or television (including commercially sponsored, sustaining and subscription or pay-per-view television, or any derivative thereof); and

(ii) in any place whatsoever, including, by way of example only and without limitation to, homes, theatres and elsewhere, and whether or not a fee is charged, directly or indirectly, for viewing any such motion picture.

(c) To broadcast, transmit or reproduce the Property or any adaptation or version thereof (including, by way of example only and without limitations to, any motion picture produced hereunder and/or any script or other material based on or utilizing the Property or any of the characters, themes or plots thereof), by means of television or any process analogous thereto whether now known or hereafter devised (including commercially sponsored, sustaining and subscription or pay-per-view television), through the use of motion pictures produced on films or by means of magnetic tape, wire, disc, audio-visual cartridge or any other device now known or hereafter devised and including such television productions presented in series or serial form, and the exclusive right generally to exercise for television purposes all the rights granted to Purchaser hereunder for motion picture purposes.

(d) Without limiting any other rights granted Purchaser, to broadcast and/or transmit by television or radio or any process analogous thereto whether now known or hereafter devised, all or any part of the Property or any adaptation or version thereof, including any motion picture or any other version or versions thereof, and announcements pertaining to said motion picture or other version or versions, for the purpose of advertising, publicizing or exploiting such motion picture or other version or versions, which broadcasts or transmissions may be accomplished through the use of living actors performing simultaneously with such broadcast or transmission or by any other method or means including the use of motion pictures (including trailers) reproduced on film or by means of magnetic tape or wire or through the use of other recordings or transcriptions.

(e) To publish, copyright and protect or cause to be published, copyrighted and protected in the name of Purchaser or its nominee in any and all languages throughout the world, in any form or media, synopses, novelizations, serializations, dramatizations, abridged and/or revised versions of the Property, not exceeding 75,000 words each, adapted from the Property or from any motion picture and/or other version of the Property for the purpose of advertising, publicizing and/or exploiting any such motion picture and/or other version.

(f) For the foregoing purposes to use all or any part of the Property and any of the characters, plots, themes and/or ideas contained therein, and the title of the Property and any title or subtitle of any component of the Property, and to use said titles or subtitles for any motion picture or other version of adaptation whether or not the same is based on or adapted from the Property and/or as the title of any musical composition contained in any such motion picture or other version or adaptation.

(g) To use and exploit commercial or merchandise licenses, tie-ups, promotions and recordings of any sort and nature arising out of or connected with the Property and/or its motion picture or other versions and/or the title or titles thereof and/or the characters thereof and/or their names or characteristics.

All rights, licenses, privileges and property herein granted to Purchaser

2

shall be cumulative and Purchaser may exercise or use any or all said rights, licenses, privileges or property simultaneously with or in connection with or separately and apart from the exercise of any other of said rights, licenses, privileges and property; provided that Purchaser's initial production hereunder is the Picture. If the Transferor hereafter makes or publishes or permits to be made or published any revision, adaptation, sequel, prequel, translation or dramatization or other versions of the Property, then Purchaser shall have and the Transferor hereby grants to Purchaser, subject to the terms and conditions, including without limitation, the payment provisions set forth hereinbelow, all of the same rights therein as are herein granted Purchaser. The terms "Picture" and "Pictures" as used herein shall be deemed to mean or include any present or future kind of motion picture production based upon the Property, with or without sound recorded and reproduced synchronously therewith, whether the same is produced on film or by any other method or means now or hereafter used for the production, exhibition and/or transmission of any kind of motion picture productions.

2. RIGHTS RESERVED:   The following limited rights are reserved for the Transferor's continued and future use and disposition:

(a) Publication Rights:   The right to publish and distribute printed versions of the Property owned or controlled by the Transferor in written book form, whether hardcover or soft-cover, and in magazine or other similar periodicals (which may be published as a continuing series of instalments), subject to Purchaser's rights as provided for in Clause 1 above.

(b) Stage Rights:  The right to perform the Property or adaptations thereof on the spoken stage with actors appearing in person in the immediate presence of the audience, provided no broadcast, telecast, recording, photography or other reproduction of such performance is made.   The Transferor agrees not to exercise, or permit any other person to exercise, said stage rights earlier than five (5) years after the first general release or telecast, if earlier, of the first Picture produced hereunder, or seven (7) years after the date of exercise of the purchaser's option to acquire the property, whichever is earlier.

(c) Radio Rights:  The right to broadcast the Property by sound (as distinguished from visually) by radio, subject however to Purchaser's right at all times to: (i) exercise its radio rights provided in Clause 1 above for advertising and exploitation purposes by living actors or otherwise, by the use of excerpts from or condensations of the Property or any Picture produced hereunder; and (ii) in any event to broadcast any Picture produced hereunder by radio.   The Transferor agrees not to exercise, or permit any other person to exercise, the Transferor's radio rights earlier than five (5) years after the Purchaser first publishes the Property.

(d) Author-Written Sequel:  A literary property (story, novel, or drama), whether written by the Transferor or by a successor in interest of the Transferor, using one or more of the characters appearing in the Property, participating in substantially different events from those found in the Property, and whose plot is substantially different from that of the Property.   The Transferor shall have the right to exercise publication rights (i.e., in book or magazine form) at any time.   The Transferor agrees not to exercise, or permit any other person to exercise, any other rights (including but not limited to motion picture or allied rights) of any kind in or to any author-written sequel earlier than five (5) years after the Purchaser first publishes the Property, provided that such restriction on the Transferor's exercise of said author-written sequel rights shall be extended to any period during which there is in effect, in any particular country or territory, a network television broadcasting agreement for a television motion picture, (i) based upon the Property, or (ii) based upon any Picture produced in the exercise of rights assigned herein, or (iii) using a character or characters of the Property.



3

(e) Inasmuch as the characters of the Property are included in the exclusive grant of motion picture rights to Purchaser, no sequel or prequel rights or television series rights may be granted to such other person or company, but such characters from the Property which are contained in the author-written sequel may be used in a motion picture and remakes thereof whose plot is based substantially on the plot of the respective author-written sequel.

It is expressly agreed that the Transferor's reserved rights under this subclause relate only to material written or authorized by the Transferor and not to any revision, adaptation, sequel, prequel, translation or dramatization written or authorized by Purchaser, even though the same may contain characters or other elements contained in the Property.

3. RIGHT TO MAKE CHANGES: the Transferor agrees that Purchaser shall have the unlimited right to vary, change, alter, modify, add to and/or delete from the Property, and to rearrange and/or transpose the Property and change the sequence thereof and the characters and descriptions of the characters contained in the Property, and to use a portion or portions of the Property or the characters, plots, or theme thereof in conjunction with any other literary, dramatic or other material of any kind. The Transferor hereby waives the benefits of any provisions of law known as the "droit moral" or any similar law in any country of the world and agrees not to permit or prosecute any action or lawsuit on the ground that any Picture or other version of the Property produced or exhibited by Purchaser, its assignees or licensees, in any way constitutes an infringement of any of the Transferor's droit moral or is in any way a defamation or mutilation of the Property or any part thereof or contains unauthorized variations, alterations, modifications, changes or translations.

4. DURATION AND EXTENT OF RIGHTS GRANTED: Upon exercise of the Option and payment of the Purchase Price, Purchaser shall enjoy, solely and exclusively, all the rights, licenses, privileges and property granted hereunder throughout the world, in perpetuity, as long as any rights in the Property are recognized in law or equity, except insofar as such period of perpetuity may be shortened due to any now existing or future copyright by the Transferor of the Property and/or any adaptations thereof, in which case Purchaser shall enjoy its sole and exclusive rights, licenses, privileges and property hereunder to the fullest extent permissible under and for the full duration of such copyright or copyrights, whether common law or statutory, and any and all renewals and/or extensions thereof, and shall thereafter enjoy all such rights, licenses, privileges and property non-exclusively in perpetuity throughout the world. The rights granted herein are in addition to and shall not be construed in derogation of any rights that Purchaser may have as a member of the public or pursuant to any other agreement. All rights, licenses, privileges and property granted herein to Purchaser are irrevocable and not subject to rescission, restraint or injunction under any circumstances. Notwithstanding the foregoing, if Purchaser exercises the Option and fails to produce the Picture within seven (7) years of the date of this Agreement or five (5) of the date of exerercise of the Option, all rights shall revert to Transferor with a lien in favour of Purchaser for Purchaser's actual out-of-pocket expenses incurred in connection with the acquisition of the Property, payable upon commencement of production of the Picture by a third party.

5. CONSIDERATION: The following terms shall apply to this Agreement:

Option: In consideration of the option payment specified below, Purchaser shall have an option (the "Option") to acquire the Rights described hereinabove on the terms and conditions specified in this Agreement.



Term: The initial option term shall be 12 months from the date of Transferor's execution of this Agreement; renewable for an additional period of 12 months upon written notice to Transferor and payment of the

4

option extension payment prior to the expiration of the initial option period.

<u>Option Payments</u>: Purchaser shall pay Transferor the sum of $500 upon execution of this Agreement for the initial period, with such payment applicable to the Purchase Price and $1,000 for the option extension payment, payment to accompany the written option extension notice; such payment shall not be applicable to the Purchase Price.

<u>Option Exercise</u>: The Option may be exercised by written notice accompanied by payment of the Purchase Price (or, if sooner, upon commencement of principal photography, in which event payment of the Purchase Price shall be made to Transferor within 5 business days thereafter).

<u>Purchase Price</u>: The amount of the Purchase Price shall equal 3% of the final budget of the Picture (with exclusions for contingency, actual bond fees, finance charges and purchase price for screenplay), floor of $125,000, cap of $250,000. If the final budget has not been determined at the time of exercise of the Option, then the minimum amount shall be paid at that time, and the balance shall be paid within 30 days of commencement of principal photography of the Picture.

<u>Box Office Bonus</u>: Transferor will be paid $50,000 at $20 million U.S. theatrical box office as reported in Daily Variety or similar if Daily Variety not available with payment within 30 days of such determination.

<u>Contingent Compensation</u>: For sole writing credit, Transferor will receive 5% of contingent Net Proceeds (or Net Profits, as applicable) defined, accounting for and paid according to the same definition applicable to the Purchaser (or, if none, then on a favored nations basis with any other recipient of a participation in the revenues of the Picture); reducible to 2½% for shared writing credit by percentage paid to another credited writer.

<u>Further Writing</u>: Transferor shall have the first opportunity to prepare one rewrite and one polish of the Property, fees at applicable WGA minimums + 10%, payable one-half upon start of writing and one-half upon delivery of each work.

<u>Passive Payments for Sequels/Remakes/Spinoffs</u>: These apply for payments to the Transferor for the particular form of work, if Transferor is not the writer and being compensated for writing the particular work. Below amounts reduced by one half if Transferor shares writing credit on the initial Picture.
(a)   Theatrical Sequels: ½ of the Purchase Price and ½ of contingent compensation percentage.
(b)   Theatrical Remakes: 1/3rd of Purchase Price and 1/3rd of contingent percentage.
(c)   Mini-series/MFT: $15,000 per hour for the first two hours, cap at $90K; proration for partial hours.
(d)   Episodic: $5,000/90 min; $3,500/hour; $2,500/half hour.
(e)   Spin-offs: one-half of applicable episodic amount for a generic spin-off, one-fourth of applicable episodic amount for a planted spin-off.

<u>Re-runs</u>: 20% of applicable episodic payment per re-run for first 5 re-runs.

<u>Credit</u>: Per WGA standards, as if applicable, and as otherwise set forth below.

<u>Premiere</u>: Invite for Kim + 1 to premiere with travel and accommodations provided. 

6. REPRESENTATIONS AND WARRANTIES:

(a) Sole Proprietor:  the Transferor represents and warrants to Purchaser

5

that the Transferor is the sole and exclusive proprietor, throughout the universe, of that certain original literary material written by the Transferor entitled "Casanova Lost and Found."

(b) Facts:  the Transferor represents and warrants to Purchaser as follows:

(i) The Transferor is the sole author and creator of the Property.

(ii) The Property is unpublished and was registered for copyright in the name of "Casanova Lost and Found" written by Kim Boyle which work has been filed in the Office of the Writers Guild of America West, Los Angeles, California, USA, under Registration Number 818924.

(iii) No motion picture or dramatic version of the Property, or any part thereof, has been manufactured, produced, presented or authorized; no radio or television development, presentation, or program based on the Property, or any part thereof, has been manufactured, produced, presented, broadcast or authorized; and no written or oral agreements or commitments whatsoever with respect to the Property, or with respect to any rights therein, have been made or entered into by o on behalf of the Transferor.

(iv) None of the rights herein granted and assigned to Purchaser have been granted and/or assigned to any person, firm or corporation other than Purchaser herein upon exercise of the Option.

(c) No Infringement or Violation of Third Party Rights:  the Transferor represents and warrants to Purchaser that the Transferor has not adapted the Property from any other literary, dramatic or other material of any kind, nature or description, nor, except for material which is in the public domain, has the Transferor copied or used in the Property the characters, themes, plot, scenes, sequence or story of any other literary, dramatic or other material; that, according to the standard applicable under Article 28 of the WGA Basic Agreement, (i) the Property does not infringe upon any common law or statutory rights in any other literary, dramatic or other material; (ii) no material contained in the Property is libelous or violative of the right of privacy of any person; (iii) the full utilization of any and all rights in and to the Property granted by the Transferor pursuant to this Agreement will not violate the rights of any person, firm or corporation; and (iv) the Property is not in the public domain in any country in the world where copyright protection is available.

(d) No Impairment of Rights:  the Transferor represents and warrants to Purchaser that the Transferor is the exclusive proprietor, throughout the universe, of all rights in and to the Property granted herein to Purchaser; that the Transferor has not assigned, licensed or in any manner encumbered, diminished or impaired any such rights; that the Transferor has not committed or omitted to perform any act by which such rights could or will be encumbered, diminished or impaired; and that there is no outstanding claim or litigation pending against or involving the title, ownership and/or copyright in the Property, or in any part thereof, or in any rights granted herein to Purchaser.  The Transferor further represents and warrants that no attempt shall be made hereafter by the Transferor to challenge, encumber, diminish or impair any of the rights granted herein and that all appropriate protection of such rights will continue to be maintained by the Transferor.

7. INDEMNIFICATION:

(a) The Transferor agrees to indemnify Purchaser against all judgments, liability, damages, penalties, losses, costs, and expense (including reasonable attorneys' fees) which may be suffered or assumed by or obtained against Purchaser by reason of any breach or failure of any warranty or agreement herein made by the Transferor. 

(b) Purchaser agrees to indemnify Transferor against all judgments,

6

liability, damages, penalties, losses, costs, and expense (including reasonable attorneys' fees and costs) which may be suffered or assumed by or obtained against Transferor by reason of any matter or things arising out of the development, production, distribution and exploitation of the Picture, the breach or failure of any warranty or agreement herein made by Purchaser and any material added to the Property by Purchaser, except to the extent that the foregoing covered by the Trnasferor's foregoing indemnity.

(c) Upon exercise of the Option and payment of the Purchase Price, All rights, licenses and privileges herein granted to Purchaser are irrevocable and not subject to rescission, restraint or injunction under any circumstances.

8. PROTECTION OF RIGHTS GRANTED: the Transferor hereby grants to Purchaser the free and unrestricted right, but at Purchaser's own cost and expense, to institute in the name and on behalf of the Transferor, or the Transferor and Purchaser jointly, any and all suits and proceedings at law or in equity, to enjoin and restrain any infringements of the rights herein granted, and hereby assigns and sets over to Purchaser any and all causes of action relative to or based upon any such infringement, as well as any and all recoveries obtained thereon.  The Transferor will not compromise, settle or in any manner interfere with such litigation if brought; and Purchaser agrees to indemnify and hold the Transferor harmless from any costs, expenses, or damages which the Transferor may suffer as a result of any such suit or proceeding.

9. COPYRIGHT: Regarding the copyright (and/or any other intellectual property right) in and to the Property, the Transferor agrees that:

(a) The Transferor will prevent the Property and any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof whether published or unpublished and whether copyrighted or uncopyrighted, from vesting in the public domain, and will take or cause to be taken any and all steps and proceedings required for copyright or similar protection in any and all countries in which the same may be published or offered for sale, insofar as such countries now or hereafter provide for copyright or similar protection. Any contract or agreement entered into by the Transferor authorizing or permitting the publication of the Property or any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof in any country will contain appropriate provisions requiring such publisher to comply with all the provisions of this clause.

(b) Without limiting the generality of the foregoing, if the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof is published in the United States or in any other country in which registration is required for copyright or similar protection in accordance with the laws and regulations of such country, and the Transferor further agrees to affix or cause to be affixed to each copy of the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof which is published or offered for sale such notice or notices as may be required for copyright or similar protection in any country in which such publication or sale occurs.

(c) Intentionally omitted.

(d) If the Property, or any arrangement, revision, translation, novelization, dramatization or new version thereof, shall ever enter the public domain, then nothing contained in this agreement shall impair any rights or privileges that the Purchaser might be entitled to as a member of the public.



(e) Upon exercise of the Option and payment of the Purchase Price, all

7

rights granted or agreed to be granted to Purchaser under this Agreement shall be irrevocably vested in Purchaser and shall not be subject to rescission by the Transferor or any other party for any cause, nor shall said rights be subject to termination or reversion by operation of law or otherwise, except to the extent, if any, that the provisions of any copyright law or similar law relating to the right to terminate grants of, or recapture rights in, literary property may apply. If, pursuant to any such copyright law or similar law, the Transferor or any successor or any other legally designated party (all herein referred to as "the terminating party") becomes entitled to exercise any right to reversion, recapture or termination (the "termination right") with respect to all or any part of the rights granted or to be granted under this Agreement, and if the terminating party exercises said termination right with respect to all or part of said rights (the "recaptured rights"), then from and after the date on which the terminating party has the right to transfer to a third party all or part of the recaptured rights, Purchaser shall have the first right to purchase and acquire the recaptured rights from the terminating party. If the terminating party is prepared to accept a bona fide offer from a third party with respect to all or part of the recaptured rights, then in each such instance the terminating party shall notify Purchaser of such offer which the terminating party is prepared to accept and the name of the third party who made the offer to the terminating party, and the terminating party shall offer Purchaser the right to enter into an agreement with the terminating party with respect to the recaptured rights on the aforesaid terms and conditions. Purchaser shall have 30 days from the date of its receipt of such written offer within which to notify the terminating party of its acceptance of such offer (provided, however, the Purchaser shall not be required to meet any terms or conditions which cannot be as easily met by one person as another, including, without limitation, the employment of a specified person, etc.) If Purchaser shall acquire from the terminating party all or part of the recaptured rights, then the terminating party agrees to enter into appropriate written agreements with Purchaser covering said acquisition. If Purchaser shall elect not to purchase the recaptured rights from the terminating party, then the terminating party may dispose of said recaptured rights, but only to the aforesaid third party and only upon the terms and conditions specified in the aforesaid written notice given by the terminating party to Purchaser, it being understood and agreed that the terminating party may not dispose of said recaptured rights either to: (a) any other proposed transferee; or (b) upon terms and conditions which are more favorable to any transferee than the terms and conditions previously offered to Purchaser hereunder, without again offering to enter into an agreement with Purchaser on: (i) the terms offered to such other transferee; or (ii) such more favorable terms and conditions offered to said proposed transferee, whichever of (a) or (b) shall apply. Any such required offer made to Purchaser by the terminating party shall be governed by the procedure set forth in the preceding four sentences of this Paragraph. The unenforceability of any portion of this Paragraph shall not invalidate or affect the remaining portions of this Paragraph of this Agreement.

10. <u>CREDIT OBLIGATIONS</u>: Purchaser shall have the right to publish, advertise, announce and use in any manner or medium, the name, approved biography and approved photographs or approved likenesses of the Transferor in connection with any exercise by Purchaser of its rights hereunder, provided such use shall not constitute an endorsement of any product or service.

The Transferor shall be accorded the following credit on a single card on screen in the main titles of the Picture and in the billing block portion of paid ads (subject to customary exceptions and exclusions), and in size of type (as to height, width, thickness and boldness) equal to the largest size of type of any other main title credit and otherwise subject to the credit requirements of the WGA Basic Agreement:



WRITTEN BY Kim Boyle

Additionally, if Purchaser shall exploit any other rights in and to the Property, then Purchaser agrees to give appropriate source material credit to the Property, to the extent that such source material credits are customarily given in connection with the exploitation of such rights.

Purchaser will notify third parties in writing of the foregoing credit requirements. No casual or inadvertent failure to comply with any of the provisions of this clause shall be deemed a breach of this agreement by the Purchaser. The Transferor hereby expressly acknowledges that in the event of a failure or omission constituting a breach of the provisions of this paragraph, the damage (if any) caused the Transferor thereby is not irreparable or sufficient to entitle the Transferor to injunctive or other equitable relief. Consequently, the Transferor's rights and remedies in the event of such breach shall be limited to the right to recover damages in an action at law; provided however, upon written notice by Transferor of a failure or omission regarding the foregoing credit requirements, Purchaser will make good faith efforts to promptly implement a cure.

11. RIGHT OF FIRST NEGOTIATION: Purchaser shall have a right of first negotiation on all Reserved Rights. The term "Right of First Negotiation" means that if the Transferor desires to dispose of or exercise a particular right reserved to the Transferor herein ("Reserved Right"), whether directly or indirectly, then the Transferor shall notify Purchaser in writing and immediately negotiate with Purchaser regarding such Reserved Right. If, after the expiration of thirty (30) days following the receipt of such notice, no agreement has been reached, then the Transferor may negotiate with third parties regarding such Reserved Right subject to Clause 12.

12. RIGHT OF LAST REFUSAL: The Purchaser shall have a right of last refusal on all Reserved Rights. The term "Right of Last Refusal" means that if Purchaser and the Transferor fail to reach an agreement pursuant to Purchaser's right of first negotiation, and the Transferor makes and/or receives any bona fide offer to transfer, sell, grant, convey, assign, license, and/or lease any Reserved Right or any interest therein ("Third Party Offer"), the Transferor shall notify Purchaser of such terms (the existence of which shall be fully disclosed) and Purchaser shall have the exclusive option for thirty (30) days to execute such proposed transaction upon the same terms and conditions as set forth in such notice. Purchaser's Right of Last Refusal shall continue in full force and effect, upon all of the terms and conditions of this paragraph, so long as the Transferor retains any rights, title or interests in or to the particular Reserved Right. Purchaser's Right of Last Refusal shall inure to the benefit of Purchaser, its successors and assigns, and shall bind the Transferor and the Transferor's heirs, successors and assigns.

13. NO OBLIGATION TO PRODUCE: Nothing herein shall be construed to obligate Purchaser to produce, distribute, release, perform or exhibit any motion picture, television, theatrical or other production based upon, adapted from or suggested by the Property, in whole or in part, or otherwise to exercise, exploit or make any use of any rights, licenses, privileges or property granted herein to Purchaser.

14. ASSIGNMENT: Purchaser may assign and transfer this agreement or all or any part of its rights hereunder to any studio, major production company, network, or similarly financially-capable person, firm or corporation without limitation, and this agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, representatives and assigns forever. Any other assignment and transfer of this Agreement shall require Transferor's written consent, not to be unreasonable withheld.

15. NO PUBLICITY: The Transferor will not, without Purchaser's prior written consent, not to be unreasonably withheld, in each instance, issue or authorize the issuance or publication of any news story or publicity



9

(except non-derogatory remarks incidental to an interview of Transferor) relating to (i) this Agreement, (ii) the subject matter or terms hereof, or to any use by Purchaser, its successors, licensees and assigns, and (iii) any of the rights granted Purchaser hereunder.

16. AGENT COMMISSIONS:  Purchaser shall not be liable for any compensation or fee to any agent of the Transferor in connection with this Agreement.

17. ADDITIONAL DOCUMENTATION:  The Transferor agrees to execute and procure any other and further instruments necessary to transfer, convey, assign, protect, enforce, and copyright all rights in the Property granted herein by the Transferor to Purchaser in any country throughout the world.  If it shall be necessary under the laws of any country that copyright registration be acquired in the name of the Transferor, Purchaser is hereby authorized by the Transferor to apply for said copyright registration thereof; and, in such event, the Transferor shall and does hereby assign and transfer the same unto Purchaser, subject to the rights in the Property reserved hereunder by the Transferor.  The Transferor further agrees, upon request, to duly execute, acknowledge, procure and deliver to Purchaser such short form assignments as may be requested by Purchaser for the purpose of copyright recordation in any country, or otherwise.  If the Transferor shall fail to so execute and deliver, or cause to be executed and delivered, the assignments or other instruments herein referred to, Purchaser is hereby irrevocably granted the power coupled with an interest to execute such assignments and instruments in the name of the Transferor and as the Transferor's attorney-in-fact.  Purchaser agrees to cover any and all expense involved in obtaining compliance with the foregoing provisions of this paragraph.

18. NOTICES:  All notices to Purchaser under this agreement shall be sent by registered mail, postage prepaid, or by email (with a copy by regular mail) addressed to the Purchaser at:

Charis Feeney-Orchard
8 Haven Green
Ealing, London, W5 2UU
United Kingdom

And to:
charisorchard@gmail.com

All notices to the Transferor under this agreement shall be sent by registered mail, postage prepaid, or by email (with a copy by regular mail) to:

Kim Boyle
C/o- Jay S. Kenoff, ESQ.
Kenoff & Machtinger, LLP
1801 Century Park East, Suite 1520
Los Angeles, California 90067
United States of America

And to:
jay@km-entertainmentlaw.com

All payments to Transferor hereunder shall be made to Transferor c/o Jay S. Kenoff, Esq., at the address set forth above.



19. MISCELLANEOUS:

(a) Relationship:  This agreement between the parties does not constitute a joint venture or partnership of any kind.

(b) Cumulative Rights and Remedies:  All rights, remedies, licenses, undertakings, obligations, covenants, privileges and other property granted

10

herein shall be cumulative, and Purchaser may exercise or use any of them separately or in conjunction with any one or more of the others.

(c) Waiver: A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

(d) Severability: If any provision of this agreement as applied to either party or any circumstances shall be adjudged by a court to be void and unenforceable, such shall in no way affect any other provision of this agreement, the application of such provision in any other circumstance, or the validity or enforceability of this agreement.

(e) Governing Law: This agreement shall be construed in accordance with the laws of the State of California.

(f) Entire Understanding: This agreement contains the entire understanding of the parties relating to the subject matter, and this agreement cannot be changed except by written agreement executed by both parties.

(g) Arbitration: Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration using the rules and procedures of the International Film and Television Alliance using a single arbitrator. The parties agree that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable attorneys' fees and expenses. The arbitration will be held in Los Angeles and any award shall be final, binding and non-appealable.

(h) Electronic or Fax Execution; Counterparts: This Agreement may be executed by original, facsimile or electronic signatures and in counterparts, each of which will be deemed an original but all of which together will constitute a single instrument. Any signed copy of this Agreement delivered electronically or by facsimile transmission will for all purposes be treated as if it had been delivered containing an original signature of the party whose signature appears in the electronic or facsimile version and will be binding upon that party in the same manner as though an original signed copy had been delivered.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and year first above written.

_____    _____
Charis Feeney-Orchard    Date        Kim Boyle        Date

_____    _____
Witness                             Witness
(please sign and print name)        (please sign and print name)

NOTARY PUBLIC
STATE OF ARIZONA
Maricopa County
DINA SWANN
My Commission Expires 07/28/15

EXECUTED before me at Sydney, NSW, Australia
this 11th day of April 2014

MICHAELANGELO K. TWEMLOW
Public Notary ID No. 1660

Michaelangelo K Twemlow
Notary Public
Level 1, 299 Elizabeth Street
Sydney NSW 2000
Australia
Tel: +61 401 915 692
michael@solicitor.sydney
W: www.solicitor.sydney

11

EXHIBIT "B"

# NOTICE OF ARBITRATION

April 25, 2019

**Charis Feeney-Orchard**
**9 Wirrilda Way**
**Forestville, NSW, 2087**
**Australia**
**E-mail: charisorchard@gmail.com**
**Phone: +61 (0) 404870918**

ATTN: **Charis Feeney-Orchard**
Via e-mail and postal mail

**Re: Notice of Arbitration**

In accordance with the requirements of Rule 2 of the Independent Film & Television Alliance Rules for International Arbitration ("Rules"), Claimant hereby notifies Respondent and the Independent Film & Television Alliance ("IFTA") of the following:

Pursuant to Rule 2.4.1., demand is hereby made that the dispute between **Adler & Associates Entertainment, Inc.** and **Charis Feeney-Orchard** be referred to arbitration.

Pursuant to Rules 2.4.2. and 2.4.3., the names, addresses, telephone, and fax numbers, if available, of the parties to this dispute and the names, addresses, telephone and fax numbers, email addresses and, if available, of the respective legal counsel are as follows:

| | |
|---|---|
| Claimant | Respondent |
| **Adler & Associates Entertainment, Inc.** | **Charis Feeney-Orchard** |
| **3500 West Olive Avenue Ste. 300** | **9 Wirrilda Way** |
| **Burbank, CA 91505** | **Forestville, NSW, 2087** |
| **United States of America** | **Australia** |
| **Email: marie-adler@adlersproductions.com** | **E-mail: charisorchard@gmail.com** |
| **Phone: +1.310.684.3545** | **Phone: +61 (0) 404870918** |
| | |
| Claimant's Counsel | Respondent's Counsel |
| Amy B. Lawrence | **Respondent's Counsel is unknown** |
| Lawrence & Associates | |
| 2550 Hollywood Way, Ste. 202 | |
| Burbank, CA 91505 | |
| United States of America | |
| Email: ablawrence@lawandassoc.com | |
| Phone: +1.818.843.6442 | |

Pursuant to Rule 2.4.4., a copy of the arbitration clause contained in the attached contract(s) located on page 15, paragraph 16, is referenced as follows:

> **Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by final, binding and non-appealable arbitration under the Rules for International Arbitration of the International Film and Television Alliance (I.F.T.A.) in effect when the arbitration is filed (the "I.F.T.A. Rules"). Each Party waives any right to adjudicate any dispute in any other court of forum, except that a Party may seek interim relief before the start of arbitration as allowed by the I.F.T.A. Rules. The arbitration will be held in the Forum designated in the Deal Terms, or, if none is designated, as determined by the I.F.T.A. Rules. The Parties will abide by any decision in the arbitration and any court having jurisdiction may enforce it. The Parties submit to the jurisdiction of the courts in the Forum to compel arbitration or to confirm an arbitration award. The Parties agree to accept service of process in accordance with the I.F.T.A. Rules.**

Pursuant to Rule 2.4.5., a copy of the relevant contract(s) are attached hereto. (Exhibit "A")

Pursuant to Rule 2.4.6., **Adler & Associates Entertainment, Inc.** sets forth a statement of the nature of the dispute and the amount involved, if any, as follows:

> **Adler & Associates Entertainment, Inc., is currently a named party in the lawsuit, "Kimberly Boyle v. Adler & Associates Entertainment, LLC", Case No. 2:19-CV-893GW (SKx) (mislabeled by Larry Zerner, Kimberly Boyle's attorney, who also mislabeled our legal counsel as Jeremy Lunt, who is not an attorney in any part of the world), whereby Kimberly Boyle has accused Adler & Associates Entertainment, Inc. of infringing on the copyright to her screenplay Casanova - Lost and Found, which Charis Feeney-Orchard optioned and adapted as the motion picture Perfect Piece. Boyle alleges that Feeney-Orchard failed to pay the full price of the option, which Boyle states was $125,000 USD and which Feeney-Orchard states was $3750 USD. Boyle is seeking $125,000 USD from the defendants in the case.**

> **When entering into the sales agent agreement for Perfect Piece with Adler & Associates Entertainment, Inc. (see attachment), Charis Feeney-Orchard warranted, represented and covenanted that as producer of the motion picture Perfect Piece she "owns or controls the exclusive right to distribute, exploit, exhibit, broadcast, publicize, reproduce and otherwise derive revenue from the licensed Picture [Perfect Piece] in the manner and form provided for in this Agreement" and that "The licensed Picture does not violate nor infringe upon the common-law right, copyright, trademark or literary rights or right of privacy of any person and will not contain any material which is libelous, slanderous or defamatory."**

> **In addition, Charis Feeney-Orchard also warranted, represented and covenanted that she "has paid or will pay all production costs, taxes, fees and charges with respect to the production and delivery of the Picture except as provided herein."**

> **Also please see attached indemnification letter from Charis Feeney-Orchard. (Exhibit "B")**

Pursuant to Rule 2.4.7., the relief or remedy sought by **Adler & Associates Entertainment, Inc.** is as follows:

> **Adler & Associates Entertainment, Inc. is hereby seeking indemnification per the executed sales agent agreement with Charis Feeney-Orchard. Adler & Associates Entertainment, Inc. is seeking damages of $125,000 USD, plus an undetermined amount of legal fees and damages that may be incurred by Adler & Associates Entertainment, Inc. as a result of having to defend itself**

from Boyle's accusation, as well as the duress placed on the company and its CEO by Boyle's attorney falsely stating that he had served Adler & Associates Entertainment, Inc. in February 2019 and because Adler & Associates Entertainment, Inc. was prevented from seeking legal counsel because Larry Zerner, Boyle's attorney, named an employee, Jeremy Lunt, the legal counsel/attorney for Adler & Associates Entertainment, Inc. The employee has never represented himself as an attorney in any part of the world.

Additionally, Adler & Associates Entertainment, Inc. is seeking indemnification for any loss that may be incurred as a result of damages awarded to Boyle and/or due to damage to the company's business relationships with Amazon.com, Inc. and Dreamscape Media, LLC, two companies also named as defendants in the lawsuit due to the fact that both were sublicensees of Adler & Associates Entertainment, Inc. for the distribution rights to Perfect Piece.

The foregoing is not intended nor shall it be construed as a complete recitation of the facts and events concerning the above-referenced matter, nor shall it be construed as a waiver of any rights, remedies or claims, legal or equitable, which Adler & Associates Entertainment, Inc. may have.

Sincerely,

Adler & Associates Entertainment, Inc.                    Marie Adler

Chief Executive Officer

cc: IFTA Arbitral Agent

**EXHIBIT "A"**

**SALES AGENT AGREEMENT FOR "PERFECT PIECE"**

# ADLER & ASSOCIATES ENTERTAINMENT, INC.
## SALES AGENCY AGREEMENT

MAILING ADDRESS:
**Adler & Associates Entertainment, Inc.**
DBA: Adler Productions
8721 Santa Monica Blvd., #312
West Hollywood, CA 90069

PHYSICAL ADDRESS:
**Adler & Associates Entertainment, Inc.**
DBA: Adler Productions
3500 West Olive Avenue, Suite #300
Burbank, CA 91505

Office: 310-684-3545  Fax: 800- 962-2352
www.adlersandassociatesentertainment.com
www.adlersproductions.com

August 2, 2015

*C. Feeney-Orchard*
*New House Pictures Ltd*
*56 Queens Gardens*
*W2 3AF  London  UK*

PROJECT: **Perfect Piece**

    This letter will confirm the agreement between *Chris Feeney-Orchard* (referred to herein as "Producer") and **Adler & Associates Entertainment, Inc.** (referred to herein as "Adler & Associates"). pursuant to which Producer appoints Adler & Associates as its Sales Agent and grants Adler & Associates the exclusive worldwide right to distribute the motion picture(s) currently entitled **Perfect Piece** (the "Picture").

PRODUCER/LICENSOR (1) _____        PRODUCER/LICENSOR (2) _____

1.   **TERRITORY**

( a ) Producer hereby appoints Adler & Associates as its exclusive Sales Agent for the Picture in all territories of the world, its territories and possessions (the "rights"), those rights which will be represented by Adler & Associates Entertainment Inc., hereinafter known as "the Territory" and as outlined in Exhibit "A".

2.   **TERM**

The term of this Agreement shall be for a period of ten (10) years (the "Term") commencing from the date of execution subject to the following conditions:

( a ) Adler & Associates' initial rights with respect to the Picture ("Initial Period") shall be for a period of seven (7) years commencing upon delivery of the Picture master to and issuance of a satisfactory technical acceptance report by a mutually agreed upon laboratory, so Adler & Associates may make the Picture available to its clients for distribution.

( b ) This Agreement shall continue in full force and effect for an additional period of three (3) years after the expiration of the Initial Period (the "Extension Period") if during the Initial Period Adler & Associates has generated gross sales (meaning sales to third party exhibitors, distributors or sub-distributors documented through deal memos or license agreements, whether or not the term of such license has commenced or if any monies are payable or collected) generating an amount equal to or in excess of two hundred thousand dollars ($200,000) net to the Producer.

( c ) At the end of the Initial Period and the Extension Period Adler & Associates will continue to represent the Picture under the terms outlined in this agreement until such time as the Producer requests the representation to end. Both parties agree that the termination will come from the Producer in the form of a thirty (30) day written notice, at which time Adler & Associates agrees to return the Producer all of the Picture's elements and a complete sales/licensing report.

PRODUCER/LICENSOR (1) _____    PRODUCER/LICENSOR (2) _____

3.  **RIGHTS**

( a ) Producer hereby grants to Adler & Associates, in its capacity as Sales Agent and executive producer, during the initial and extension terms, if applicable, the exclusive right throughout the Territory, to exhibit, distribute, sub-distribute, market, exploit, sell, perform, promote and otherwise exploit the Picture on the Producer's behalf, and will issue licenses to others (including but not limited to sub-distributors) relative thereto, in any and all media, now known or hereinafter developed, including but not limited to, theatrical, "non-theatrical" exhibition, free television exhibition, pay-per-view, VOD, pay/cable/ satellite television exhibition and videogram (e.g., video cassette and video disc).

( b ) All third party contracts will carry a term of no more than eight (8) years. Any third party contracts which would exceed the eight (8) year maximum, with the exception for Germany (which may be up to fifteen (15) years), must either (i) be approved by Producer in advance of those contracts being signed with the third party or (ii) such contracts may be concluded by Adler & Associates with such third parties if they are made subject to subsequent ratification and approval by Producer.

( c ) Adler & Associates and its licensees shall retain the right to change the title of the Picture as is deemed necessary in order to execute its obligations and responsibilities in this Agreement.

( d ) Adler & Associates and its licensees shall retain the right to edit the visual and audio content the Picture as necessary in order to create versions of the Picture that will be approved by censors, ratings boards, broadcast authorities and other regulatory bodies in the Territory, or to otherwise enable the exploitation of the rights specified in 3(a). Adler & Associates agrees that no alterations will be made to the original negative or video master of the Picture.

( e ) Adler & Associates and its licensees shall retain the right at their discretion to incorporate into the Picture preceding and/or following the main and end titles of the Picture and trailers thereof, and in all publicity and advertising relating thereto, in such manner, position, form and substance as Adler & Associates or its licensees may elect, Adler & Associates' or its licensees trademark, logo and presentation announcement, and the designation of Adler & Associates or its licensees as the distributor of the Picture.

PRODUCER/LICENSOR (1) _____        PRODUCER/LICENSOR (2) _____

4.    **CREDITS**

( a ) Adler & Associates shall take an executive producer credit on the Picture under the name of "Marie Adler" ("the EP Credit"). The EP Credit shall appear as applicable in the opening and ending credits of the Picture.

( i ) The EP Credit shall also appear on posters, home video releases and promotional materials whenever a billing block is present.

5.    **FIRST RIGHT OF REFUSAL**

Should any sequel, prequel, expanded version, remake, web series or television series based upon the Picture or utilizing its primary characters therein (a "Derivative Property") be produced during the Term of this Agreement, Adler & Associates will retain the first right of refusal to act as its Sales Agent.

( a ) Producer understands and acknowledges that they shall not enter into any other agreement for the sale, distribution, marketing, promotion, performance, exploitation or sale or licensing of ancillary products of a Derivative Property without written approval from Adler & Associates.

6.    **EXCLUSIVITY**

Producer agrees that it will not exhibit, distribute, sub-distribute, market, exploit, sell, perform or otherwise exploit the Picture (including the sale of legally manufactured copies purchased from Adler & Associates' licensees) at any time during the Term of this Agreement

7.    **BEST EFFORTS**

Adler & Associates agrees to at all times during the Initial term and the extension terms, if applicable to use its best efforts in rendering services as Sales Agent as such services and designations are customarily understood and rendered in the motion picture business.

PRODUCER/LICENSOR (1) _____    PRODUCER/LICENSOR (2) _____

8.     **FEES AND EXPENSES**

( a ) As between Adler & Associates and Producer, Adler & Associates shall have the sole right to collect all monies which may be generated from Adler & Associates' activities as Producer's Sales Agent. From such gross receipts Adler & Associates shall be entitled to retain thirty-five percent (35%) as a sales commission from the sales of the Picture and any and all ancillary products.

( b ) Adler & Associates shall be entitled to collect a one-time administration fee of four thousand five hundred dollars ($4500) and a one-time audit fee of three thousand five hundred dollars ($3500). These fees shall be collected from the monies received from the sales of the Picture and any and all ancillary products and shall be collected before any funds are disbursed to Producer and before Adler & Associates reimburses itself for any "out of pocket" distribution expenses as specified in 8 (c), (d) and (e) below. By initialing below, Producer hereby acknowledges that they have been informed that these fees are a cost of doing business for Adler & Associates. Furthermore, by initialing below Producer affirms that any and all questions they have about these fees have been answered to their satisfaction by Adler & Associates. By initialing below Producer affirms that they accept these fees as a cost of doing business for Adler & Associates and have no further questions.

(Producer/Licensor [1] _____ )     (Producer/Licensor [2] _____ )

( c ) Subject to the limitations specified in 8(d) below, Adler & Associates shall be entitled to reimburse itself for its actual, "out of pocket" distribution expenses from the balance of the gross receipts. It is agreed that such distribution expenses shall be limited to all reasonable and necessary costs customarily deemed "distribution expenses" in the motion picture, television and video industries, including but not limited to trailers, artwork, advertising, market costs, non-market administration expenses, legal, accounting, laboratory, transfer fees, etc. and such other expenses it may incur or deem it necessary to incur in its distribution of the Picture. There shall be no deduction for overhead fees by Adler & Associates nor shall any deduction result in a double deduction for Adler & Associates.

( d ) It is agreed that said deductible expenses shall be those expenses defined in the following categories:

( i ) Film and television market costs necessary in order for Adler & Associates to attend, exhibit, promote and market the Picture at foreign and domestic film and television markets or to submit it to film festivals.

PRODUCER/LICENSOR (1) _____     PRODUCER/LICENSOR (2) _____

( ii ) Cost of producing trailers, artwork, electronic press kits, making-of documentaries, commentary tracks and other promotional materials to be utilized in the exploitation of the Picture, including the exploitation of the Picture at film, television and/or video markets or film festivals, which Producer hereby grants permission to Adler & Associates to create.

( iii ) Actual, direct "out of pocket" expenses for advertising and publicity costs: print, tape, cassette and disc manufacturing costs; packaging, shipping, handling, storage, insurance and customs costs; dubbing and subtitling costs; quality control evaluation and reporting costs; format conversion costs; editing costs and audio/video correction costs; censorship and rating fees; copyright registration fees and all insurance premiums and other fees or costs which Adler & Associates may agree to pay on behalf of Licensor, if any.

( e ) It is agreed that the total of all expenses recoupable by Adler & Associates pursuant to sub-paragraphs 8(c) and 8(d)(i), (ii) and (iii) above shall not exceed sixty-five thousand dollars ($65,000) without the prior written approval of Producer.

( f ) GROSS RECEIPTS are hereby defined as all non-returnable revenues, sums, compensations, monies and other forms of consideration collected by Adler & Associates as license fees or otherwise through exploitation of the Picture, but excluding any sales, use or remittance taxes collected and paid to the appropriate authorities by Adler & Associates. No amounts shall be included in Gross Receipts until received by Adler & Associates in the United States in United States dollars. Any amounts received by Adler & Associates in foreign currencies shall be converted into U.S. dollars and remitted to Adler & Associates as promptly as possible. Gross receipts shall also include any awards, damages, fees or other amounts collected by Adler & Associates from third parties for infringement of the Program's copyright or any of Adler & Associates' rights hereunder, but only if legal fees and other expenses incurred in connection with such amounts are recoupable as distribution expenses.

( g ) All other remaining proceeds shall be paid to the Producer.

PRODUCER/LICENSOR (1) _____   PRODUCER/LICENSOR (2) _____

## 9.   SCHEDULED MINIMUMS

( a ) The parties have or will mutually approve a schedule of minimum asking prices for the Picture when sold individually (attached hereto as Exhibit "A"). During the first ninety (90) days after execution of this Agreement, Adler & Associates will not accept any offer for rights in a territory which do not provide for a minimum guarantee or license fee equaling or exceeding that set forth in said schedule for such rights without first obtaining the Producer's approval.

( b ) After the first ninety (90) days following the date of execution for this Agreement, Adler & Associates may unilaterally modify any minimum asking price in Exhibit "A" upwards or downwards in response to changes in market conditions, providing that the total increase or decrease is equal or less than three percent (3%) of the currently agreed upon figure. Producer will be informed of any such changes in writing and Adler & Associates will not accept any offer for rights in a territory which do not provide for a minimum guarantee or license fee equaling or exceeding that revised figure without first obtaining the Producer's approval.

( c ) The parties also agree to review and revise such minimum asking prices on a regular basis to more accurately reflect prevailing market conditions.

( d ) If the Picture is included in a package with other motion pictures sold to a buyer, then the price allocated to the Picture shall be on the basis of a reasonable allocation of revenues in light of the commercial worth of all the motion pictures in the package. Whenever the Picture is sold as part of a package, Adler & Associates shall disclose the license fee allocated to each motion picture in the package.

## 10.   ACCOUNTING

( a ) Once delivery of the Picture has commenced, accounting to Producer shall be rendered within ninety (90) days following the close of each fiscal quarter during the Term of this Agreement. Any moneys shown to be owing to Producer shall accompany each statement showing a breakdown by territory as well as a breakdown of expenses.

( b ) Upon receipt of written request, Adler & Associates agrees to provide the Producer with copies of all Deal Memos which pertain to the Picture within thirty (30) working days.

PRODUCER/LICENSOR (1) _____     PRODUCER/LICENSOR (2) _____

( c )  Adler & Associates further agrees to maintain a complete set of files and records of account which pertain to the Picture and in its main offices. The Producer shall have the right, upon giving Adler & Associates thirty (30) working days prior written notice, to audit Adler & Associates' books and records insofar as they relate to this Agreement, at Adler & Associates' regular place of business and during Adler & Associates' regular working hours. Such audit shall be conducted at Producer's sole cost and expense. In addition, such audit shall be conducted no more frequently than once every six months and for not more than thirty (30) consecutive days, no statement may be audited more than once and no such audit shall be conducted in a manner that will unreasonably interfere with the normal operations of Adler & Associates' business. Any statements not disputed or records not audited by Producer for a period of twenty-four (24) months shall be deemed final and correct.

## 11.   DELIVERY

( a )  Producer agrees to deliver to Adler & Associates, or to such laboratories as are designated by Adler & Associates, those master and other materials indicated in the attached Exhibit "B", sufficient to enable Adler & Associates to make delivery of the Picture to all of its licensees. Such delivery is to be made at a mutually agreed time and materials are to include but not be limited to a Laboratory Access Letter in the form attached hereto as Exhibit "C". All materials to be delivered to Adler & Associates shall be of satisfactory technical quality so as to enable Adler & Associates' licensees to utilize same and, accordingly, shall conform to all of the technical standards as are customary in the motion picture, television and home video industries. It is further agreed that all delivery materials required to effect this agreement must be reviewed and approved by Adler & Associates.

( b )  It is further agreed that in the case where a specific delivery element is needed for delivery but has not yet been created by the Producer, Adler & Associates agrees to give the Producer final approval before closing the deal. If the Producer approves the deal Adler & Associates will negotiate delivery so that there will be sufficient advance notice to create that element and if the Producer fails to supply the delivery item, or otherwise directs Adler & Associates to create it on the Producer's behalf, Adler & Associates may at its own discretion create that element necessary to complete delivery to its client and take the cost of that element out of the proceeds from that sale.

PRODUCER/LICENSOR (1) _____     PRODUCER/LICENSOR (2)  _____

( c ) In the event Producer fails to i ) completely deliver all materials specified on Exhibit "B or ii ) if such materials are not of acceptable technical quality so as to enable Adler & Associates' licensees to utilize same or iii ) if such materials do not conform to all of the technical standards as are customary in the motion picture, television and home video industries or iv ) which are rejected by Adler & Associates in its sole discretion as being undeliverable to its Licensees, then Adler & Associates shall so advise Producer in writing of such non-delivery. Thereafter, Producer shall have thirty (30) days from the date of such notice ("delivery cure period") to correct said deficiencies at Producer's sole cost and expense and redeliver such corrected materials to Adler & Associates. If Producer fails to deliver said corrected materials to Adler & Associates within the delivery cure period, then Adler & Associates, in its sole discretion, may expend those amounts required to correct said deficiencies. In such event, Adler & Associates shall be entitled to recoup said costs out of 100% of the Picture's gross receipts. Furthermore, if the amounts advanced by Adler & Associates for said corrected materials exceeds fifteen thousand dollars ($15,000.00), then the parties hereby agree that, in addition to recoupment of such amounts by Adler & Associates, the sales commission specified in Section (8) Paragraph (a) above shall increase by 10% (e.g. – if the fee is 30% it shall increase to 40%), in addition to any other fees and expenses it is otherwise entitled to recoup or be paid.

12.    **WARRANTIES AND REPRESENTATIONS:**

( a ) Producer warrants, represents and covenants that:

( i ) It owns or controls the exclusive right to distribute, exploit, exhibit, broadcast, publicize, reproduce and otherwise derive revenue from the licensed Picture in the manner and form provided for in this Agreement.
     (Producer/Licensor [1] _____ )    (Producer/Licensor [2] _____ )

( ii ) The licensed Picture does not violate nor infringe upon the common-law right, copyright, trademark or literary rights or right of privacy of any person and will not contain any material which is libelous, slanderous or defamatory.
     (Producer/Licensor [1] _____ )    (Producer/Licensor [2] _____ )

PRODUCER/LICENSOR (1)_____    PRODUCER/LICENSOR (2) _____

( iii ) Producer warrants that the data on any and all hard drives, flash drives or optical discs provided to Adler & Associates for the purposes of delivering the Picture shall also be backed up and archived elsewhere by Producer to prevent any irreversible loss of such data. Producer hereby acknowledges that Adler & Associates has advised them that, prior to shipping, they are to remove all personal information from such drives or discs and to remove all other data not necessary for the delivery of the Picture. Producer also acknowledges that Adler & Associates has advised them to insure all shipments of materials sent to Adler & Associates for the purposes of delivering the Picture. Producer further acknowledges that, in the event of damage to, destruction of or data loss from hard drives, flash drives or optical discs, Adler & Associates shall be responsible only for the cost of replacing the media, and shall not be responsible for any other damages or costs stemming from any loss of data or breach of privacy from, or any damage to or destruction, failure or mishandling of the media.

(Producer/Licensor [1] _____ )     (Producer/Licensor [2] _____ )

( iv ) Adler & Associates shall have no responsibility or liability for any services, elements, or products performed or provided by any person, firm or corporation in connection with the production of the licensed Picture, and Adler & Associates shall in no way be responsible or liable for the making of payments to any third party, whether in the form of deferments, participations or otherwise by virtue of the permitted use made of the licensed Picture hereunder, including all residuals, royalties, fees, contributions and other benefits required under any guild, union or other agreement.

(Producer/Licensor [1] _____ )     (Producer/Licensor [2] _____ )

( v ) Producer warrants that it has paid or will pay all production costs, taxes, fees and charges with respect to the production and delivery of the Picture except as provided herein. As used herein, "production costs" will include all costs incurred with the production of the Picture and its delivery, including payments to writers, producers, directors, artists, and all other persons rendering services in connection with the Picture and/or its delivery.

(Producer/Licensor [1] _____ )     (Producer/Licensor [2]) _____ )

PRODUCER/LICENSOR (1) _____     PRODUCER/LICENSOR (2) _____

( vi ) Producer warrants that all music synchronization, master use and other licenses for music or lyrics incorporated within the Picture sufficient to permit Adler & Associates anticipated use hereunder have been properly obtained; that such licenses shall be maintained throughout the Term; and that the performing rights in the music are either (a) controlled by a performing rights society having jurisdiction, or (b) in the public domain, or (c) controlled by Producer to the extent necessary to permit Adler & Associates' use hereunder. Producer agrees that it will submit copies of all documents pertaining to the rights to use music in the Picture.

(Producer/Licensor [1] _____ )    (Producer/Licensor [2] _____ )

( vii ) That the Picture has been and will continue to be protected under copyright; that Producer will maintain and defend such copyright protection; and that if Producer fails to maintain and defend such copyright, Adler & Associates may, at Adler & Associates' sole discretion, elect to maintain and defend such copyright, and is hereby appointed Producer's attorney-in-fact for such purpose, and may recoup any amounts expended as an additional distribution expenses.

(Producer/Licensor [1] _____ )    (Producer/Licensor [2] _____ )

( viii ) Upon request by Adler & Associates and only at a time where it is deemed necessary to complete a deal, the Producer will secure and maintain during the Term of this Agreement Errors and Omissions ("E&O") insurance providing the Picture with coverage. Producer shall furnish Adler & Associates with a certificate of insurance naming Adler & Associates as an additional insured party and which provides no less than sixty (60) days notice to Adler & Associates in the event of expiration or termination.

( a ) By initialing below, Producer warrants and affirms their understanding that the estimated size of the E&O insurance policy will be ONE MILLION DOLLARS / THREE MILLION DOLLARS   ($1,000,000.00   / $3,000,000.00) of coverage, but that the amount required may increase based upon market conditions, Picture budget, licensee requirements and territories covered.

(Producer/Licensor [1] _____ )    (Producer/Licensor [2] _____ )

( b ) By initialing below, Producer warrants and affirms their understanding that, if they fail to secure and maintain an E&O insurance policy when requested, then Adler & Associates or Adler & Associates' licensees have permission to secure a policy for coverage from an insurer of their choosing, the cost of which shall be recoupable by Adler & Associates or its licensees.

(Producer/Licensor [1] _____ )    (Producer/Licensor [2] _____ )

PRODUCER/LICENSOR (1) _____      PRODUCER/LICENSOR (2) _____

( c ) By initialing below, Producer further affirms that, due to the size, structure, valuation, income and number of employees of Adler & Associates and its licensees, E&O insurance policies purchased and maintained by them are likely to be substantially more expensive than E&O policies purchased and maintained by Producer.

(Producer/Licensor [1] _____ )    (Producer/Licensor [2] _____ )

( d ) By initialing below, Producer hereby accepts that, in the event that Adler & Associates purchases an E&O policy to cover the Picture, the total limit on recoupable expenses agreed upon in paragraph 8(d) shall be increased by an amount not to exceed twenty thousand dollars ($20,000). Before the total limits set by paragraph 8(d) are increased, Producer will be informed of the change in writing and given an opportunity to purchase their own E&O insurance policy by the date necessary in order to successfully execute a licensing agreement.

(Producer/Licensor [1] _____ )    (Producer/Licensor [2] _____ )

( ix ) Producer warrants that it understands that Adler & Associates is a film production, film sales, film distribution, film finance and film consulting company. Producer warrants that it understands that Adler & Associates is representing other producers in a similar capacity, is producing and financing motion pictures, and is otherwise engaged as a consultant in production, finance, sales and distribution of motion pictures.

(Producer/Licensor [1] _____ )    (Producer/Licensor [2] _____ )

( x ) That all warranties and representations made herein by Producer shall survive the performance or termination of this Agreement.

(Producer/Licensor [1] _____ )    (Producer/Licensor [2] _____ )

( b ) Adler & Associates represents and warrants to the Producer and covenants, as follows:

( i ) There are no existing or threatened claims or litigation which would adversely affect or impair Adler & Associates' ability to completely perform under this Agreement.

( ii ) Adler & Associates agrees that all versions of the Picture disseminated will carry the copyright noticed currently affixed to the Picture, or an equivalent notice translated into the language of exhibition or distribution for that version of the Picture.

PRODUCER/LICENSOR (1) _____    PRODUCER/LICENSOR (2) _____

( iii ) Adler & Associates further agrees not to delete or modify the screen credits afforded to cast, crew or other personnel as such credits now appear on the positive prints of the Picture without providing equivalent credits in English or translated into another language of exhibition and distribution. In exercising the rights set forth herein, Adler & Associates shall not alter or delete any logo or trademark notice appearing on the Picture without providing an equivalent notice in English or translated into another language of exhibition and distribution.

( iv ) Adler & Associates will not exploit any reserved rights or any other rights not specifically licensed to Adler & Associates in this Agreement, nor will Adler & Associates exhibit or market the Picture outside the Territory or after the Term.

( v ) Adler & Associates will keep accurate records of all transactions related to its activities hereunder.

PRODUCER/LICENSOR (1) _____    PRODUCER/LICENSOR (2) _____

13.   **INDEMNITY**

Producer does hereby and shall at all times indemnify and hold harmless Adler & Associates, its subsidiaries and licensees, and its and their officers, directors and employees, and its and their exhibitors, licensees and assignees, of and from any and all charges, claims, damages, costs, judgments, decrees, losses, expenses (including reasonable attorneys' fees), penalties, demands, liabilities and causes of action, whether or not groundless, of any kind or nature whatsoever by reason of, based upon, relating to, or arising out of a breach or claim of breach or failure of any of the covenants, agreements, representations or warranties of Producer hereunder or by reason of any claims, actions or proceedings asserted or instituted, related to or arising out of any such breach or failure or conduct or activity resulting in a breach or claim of breach. All rights and remedies hereunder shall be cumulative and shall not interfere with or prevent the exercise of any other right or remedy which may be available to Adler & Associates. Upon notice from Adler & Associates of any such claim, demand or action being advanced or commenced, Producer agrees to adjust, settle, compromise, litigate, contest, satisfy judgments and take any other action necessary or desirable for the disposition of such claim, demand or action. In any such case, Producer, within twenty (20) days after demand by Adler & Associates, shall fully reimburse Adler & Associates for all such payments and expenses, including reasonable attorneys' fees. If Producer shall fail so to reimburse Adler & Associates, then, without waiting its right to otherwise enforce such reimbursement, Adler & Associates shall have the right to deduct the said amount of such payments and expenses, or any part thereof, from any sums accruing under this Agreement or any other agreement, to or for the account of the Producer. Also, in the event of any matter to which the foregoing indemnity relates, Adler & Associates shall have the right to withhold from disbursements to or for the account of the Producer a sum which in Adler & Associates' opinion may be reasonably necessary to satisfy any liability or settlement in connection with such matter, plus a reasonable amount to cover the expenses of contesting or defending such claim and shall have the further right to apply the amount withheld to the satisfaction of such liability or settlement and to reimbursement of such expenses.

PRODUCER/LICENSOR (1) _____   PRODUCER/LICENSOR (2) _____

14. **MANNER OF DISTRIBUTION**

Adler & Associates has not made any express or implied representation, warranty, guarantee or agreement as to the manner of extent of any distribution or exploitation of the Picture, nor the amount of money to be derived from the distribution, exhibition and exploitation of the Picture, nor as to the maximum or minimum amount of moneys to be expended in connection therewith, nor that there will be any sums payable to the Producer hereunder, nor that the Picture will be favorably received by exhibitors or by the public, or will be distributed or exploited continuously.

15. **NO GUARANTEE**

Adler & Associates does not guarantee the performance by any sub distributor, licensee or exhibitor of any contract regarding the distribution and exploitation of the Picture. In no event shall Adler & Associates incur any liability based upon any claim by the Producer that Adler & Associates has failed to realize receipts or revenue which should or could have been realized.

16. **ARBITRATION**

Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by final, binding and non-appealable arbitration under the Rules for International Arbitration of the International Film and Television Alliance (I.F.T.A.) in effect when the arbitration is filed (the "I.F.T.A. Rules"). Each Party waives any right to adjudicate any dispute in any other court of forum, except that a Party may seek interim relief before the start of arbitration as allowed by the I.F.T.A. Rules. The arbitration will be held in the Forum designated in the Deal Terms, or, if none is designated, as determined by the I.F.T.A. Rules. The Parties will abide by any decision in the arbitration and any court having jurisdiction may enforce it. The Parties submit to the jurisdiction of the courts in the Forum to compel arbitration or to confirm an arbitration award. The Parties agree to accept service of process in accordance with the I.F.T.A. Rules.

PRODUCER/LICENSOR (1) _____     PRODUCER/LICENSOR (2) _____

Page 15 of 22

17.   **ASSIGNMENTS**

( a ) Adler & Associates may assign or license any of its right hereunder in whole or in part to any person, firm, or corporation, and such rights may be assigned or licensed by any assignee hereof; provided, however, that no such assignment or license shall relieve Adler & Associates of any obligations hereunder.

( b ) Producer may not assign or license any right or obligation hereunder, except for the right to receive payments.

18.   **INTERFERENCE**

Both parties represent and warrant to the other: that it has full right, power and authority to enter into and perform under this Agreement, and that it is under no obligation, contractual or otherwise, which might in any way interfere with its full and complete performance of this Agreement.

19.   **GOVERNING LAW**

This Agreement shall be governed by the laws of the State of California.

20.   **COMPLETE AGREEMENT**

This Agreement expresses the entire understanding of the parties hereto and replaces any and all former agreements, understandings or representations relating in any way to the subject matter hereof, and contains all of the terms, conditions, understandings and promises of the parties hereto. Each party acknowledges that no representation or agreement not expressly contained in this Agreement has been made to the other party or any of such party's agents, employees or representatives. Agreement may not be modified or amended except in writing signed by the party to be charged.

21.   **PUBLICITY**

No party will issue any publicity release or announcement concerning the contemplated transaction without advance written approval of the form and substance thereof by the other parties, which approval shall not be unreasonably withheld.

PRODUCER/LICENSOR (1) _____     PRODUCER/LICENSOR (2) _____

22.   **COSTS**

If any legal action, arbitration or other proceeding is brought for the enforcement of or to declare rights or obligations under this Agreement or as a result of a breach, default or misrepresentation in connection with any of the provisions of this Agreement, its subject matter or the actions, statements or conduct of the parties hereunder, the prevailing party shall be entitled to recover from the other party all costs and expenses incurred in connection therewith, including but not limited to attorney's fees, attorney's costs and court costs, in addition to any other relief to which that party may be entitled.

23.   **ACKNOWLEDGEMENT**

Producer hereby acknowledges and agrees that there are no prior or contemporaneous agreements in effect between Producer and Adler & Associates and/or person(s) that does not exist in this contract. Producer and Adler & Associates further agree that no other obligations exist or shall exist or be deemed to exist unless and until a formal written agreement has been prepared and entered into by both Producer and Adler & Associates, in which then Producer's and Adler & Associates' rights and obligations shall be only such as are expressed in said formal agreements.

( a ) Should any provision or part of any provision be void or unenforceable, such provision or part thereof shall be deemed omitted, and this agreement with such provision or part thereof omitted shall remain in full force and effect.

( b ) Producer understands that Adler & Associates suggests that they seek legal counsel on all contracts. By initialing this paragraph Producer affirms that all questions have been answered to their satisfaction and that all answers have been understood.
(Producer/Licensor [1] _____ )   (Producer/Licensor [2] _____ )

I have read and understand this agreement and no oral representations of any kind have been made to me and this agreement states our entire understanding with reference to the subject matter hereof. Any modification or waiver of any of the provisions of this agreement must be in writing and signed by both of us.

PRODUCER/LICENSOR (1) _____   PRODUCER/LICENSOR (2) _____

If the foregoing accurately reflects your understanding, please execute this
Agreement where specified below, indicating your agreement of the terms set
forth herein.

**ADLER & ASSOCIATES ENTERTAINMENT, INC.**

By: _Jeremy J Lunt_ _____ Date: _22 November, 2017_

Sales Agent Representative: _Jeremy J. Lunt_ _____
(Please print)

**AGREED TO AND ACCEPTED**

Licensor/Owner (1): _Charis Feeney Orchard_ _____

By: _Charis Dwyer Feeney Orchard_ ___ Date: _14/09/16_

Film Company: _New House Pictures Ltd_ Tax I.D.# _NA_

Address: _9 Wirrilda Way, Forestville, 2087_
_Sydney, Australia,_

Phone: _0457955152_ E-mail: _charisfeeney77@gmail.com_
_charisorchard@gmail.com_

Licensor/Owner (2): _N/A_ _____

By: _____ Date: _____

Film Company: _____ Tax I.D.# _____

Address: _____

_____

Phone: _____ E-mail: _____

Page 18 of 22

## EXHIBIT "A"

| TERRITORY | ASKING | ALL MINS | VIDEO MINS | TV MINS |
|---|---|---|---|---|
| ARGENTINA / URU / PAR | $25,000 | $12,500 | $2,500 | $10,000 |
| AUSTRALIA / NZ | $26,000 | $13,000 | $3,000 | $10,000 |
| BANGLADESH | $10,000 | $5,000 | $2,500 | $2,500 |
| BENELUX | $25,000 | $12,500 | $2,500 | $10,000 |
| BRAZIL | $30,000 | $15,000 | $5,000 | $10,000 |
| BULGARIA | $8,000 | $4,000 | $2,000 | $2,000 |
| CANADA (ENGLISH) | $50,000 | $25,000 | $5,000 | $20,000 |
| CANADA (FRENCH) | $18,000 | $9,000 | $3,000 | $6,000 |
| CENTRAL AMERICA | $4,000 | $2,000 | $1,000 | $1,000 |
| CHILE | $4,000 | $2,000 | $1,000 | $1,000 |
| CHINA | $8,000 | $4,000 | $1,500 | $2,500 |
| COLOMBIA | $8,000 | $4,000 | $1,500 | $2,500 |
| CROAT / SLOV. | $6,000 | $3,000 | $1,000 | $2,000 |
| CZECH / SLOVAK | $4,000 | $2,000 | $1,000 | $1,000 |
| DOMINICAN REPUBLIC | $7,000 | $3,500 | $1,500 | $2,000 |
| EAST AFRICA | $10,000 | $5,000 | $2,500 | $2,500 |
| ECU / PERU / BOL | $5,000 | $2,500 | $1,500 | $1,000 |
| ENGLAND / UK | $30,000 | $15,000 | $5,000 | $10,000 |
| FRANCE | $20,000 | $10,000 | $5,000 | $5,000 |
| GERMANY | $50,000 | $25,000 | $5,000 | $20,000 |
| GREECE | $4,000 | $2,000 | $1,000 | $1,000 |
| HONG KONG | $8,000 | $4,000 | $2,000 | $2,000 |
| HUNGARY | $4,000 | $2,000 | $1,000 | $1,000 |
| INDIA | $8,000 | $4,000 | $2,000 | $2,000 |
| INDONESIA | $10,000 | $5,000 | $2,000 | $3,000 |
| ISRAEL | $10,000 | $5,000 | $2,000 | $3,000 |
| ITALY | $64,000 | $32,000 | $7,000 | $25,000 |
| JAPAN | $32,000 | $16,000 | $8,000 | $8,000 |
| MALAYSIA | $4,000 | $2,000 | $1,000 | $1,000 |
| MEXICO | $24,000 | $12,000 | $4,000 | $8,000 |
| MIDDLE EAST | $8,000 | $4,000 | $2,000 | $2,000 |
| PAKISTAN | $4,000 | $2,000 | $500 | $1,500 |
| PHILIPPINES | $4,000 | $2,000 | $1,000 | $1,000 |
| POLAND | $12,000 | $6,000 | $3,000 | $3,000 |
| PORTUGAL | $8,000 | $4,000 | $1,500 | $2,500 |
| ROMANIA | $8,000 | $4,000 | $1,500 | $2,500 |
| RUSSIA | $14,000 | $7,000 | $2,500 | $4,500 |
| SCAND | $24,000 | $12,000 | $6,000 | $6,000 |
| SINGAPORE | $4,000 | $2,000 | $1,000 | $1,000 |
| SOUTH AFRICA | $4,000 | $2,000 | $500 | $1,500 |
| SOUTH KOREA | $32,000 | $16,000 | $8,000 | $8,000 |
| SPAIN | $40,000 | $20,000 | $5,000 | $15,000 |
| TAIWAN | $8,000 | $4,000 | $1,500 | $2,500 |
| THAILAND | $12,000 | $6,000 | $2,500 | $3,500 |
| TURKEY | $13,000 | $6,500 | $2,000 | $4,500 |
| USA | $90,000 | $45,000 | $15,000 | $30,000 |
| VENEZUELA | $5,000 | $2,500 | $1,000 | $1,500 |
| WEST AFRICA | $8,000 | $4,000 | $2,000 | $2,000 |
| WEST INDIES | $8,000 | $4,000 | $2,000 | $2,000 |
| AIRLINES | $50,000 | $30,000 | - | - |
| TOTAL | $872,000 | $441,000 | $141,500 | $269,500 |

**EXHIBIT "B"**

**TECHNICAL ITEMS:**

1) High-definition (1920x1080) Quicktime file of the finished film, encoded with ProRes4444 video codec.
2) Complete 5.1 audio mix (attached to Quicktime file) with the following channel specifications:

> Channel 01 – Left Full Mix
> Channel 02 – Right Full Mix
> Channel 03 – M&E Left Full Mix
> Channel 04 – M&E Right Full Mix
> Channel 05 – Left
> Channel 06 – Right
> Channel 07 – Center
> Channel 08 – Subwoofer (LFE)
> Channel 09 – Left Surround
> Channel 10 – Right surround

3) Complete 5.1 mix as an AC3 audio file.
4) Isolated dialogue, music, effects and combined music and effects (M&E) tracks as isolated WAV or AIFF files in uncompressed PCM audio format.
5) "Textless" scenes and shots as high-definition (1920x1080) ProRes4444 Quicktime files.
6) All musical tracks for the complete film as individual files in uncompressed PCM audio format.
7) Complete time-coded English language transcripts for every spoken word in the film matching the Quicktime file.
8) Synced closed caption file in English in .scc, .mcc, .xml or .stl format conforming to the Quicktime file.

**PROMOTIONAL/SPECIAL FEATURES:**

1) Behind-the-scenes photographs
2) Behind-the-scenes footage
3) Production stills
4) Video EPK in Quicktime ProRes 4444 format with 1920x1080 resolution
5) Trailer in Quicktime ProRes 4444 format with 1920x1080 resolution
6) Poster/graphical artwork in 300 dpi resolution.

## EXHIBIT "B"

# LEGAL MATERIAL AND OTHER DOCUMENTATION:

1) LLC documentation, including ownership information, for the production entity or entities.
2) Crew contracts with the following specifics: work for hire agreement, rights to use their image/voice, payment records, position hired for, credit requirements, equipment to be provided and any other compensation.
3) Cast contracts with the following specifics: work for hire agreement, rights to use their image/voice, payment records, position hired for, credit requirements, equipment to be provided and any other compensation.
4) Crew engagement documents stating that all services were rendered, all payments were made, everything created was a work-for-hire and that any potential copyright options belonging to artist are assigned to production company, that anything created by the artist was in fact created by artist, that all credits are at the discretion of production company, that the company may freely assign these rights and that the artist may not enjoin or restrain distribution of picture.
5) Cast engagement documents stating that all services were rendered, all payments were made or voluntarily deferred, everything created was a work-for-hire and that any potential copyright options belonging to artist are assigned to production company, that anything created by the artist was in fact created by artist, that all credits are at the discretion of production company, that the company may freely assign these rights and that the artist may not enjoin or restrain distribution of picture.
6) Complete copy of the shooting script in PDF format (for feature films – if a documentary please provide complete copy of the editing script as PDF).
7) An up-to-date chain of title for the film.
8) A satisfactory quality control (QC) report from a mutually agreed upon post-production facility.
9) A valid insurance certificate.
10) A complete list of all cast members, along with their roles, and all crew members, along with their position(s). Also please provide a head credits list, a tail credits list, and a billing block credits list.
11) Credit and logo obligations for any co-production companies, equipment/service providers or product placements.
12) Product placement contracts and obligations (if applicable)
13) Any Union or SAG/AFTRA documentation.
14) A fully updated Internet Movie Database (IMDb) entry with all credited cast and crew and featuring mutually agreed upon poster art for the film.

EXHIBIT "C"

Licensor: C. Feeney Orchard
New House Pictures
R/E - Perfect Piece

Laboratory: _____
_____
_____
_____

To Whom It May Concern:

We currently have and/or will have on deposit with you certain preprint material no later than _01/11/15_, 2015 concerning the film/video title property currently entitled _Perfect Piece_ (hereinafter referred to as the "Title").

You are hereby advised that Adler & Associates Entertainment, Inc., (hereinafter referred to as "Licensee"), its successors, designates and assigns, has been granted the right to act as the agent to license, distribute, sub-distribute, and sub-license the film/video Title by _Perfect Piece_ (hereinafter referred to as the "Licensors"). You are hereby irrevocably authorized, directed and instructed, and you agree to fill all orders from Licensee for film/video duplication material or such other laboratory services with respect to, the Title that Licensee needs to properly service the Title for distribution. All orders are to be billed to Licensee and will be the responsibility of the Licensee.

You agree that you shall not, during the term of Licensee's agreement, without written consent of the Licensor and Licensee, permit removal from your possession of such materials as may be necessary to permit you to manufacture for Licensee film/video elements of the Title; provided, however, that such materials may be transferred to another laboratory designated by the undersigned and Licensee to be held subject to a laboratory access letter similar to this letter, copies of which shall be executed by the Licensee and the undersigned and delivered to you by the Licensee and Licensor.

The instructions contained herein are irrevocable and they may not be modified or rescinded except in a writing signed by the Licensee and Licensors. If the contract dated _02/08/15_, 2015 between _Chris Orchard_ and Adler & Associates Entertainment, Inc. becomes null and void, all materials needed to complete any outstanding deals will therefore be handled accordingly on a deal by deal basis. Upon Licensee's completion of their deal obligations, all materials will be promptly returned to Licensor or the laboratory they designate.

Please signify your understanding and agreement of the foregoing by signing in the space provided below.

By: _Chris Feeney Orchard_

Licensor: _Feeney_

Date: _09/08/15_

| AGREED TO AND ACCEPTED: | |
|---|---|
| Adler & Associates Entertainment, Inc. ("Licensee") | "Laboratory" |
| By: _____ | By: _____ |
| Date: _____ | Date: _____ |



# CERTIFICATE OF ACKNOWLEDGMENT OF EXECUTION OF AN INSTRUMENT

Commonwealth of Australia
*(Country)*

State of New South Wales
*(County and/or Other Political Division)*

City of Sydney
*(County and/or Other Political Division)*

 ss

Consulate General of the United States
*(Name of Foreign Service Office)*

I                                    Karen Kuzis Meyer

*of the United States of America at*                    Sydney, Australia

*duly commissioned and qualified, do hereby certify that on this day of*     09-14-2016     *, before me personally appeared*
                                        Date *(mm-dd-yyyy)*

Charis Dwyer Feeney who presented her Australian Passport as evidence of identity************************

******************************************************************************************************

******************************************************************************************************

*to me personally known, and known to me to be the individual described in, whose name*          is          *subscribed to,*

*and who executed the annexed instrument, and being informed by me of the contents of said instrument*          she

*duly acknowledged to me that*          she          *executed the same freely and voluntarily for the uses and purposes*

*therein mentioned.*

[SEAL]                                    *In witness whereof I have hereunto set my hand and*
                                        *official seal the day and year last above written.*

                                        Karen Kuzis Meyer, Consul     *of the United States of America.*

                    *This document consists of* 23 *pages including the Acknowledgement certificate.*

                NOTE: Wherever practicable all signatures to a document should be included in one certificate.

OF-175 *(Formerly FS-88)*
01-2009

**EXHIBIT "B"**

**INDEMNIFICATION LETTER FROM CHARIS FEENEY-ORCHARD**

Date:   27th March 2019

To:

Ms. Marie Adler
Adler & Associates Entertainment,
3500 West Olive Ave. Ste 300 Burbank, CA 91505
Telephone: (310) 684-3545
Email: info@adlersproductions.com

Re:     Kimberly Boyle v. Adler & Associates Entertainment, LLC et al Civil Action No. 2:19-
CV-893 (C.D. Ca, filed February 6, 2019)

Dear Ms. Marie Adler,

I am writing this letter to confirm that I, Charis Feeney, indemnify and hold Alder and
Associates harmless with respect to the claims made in the above-named lawsuit, pursuant to my
obligations under Section 13 of the Agreement made between our parties.

Sincerely,

Charis Feeney-Orchard
Director and Producer of 'Perfect Piece'

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action. My business address is **2550 Hollywood Way, Suite 202, Burbank, California 91505.**

On May 22, 2019 I served the foregoing document described as **DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S MOTION TO COMPEL ARBITRATION AND TO DISMISS AND/OR STAY THE LITIGATION** on the interested parties in this action by placing the original and/or a true copy thereof enclosed in (a) sealed envelope(s), addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **BY REGULAR MAIL:** I deposited such envelope in the mail at 2550 Hollywood Way, Suite 202, Burbank, California 91505. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☐ **BY FACSIMILE MACHINE:** I transmitted a true copy of said document(s) by facsimile machine, and no error was reported. Said fax transmission(s) were directed as indicated on the service list.

☐ **BY OVERNIGHT DELIVERY:** I caused such documents to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressees. The envelope or package was deposited with delivery fees thereon fully prepaid.

☐ **BY ELECTRONIC MAIL:** I transmitted a true copy of said document(s) via electronic mail, and no error was reported. Said email was directed as indicated on the service list.

☐ **BY PERSONAL SERVICE:** I caused such envelope(s) to be delivered by hand to the above addressee(s).

☑ **BY CM/ECF:** I electronically transmitted a true copy of said document(s) to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the aforementioned CM/ECF registrants.

I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 22, 2019, at Los Angeles, California.

_____
Raisa Rosa

**SERVICE LIST**

| | |
|---|---|
| Larry Zerner<br>LAW OFFICES OF LARRY ZERNER<br>1801 Century Park East, Suite 2400<br> Los Angeles, CA 90067 | E: larry@zernerlaw.com<br><br>Tel: (310) 773-3623<br>Fax: (310) 388-5624<br><br>*Representing plaintiff Kimberly Boyle* |
| Gregory L. Doll<br>Jamie Olivia Kendall<br>Brett H. Oberst<br>Doll Amir & Eley LLP<br>725 South Figueroa Street, Suite 3275<br>Los Angeles, CA 90017 | E: boberst@dollamir.com<br> gdoll@dollamir.com<br> jkendall@dollamir.com<br><br>Tel: (213) 542-3380<br>Fax: (213) 542-3381<br><br>*Representing Defendant Amazon.com* |
| Marc Victor Allaria<br>Litchfield Caov LLP<br>251 South Lake Avenue Suite 750<br>Pasadena, CA 91101 | E: allaria@litchfieldcavo.com<br><br>Tel: (626) 683-1100<br>Fax: (626) 683-1113<br><br>*Representing Defendant Dreamscape* |

**PROOF OF SERVICE**