Amy B. Lawrence, Esq. - Bar # 115874
LAWRENCE & ASSOCIATES
Attorneys at Law
2550 N. Hollywood Way, Suite 202
Burbank, CA 91505
Telephone: (818) 843-6442
Facsimile: (818) 566-7875
Email: ablawrence@lawandassoc.com

Attorneys for Defendant
ADLER & ASSOCIATES ENTERTAINMENT, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY BOYLE<br><br>Plaintiff,<br><br>vs.<br><br>ADLER & ASSOCIATES ENTERTAINMENT, LLC, a California LLC; AMAZON.COM, INC., a Delaware corp.; DREAMSCAPE MEDIA, LLC, an Ohio LLC; and DOES 1 through 10, inclusive,<br><br>Defendants. | **CASE NO. 2:19CV00893-GW(SKx)**<br><br>**DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR EITHER 1) AN ORDER THAT DEFENDANTS COMPLY WITH THE COURT'S ORDER OF 9/12/19 AND PARTICIPATE IN AN IFTA ARBITRATION OR, IN THE ALTERNATIVE 2) SENDING THE CASE BACK TO FEDERAL COURT**<br><br>Date:  December 23, 2019<br>Time:  8:30 a.m.<br>Courtroom:  9D<br><br>Trial Date:  None<br><br>Judge: Hon. George H. Wu |

## I. INTRODUCTION

Plaintiff Kimberly Boyle ("Boyle") has raced to the Court to file her instant motion to "beat" Defendant Adler & Associates Entertainment, LLC ("Adler") to the "punch." Concurrently with this opposition, Adler has filed its *Motion to Dismiss Based Upon Plaintiff Kimberly Boyle's Failure to Include Defendant in Arbitration Proceedings in Contravention of Prior Court Order Compelling Plaintiff to Arbitrate* ("Motion to Dismiss"), set to be heard on **January 2, 2020**. Once Boyle learned Adler would file its Motion to Dismiss through the required L.R. 7-3 meet and confer, Boyle rushed to file first. Her haste is reflected in her motion's defects, misleading facts, paltry argument and citation to a single case, which also demonstrate that Boyle's motion is without merit. In contrast, Adler's Motion to Dismiss contains a lengthy factual and legal analysis establishing that ***Boyle's failure to comply with the Court's order compelling arbitration requires dismissal***. Because the issues to be decided in two motions are essentially mirror images of each other, Adler incorporates the Motion to Dismiss and supporting evidence in its entirety as though fully set forth herein.[1]

In short, Boyle played "fast and loose" with the Court's order compelling arbitration. Instead of filing and completing one arbitration against all defendants, Boyle singled out and arbitrated solely against Charis Feeney-Orchard ("Director/Producer"). Boyle's design was and is to "game" the system, and she did in fact cause prejudice to Adler. As a result, when analyzing the law, the facts and the overall circumstances, the Court can reach only two conclusions:

First, Boyle, through her own conduct, has either abandoned and/or waived arbitration against Adler, and in any event has no direct arbitration agreement to enforce against Adler to require a "second" arbitration; and

---

[1] For economy, Boyle's motion should be heard on January 2, 2020 with Adler's Motion to Dismiss, attached to the Lawrence Declaration and incorporated by reference.

**DEFENDANT ADLER'S OPPOSITION TO
MOTION TO COMPLY WITH 9/12/19 ORDER**

Second, Boyle cannot return to federal court to pursue her infringement action against Adler, as this would reward her intentional and fully culpable violation of the Court's order to arbitrate.

Thus, Boyle's motion should be denied in its entirety.

## II.    SUMMARY OF FACTS

Boyle's motion fails to adequately describe the true circumstances or explain why Adler refused to sign the "stipulation" to agree to a "second" arbitration. Adler incorporates by reference all of the facts and evidence set forth and referenced in Section I of Adler's Motion to Dismiss.

In short, Boyle engaged in a "First Refusal to Arbitrate" which caused Adler to file her motion to compel arbitration. As Adler was a non-signatory to the Rights Agreement and arbitration clause contained therein, Adler's motion was based upon the "*equitable estoppel*" doctrine set forth in *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 219 (2009).

Prior to issuing its ruling, the Court ordered the parties to confer with the IFTA arbitrator and file a Joint Status Report. The parties' September 10, 2019 Joint Status Report states, among other things, that "Plaintiff's recourse if the Motion is granted is to file her own arbitration *including all parties*." Thereafter, the Court ordered Boyle to arbitrate against Adler.

Boyle then engaged in a "Second Refusal to Arbitrate." Despite the fact that (a) Boyle had no separate arbitration agreement with Adler, and (b) the Court had compelled Boyle to arbitrate based upon "equitable estoppel," Boyle refused to add Adler to the IFTA Infringement Arbitration. Boyle *knew* that Director/Producer would not be represented by counsel for the arbitration, and thus would not present as complete a defense as Adler and the other "distributor" defendants. Unsurprisingly, Director/Producer lost her arbitration.

However, Boyle now had a problem: when she attempted to open a second arbitration with IFTA, IFTA refused because there was no supporting arbitration

3

agreement between the remaining parties. Boyle demanded that Adler sign a purported "stipulation." However, as Boyle no longer sought arbitration based upon the Rights Agreement (having already concluded it), Adler had no legal obligation to enter into a stand-alone agreement to arbitrate.

Moreover, Boyle's conduct has severely prejudiced Adler's ability to conduct a fair and complete "second" arbitration. Without limitation, Boyle also *knew* that Director/Producer - Adler's "key witness" to its defense - resides in Australia and is outside California's jurisdiction. Although Director/Producer was available as a witness in the first arbitration, Director/Producer has now flatly refused to return to California for any further arbitration proceedings. Moreover, while Adler is not bound to the first arbitration award, and is represented by counsel who will present a far more complete defense, Boyle seeks to arbitrate before the very same tribunal that ruled against Director/Producer to further compromise Adler's due process rights.

## III. ADLER'S MOTION TO DISMISS ESTABLISHES BOYLE'S WAIVER AND/OR ABANDONMENT OF ARBITRATION

Critically, Adler is not the party who was ordered to arbitrate by the Court in its September 12, 2019 order, and thus Adler cannot be in "violation" of that order. Rather, Boyle's present motion is nothing short of a request to impose an unenforceable mandatory injunction upon Adler to sign a new and separate arbitration agreement. *See* Boyle's Notice of Motion (stating Boyle "will move the Court for an order that Defendants either *agree to submit this matter to IFTA arbitration*); Boyle's [Proposed] Order (requesting order "that [Adler] *sign the stipulation*").[2]

---

[2]   Boyle disingenuously claims in its memorandum that IFTA refused to open a second arbitration against Adler merely because the Court did not specify IFTA in its prior order. This contention is refuted by her counsel's declaration, which states IFTA refused arbitration "because there was no written contract between Boyle

4

As set forth in Adler's Motion to Dismiss (Section II(B)), Boyle's motion should be denied for the same reasons that Boyle's action should be dismissed:

- Boyle unreasonably delayed the court-ordered arbitration against Adler which was based upon "equitable estoppel;"
- Adler has been severely prejudiced by Boyle's failure to include Adler in the first arbitration against Director/Producer;
- Boyle is culpable because she tried to "game" the system to her benefit and intended the disadvantage to Adler;
- Boyle has no direct arbitration agreement with Adler;
- Adler has no obligation to enter into a new and separate arbitration with Boyle; and
- Adler is not culpable in the prejudice it has suffered.

As a result, Boyle's own conduct gives rise to the grounds for denying her motion, including based upon her waiver and/or abandonment of arbitration.

## IV.  ADDITIONAL GROUNDS EXIST TO DENY BOYLE'S MOTION

### A.  Boyle's Motion is Procedurally Defective

A notice of motion must set forth the relief or order sought. Fed. R. Civ. P. 7(b)(1)(C).  A written motion must state with particularity the grounds on which the motion is made.  Fed. R. Civ. P.  7(b)(1)(B). The notice of motion serves to provide notice to the court and to the parties of the relief sought and the statute or rule, if any, on which the motion is predicated.  Fed. R. Civ. P.  7(b)(1). The notice of motion must be served and filed with a brief *with complete* memorandum in support and the points and authorities on which the moving party may rely, along with the evidence on which the moving party will rely in support of the motion. CD Cal Civ LR 7-5. A motion may be denied where it lacks clarity or fails to articulate a cognizable basis for the motion. *Florens Container v. Cho Yang*

and the Defendants" and she would "need a stipulation."

DEFENDANT ADLER'S OPPOSITION TO
MOTION TO COMPLY WITH 9/12/19 ORDER

1 | *Shipping* (N.D.Cal. 2002) 245 F.Supp.2d 1086, 1089.

2 |     The haste with which Boyle filed her motion is evident by the motion papers
3 | themselves: the relief allegedly sought is described inconsistently across all papers.
4 | The declaration and proposed order Boyle submitted suggest she has brought a
5 | "motion to compel arbitration." However, a review of the motion itself reflects that
6 | is not the case: although the caption suggests the motion seeks "an order that
7 | defendants comply with the court's order of 9/12/19," neither the notice of motion
8 | or proposed order expressly seeks any such "compliance" with such prior order.
9 | Instead, Boyle's notice of motion or proposed order clearly reflect that Boyle is
10 | requesting the Court to enter a ***new and different*** order (*i.e.,* a mandatory
11 | injunction) that Adler sign Boyle's self-serving "stipulation." Boyle must be
12 | limited to only that relief clearly sought and identified in the notice of motion: the
13 | request that Adler be ordered to sign the "stipulation."

14 |     Moreover, Boyle's motion is filled with suppositions and assumptions. For
15 | example, Boyle simply assumes - without citing any authority - that she was
16 | entitled to arbitrate against Director/Producer alone and then proceed to a "second"
17 | arbitration. Boyle also presupposes that the Court has authority to compel another
18 | party to sign a "stipulation." Boyle also assumes that a ***plaintiff*** may move to
19 | compel arbitration.[3] As Boyle cites no authority whatsoever for these propositions,
20 | they must be disregarded.

21 |     Indeed, Boyle cites only one case in total (and no statutes) to support the
22 | relief she seeks, claiming only that "the court has authority to grant this motion
23 | under its inherent powers 'that are necessary to the exercise of all others.'" *Primus*
24 | *Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997). Such a broad

25 |

---

26 | [3] The presence or absence of prejudice is a determinative issue as to whether a
plaintiff may compel arbitration under federal law. *Merrill Lynch, Pierce, Fenner*
27 | *& Smith v. Lecopulos* (2d Cir. 1977) 553 F.2d 842, 845. Plaintiff has entirely
28 | failed to engage in any reasonable prejudice analysis.

**DEFENDANT ADLER'S OPPOSITION TO**
**MOTION TO COMPLY WITH 9/12/19 ORDER**

legal maxim hardly fulfills Boyle's burden as the moving party.

As Boyle fails to clearly articulate all of the relief sought much less articulate a cognizable basis for the motion, it must be denied for these reasons alone.

### B. Boyle Cannot Seek Arbitration Based on "Equitable Estoppel" Because Arbitration is <u>no Longer Equitable</u>.

There is no rule of equity more firmly established than the one which says that "he who seeks equity must do equity." *Richman v. Bank of Perris* (1929) 102 Cal.App. 71, 83. Another rule closely associated with the above rule is that "he who comes into equity must come with clean hands." <u>Id</u>. At 85. And, as the Civil Code has long required:  One must so use his own rights as not to infringe upon the rights of another (section 3514); No one should suffer by the act of another (section 3520); and No one can take advantage of his own wrong. (section 3517).

"Equitable estoppel" is by definition a creature of *equity*.  Even if Boyle's motion were to adequately seek to compel arbitration based upon equitable estoppel theory (it does not), Boyle is not eligible for such relief because it is *no longer equitable* to enforce the arbitration provision of the Rights Agreement (or any agreement).   Separate and apart from the theories of waiver and/or abandonment which give rise to grounds for dismissal (and which are addressed in the Motion to Dismiss), Boyle - by her motion - seeks *affirmative* relief from this court which cannot be granted precisely because Boyle's own conduct has rendered any relief to be inequitable. By picking and choosing when to arbitrate against Adler - with whom she has no separate arbitration agreement - and in a manner which caused prejudiced to Adler, the "equitable" basis for arbitration has long since passed as a result of Boyle's own conduct.

### C. The Other Defendants' Arbitration Agreements Alone do not Provide Grounds for this Court to Compel Arbitration

Although it is not clear, Boyle seems to argue that the Court may order Adler to arbitrate based on the additional arbitration agreements which exist between

7

Adler and the other distributors. However, in ruling on Adler's Motion to Compel Arbitration, the Court *disregarded* all of the other arbitration agreements and focused on the Rights Agreement *alone*. To the extent Boyle is purportedly attempting to "enforce" the Court's prior order compelling arbitration, Boyle is necessarily limited to the Rights Agreement and *cannot* rely on other arbitration clauses between other parties.

If Boyle is trying to bring a standalone motion to compel arbitration based upon the *other* arbitration agreements, she failed to clearly state so in her notice of motion, submit those arbitration agreements as evidence or otherwise support such an argument with authority. It would be Boyle's burden to explain to this Court how and why those *other* arbitration agreements could give rise to *Boyle's* right to compel arbitration thereunder, and she has entirely failed to do so.

Nor could she do so. The *other* arbitration agreements, standing alone, cannot give rise to "equitable estoppel" requiring arbitration. While it is clear that the copyright claim is *inextricably bound up in the obligations and terms of the Option Agreement*, the same cannot be said of the subsequent distribution agreements. Rather, those agreements will have *no* bearing on whether Director/Producer successfully obtained the Option rights so as to constitute an affirmative defense. Although Adler mentioned those other arbitration agreements in her motion to compel arbitration, she did so only in conjunction with the Rights Agreement and to demonstrate that one single arbitration was possible across all parties. That one single arbitration is no longer possible now that Boyle has already concluded the arbitration against Director/Producer.

## V.   THE COURT SHOULD NOT LIFT THE STAY OR OTHERWISE RETURN THE MATTER TO ACTIVE LITIGATION

As set forth above, Boyle cannot force Adler to join in a "second" arbitration of the infringement action now that Boyle has arbitrated solely against Director/Producer. Nor may Boyle return to federal court to litigate her

8

infringement action against Adler given Boyle's intentional violation of the Court's prior order to arbitrate and the resulting prejudice to Adler.  If a plaintiff were allowed to return to Court to litigate under these circumstances, then a plaintiff would have absolutely no incentive to comply with an order compelling arbitration - a plaintiff would simply "game" the system enough to try to return to federal court.

Although the penalty of denying Boyle's motion and ultimate dismissal of this action may be harsh, Plaintiff has only herself to blame.  It is Plaintiff's own actions that have given rise to the circumstances that dismissal with prejudice is (1) the only fair and proper protection of Adler's rights and (2) necessary to protect the integrity of the Court's process and orders.

## VI.    CONCLUSION

As a result, Boyle's motion should be denied.

Respectfully submitted,

DATED:  December _2_ 2019          LAWRENCE & ASSOCIATES
                                   Attorneys at Law

                          By: _____
                                   Amy B. Lawrence
                                   Attorneys for Defendant
                                   ADLER & ASSOCIATES
                                   ENTERTAINMENT, LLC

9

**DEFENDANT ADLER'S OPPOSITION TO**
**MOTION TO COMPLY WITH 9/12/19 ORDER**

**DECLARATION OF AMY B. LAWRENCE**

I, Amy B. Lawrence, hereby declare as follows.

1. I am the counsel of record for Defendant Adler & Associates Entertainment, LLC ("Adler"). I have personal knowledge of the facts set forth herein. This declaration is submitted in support of Defendant Adler's Opposition to Motion to Comply with 9/12/19 Order.

2. Attached hereto and incorporated by reference as Exhibit "A" herein is Defendant Adler & Associates Entertainment, LLC's Motion to Dismiss Based Upon Plaintiff Kimberly Boyle's Failure to Include Defendant in Arbitration Proceedings in Contravention of Prior Court Order Compelling Plaintiff To Arbitrate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 2, 2019

Amy B. Lawrence

**DEFENDANT ADLER'S OPPOSITION TO
MOTION TO COMPLY WITH 9/12/19 ORDER**

EXHIBIT "A"

1  Amy B. Lawrence, Esq. - Bar # 115874
2  LAWRENCE & ASSOCIATES
   Attorneys at Law
3  2550 N. Hollywood Way, Suite 202
4  Burbank, CA 91505
   Telephone: (818) 843-6442
5  Facsimile: (818) 566-7875
6  Email: ablawrence@lawandassoc.com

7  Attorneys for Defendant
8  ADLER & ASSOCIATES ENTERTAINMENT, LLC

9
               **UNITED STATES DISTRICT COURT**
10
               **CENTRAL DISTRICT OF CALIFORNIA**
11

12 | KIMBERLY BOYLE | **CASE NO.  2:19CV00893-GW(SKx)** |

13 |                | Plaintiff, |

14 |  vs.           | **DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S MOTION TO DISMISS BASED UPON PLAINTIFF KIMBERLY BOYLE'S FAILURE TO INCLUDE DEFENDANT IN ARBITRATION PROCEEDINGS IN CONTRAVENTION OF PRIOR COURT ORDER COMPELLING PLAINTIFF TO ARBITRATE** |

15 ADLER & ASSOCIATES
16 ENTERTAINMENT, LLC, a California
   LLC; AMAZON.COM, INC., a
17 Delaware corp.; DREAMSCAPE
   MEDIA, LLC, an Ohio LLC; and
18 DOES 1 through 10, inclusive,

19              Defendants.          [*Filed Concurrently with Declaration of Amy B. Lawrence; and [Proposed] Order*]
20

21                                  Date: January 2, 2019
22                                  Time: 8:30 am
                                    Courtroom:  9D
23
                                    Judge: Hon. George H. Wu
24

25

26

27

28
_____
               **DEFENDANT ADLER'S MOTION TO DISMISS**

TO PLAINTIFF KIMBERLY BOYLE AND HER ATTORNEY OF RECORD AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on January 2, 2020 at 8:30 a.m. or as soon thereafter as the matter may be heard in Courtroom 9D of the above Court, located at 350 W. 1st Street, Los Angeles, CA 90012, Defendant ADLER & ASSOCIATES ENTERTAINMENT, LLC ("Adler") will, and hereby does, move this Court for an order dismissing this entire action against Adler with prejudice on the grounds that, in contravention of the Court's prior order compelling Kimberly Boyle ("Boyle") to arbitrate her copyright infringement action against Adler as a non-signatory to the Rights Agreement on the grounds of "equitable estoppel," Boyle refused to include Adler in the arbitration conducted against Charis Feeney-Orchard ("Director/Producer") pursuant to the Rights Agreement, and thereby waived and/or abandoned her claims against Adler.

This Motion is made pursuant to Federal Rules of Civil Procedure, Rule 41(b), the Court's inherent power to manage its own affairs, and other applicable law as cited herein. Good cause exists for the Motion. Without limitation, Boyle's conduct has severely prejudiced Adler's ability to conduct a fair and complete "second" arbitration. Boyle, through her own conduct, either abandoned and/or waived arbitration against Adler, and in any event has no direct arbitration agreement to enforce against Adler to require a "second" arbitration. Boyle also cannot return to federal court to pursue her infringement action against Adler, as this would reward her intentional and fully culpable violation of the Court's order to arbitrate.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on November 12, 2019. Declaration of Amy B. Lawrence ("Lawrence Decl.") at ¶ 48.

This Motion is based on this Notice of Motion and Motion; the attached

ii

**DEFENDANT ADLER'S MOTION TO DISMISS**

Memorandum of Points and Authorities; the concurrently filed declaration of Amy B. Lawrence and all exhibits thereto; the other pleadings and papers on file in this action; all matters which may be judicially noticed, and further evidence and arguments as may be offered to the Court at the hearing on this matter, and all other evidence or matters that the Court deems just and proper.

Respectfully submitted,

DATED: December 2, 2019

LAWRENCE & ASSOCIATES
Attorneys at Law

By: _____
Amy B. Lawrence
Attorneys for Defendant
ADLER & ASSOCIATES
ENTERTAINMENT, LLC

**DEFENDANT ADLER'S MOTION TO DISMISS**

## TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES**..............................1

**I.    FACTS SUPPORTING DISMISSAL**................................................3

    A.   Background Facts Giving Rise to the Dispute.......................…......3

    B.   Boyle Files a Copyright Infringement Action...............................5

    C.   Director/Producer and Boyle Proceed to Arbitration.....................…....5

    D.   After Boyle's First Refusal to Arbitrate, the Court Compels Boyle to Arbitrate Against Adler Based on "Equitable Estoppel".......................6

    E.   As a Second Refusal to Arbitrate, Boyle Refuses to Include Adler in the IFTA Arbitration and Proceeds Only Against Director/Producer, who Remained in Pro Per...............................................................8

    F.   After the IFTA Arbitration Concludes, Boyle Demands that Adler Enter into a New and Separate Arbitration Agreement for a Second Copyright Infringement Arbitration.......................................................9

    G.   Facts Supporting Prejudice to Adler by "Separate" Arbitrations...........10

    H.   Facts Supporting Prejudice to Adler Based Upon Unavailability of Director/Producer as a "Key Witness" to Adler's Defense................... 10

**II. ARGUMENT**..................................................................12

    A. Authority in Support of the Motion............................................12

    B. The Entirety of the Circumstances Compel the Conclusion that Boyle's Federal Action Should be Dismissed with Prejudice Based on her Failure to Prosecute, Failure to Comply with a Court Order to Arbitrate and the Resulting Prejudice to Adler...................................................15

**III.   CONCLUSION**.............................................................23

**DEFENDANT ADLER'S MOTION TO DISMISS**

1

## <u>**TABLE OF AUTHORITIES**</u>

2

**CASES**

3 *Goldman v. KPMG LLP*............................................................*6*

4      173 Cal. App. 4th 209, 219 (2009)

5 *Link v. Wabash R.R. Co*...........................................................*12*

6      370 U.S. 626, 630-31 (1962)

7 *Morris v. Morgan Stanley & Co*.................................................*12*

8      (9th Cir. 1991) 942 F.2d 648, 653 12

9 *Windward Agency, Inc. v. Cologne Life Reinsurance Co.,*........................*12*

10      123 Fed. Appx. 481 (3d Cir. 2005) 12

11 *James v. McDonald's Corp.,* .....................................................*12*

12      417 F.3d 672, 681 (7th Cir. 2005)

13 *The Sydfold*........................................................................*13*

14      25 F. Supp. 662 (D.N.Y. 1938).

15 *Charles J. Rounds Co. v. Joint Council of Teamsters No*...........................*13*

16      42 (1971) 4 Cal. 3d 888, 894

17 *Grunwald-Marx, Inc. v. L.A. Joint Bd., Amalgamated Clothing Workers* .......*13*

18      (1961) 192 Cal. App. 2d 268, 277

19 *Austin v. Owens-Brockway Glass Container*....................................*13*

20      78 F.3d 875 (4th Cir. 1996)

21 *Iskanian v. CLS Transp. L.A., LLC*............................................*13*

22      (2014) 59 Cal. 4th 348, 374

23 *Platt Pac., Inc. v. Andelson* .....................................................*13*

24      (1993) 6 Cal. 4th 307, 315–316

25 *Sawday v. Vista Irrigation Dist*.................................................*14*

26      (1966) <u>64 Cal. 2d 833</u>, 836

27 *Spear v. Cal. State Auto. Ass'n*.................................................*14*

28      (1992) 2 Cal. 4th 1035, 1043.

v

**DEFENDANT ADLER'S MOTION TO DISMISS**

*Nunez v. Nevell Grp., Inc.* ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ....*14*

    (2019) 35 Cal. App. 5th 838, 843.

*Martin v. Yasuda* ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ....*14*

    (9th Cir. 2016) 829 F.3d 1118, 1124;

*Gutierrez v. Wells Fargo Bank* ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ....*14*

    (9th Cir. 2012) 704 F.3d 712, 720–721;

*Fisher v. A.G. Becker Paribas Inc.*...............................................*14*

    (9th Cir. 1986) 791 F.2d 691, 694.

*First Options of Chi., Inc. v. Kaplan*... ... ... ... ... ... ... ... ... ... ... ... ...*14*

    (1995) 514 U.S. 938, 944

*Knutson v. Sirius XM Radio Inc.* ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...*14*

    (9th Cir. 2014) 771 F.3d 559, 564–565 (under FAA);

*Avery v. Integrated Healthcare Holdings, Inc.*... ... ... ... ... ... ... ... ... ...*14*

    (2013) 218 Cal. App. 4th 50, 60.

*Vandenberg v. Superior Court.*... ... ... ... ... ... ... ... ... ... ... ... ...... .......*15*

    (1999) 21 Cal. 4th 815, 824, 834, 836–837

*Cuevas v. Truline Corp.* ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...*15*

    (2004) 118 Cal. App. 4th 56, 62;

*Flores v Transam. HomeFirst, Inc*... ... ... ... ... ... ... ... ... ...... ... ...*15*

    (2001) 93 Cal. App. 4th 846, 852

*Tillman v. Tillman*... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... .......*15*

    (9th Cir. 2016) 825 F.3d 1069, 1073

vi

**DEFENDANT ADLER'S MOTION TO DISMISS**

## MEMORANDUM OF POINTS AND AUTHORITIES

By this motion, Defendant Adler & Associates Entertainment, LLC ("Adler") seeks an order dismissing the complaint of Plaintiff Kimberly Boyle ("Boyle") with prejudice for her failure to comply with the Court's July 15, 2015 order compelling Boyle to arbitrate against Adler and/or for Boyle's other abandonment and/or waiver of her copyright infringement claims against Adler.

Contractual arbitration is solely a creature of contract, and no direct arbitration agreement exists between Boyle and Adler. Rather, based on the arbitration agreement between Boyle and Charis Feeney-Orchard ("Director/Producer"), the Court ordered Boyle to arbitrate against non-signatory Adler based on the "equitable estoppel" doctrine alone. Notably, the parties' Joint Status Report reflected the arbitrator's conclusion that Plaintiff should proceed against all defendants in a single arbitration.

Instead of filing and completing one arbitration against all defendants, Boyle instead chose to single out and arbitrate solely against Charis Feeney-Orchard ("Director/Producer") - the only party with whom Boyle had a direct arbitration agreement.  Boyle's design was and is to "game" the system: Boyle knew that Director/Producer would not be represented by counsel for the arbitration, and thus would not present as complete a defense as Adler and the other "distributor" defendants. Unsurprisingly, Director/Producer lost her arbitration. With that advantage, Boyle then demanded that Adler sign a "stipulation," which in fact was simply a new and separate arbitration agreement unrelated to the Court's July 15, 2015 order compelling Boyle to arbitrate, whereby Boyle sought to engage Adler in a purported "second" arbitration.

As set forth in detail below, Boyle's conduct has severely prejudiced Adler's ability to conduct a fair and complete "second" arbitration. Without limitation, Director/Producer (as Boyle well knew) remains Adler's "key witness" to its defense but resides in Australia and cannot be compelled to testify

1

**DEFENDANT ADLER'S MOTION TO DISMISS**

at any hearing in California. Director/Producer has flatly refused to return for any further arbitration proceedings. Had Director/Producer been available as a witness (as she was at the initial arbitration), Adler would have been able to present credible, dispositive evidence in its favor. Moreover, while Adler is not bound to the first arbitration award, and is represented by counsel who will present a far more complete defense, Boyle seeks to arbitrate before the very same arbitrator who ruled against Director/Producer to further compromise Adler's due process rights. The prejudice arises from Boyle's own conduct.

As a result, when analyzing the law, the facts and the overall circumstances, the Court can reach only two conclusions:

First, Boyle, through her own conduct, has either abandoned and/or waived arbitration against Adler, and in any event has no direct arbitration agreement to enforce against Adler to require a "second" arbitration; and

Second, Boyle cannot return to federal court to pursue her infringement action against Adler, as this would reward her intentional and fully culpable violation of the Court's order to arbitrate. The power of the District Court to dismiss is critical; otherwise, any party ordered to arbitrate could simply refuse to arbitrate in order to return to court.

At its core, Boyle has committed two separate failures to arbitrate:  After her first failure to arbitrate against Adler, Adler requested and obtained the order compelling Plaintiff to arbitrate. Boyle then failed to arbitrate a second time by proceeding against only Director/Producer. Boyle is not entitled to a second arbitration of the same issues. Consequently, Boyle's complaint should be dismissed with prejudice pursuant to Federal Rules of Civil Procedure, Rule 41(b) and other applicable law.

///

///

DEFENDANT ADLER'S MOTION TO DISMISS

# I.   FACTS SUPPORTING DISMISSAL

## A.   Background Facts Giving Rise to the Dispute

While completing her master's degree at the University of Western London and the Met Film School, Director/Producer had limited funds available to direct and produce a film required for her thesis graduation project. Approximately six or seven years earlier, Director/Producer had read and liked a screenplay written by Boyle. Boyle had never sold a screenplay before, and her only screenplay had failed to sell up to that time. Director/Producer informed Boyle and her attorney that Director/Producer was a student of limited means with a very small budget to make a film, and Director/Producer rejected the higher fees Boyle initially requested. Lawrence Decl., ¶ 6, Ex. D (Director/Producer's arbitration claim).

On November 4, 2014, Boyle and Director/Producer entered into a "SCREENPLAY OPTION PURCHASE AGREEMENT" (the "Rights Agreement") dated May 12, 2014 for the purchase of the rights to Boyle's screenplay then entitled "Casanova Lost and Found." (the "Screenplay"). Lawrence Decl., ¶ 2, Ex. A (attaching Feeney-Orchard Decl., see ¶ 3, Ex. A). Paragraph 19(g) (page 11) of the Rights Agreement contains the following standard arbitration clause often used in the film industry (emphasis added):

> Arbitration:  Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration using the rules and procedures of the International Film and Television Alliance ["IFTA"] using a single arbitrator. . . . *__The__* arbitration will be held in Los Angeles and any award shall be final, binding and non-appealable."

**DEFENDANT ADLER'S MOTION TO DISMISS**

1   Lawrence Decl., ¶ 2, Ex. A (attaching Feeney-Orchard Decl., *see* ¶ 3, Ex. A).

2   In paragraph 5 (page 5) of the "Rights Agreement," the purchase price is
3   described as:

4   "3% of the final budget of the picture (with exclusions for
5   contingency, actual bond fees, finance charges, and purchase
6   price for screenplay), floor of $125,000, cap of $250,000."

7   Lawrence Decl., ¶ 2, Ex. A (attaching Feeney-Orchard Decl., *see* ¶ 3, Ex. A).

8   The meaning and interpretation of this contract language in part forms
9   the foundation of the parties' dispute: Director intended, and Adler and all
10  Defendants contend, that the phrase "floor of $125,000, cap of $250,000" means
11  the floor and cap of the <u>budget</u>, so that 3% of the budget would result in a
12  purchase price floor of $3,750; Boyle - whose attorneys wrote the agreement -
13  now contends the phrase "floor of $125,000, cap of $250,000" means the floor
14  and cap of the screenplay <u>purchase price itself</u>, in which event the price of the
15  screenplay would be far greater than the film's actual final budget and <u>more than</u>
16  <u>33 times</u> the amount Director/Producer, a meager film student, intended to pay.
17  Lawrence Decl., ¶¶ 35-36.

18  Director/Producer was entitled to undertake principal photography before
19  paying Boyle the purchase price under the Rights Agreement because the
20  purchase price was to be based upon the "final budget" of the film. (Lawrence
21  Decl., ¶ 2, Ex. A (attaching Feeney-Orchard Decl., *see* ¶ 3, Ex. A, ¶ 5.) The film
22  was made and its title was changed to "Inner Peace." Boyle knew the film was
23  being made, and it was ultimately completed.

24  In 2015, Director/Producer wrote Boyle a check for $3,750 and told
25  Boyle she would mail it to Boyle. Director/Producer did not mail the check only
26  because Boyle told Director/Producer in effect "don't bother" because Boyle
27  asserted she was instead owed $125,000. Lawrence Decl., ¶ 6, Ex. D
28  (Director/Producer's arbitration demand) and ¶¶ 37, 38.

4

**B. Boyle Files a Copyright Infringement Action**

On February 6, 2019, Boyle filed a complaint for copyright infringement against four defendants:

    a)  Director/Producer Charis Feeney-Orchard "Director/Producer");

    b)  Adler & Associates Entertainment, LLC ("Adler");

    c)  Dreamscape Media, LLC ("Dreamscape"); and

    d)  Amazon.com, Inc. ("Amazon").

In summary, Boyle claimed that Director/Producer had breached the Rights Agreement, and as a result, Director/Producer as well as those down the distribution ladder (i.e., Adler, Dreamscape and Amazon) had infringed upon Boyle's copyright. Lawrence Decl., ¶ 3, Ex. B.[1]

**C. Director/Producer and Boyle Proceed to Arbitration**

On March 29, 2019, Director/Producer responded to the Complaint by filing a "Request for a motion to dismiss" ("Director/Producer's Motion to Dismiss") citing the arbitration clause in the Rights Agreement and requesting the Court to require Boyle to arbitrate the dispute with IFTA. Lawrence Decl., ¶ 6, Ex. C. On April 10, 2019, Boyle conceded that she must arbitrate by filing a First Amended Complaint ("FAC") which dropped Director/Producer from the federal action entirely. As a result, the Court dismissed the claims against Director/Producer and vacated her Motion to Dismiss. See Apr. 11, 2019 Civil Minutes; Lawrence Decl., ¶ 5, Ex. B.

On or about April 11, 2019, Director/Producer filed an arbitration claim against Boyle with IFTA. Lawrence Decl., ¶ 6, Ex. D. On or about May 15, 2019, Boyle

---

[1] Because the alleged liability of Dreamscape and Amazon flows from Adler's alleged liability, all of the issues presented herein and the relief requested by this Motion also apply to Boyle's claims against Dreamscape and Amazon. The same was true with respect to Adler's motion to compel arbitration, which, as discussed below, the Court granted with respect to Boyle's claims against all of these defendants.

5

filed an Answer and Counter-Claim against Director/Producer in the IFTA arbitration, alleging that Director/Producer was liable for Copyright Infringement and re-alleging the same allegations in her federal Copyright Infringement complaint - including Adler's involvement in the distribution of the Film. Lawrence Decl., ¶ 7, Ex. E. Collectively, the IFTA claims and counterclaims filed by Boyle and Producer/Director as parties to the arbitration clause contained in the Rights Agreement are referred to as the "IFTA Infringement Arbitration."

**D.    After Boyle's First Refusal to Arbitrate, the Court Compels Boyle to Arbitrate Against Adler Based on "Equitable Estoppel"**

Despite Boyle's willingness to arbitrate against Director/Producer, Boyle refused to arbitrate against Adler, arguing that Adler did not have an arbitration agreement with Boyle (her "First Refusal to Arbitrate"). Lawrence Decl., ¶¶ 10-11. As a result, on May 22, 2019, Adler filed her Motion to Compel Arbitration and to Dismiss and/or Stay the Litigation  ("Adler's Motion to Compel Arbitration") based upon, without limitation, the "equitable estoppel" doctrine set forth in *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 219 (2009) and other related case law.  On May 24, 2019, the other remaining defendants (Amazon and Dreamscape) filed motions to join Adler's Motions to Compel Arbitration. Lawrence Decl., 12.  Boyle opposed Adler's Motion to Compel Arbitration, claiming without limitation that (1) Adler's Motion was based on the false premise that Boyle's federal lawsuit involves a contract dispute, and (2) even if there was a contract dispute, Adler could not enforce the arbitration clause in the Rights Agreement because she was not a party to the agreement. Lawrence Decl., ¶ 13.

On July 15, 2019, the Court issued a tentative ruling granting Adler's Motion to Compel Arbitration, indicating that, although a non-signatory to the arbitration clause, Adler fell within the "equitable estoppel" doctrine as "the

6

**DEFENDANT ADLER'S MOTION TO DISMISS**

Court would find that the copyright claim is inextricably bound up in the obligations and terms of the Option Agreement." Lawrence Decl., ¶ 15, Ex. F.

At the July 15, 2019 hearing, the Court again indicated it would grant the Motion, but observed that there were two arbitrations already pending - i.e. Adler had also filed an IFTA arbitration indemnification action against Director/Producer for damages in the event Boyle prevailed on her copyright infringement action against Adler (the "**Indemnity Arbitration**"). The Court then asked the parties to assist with the determination of two questions: (1) "which" of the two pending IFTA arbitrations the Court should "refer" Plaintiff's Federal Case to as part of his order granting the Motion, and (2) whether perhaps the arbitrator could order both of the pending arbitrations consolidated. Lawrence Decl., ¶ 16, Ex. G.

On August 23, 2019, the arbitrator appointed to the IFTA Infringement Arbitration (but not appointed in the Indemnity Arbitration) held a status conference with the parties, including Adler, to address the Court's procedural questions. Lawrence Decl., ¶ 17. On September 10, 2019, the parties - including Boyle - submitted their jointly prepared Joint Status Report. Lawrence Decl., ¶¶ 17-18, Ex. H. In summary, the arbitrator pointed out that, if the Court was inclined to grant Adler's Motion to Compel Arbitration, the Motion should simply be granted without addressing either point. *Id.*

Specifically, the Joint Status Report reflects:

> As to "which" pending arbitration the Court should "refer" Plaintiff to, Arbitrator Rifkin pointed out that:
>
> (1) Plaintiff's recourse if the Motion is granted is to *file her own arbitration including all parties*;
>
> (2) Neither arbitration appropriately supports a "referral" because *neither arbitration contains all of Plaintiff's actual copyright claims*;
>
> (3) Arbitrator Rifkin does not have all parties to the Federal Case before him in the First Arbitration; and

7

**DEFENDANT ADLER'S MOTION TO DISMISS**

(4) The arbitrator appointed to Plaintiff's arbitration must successfully review and clear any conflicts, which is premature at this time because all the parties are not before Arbitrator Rifkin at this time.

As to the Court's suggestion that the arbitrator consolidate the already pending arbitrations, Arbitrator Rifkin pointed out:

(1) Consolidation of the First and Second Arbitrations is not a critical concern because the Second Arbitration is one for indemnity which, as a practical matter, is premature because it can be resolved only after a hearing on the First Arbitration in any event.
(2) Arbitrator Rifkin is appointed for only the First Arbitration and thus has no power over the Second Arbitration, and no authority or ability at this time to order that second arbitration consolidated with the first. (Ex. H, pp. 2:19- 3:13.)

In Part II(A) of the Joint Status Report, Boyle conceded that "as Arbitrator Rifkin has pointed out, Defendant's claim for indemnity "is premature. None of the Defendants in the Federal Case have been ordered to pay any money to Plaintiff." (Ex. H, p. 3:20-22.)

In Part II(B) of the Joint Status Report, Adler stated that:

"As Arbitrator Rifkin respectfully suggested, the proper procedure for ruling on the Motion would be for the Court to simply grant the Motion using the standard form of order whereby the court stays or dismisses the action. ***Plaintiff will then either file her copyright claims against <u>all parties in arbitration <u>or abandon her case</u>.</u>***"

On September 12, 2019, the Court concluded that it would only enter an Order compelling Boyle to arbitrate; based on the tentative ruling issued on July 15, 2019, and for reasons stated on the record, granted Adler's Motion to Compel Arbitration. Lawrence Decl., 22, Ex. I.

**E.     As a Second Refusal to Arbitrate, Boyle Refuses to Include Adler in the IFTA Arbitration and Proceeds Only Against Director/Producer, who Remained in Pro Per**

Despite the fact that (a) Boyle had no separate arbitration agreement with Adler, and (b) the Court had compelled Boyle to arbitrate based upon "equitable

8

estoppel," Boyle refused to add Adler to the IFTA Infringement Arbitration. (Arbitrator Rifkin had agreed to stay the matter so the parties could stipulate to adding all necessary parties, but Boyle refused.) Lawrence Decl., 23-24.   As Adler pointed out to Boyle's counsel, Boyle's plan was to "pick off" and proceed against Director/Producer alone because she was and is a critical witness to all defendants' defense of copyright infringement, would not represented by an attorney at the arbitration, and had no experience with arbitration or litigation, and that Boyle was seeking (among other things) an unfair advantage. Lawrence Decl., 25.

Director/Producer, who had no counsel to represent her, lost her case and the arbitrator held that Director/Producer had infringed Boyle's copyright. Lawrence Decl., 25, Ex. J.

**F. After the IFTA Arbitration Concludes, Boyle Demands that Adler Enter into a New and Separate Arbitration Agreement for a Second Copyright Infringement Arbitration**

On October 22, 2019, Boyle indicated she was now ready to proceed with the same copyright infringement claims against Adler and the remaining distributor defendants (Amazon and Dreamscape).  Lawrence Decl., 26, Ex. B. However, Boyle now had a problem: she had attempted to open a second arbitration with IFTA sans Director/Producer, but IFTA refused because there was no supporting arbitration agreement between the remaining parties. Boyle thus requested Adler to sign a proposed "stipulation" which, in reality, contained the following, separate agreement to arbitrate clause:

> "Plaintiff and Defendants hereby stipulate, by and through their attorneys
> of record, that the copyright infringement dispute be administered and
> resolved by final and binding arbitration under the IFTA Rules for
> International Arbitration, the arbitration shall be heard in Los Angeles,
> California. The Parties agree to accept service of process in accordance

9

**DEFENDANT ADLER'S MOTION TO DISMISS**

with the IFTA® Rules and agree that such service satisfies all requirements to establish personal jurisdiction over the Parties."

Lawrence Decl., ¶ 26, Ex. K. In other words, Boyle no longer sought arbitration based upon the Rights Agreement (having already concluded it), but rather demanded Adler enter into a stand-alone agreement to arbitrate. As Adler had no legal obligation to do so, Adler refused. Lawrence Decl., 27, Ex. L.

### G.   Facts Supporting Prejudice to Adler by "Separate" Arbitrations

As more fully set forth below, Adler will seek to present a full defense to any infringement action by Boyle - including by revisiting all defenses and issues which were or could have been tried in the initial IFTA Infringement Arbitration against Director/Producer, such as the disputed interpretation of the amount of the Option fee and whether Director/Producer in fact performed. Adler will present its defense in a vastly different and more complete manner than Director/Producer did in pro per. Lawrence Decl., 28. By singling out Director/Producer and proceeding solely against her first while she was in pro per, Boyle has already "gamed" the arbitration system: IFTA will either re-assign the same arbitrator who cannot "unring the bell," and even a different arbitrator (or even a different tribunal altogether) will likely be influenced by the first IFTA Infringement Arbitration ruling. Lawrence Decl., 29-32.

### H.   Facts Supporting Prejudice to Adler Based Upon <u>Unavailability</u> of Director/Producer as a "Key Witness" to Adler's Defense

Even more problematic, Director/Producer is no longer within the subpoena power of a California judge or arbitrator. Boyle *knew* that Director/Producer lived in a different country, and further "gamed" the system by anticipating that Director/Producer would not voluntarily return for a second arbitration. And in fact, Director/Producer has flatly refused, stating in an email that a "shameful system exists in the United States" and "I have no intention of further dealing with IFTA." Lawrence Decl., ¶¶ 33, 41-47, Ex. N.

10

**DEFENDANT ADLER'S MOTION TO DISMISS**

However, as more fully discussed below, Director/Producer remains a *critical* witness for Adler's defense against copyright infringement. Based upon Adler's interviews of Director/Producer and review of the documents available (*e.g., see* Ex. D (Director/Producer's arbitration claim)), there are numerous issues for which Director/Producer appears to be the *only* reliable witness for Adler's defense. Without limitation, Adler would have introduced Director/Producer's testimony to support that a purchase price of $3,750 is the most reasonable interpretation, such as the facts that Director/Producer informed Boyle that she was completing her master's degree and had limited funds to direct and produce a film, and Director/Producer rejected the higher fees Boyle initially requested, Director/Producer expressly told Boyle that the *"floor"* was to be the *"fee,"* and *provided an example that if the budget was $55,000, then the fee would be $1,650 (3% x $55,000 = $1,650),* and that Director/Producer then offered to raise the floor of the minimum budget (e.g., to $125,000, so that the minimum fee would be $3,750) to which Boyle said "yes." Lawrence Decl., ¶¶ 35-36.

In addition, Adler would have called Director/Producer to establish her performance of the Option, namely that after the Film was made, Director/Producer wrote Boyle a check for $3,750 and in fact told Boyle she was mailing it, and that the only reason that Director/Producer did not mail the check was because Boyle's attorney told Director/Producer, in effect, "don't bother to mail the check" because Boyle was instead owed $125,000. Lawrence Decl., ¶¶ 37-38, Ex. M.

Had Boyle proceeded with one single arbitration against all defendants, Director/Producer would have been available as a witness to Adler's defense. Lawrence Decl., ¶ 46.   Now, Adler is prevented from putting on a proper, complete defense whatsoever.

///

**DEFENDANT ADLER'S MOTION TO DISMISS**

## II.    ARGUMENT

### A.    Authority in Support of the Motion

1.    *General Authority of Court to Dismiss for Failure to Prosecute or Comply with Court Order (RFCP Rule 41(b)*

Federal Rules of Civil Procedure, Rule 41(b) states: "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." The District Court's authority to dismiss in this manner "has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630-31 (1962).

Despite ordering a case to arbitration and entering a stay, the District Court retains the power to enter a Rule 41(b) motion and dismiss when a plaintiff, who has been ordered to arbitrate, fails to timely do so. *Morris v. Morgan Stanley & Co.* (9th Cir. 1991) 942 F.2d 648, 653 (lawsuit dismissed where appellants had unnecessarily delayed arbitration and the adjudication of federal claims); see also *Windward Agency, Inc. v. Cologne Life Reinsurance Co.,* 123 Fed. Appx. 481 (3d Cir. 2005) (where appellant failed to abide by order to arbitrate, it was issue for district court, not nonexistent arbitration panel, to dismiss action for failure to prosecute under Fed. R. Civ. P. 41(b)). "Once a party invokes the judicial system by filing a lawsuit, it must abide by the rules of the court; a party can not decide for itself when it feels like pressing its action and when it feels like taking a break because trial judges have a responsibility to litigants to keep their court calendars as current as humanly possible." *James v. McDonald's Corp.,* 417 F.3d 672, 681 (7th Cir. 2005) (emph. added) (affirming dismissal of case with prejudice, after plaintiff had delayed one year and had not yet initiated arbitration). As the *Morris* Court recognized, the power of the District Court to dismiss is critical; otherwise, a party could simply refuse to go forward with the arbitration. If a district court was

12

**DEFENDANT ADLER'S MOTION TO DISMISS**

without power to influence that choice, then the opportunity to undermine an agreement to arbitration - and by extension the Court's order to arbitrate - "would be enormous." *Morris*, 942 F.2d at 653.

In addition to dismissal on the grounds of a "failure to prosecute," dismissal under rule 41(b) may be based upon a plaintiff's failure to comply with an "order" to arbitrate.  When a defendant obtains an order compelling arbitration, the order in substance is a decree for specific performance of an agreement to arbitrate. *The Sydfold*, 25 F. Supp. 662 (D.N.Y. 1938). Where arbitration is required, it is in effect a condition precedent to the right to maintain a court action. *Charles J. Rounds Co. v. Joint Council of Teamsters No.* 42 (1971) 4 Cal. 3d 888, 894.

2.    *The Doctrines of Abandonment and Waiver Apply to Arbitration*

A party to an arbitration agreement may, by dilatory tactics or express refusal to proceed, abandon and/or repudiate arbitration. *Grunwald-Marx, Inc. v. L.A. Joint Bd., Amalgamated Clothing Workers* (1961) 192 Cal. App. 2d 268, 277. Indeed, where a ***plaintiff*** is obligated to arbitrate, the plaintiff has only two choices: the plaintiff may "either" arbitrate "or" abandon the claim. *Austin v. Owens-Brockway Glass Container*, 78 F.3d 875 (4th Cir. 1996)

Although waiver can be said to denote the voluntary relinquishment of a known right, it can also mean the loss of an opportunity or a right as a result of a party's **failure** to perform an act it is required to perform, **regardless of the party's intent** to abandon or relinquish the right. *Iskanian v. CLS Transp. L.A., LLC* (2014) 59 Cal. 4th 348, 374.  In the context of arbitration, then, "waiver" is also used as a "shorthand statement" for the conclusion that a contractual right to arbitration has been lost despite the fact the party did not intend to lose it. *Platt Pac., Inc. v. Andelson* (1993) 6 Cal. 4th 307, 315–316 (failure to make a timely demand for arbitration relinquished right to arbitrate despite lack of intent to relinquish the right to arbitrate the dispute).

13

Consequently, an unreasonable delay in demanding arbitration may constitute a waiver of the right to arbitrate. *Sawday v. Vista Irrigation Dist.* (1966) 64 Cal. 2d 833, 836 (party who did not demand arbitration within a reasonable time was deemed to waive right to arbitration). What constitutes a reasonable time is a question of fact, depending on the situation of the parties, the nature of the transaction, and the facts of the particular case. *Id.* Among the facts a court may consider is any prejudice the opposing party suffered because of the delay. *Id.* at 837; *Spear v. Cal. State Auto. Ass'n* (1992) 2 Cal. 4th 1035, 1043.

A party's statement that the party has elected not to proceed with arbitration constitutes an express waiver. *Nunez v. Nevell Grp., Inc.* (2019) 35 Cal. App. 5th 838, 843.

Under the FAA, when waiver applied to a defendant's right to move to compel arbitration, a waiver of a contractual arbitration occurs where the defendant: (1) had knowledge of an existing right to compel arbitration, (2) acted inconsistent with that existing right, and (3) caused prejudice to the party opposing arbitration resulting from such inconsistent acts. *Martin v. Yasuda* (9th Cir. 2016) 829 F.3d 1118, 1124; *Gutierrez v. Wells Fargo Bank* (9th Cir. 2012) 704 F.3d 712, 720–721; *Fisher v. A.G. Becker Paribas Inc.* (9th Cir. 1986) 791 F.2d 691, 694.

### 3. Arbitration is a Creation of Contract

The right to arbitration depends entirely upon contract. There is no public policy favoring arbitration of disputes that the parties have not agreed to arbitrate. *First Options of Chi., Inc. v. Kaplan* (1995) 514 U.S. 938, 944 (including agreement governed by Federal Arbitration Act (FAA)); *Knutson v. Sirius XM Radio Inc.* (9th Cir. 2014) 771 F.3d 559, 564–565 (under FAA); *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal. App. 4th 50, 60.

///

4. *No Res Judicata or Collateral Estoppel Effect of First Arbitration.*

Because Adler was not a party to the first arbitration, res judicata and/or collateral estoppel does not apply to the first arbitration award in any subsequent proceeding against Adler; the issue of the contract interpretation and all contractual defenses must be re-adjudicated. See *Vandenberg v. Superior Court* (1999) 21 Cal. 4th 815, 824, 834, 836–837 (a private arbitration award, even if judicially confirmed, is not entitled to collateral estoppel effect ("issue preclusion") against a nonparty unless the parties to the arbitration so agree); see also *Cuevas v. Truline Corp.* (2004) 118 Cal. App. 4th 56, 62; *Flores v Transam. HomeFirst, Inc.* (2001) 93 Cal. App. 4th 846, 852 (court of appeal refused to give collateral estoppel effect to unreported decision regarding unconscionability of arbitration provision in identical loan documents signed by different parties under different circumstances).

**B. The Entirety of the Circumstances Compel the Conclusion that Boyle's Federal Action Should be Dismissed with Prejudice Based on her Failure to Prosecute, Failure to Comply with a Court Order to Arbitrate and the Resulting Prejudice to Adler**

Although dismissal with prejudice is a high price for Boyle to pay, the facts before the Court - in particular Boyle's own choices - require this result as a matter of law, equity and fair jurisprudence. The Ninth Circuit's decision in *Tillman v. Tillman* (9th Cir. 2016) 825 F.3d 1069 is illuminating. In *Tillman,* the plaintiff client had entered into an arbitration agreement with defendant law firm, and the Court was thus bound to "enforce" the arbitration under the FAA. The federal court ordered plaintiff to arbitrate and plaintiff initiated arbitration proceedings, but the arbitrator dismissed the arbitration because the plaintiff could no longer afford the arbitrator's fees. Defendant moved to dismiss the federal action on the grounds

15

**DEFENDANT ADLER'S MOTION TO DISMISS**

1  that plaintiff had failed to arbitrate.  The Ninth Circuit upheld the trial court's

2  decision not to dismiss, concluding that plaintiff was willing to arbitrate but merely

3  **unable** to pay for it, and further that defendant could have fronted the costs but did

4  not. Plaintiff's failure to comply with the order to arbitrate was debatable, as

5  plaintiff was "not culpable" and did "not merit a harsh penalty." *Id.* at 1074.

6       Notably, the Ninth Circuit further cautioned: "Our decision that Tillman's

7  case may proceed *does not* mean that parties may refuse to arbitrate

8  by *choosing* not to pay for arbitration." *Id.* at 1075 (emph. added).  Rather, the

9  Ninth Circuit was bound and influenced by the fact that the trial court had, in fact,

10 found that its plaintiff had no ability to pay for the arbitration.  The Ninth Circuit

11 further advised that, had the trial court found plaintiff had an ability to pay, but had

12 refused to arbitrate, "*the court could, and most probably should, dismiss*

13 *Tillman's complaint under Fed. R. Civ. P. 41(b), for failure to comply with the*

14 *order to arbitrate despite its ability to do so.*" *Id.* at 1075-1076 (emph. added).

15      In light of *Tillman* and the law stated above, dismissal of Boyle's action is

16 the only tenable result here, for the following reasons:

17              1.    *The Joint Status Report Placed Boyle on Notice*

18      First, Boyle was on notice, through the Joint Status Report signed by

19 her counsel, that it was Boyle's obligation to initiate an arbitration "including all

20 parties" and to either "file her copyright claims against all parties in arbitration or

21 abandon her case."  Boyle did not dispute these statements at the time her counsel

22 signed the Joint Status Report or at the final hearing on Adler's Motion to Compel

23 Arbitration.  Based on the Joint Status Report, this Court issued its final ruling on

24 the Motion to Compel Arbitration, and compelled Boyle to arbitrate pursuant to the

25 "equitable estoppel" doctrine.  Thus, the Joint Status Report "informs" the Court's

26 final order to arbitrate, including the expectation that Boyle would in fact file and

27 pursue a single arbitration against all parties.  Boyle's failure to do so is therefore a

28 violation of the Court's order itself.

**DEFENDANT ADLER'S MOTION TO DISMISS**

2.   *Boyle Unreasonably Delayed Arbitration*

Second, and even apart from the Joint Status Report, the case law cited above clearly reflects that an order compelling arbitration, without more, imposes upon a Boyle a duty not to unreasonably delay or unreasonably prejudice a defendant, and thus precluded Boyle from "decid[ing] for [herself] when [she] feels like pressing its action and when [she] feels like taking a break." *James,* 417 F.3d at 681.   Instead, and without seeking any guidance or permission from the Court, Boyle simply flouted the order compelling her to arbitrate by deciding, on her own, when and how she would proceed, even though she knew it would prejudice Adler (as further discussed below).

3.   *Boyle has no Direct Arbitration Agreement with Adler*

Third, and even more critically, Boyle has no direct arbitration agreement with Adler upon which Boyle may require a second arbitration.  Rather, "equitable estoppel" - based on the arbitration provision of the Rights Agreement - formed the only ground for the Court order to Boyle to arbitrate.  Boyle willingly chose to exclude Adler from the arbitration permitted under the Rights Agreement, an arbitration clause which expressly refers to a "single" arbitrator and "the" arbitration and thus itself contemplates a single arbitration.

4.   *Adler Need not Agree to a "New" Arbitration Agreement*

Fourth, Boyle left herself with no mechanism to require Adler to participate in a "second" arbitration. Boyle could not reasonably demand or expect Director/Producer to sign a purported "stipulation" which was in fact - in and of itself - a new and separate agreement to arbitrate after the IFTA Infringement Arbitration had concluded.  The Court had ordered Boyle to arbitrate under the Rights Agreement, and Boyle intentionally chose to proceed without Adler.

Alder had no subsequent obligation to enter into a "new" arbitration agreement now that Boyle's conduct had prejudiced Adler's defense (as further discussed below).

**DEFENDANT ADLER'S MOTION TO DISMISS**

5.    *Adler is Severely Prejudiced as a Result of Boyle's Conduct*

Fifth, and perhaps most critically, Boyle has overtly, intentionally and severely ***prejudiced*** Adler by proceeding with the IFTA Infringement Arbitration without it, without limitation as follows:

<u>Prejudice Resulting From Separate Arbitrations</u>:    Because the IFTA Infringement Arbitration award is not binding upon Adler (see Memorandum of Points and Authorities, section II(A)(4)), Adler will seek to present a full defense to any infringement action by Boyle -  including by revisiting all defenses and issues tried or which could have been tried in the initial IFTA Infringement Arbitration against Director/Producer, such as the disputed interpretation of the amount of the Option fee and whether Director/Producer in fact performed. Adler's counsel would present Adler's defense in a vastly different and more complete manner than Director/Producer did in pro per.  Lawrence Decl. at ¶ 28.

By singling out Director/Producer and proceeding solely against her first while she was in pro per, Boyle already "gamed" the arbitration system. Boyle likely seeks to foist a new and separate IFTA arbitration upon Adler precisely because IFTA is a small and unique venue, where the arbitrators all know each other.

Even if a different arbitrator (or even a tribunal altogether) were assigned to adjudicate the matter, an arbitrator is ordinarily not bound to the rules of evidence. Boyle's counsel will likely disclose the first IFTA Infringement Arbitration ruling to a second arbitrator, who could then consider and possibly even rely upon the ruling when making his or her own adjudication of the infringement claims against Adler, despite the fact that Adler did not have any opportunity therein to defend itself or its interpretation of the Rights Agreement, and cannot be bound to such determination.

Thus, Boyle's attempt to secure a second arbitration against Adler (with no separate arbitration agreement in place to support such second arbitration), unduly

18

**DEFENDANT ADLER'S MOTION TO DISMISS**

prejudices Adler for any future arbitration of this matter and at worst violates Adler's due process rights because it erodes Adler's right to a full and fair determination of all issues - which Adler never waived or agreed to because she never entered into a separate arbitration agreement.

Unavailability of a "Key Witness:" Director/Producer is no longer within the subpoena power of a California judge or arbitrator, as she resides in Australia. In fact, Director/Producer has flatly refused to voluntarily appear, stating in an email that a "shameful system exists in the United States" and "I have no intention of further dealing with IFTA." Lawrence Decl., ¶¶ 33, 41-47, Ex. N. Boyle was well aware that Director/Producer lived outside the United States, and knew Director/Producer may not be willing or able to return for a "second" arbitration. *See e.g.,* Plaintiff's initial federal Complaint (describing Director/Producer as "an individual currently residing in London, England").

However, Director/Producer remains a ***critical*** witness for Adler's defense against copyright infringement. As the Court acknowledged when ordering Boyle to arbitrate her copyright infringement claims against Adler (*see* Ex. F, p. 9), defendants view the question of whether Director/Producer obtained rights to the Screenplay pursuant to the Option Agreement to be ***fundamental*** to the question of whether Defendants infringed on Boyle's copyright. Because the IFTA Infringement Arbitration award is not binding upon Adler (see Memorandum of Points and Authorities, section II(A)(4)), Adler would be entitled to retry any issues addressed in the first IFTA Infringement Arbitration against Director/Producer as well as introduce any evidence that Director/Producer - in pro per - failed to introduce.

The Declaration of Amy B. Lawrence, pars. 33-40, sets forth various issues for which Director/Producer appears to be the ***only*** reliable witness for Adler's defense against infringement. If Director/Producer was available as a witness (as she was at the initial IFTA Infringement Arbitration), Adler would

19

DEFENDANT ADLER'S MOTION TO DISMISS

have called her as a witness as follows, and without limitation:

*Amount of Initial Purchase Price*: Under the Rights Agreement, the purchase price is described as "3% of the final budget of the Picture (with exclusions for contingency, actual bond fees, finance charges and purchase price for screenplay), floor of $125,000, cap of $250,000." (*See* Ex. A, Feeney-Orchard Decl. ¶ 3, Ex. A at 5.) Boyle interprets the purchase price language to mean that the stated floor and cap refer to the final purchase price itself, so that Director/Producer would pay at minimum $125,000. See FAC ¶¶ 5, 7-9. At any adjudication, Adler would contend that the purchase price language instead means that the stated floor and cap are of the budget, so that Director/Producer would pay at minimum $3750 (3% x $125,000 minimum = $3750), and establish that the contract is vague and requires interpretation. Adler would have called Director/Producer as a witness to establish and introduce the following facts and evidence on the contractual ambiguity and supporting Adler's $3,750 interpretation, that:

• Director/Producer was completing her master's degree at the University of Western London and the Met Film School and had limited funds available to direct and produce a film required for her thesis graduation project;

• Director/Producer informed Boyle and her attorney that Director/Producer was a student of limited means with a very small budget to make a film, and Director/Producer rejected the higher fees Boyle initially requested (*see* Ex. D (Director/Producer's arbitration claim));

• During the ***pre-contract*** negotiations, Director/Producer expressly told Boyle that the "floor" was to be the "fee," and provided an example that if the budget was $55,000, then the fee would be $1,650 (3% x $55,000 = $1,650). In response, Boyle said she was looking for a different deal. But then, in response to Boyle, Director/Producer offered to raise the floor of the minimum budget (*e.g.*, to $125,000, so that the minimum fee would be $3,750) -

20

**DEFENDANT ADLER'S MOTION TO DISMISS**

to which Boyle said "**yes**" and then signed the Rights Agreement; and

- The actual budget for the film was approximately $125,000, such that the amount Boyle now claims as her fee was literally the entire budget for the Film, and further that all draft budgets for the Film reflected a fee to Boyle consistent with Adler's interpretation of the Rights Agreement.

*Director/Producer's Performance of Rights Agreement*: To refute Boyle's contention that Adler never paid the purchase price of $3,750, Adler would have called Director/Producer as a witness to establish and introduce the following facts, evidence and argument that:

- After the film was made, Director/Producer wrote Boyle a check for $3,750, was intending to mail the check to Boyle, and in fact told Boyle she was mailing it, through which Adler would argue Director/Producer expressly tendered of her performance of the Option purchase price under the Rights Agreement with the effect that the obligation was extinguished (*see* Civil Code sections 1485, 1504); and/or

- The only reason that Director/Producer did not mail the check was because Boyle's attorney responded and told Director/Producer in effect "don't bother to mail the check" because Boyle was instead owed $125,000, which through which Adler would argue that Boyle refused to accept Director/Producer's tender of performance thereby excusing Director/Producer's performance and equating it to actual production thereof (*see* C.C.P. section 2074).

<u>Resolution of Dispute by Subsequent Directions to Pay and Payment</u>: Once Adler learned that Boyle and Director/Producer were in a dispute over payment of the Option, Adler encouraged Orchard to resolve the dispute with Boyle as she continued to have extensive contacts with Boyle. Orchard ended up negotiating a "direction to pay" with Boyle. Adler would have called Director/Producer as a witness to establish that Adler's associate, Mr. Lunt, did

**DEFENDANT ADLER'S MOTION TO DISMISS**

1  in fact timely acknowledge the direction(s) to pay by mail, and subsequently
2  acted upon it.

3        Had Boyle proceeded with one single arbitration against all defendants,
4  Director/Producer would have been available as a witness to the defense, and
5  Adler and all defense counsel would have been able to question
6  Director/Producer on the stand and obtain testimony from Director/Producer on
7  the critical issues described above. Instead, Boyle demands that Adler arbitrate
8  in a "second" arbitration, where Adler cannot subpoena or legally enforce the
9  testimony of Director/Producer, who has already indicated that she will not
10  return voluntarily.

11            6.    *Boyle is Culpable Because she Intentionally Tried to "Game"*
12                  *the System*

13       Sixth, and entirely unlike the *Tillman* plaintiff, Boyle is alone and directly
14  culpable for her decision to proceed against Director/Producer alone - her
15  culpability is not "debatable" at all.  Boyle made her decision willfully and
16  intentionally to "game" the system, with an eye toward causing the very prejudice
17  that Adler has now in fact suffered, as described in detail above.

18            7.    *Adler is not Culpable*

19       Seventh, unlike the *Tillman* defendant, who could have volunteered to
20  advance fees to continue participating in the (one and only) arbitration, Boyle
21  intentionally left Adler out of the IFTA Copyright Arbitration *entirely*.  Adler had
22  no standing with the arbitrator to object, and Adler had *already* obtained the
23  requisite order compelling Boyle to include Boyle in the arbitration - which was in
24  legal effect a mandatory injunction which Boyle disregarded. As a result, when
25  analyzing the facts and the overall circumstances, the Court can reach only two
26  overall conclusions which subjects Boyle to dismissal under Rule 41(b):

27       (1)    Boyle abandoned and/or waived arbitration against Adler under the
28

22

**DEFENDANT ADLER'S MOTION TO DISMISS**

1    "equitable estoppel" order, and in any event has no direct arbitration
2    agreement to enforce against Adler to require a "second" arbitration; and
3    (2)    Boyle cannot return to federal court to pursue her infringement action
4    against Adler, as this would reward her intentional and fully culpable
5    violation of the Court's order to arbitrate.    The power of the District Court
6    to dismiss is critical; otherwise, any party ordered to arbitrate could simply
7    refuse to arbitrate in order to return to court. *See Morris*, 942 F.2d at 653.
8    Given the Ninth Circuit's direction in *Tillman* as well as all the authority
9    cited above, this Court should find Boyle's conduct worthy of dismissal with
10   prejudice and order the same.

11   **III.    CONCLUSION**

12   As Boyle cannot now claim a "good faith" intention or right to proceed
13   with a "second" arbitration or in court, Adler respectfully requests the Court to
14   dismiss this action in its entirety with prejudice.

15

16   Respectfully submitted,

17

18   DATED: December 2, 2019                  LAWRENCE & ASSOCIATES
                                              Attorneys at Law
19

20                                           By:
21                                               Amy B. Lawrence
22                                           Attorneys for Defendant
                                             ADLER & ASSOCIATES
23                                           ENTERTAINMENT, LLC

24

25

26

27

28

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is **2550 Hollywood Way, Suite 202, Burbank, California 91505.**

On December 2 , 2019 I served the foregoing document described as **DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S MOTION TO DISMISS BASED UPON PLAINTIFF KIMBERLY BOYLE'S FAILURE TO INCLUDE DEFENDANT IN ARBITRATION PROCEEDINGS IN CONTRAVENTION OF PRIOR COURT ORDER COMPELLING PLAINTIFF TO ARBITRATE** on the interested parties in this action by placing the original and/or a true copy thereof enclosed in (a) sealed envelope(s), addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **BY REGULAR MAIL:** I deposited such envelope in the mail 2550 Hollywood Way, Suite 202, Burbank, California 91505. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☐ **BY FACSIMILE MACHINE:** I transmitted a true copy of said document(s) by facsimile machine, and no error was reported. Said fax transmission(s) were directed as indicated on the service list.

☐ **BY OVERNIGHT DELIVERY:** I caused such documents to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressees. The envelope or package was deposited with delivery fees thereon fully prepaid.

☐ **BY ELECTRONIC MAIL:** I transmitted a true copy of said document(s) via electronic mail, and no error was reported. Said email was directed as indicated on the service list.

☐ **BY PERSONAL SERVICE:** I caused such envelope(s) to be delivered by hand to the above addressee(s).

☑ **BY CM/ECF:** I electronically transmitted a true copy of said document(s) to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the aforementioned CM/ECF registrants.

I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 2 , 2019, at Los Angeles, California.

_____
Raisa Rosa

24
**PROOF OF SERVICE**

1

## SERVICE LIST

| | |
|---|---|
| Larry Zerner<br>LAW OFFICES OF LARRY ZERNER<br>1801 Century Park East, Suite 2400<br> Los Angeles, CA 90067 | E: larry@zernerlaw.com<br><br>Tel: (310) 773-3623<br>Fax: (310) 388-5624<br><br>*Representing plaintiff Kimberly Boyle* |
| Gregory L. Doll<br>Jamie Olivia Kendall<br>Brett H. Oberst<br>Doll Amir & Eley LLP<br>725 South Figueroa Street, Suite 3275<br>Los Angeles, CA 90017 | E: boberst@dollamir.com<br>   gdoll@dollamir.com<br>   jkendall@dollamir.com<br><br>Tel: (213) 542-3380<br>Fax: (213) 542-3381<br><br>*Representing Defendant Amazon.com* |
| Marc Victor Allaria<br>Litchfield Caov LLP<br>251 South Lake Avenue Suite 750<br>Pasadena, CA 91101 | E: allaria@litchfieldcavo.com<br><br>Tel: (626) 683-1100<br>Fax: (626) 683-1113<br><br>*Representing Defendant Dreamscape* |

25

**PROOF OF SERVICE**

1  Amy B. Lawrence, Esq. - Bar # 115874
2  LAWRENCE & ASSOCIATES
   Attorneys at Law
3  2550 N. Hollywood Way, Suite 202
4  Burbank, CA 91505
   Telephone: (818) 843-6442
5  Facsimile: (818) 566-7875
   Email: ablawrence@lawandassoc.com
6
7  Attorneys for Defendant
8  ADLER & ASSOCIATES ENTERTAINMENT, LLC

9            **UNITED STATES DISTRICT COURT**

10          **CENTRAL DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| 12  KIMBERLY BOYLE | **CASE NO.  2:19CV00893-GW(SKx)** |
| 13              Plaintiff, | |
| 14       vs. | **DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S MOTION TO DISMISS BASED UPON PLAINTIFF KIMBERLY BOYLE'S FAILURE TO INCLUDE DEFENDANT IN ARBITRATION PROCEEDINGS IN CONTRAVENTION OF PRIOR COURT ORDER COMPELLING PLAINTIFF TO ARBITRATE** |
| 15  ADLER & ASSOCIATES ENTERTAINMENT, LLC, a California LLC; AMAZON.COM, INC., a Delaware corp.; DREAMSCAPE MEDIA, LLC, an Ohio LLC; and DOES 1 through 10, inclusive, | |
| 16 | |
| 17 | |
| 18 | |
| 19              Defendants. | |
| 20 | *[Filed Concurrently with Motion to Dismiss Based Upon Plaintiff Kimberly Boyle's Failure to Include Defendant in Arbitration Proceedings in Contravention of Prior Court Order Compelling Plaintiff to Arbitrate; and [Proposed] Order]* |
| 21 | |
| 22 | |
| 23 | |
| 24 | Date: January 2, 2020 |
| 25 | Time: 8:30 am |
|    | Courtroom:  9D |
| 26 | Judge: Hon. George H. Wu |

27

28

**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF**
**MOTION TO DISMISS**

I, Amy B. Lawrence, hereby declare as follows.

1.      I am the counsel of record for Defendant Adler & Associates Entertainment, LLC ("Adler"). I have personal knowledge of the facts set forth herein.  This declaration is submitted in support of Adler's Motion to Dismiss Based Upon Plaintiff Kimberly Boyle's Failure to Include Defendant in Arbitration Proceedings in Contravention of Prior Court Order Compelling Plaintiff to Arbitrate.

### Plaintiff Withdraws her Federal Copyright Infringement Action Against Director/Producer

2.      As set forth in the previously filed Declaration of Charis Feeney-Orchard, on or about dated May 12, 2014, Plaintiff Kimberly Boyle ("Boyle") and Director/Producer Charis Feeney-Orchard ("Director/Producer") entered into a "SCREENPLAY OPTION PURCHASE AGREEMENT" (the "Rights Agreement") which contains the following arbitration provision (emph. added):

> "Arbitration:  Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration using the rules and procedures of the International Film and Television Alliance ["IFTA"] using a single arbitrator.  . . . ***The*** arbitration will be held in Los Angeles and any award shall be final, binding and non-appealable."

A true and correct copy of the previously filed Declaration of Charis Feeney-Orchard, authenticating and attaching the Rights Agreement, is attached hereto as Exhibit A.

3.      On or about February 6, 2019, Boyle filed a complaint for copyright infringement against four defendants:

    a)   Director/Producer Charis Feeney-Orchard "Director/Producer");

    b)   Adler & Associates Entertainment, LLC ("Adler");

2

c)   Dreamscape Media, LLC ("Dreamscape"); and

d)   Amazon.com, Inc. ("Amazon").

In summary, Boyle claimed that Director/Producer had breached the Rights Agreement, and as a result, Director/Producer as well as those down the distribution ladder (*i.e.,* Adler, Dreamscape and Amazon) had infringed upon Boyle's copyright. A true and correct copy of the complaint ("Complaint") is attached as Exhibit B.

4.   On March 29, 2019, Director/Producer responded to the Complaint by filing a "Request for a motion to dismiss" ("Director/Producer's Motion to Dismiss") whereby Director/Producer, among other things, cited the arbitration clause in the Rights Agreement and requested the Court to require Boyle to arbitrate the dispute with IFTA.  A true and correct copy of Director/Producer's Motion to Dismiss is attached as Exhibit C.

5.   On April 10, 2019, Boyle conceded that she was subject to this arbitration provision, and that Director/Producer's effort to compel arbitration had merit, by filing a First Amended Complaint ("FAC") which dropped Director/Producer from the federal action entirely. As a result, the Court terminated Director/Producer and vacated her Motion to Dismiss. *See* Apr. 11, 2019 Civil Minutes; *see generally* FAC.

Director/Producer Concurrently Initiates Arbitration Against Boyle; Boyle Counter-Claims Against Director/Procedure for Copyright Infringement

6.   On or about April 11, 2019, Director/Producer filed an arbitration claim against Boyle with IFTA. A true and correct copy of said arbitration claim is attached as Exhibit D.

7.   On or about May 15, 2019, Boyle filed an Answer and Counter-Claim against Director/Producer in the IFTA arbitration, alleging that Director/Producer was liable for Copyright Infringement. Boyle re-alleged the

3

1 same allegations as Boyle had alleged in her federal Copyright Infringement
2 complaint and again referenced Adler's involvement in the distribution of the
3 Film. A true and correct copy of said arbitration claim is attached as Exhibit E.

4   8.   Collectively, the IFTA claims and counterclaims filed by Boyle and
5 Producer/Director as parties to the arbitration clause contained in the Rights
6 Agreement are referred to as the "**IFTA Infringement Arbitration**."

7   After Boyle's *First* Refusal to Arbitrate Against Adler, the Court Compels
8   Boyle to Arbitrate Against Adler Based Upon "Equitable Estoppel"

9   9.   Upon my information and belief, Adler does not have an arbitration
10 agreement with Boyle, and Boyle has never claimed any such separate
11 agreement exists.

12   10.   Notwithstanding the lack of such an arbitration agreement between
13 these parties, and the fact that Adler was not a party to the arbitration clause in
14 the Rights Agreement, I believed Adler could still compel Boyle to arbitrate
15 against Adler pursuant to the arbitration clause in the Rights Agreement based
16 upon the theory of "equitable estoppel," and set forth in, *e.g., Goldman v. KPMG*
17 *LLP*, 173 Cal. App. 4th 209, 219 (2009) and other related case law. I thus met
18 and conferred with Boyle's counsel in advance of filing a motion to compel
19 arbitration based upon the "equitable estoppel" theory.

20   11.   Boyle, through her counsel, refused to arbitrate and argued that
21 Adler cannot require or compel arbitration because, among other things, Boyle
22 contended that Adler did not have an arbitration agreement with Boyle (her
23 "First Refusal to Arbitrate").

24   12.   On May 22, 2019, and as a result of Boyle's First Refusal to
25 Arbitrate, Adler filed her Motion to Compel Arbitration and to Dismiss and/or
26 Stay the Litigation ("Adler's Motion to Compel Arbitration") based upon,
27 without limitation, the "equitable estoppel" theory set forth in *Goldman* and

28

4

other related case law.  On May 24, 2019, the other remaining defendants to this action (Amazon and Dreamscape), filed motions to join Adler's Motions to Compel Arbitration.

13.     On May 30, 2019, Boyle filed her **Opposition** to Adler's Motion to Compel Arbitration, claiming without limitation that (1) Adler's Motion was based on the false premise that Boyle's federal lawsuit involves a contract dispute, and (2) even if there was a contract dispute, Adler could not enforce the arbitration clause in the Rights Agreement because she was not a party to the agreement.

14.     On June 27, 2019, Adler filed her Reply in support of her Motion to Compel Arbitration.

15.     On or about July 15, 2019, the Court issued a tentative ruling on Adler's Motion to Compel Arbitration.  The Court tentatively concluded that:

(A)     "[W]hether [Director/Producer] validly exercised the Option Agreement is a dispute that arises under that contract, such that [***Director/Producer***] and Plaintiff would be required to arbitrate that dispute" (*see* p. 7);

(B)     "[T]he question of whether [Director/Producer] obtained rights to the Screenplay pursuant to the Option Agreement is fundamental to the question of whether [***the other***] Defendants infringed on Plaintiff's copyright (*see* p. 9); and

(C)     Although Adler was a non-signatory to the arbitration clause, under the "equitable estoppel" doctrine of *Goldman* and related case law, "the Court would find that the copyright claim is inextricably bound up in the obligations and terms of the Option Agreement," citing *ValueSelling Assocs. LLC v. Temple*, 2009 WL 3736264, at *8-*10 (S.D. Cal. Nov. 5,

5

2009) (holding that nonsignatory defendant could compel arbitration against signatory plaintiff alleging a copyright infringement claim). (*see* p. 11)."

Thus, the Court tentatively concluded it would grant Adler's Motion to Compel Arbitration based upon the "equitable estoppel" theory.  A true and correct copy of the Court's tentative ruling is attached as Exhibit F.

16.    On July 15, 2019, at the hearing on Adler's Motion to Compel Arbitration, the Court again indicated it would grant the Motion, but observed that there were ***two*** arbitrations already pending - *i.e.* Adler had filed an IFTA arbitration indemnification action against Director/Producer for damages in the event Boyle prevailed on her copyright infringement action against Adler (the "Indemnity Arbitration").  The Court then asked the parties to assist with the determination of two questions: (1) "which" of the two pending IFTA arbitrations he should "refer" Plaintiff's Federal Case to as part of his order granting the Motion, and (2) whether perhaps the arbitrator could order both of the pending arbitrations consolidated. The Court ordered the parties to confer with the arbitrator to obtain his response to this procedural question.  A true and correct copy of the Court's minute order dated July 15, 2019 is attached hereto as Exhibit G.

17.    On August 23, 2019, the arbitrator appointed to the IFTA Infringement Arbitration (but not appointed in the Indemnity Arbitration) held a telephonic status conference with the parties, including Adler, to address the Court's procedural questions.  Thereafter, the parties - including Boyle - drafted and distilled the arbitrator's comments into a joint status report informing the Court of the results of the August 23, 2019 hearing with the arbitrator, including the arbitrator's conclusions ("Joint Status Report").

18.    On September 10, 2019, the parties - including Boyle's counsel -

6

**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF MOTION TO DISMISS**

executed and submitted the Joint Status Report. A true and correct copy of the Joint Status Report is attached as Exhibit H. In summary, the arbitrator pointed out that, if the Court was inclined to grant Adler's Motion to Compel Arbitration, the Motion should simply be granted without addressing either point.

19.   As to the arbitrator's specific comments on the two questions, the Joint Status Report states that, during the one-hour telephone conference with the arbitrator (which took place on August 23, 2019, and not September 4, 2019, as stated in the Joint Status Report), the arbitrator had stated:

> As to "which" pending arbitration the Court should "refer" Plaintiff to, Arbitrator Rifkin pointed out that:
>
> (1) Plaintiff's recourse if the Motion is granted is to *file her own arbitration including all parties*;
>
> (2) Neither arbitration appropriately supports a "referral" because *neither arbitration contains all of Plaintiff's actual copyright claims*;
>
> (3) Arbitrator Rifkin does not have all parties to the Federal Case before him in the First Arbitration; and
>
> (4) The arbitrator appointed to Plaintiff's arbitration must successfully review and clear any conflicts, which is premature at this time because all the parties are not before Arbitrator Rifkin at this time.
>
> As to the Court's suggestion that the arbitrator consolidate the already pending arbitrations, Arbitrator Rifkin pointed out:
>
> (1) Consolidation of the First and Second Arbitrations is not a critical concern because the Second Arbitration is *one for indemnity* which, as a practical matter, is premature because it can be resolved only after a hearing on the First Arbitration in any event.
>
> (2) Arbitrator Rifkin is appointed for only the First Arbitration and thus *has no power over the Second Arbitration*, and no authority or ability at this time to order that second arbitration consolidated with the first.

(*See* pp. 2:19- 3:13.)

20.   In Part II(A) of the Joint Status Report, Boyle conceded that "as

7

1  Arbitrator Rifkin has pointed out, Defendant's claim for indemnity is premature.

2  None of the Defendants in the Federal Case have been ordered to pay any money

3  to Plaintiff." (*See* p. 3:20-22.)

4     21.   In Part II(B) of the Joint Status Report, Adler stated that:

> "As Arbitrator Rifkin respectfully suggested, the proper procedure
> for ruling on the Motion would be for the Court to simply grant the
> Motion using the standard form of order whereby the court stays or
> dismisses the action. ***Plaintiff will then either file her copyright
> claims against <u>all</u> parties in arbitration <u>or abandon her case</u>.***"

     22.   On September 12, 2019, the Court in effect concluded that it was
required only to enter an Order compelling Boyle to arbitrate, and based on the
tentative ruling issued on July 15, 2019, and for reasons stated on the record,
granted Adler's Motion to Compel Arbitration. A true and correct copy of the
Court's final Order is attached as Exhibit I.

### <u>As a *Second* Refusal to Arbitrate, Boyle Refuses to Include Adler in the IFTA Arbitration and Proceeds Only Against Director/Producer, who Remained in Pro Per</u>

     23.   Before the IFTA Infringement Arbitration began, and despite the
fact that (a) Boyle had no separate arbitration agreement with Adler, and (b) the
Court had compelled Boyle to arbitrate based upon "equitable estoppel," Boyle's
counsel told me that he would not agree not to include Adler in the IFTA
Infringement Arbitration. (Judge Rifkin had agreed to stay the matter so the
parties could stipulate to adding all necessary parties). I stated to and made it
clear to Boyle's counsel that proceeding to arbitration without Adler was
improper for numerous reasons, including that it was apparent that Boyle was
trying to "pick off" and proceed against Director/Producer alone because she was
and is a critical witness to all defendants' defense of copyright infringement,
would not represented by an attorney at the arbitration, and had no experience

8

with arbitration or litigation, and that Boyle was seeking (among other things) an unfair advantage.

24.    Notwithstanding, Boyle proceeded in the IFTA Arbitration - which was grounded upon the arbitration provision contained in the Rights Agreement - against the Director/Producer alone, who remained in pro per for the arbitration just as she had in this litigation.

25.    Director/Producer, who had no counsel to represent her, lost her case and the arbitrator decided that Director/Producer had infringed Boyle's copyright.  A true and correct copy of the arbitration award is attached as Exhibit J.

<u>After the IFTA Arbitration Concludes, Boyle Demands that Adler Enter into a **New and Separate** Arbitration Agreement for a Second Arbitration</u>

26.    On October 22, 2019, Boyle's counsel sent me an email stating that, having successfully concluded a first arbitration against Director/Producer in pro per for copyright infringement, he was now ready to proceed with the same copyright infringement claims against Adler and the remaining distributor defendants (Amazon and Dreamscape). However, Boyle counsel relayed that IFTA had **refused** to open a new, second arbitration without a supporting arbitration agreement between parties, and that "in order for IFTA to accept the arbitration, it would need a stipulation filed by the parties agreeing to the IFTA arbitration."  Boyle's counsel attached a proposed "stipulation" to his email which, in fact, contained the following, separate agreement to arbitrate clause:

> "Plaintiff and Defendants hereby stipulate, by and through their attorneys of record, that the copyright infringement dispute be administered and resolved by final and binding arbitration under the IFTA Rules for International Arbitration, the arbitration shall be heard in Los Angeles, California. The Parties agree to accept service of process in accordance with the IFTA® Rules and agree that such service satisfies all requirements to establish personal

9

---

**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF MOTION TO DISMISS**

jurisdiction over the Parties."

A true and correct copy of that email and proposed stipulation is attached as Exhibit K.

27.    In communications with Boyle's counsel, I indicated that, since Boyle had *already* proceeded to arbitration based upon the arbitration provision set forth in the Rights Agreement - the very agreement upon which the Court based its "equitable estoppel" arbitration order - Adler had no obligation to enter into a new, separate arbitration agreement with Boyle.  A true and correct copy of certain of our email communications from our meet and confer between November 1, 2019 and November 13, 2019 is attached hereto as Exhibit L.

Prejudice to Adler Based Upon "Separate" Arbitrations

28.    Because the IFTA Infringement Arbitration award is not binding upon Adler (see Memorandum of Points and Authorities, section II(A)(4)), Adler will seek to present a full defense to any infringement action by Boyle - including by revisiting all defenses and issues tried or which could have been tried in the initial IFTA Infringement Arbitration against Director/Producer, such as the disputed interpretation of the amount of the Option fee and whether Director/Producer in fact performed. Based on my review of the arbitration award, I can see that my approach to the lawsuit was different and that I would have presented Adler's defense in a vastly different and more complete manner than Director/Producer did in pro per.

29.    However, by singling out Director/Producer and proceeding solely against her first while she was in pro per, Boyle has already "gamed" the arbitration system. Without limitation:

30.    I anticipate that Boyle seeks to foist a new and separate IFTA arbitration upon Adler precisely because this will enable Boyle to request IFTA to assign the very same arbitrator who presided over the initial IFTA

10

Infringement Arbitration and ruled in Boyle's favor. Having already made a decision on the very same infringement issues, the arbitrator - with all due respect to all adjudicators - is human and cannot "unring the bell" of his prior conclusions.  As such, the same arbitrator could be disposed, whether knowingly or not, to reaching the same conclusions as he did before, regardless of the fact that defense lawyers would handle the proceeding.

31.    Even if a different IFTA arbitrator (or even a different tribunal altogether) were assigned to adjudicate the matter, an arbitrator is ordinarily not bound to the rules of evidence. Boyle's counsel will likely attempt to disclose the first IFTA Infringement Arbitration ruling to the second arbitrator, who could then consider and possibly even rely upon the ruling when making his or her own adjudication of the infringement claims against Adler, *despite* the fact that Adler did not have any opportunity therein to defend itself or its interpretation of the Rights Agreement, and cannot be bound to such determination.

32.    Boyle's attempt to secure a second arbitration against Adler (with no separate arbitration agreement in place to support such second arbitration), unduly prejudices Adler for any future arbitration of this matter and at worst violates Adler's due process rights because it erodes Adler's right to a full and fair determination of all issues - which Adler never waived or agreed to because she never entered into a separate arbitration agreement.

Prejudice to Adler Based Upon *Unavailability* of Director/Producer as a "Key Witness" to Adler's Defense

33.    As set forth below, Director/Producer is no longer within the subpoena power of a California judge or arbitrator. However, Director/Producer remains a *critical* witness for Adler's defense against copyright infringement. As the Court acknowledged when ordering Boyle to arbitrate her copyright infringement claims against Adler (*see* Ex. F, p. 9), defendants view the question

11

of whether Director/Producer obtained rights to the Screenplay pursuant to the Option Agreement to be fundamental to the question of whether Defendants infringed on Boyle's copyright. Because the IFTA Infringement Arbitration award is not binding upon Adler (see Memorandum of Points and Authorities, section II(A)(4)), Adler would be entitled to retry any issues addressed in the first IFTA Infringement Arbitration against Director/Producer as well as introduce any evidence that Director/Producer - in pro per - failed to introduce.

34.   Based upon my witness interviews of Director/Producer and review of the documents available (*e.g., see* Ex. D (Director/Producer's arbitration claim), I present Adler's "offer of proof" (so to speak) of examples of evidence for numerous issues of which Director/Producer appears to be the only reliable witness for Adler's defense against infringement, without limitation:

35.   *Amount of Initial Purchase Price*: Under the Rights Agreement, the purchase price is described as "3% of the final budget of the Picture (with exclusions for contingency, actual bond fees, finance charges and purchase price for screenplay), floor of $125,000, cap of $250,000." (*See* Ex. A, Feeney-Orchard Decl. ¶ 3, Ex. A at 5.) Boyle interprets the purchase price language to mean that the stated floor and cap refer to the final purchase price itself, so that Director/Producer would pay at minimum $125,000. See FAC ¶¶ 5, 7-9. At any adjudication, Adler would contend that the purchase price language instead means that the stated floor and cap are of the budget, so that Director/Producer would pay at minimum $3750 (3% x $125,000 minimum = $3750), and establish that the contract is vague and requires interpretation.

36.   If Director/Producer was available as a witness (as she was at the initial IFTA Infringement Arbitration) Adler would have called Director/Producer as a witness to establish and introduce the following facts and evidence on the contractual ambiguity and supporting Adler's $3,750

**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF
MOTION TO DISMISS**

interpretation, that:

- Director/Producer was completing her master's degree at the University of Western London and the Met Film School and had limited funds available to direct and produce a film required for her thesis graduation project;

- Director/Producer informed Boyle and her attorney that Director/Producer was a student of limited means with a very small budget to make a film, and Director/Producer rejected the higher fees Boyle initially requested (*see* Ex. D (Director/Producer's arbitration claim);

- During the ***pre-contract*** negotiations, Director/Producer expressly told Boyle that the "floor" was to be the "fee," and provided an example that if the budget was $55,000, then the fee would be $1,650 (3% x $55,000 = $1,650). In response, Boyle said she was looking for a different deal. But then, in response to Boyle, Director/Producer offered to raise the floor of the minimum budget (*e.g.,* to $125,000, so that the minimum fee would be $3,750) - to which Boyle said "**yes**" and then signed the Rights Agreement; and

- The actual budget for the film was approximately $125,000, such that the amount Boyle now claims as her fee was literally the entire budget for the Film, and further that all draft budgets for the Film reflected a fee to Boyle consistent with Adler's interpretation of the Rights Agreement.

37.     *Director/Producer's Performance of Rights Agreement*: I am informed and believe based upon my discussions with Boyle's counsel that, if there were an adjudication between Boyle and Adler, Boyle will contend that

13

**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF MOTION TO DISMISS**

even if the purchase price were $3,750, Orchard never paid it.

38.     If Director/Producer was available as a witness (as she was at the initial IFTA Infringement Arbitration) Adler would have called Director/Producer as a witness to establish and introduce the following facts, evidence and argument that:

- After the film was made, Director/Producer wrote Boyle a check for $3,750, was intending to mail the check to Boyle, and in fact told Boyle she was mailing it, through which Adler would argue Director/Producer expressly tendered of her performance of the Option purchase price under the Rights Agreement with the effect that the obligation was extinguished (*see* Civil Code sections 1485, 1504); and/or

- The only reason that Director/Producer did not mail the check was because Boyle's attorney responded and told Director/Producer in effect "don't bother to mail the check" because Boyle was instead owed $125,000, which through which Adler would argue that Boyle refused to accept Director/Producer's tender of performance thereby excusing Director/Producer's performance and equating it to actual production thereof (*see* C.C.P. section 2074).

A true and correct copy of the $3,750 check which I am informed and believe would have been authenticated by Director/Producer is attached hereto as Exhibit M.

39.     *Resolution of Dispute by Subsequent Directions to Pay and Payment*:   Once Adler learned that Boyle and Director/Producer were in a dispute over payment of the Option, Adler encouraged Orchard to resolve the dispute, as she continued to have extensive contacts with Boyle, including by

14

negotiating a "direction to pay" Boyle.  Among other things, I am informed and believe that Boyle will claim that Mr. Lunt never mailed the first direction to pay to Boyle's attorney.

40.   If Director/Producer was available as a witness (as she was at the initial IFTA Infringement Arbitration), Adler would have called Director/Producer as a witness to establish that:

- Mr. Lunt did in fact timely return the direction(s) to pay by mail, and subsequently acted upon it with her, including requiring substantial execution of an assignment based upon it.

41.   However, although Director/Producer attended the initial IFTA Infringement Arbitration, she is _**no longer within the subpoena power of this Court or any arbitrator**_.

42.   In her initial federal Complaint, Boyle describes Director/Producer as "an individual currently residing in London, England." (Ex. B, par. 5.)

43.   I am informed and believe that Director/Producer is a citizen and resident of Australia, based upon without limitation that Director/Producer stated so much to me orally and in writing.  I am also informed and believe that Boyle was aware that Director/Producer did not reside in the United States at the time Boyle was compelled to arbitrate this matter and participated in the IFTA Copyright Arbitration.

44.   On or about October 20, 2019, Director/Producer emailed IFTA, stating "What a shameful system exists in the United States. Thankfully I live in Australia thus I will require that this is pursued in the Australian Courts  in order for any further payments to be made."   In the same email string, Director/Producer further emailed me to confirm that she will not participate in any further arbitrations through IFTA (including the IFTA Indemnity Arbitration

15

**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF MOTION TO DISMISS**

presently pending against her), stating "*I have no intention of further dealing with IFTA* and as such I will not be participating in your arbitration. If you seek further indemnification, *please contact me through an Australian lawyer and the Australian courts*."). A true a correct copy of this email string is attached as Exhibit N.

45.    Adler thus has no ability to compel Director/Producer's attendance at any further proceedings in California of any type - whether by deposition or attendance at a hearing.

46.    Had Boyle proceeded with one single arbitration against all defendants, Director/Producer would have been available as a witness to the defense, and Adler and all defense counsel would have been able to question Director/Producer on the stand and obtain testimony from Director/Producer on the critical issues described above.

47.    Instead, Boyle (who was aware that Director/Producer was not amenable to subpoena in California) demands that Adler arbitrate in a "second" arbitration, where Adler is now further prejudiced by Adler's inability to subpoena and legally enforce the testimony of Director/Producer, who has already indicated that she will not return voluntarily.

The Present Motion to Dismiss and Local Rule 7-3 Compliance

48.    In addition to the communications between counsel set forth above, on November 12, 2019, I formally met and conferred by telephone with Boyle's counsel pursuant to L.R. 7-3 in advance of filing this motion to dismiss. At this official meet and confer conference, the propriety of a separate second arbitration of this dispute and the grounds therefore were discussed by both counsel, including Adler's arguments that Boyle abandoned and/or waived any ability to pursue a copyright infringement action against Adler when Boyle refused to abide by the Court's Order compelling Boyle to arbitrate by failing to

**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF MOTION TO DISMISS**

include Adler in the Arbitration against Boyle, which was the only contractual arbitration then properly supported by the Rights Agreement.  A true and correct copy of my November 12, 2019 email to Boyle's counsel confirming our oral meet and confer is attached as Exhibit O.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _December 2,_ 2019

Amy B. Lawrence

---

17

**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF
MOTION TO DISMISS**

EXHIBIT "A"

1   Amy B. Lawrence, Esq. - Bar # 115874
2   LAWRENCE & ASSOCIATES
    Attorneys at Law
3   2550 N. Hollywood Way, Suite 202
    Burbank, CA 91505
4   Telephone: (818) 843-6442
5   Facsimile: (818) 566-7875
    Email: ablawrence@lawandassoc.com
6

7   Attorneys for Defendant
8   ADLER & ASSOCIATES ENTERTAINMENT, LLC

9                   UNITED STATES DISTRICT COURT
10                  CENTRAL DISTRICT OF CALIFORNIA
11

12  KIMBERLY BOYLE                      | CASE NO.  2:19CV00893-GW(SKx)
13                     Plaintiff,        |
                                         | DECLARATION OF CHARIS
14       vs.                             | FEENEY-ORCHARD IN SUPPORT
                                         | OF DEFENDANT ADLER &
15                                       | ASSOCIATES ENTERTAINMENT,
    ADLER & ASSOCIATES                   | LLC'S MOTION TO COMPEL
16  ENTERTAINMENT, LLC, a California     | ARBITRATION AND TO DISMISS
    LLC; AMAZON.COM, INC., a             | AND/OR STAY THE LITIGATION
17  Delaware corp.; DREAMSCAPE           |
    MEDIA, LLC, an Ohio LLC; and         | [Filed Concurrently with Motion to
18  DOES 1 through 10, inclusive,        | Compel Arbitration and to Dismiss
                                         | and/or Stay the Litigation; Declaration
19                     Defendants.       | of Jeremy J. Lunt; Declaration of Amy
                                         | B. Lawrence; and [Proposed] Order]
20                                       |
21                                       | Date: June 20, 2019
                                         | Time: 8:30 a.m.
22                                       | Courtroom:  9D
                                         |
23                                       | Trial Date: None set
                                         |
24                                       | Judge: Hon. George H. Wu
25
26
27
28
    _____
         DECLARATION OF CHARIS FEENEY-ORCHARD IN SUPPORT OF
                    MOTION TO COMPEL ARBITRATION

I, Charis Feeney-Orchard, hereby declare as follows.

1.    I am over 18 years of age and have personal knowledge of the facts set forth herein.

2.    I am the director and producer of the film "Inner Peace."

3.    On or about November 4, 2014, Kimberly Boyle and I entered into a "SCREENPLAY OPTION PURCHASE AGREEMENT" (the **"Rights Agreement"**) dated May 12, 2014 for the purchase of the rights to Boyle's screenplay then entitled "Casanova Lost and Found," which was used for the film "Perfect Piece."  A true and correct copy of said agreement is attached as Exhibit A.

4.    On or about March 6, 2019, I received an email from counsel for Kimberly Boyle in which he demanded "payment of the $125,000 that you owe her under the terms of your option agreement." A true and correct copy of said email is attached as Exhibit B.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: ᒣ7th May_____, 2019

_Charis Feeney Orchard_
Charis Feeney-Orchard

2

**DECLARATION OF CHARIS FEENEY-ORCHARD IN SUPPORT OF MOTION TO COMPEL ARBITRATION**

EXHIBIT "A"

MOTION TO DISMISS: Attachment B

Charis Feeney-Orchard
Purchaser/Director
8 Haven Green
Ealing, London, W5 2UU
United Kingdom
Email: charisorchard@gmail.com
Tel: +44 7455 309593

Kim Boyle
C/o Jay S. Kenoff, ESQ.
Kenoff & Machtinger, LLP
1801 Century Park East,
Suite 1520
Los Angeles, California 90067
United States of America
Email:Jay@km-
entertainmentlaw.com
Tel: +1 (310) 552 0808

## SCREENPLAY OPTION PURCHASE AGREEMENT

This Option Purchase Agreement made on 12 May 2014 by and between Kim Boyle, (hereinafter referred to as the "Transferor") and Charis Feeney-Orchard (hereinafter referred to as "Purchaser").

WHEREAS, the Transferor is the sole and exclusive owner throughout the world of all rights in and to the screenplay for a feature-length motion picture (the "Picture") presently-entitled: "Casanova Lost and Found" (formerly known as "This Albert DiGrazia"! that was also written by the Transferor which work has been filed in the Office of the Writers Guild of America West, Los Angeles, California, USA, under Registration Number 818942 (a copy of which is attached as Appendix A to this Agreement), this work including all adaptations and/or versions, the titles, characters, plots, themes and story line is collectively referred to as the "Property"; and

WHEREAS, Purchaser wants to acquire certain rights of the Transferor in consideration for the purchase price provided herein and in reliance upon the Transferor's representations and warranties;

NOW, THEREFORE, the parties agree as follows:

1. RIGHTS: Upon exercise of the Option (as described below) and payment of the Purchase Price (as described herein), the Transferor will irrevocably transfer, sell, grant, convey and assign to the Purchaser, and the Purchaser's successors, licensees and assigns exclusively and forever, except for the reserved rights described below, all motion picture rights (including all silent, sound dialogue and musical motion picture rights), all television motion picture and other television rights, together with limited radio broadcasting rights and 7,500 word publication rights for advertisement, publicity and exploitation purposes, and certain incidental and allied rights, throughout the world, in and to the Property and in and to any intellectual property including the copyright thereof and all renewals and extensions of copyright. Included among the rights granted to Purchaser hereunder (without in any way limiting the grant of rights hereinabove made) are the following sole and exclusive rights throughout the world in perpetuity:

(a) To make, produce, adapt and copyright (or otherwise protect) one or more motion picture adaptations or versions (the initial one of which shall be the Picture), whether fixed on film, tape, disc, wire, audio-visual cartridge, cassette or through any other technical process whether now known or hereafter devised, based in whole or in part on the Property, of every size, gauge, colour, dimension or type, including, but not limited to, musical motion pictures and remakes of and sequels (or prequels) to any motion picture produced hereunder and motion pictures in series or serial form, and for such purposes to record and reproduce and license others to record and reproduce, in synchronization with such motion pictures, spoken words taken from or based upon the text or theme of the Property and any and all kinds of music, musical accompaniments and/or lyrics to be performed or sung by the performers in any such motion picture and any and all other kinds of sound and sound effects.

1

(b) To make, produce, distribute, sell, license, assign, transfer, exhibit, perform, rent, lease and generally deal in and with any of the foregoing:

(i) by all means or technical processes whatsoever, whether now known or hereafter devised including, by way of example only, film, tape, disc, wire, audio-visual cartridge, cassette or television (including commercially sponsored, sustaining and subscription or pay-per-view television, or any derivative thereof); and

(ii) in any place whatsoever, including, by way of example only and without limitation to, homes, theatres and elsewhere, and whether or not a fee is charged, directly or indirectly, for viewing any such motion picture.

(c) To broadcast, transmit or reproduce the Property or any adaptation or version thereof (including, by way of example only and without limitations to, any motion picture produced hereunder and/or any script or other material based on or utilizing the Property or any of the characters, themes or plots thereof), by means of television or any process analogous thereto whether now known or hereafter devised (including commercially sponsored, sustaining and subscription or pay-per-view television), through the use of motion pictures produced on films or by means of magnetic tape, wire, disc, audio-visual cartridge or any other device now known or hereafter devised and including such television productions presented in series or serial form, and the exclusive right generally to exercise for television purposes all the rights granted to Purchaser hereunder for motion picture purposes.

(d) Without limiting any other rights granted Purchaser, to broadcast and/or transmit by television or radio or any process analogous thereto whether now known or hereafter devised, all or any part of the Property or any adaptation or version thereof, including any motion picture or any other version or versions thereof, and announcements pertaining to said motion picture or other version or versions, for the purpose of advertising, publicizing or exploiting such motion picture or other version or versions, which broadcasts or transmissions may be accomplished through the use of living actors performing simultaneously with such broadcast or transmission or by any other method or means including the use of motion pictures (including trailers) reproduced on film or by means of magnetic tape or wire or through the use of other recordings or transcriptions.

(e) To publish, copyright and protect or cause to be published, copyrighted and protected in the name of Purchaser or its nominee in any and all languages throughout the world, in any form or media, synopses, novelizations, serializations, dramatizations, abridged and/or revised versions of the Property, not exceeding 75,000 words each, adapted from the Property or from any motion picture and/or other version of the Property for the purpose of advertising, publicizing and/or exploiting any such motion picture and/or other version.

(f) For the foregoing purposes to use all or any part of the Property and any of the characters, plots, themes and/or ideas contained therein, and the title of the Property and any title or subtitle of any component of the Property, and to use said titles or subtitles for any motion picture or other version of adaptation whether or not the same is based on or adapted from the Property and/or as the title of any musical composition contained in any such motion picture or other version or adaptation.

(g) To use and exploit commercial or merchandise licenses, tie-ups, promotions and recordings of any sort and nature arising out of or connected with the Property and/or its motion picture or other versions and/or the title or titles thereof and/or the characters thereof and/or their names or characteristics. 

All rights, licenses, privileges and property herein granted to Purchaser

2

shall be cumulative and Purchaser may exercise or use any or all said rights, licenses, privileges or property simultaneously with or in connection with or separately and apart from the exercise of any other of said rights, licenses, privileges and property; provided that Purchaser's initial production hereunder is the Picture. If the Transferor hereafter makes or publishes or permits to be made or published any revision, adaptation, sequel, prequel, translation or dramatization or other versions of the Property, then Purchaser shall have and the Transferor hereby grants to Purchaser, subject to the terms and conditions, including without limitation, the payment provisions set forth hereinbelow, all of the same rights therein as are herein granted Purchaser. The terms "Picture" and "Pictures" as used herein shall be deemed to mean or include any present or future kind of motion picture production based upon the Property, with or without sound recorded and reproduced synchronously therewith, whether the same is produced on film or by any other method or means now or hereafter used for the production, exhibition and/or transmission of any kind of motion picture productions.

2. RIGHTS RESERVED: The following limited rights are reserved for the Transferor's continued and future use and disposition:

(a) Publication Rights: The right to publish and distribute printed versions of the Property owned or controlled by the Transferor in written book form, whether hardcover or soft-cover, and in magazine or other similar periodicals (which may be published as a continuing series of instalments), subject to Purchaser's rights as provided for in Clause 1 above.

(b) Stage Rights: The right to perform the Property or adaptations thereof on the spoken stage with actors appearing in person in the immediate presence of the audience, provided no broadcast, telecast, recording, photography or other reproduction of such performance is made. The Transferor agrees not to exercise, or permit any other person to exercise, said stage rights earlier than five (5) years after the first general release or telecast, if earlier, of the first Picture produced hereunder, or seven (7) years after the date of exercise of the purchaser's option to acquire the property, whichever is earlier.

(c) Radio Rights: The right to broadcast the Property by sound (as distinguished from visually) by radio, subject however to Purchaser's right at all times to: (i) exercise its radio rights provided in Clause 1 above for advertising and exploitation purposes by living actors or otherwise, by the use of excerpts from or condensations of the Property or any Picture produced hereunder; and (ii) in any event to broadcast any Picture produced hereunder by radio. The Transferor agrees not to exercise, or permit any other person to exercise, the Transferor's radio rights earlier than five (5) years after the Purchaser first publishes the Property.

(d) Author-Written Sequel: A literary property (story, novel, or drama), whether written by the Transferor or by a successor in interest of the Transferor, using one or more of the characters appearing in the Property, participating in substantially different events from those found in the Property, and whose plot is substantially different from that of the Property. The Transferor shall have the right to exercise publication rights (i.e., in book or magazine form) at any time. The Transferor agrees not to exercise, or permit any other person to exercise, any other rights (including but not limited to motion picture or allied rights) of any kind in or to any author-written sequel earlier than five (5) years after the Purchaser first publishes the Property, provided that such restriction on the Transferor's exercise of said author-written sequel rights shall be extended to any period during which there is in effect, in any particular country or territory, a network television broadcasting agreement for a television motion picture, (i) based upon the Property, or (ii) based upon any Picture produced in the exercise of rights assigned herein, or (iii) using a character or characters of the Property.



3

(e)  Inasmuch  as  the  characters  of  the  Property  are  included  in  the exclusive grant of motion picture rights to Purchaser, no sequel or prequel rights  or  television  series  rights  may  be  granted  to  such  other  person  or company,  but  such  characters  from  the  Property  which  are  contained  in  the author-written  sequel  may  be  used  in  a  motion  picture  and  remakes  thereof whose  plot  is  based  substantially  on  the  plot  of  the  respective  author-written sequel.

It  is  expressly  agreed  that  the  Transferor's  reserved  rights  under  this subclause  relate  only  to  material  written  or  authorized  by  the  Transferor and  not  to  any  revision,  adaptation,  sequel,  prequel,  translation  or dramatization  written  or  authorized  by  Purchaser,  even  though  the  same  may contain  characters  or  other  elements  contained  in  the  Property.

3.  RIGHT  TO  MAKE  CHANGES:   the  Transferor  agrees  that  Purchaser  shall  have the  unlimited  right  to  vary,  change,  alter,  modify,  add  to  and/or  delete from  the  Property,  and  to  rearrange  and/or  transpose  the  Property  and change  the  sequence  thereof  and  the  characters  and  descriptions  of  the characters  contained  in  the  Property,  and  to  use  a  portion  or  portions  of the  Property  or  the  characters,  plots,  or  theme  thereof  in  conjunction  with any  other  literary,  dramatic  or  other  material  of  any  kind.   The  Transferor hereby  waives  the  benefits  of  any  provisions  of  law  known  as  the  "droit moral"  or  any  similar  law  in  any  country  of  the  world  and  agrees  not  to permit  or  prosecute  any  action  or  lawsuit  on  the  ground  that  any  Picture  or other  version  of  the  Property  produced  or  exhibited  by  Purchaser,  its assignees  or  licensees,  in  any  way  constitutes  an  infringement  of  any  of the  Transferor's  droit  moral  or  is  in  any  way  a  defamation  or  mutilation  of the  Property  or  any  part  thereof  or  contains  unauthorized  variations, alterations,  modifications,  changes  or  translations.

4.  DURATION  AND  EXTENT  OF  RIGHTS  GRANTED:   Upon  exercise  of  the  Option  and payment   of   the   Purchase   Price,   Purchaser   shall   enjoy,   solely   and exclusively,   all   the   rights,   licenses,   privileges   and   property   granted hereunder  throughout  the  world,  in  perpetuity,  as  long  as  any  rights  in  the Property  are  recognized  in  law  or  equity,  except  insofar  as  such  period  of perpetuity  may  be  shortened  due  to  any  now  existing  or  future  copyright  by the  Transferor  of  the  Property  and/or  any  adaptations  thereof,  in  which case  Purchaser  shall  enjoy  its  sole  and  exclusive  rights,  licenses, privileges  and  property  hereunder  to  the  fullest  extent  permissible  under and  for  the  full  duration  of  such  copyright  or  copyrights,  whether  common law  or  statutory,  and  any  and  all  renewals  and/or  extensions  thereof,  and shall  thereafter  enjoy  all  such  rights,  licenses,  privileges  and  property non-exclusively  in  perpetuity  throughout  the  world.   The  rights  granted herein  are  in  addition  to  and  shall  not  be  construed  in  derogation  of  any rights  that  Purchaser  may  have  as  a  member  of  the  public  or  pursuant  to  any other  agreement.    All  rights,  licenses,  privileges  and  property  granted herein  to  Purchaser  are  irrevocable  and  not  subject  to  rescission, restraint  or  injunction  under  any  circumstances.    Notwithstanding  the foregoing,  if  Purchaser  exercises  the  Option  and  fails  to  produce  the Picture  within  seven  (7)  years  of  the  date  of  this  Agreement  or  five  (5)  of the  date  of  exerercise  of  the  Option,  all  rights  shall  revert  to  Transferor with  a  lien  in  favour  of  Purchaser  for  Purchaser's  actual  out-of-pocket expenses  incurred  in  connection  with  the  acquisition  of  the  Property, payable  upon  commencement  of  production  of  the  Picture  by  a  third  party.

5.  CONSIDERATION:   The  following  terms  shall  apply  to  this  Agreement:

Option:   In  consideration  of  the  option  payment  specified  below,  Purchaser shall  have  an  option  (the  "Option")  to  acquire  the  Rights  described hereinabove  on  the  terms  and  conditions  specified  in  this  Agreement.

Term:   The  initial  option  term  shall  be  12  months  from  the  date  of Transferor's  execution  of  this  Agreement;  renewable  for  an  additional period  of  12  months  upon  written  notice  to  Transferor  and  payment  of  the

4

option extension payment prior to the expiration of the initial option period.

Option Payments: Purchaser shall pay Transferor the sum of $500 upon execution of this Agreement for the initial period, with such payment applicable to the Purchase Price and $1,000 for the option extension payment, payment to accompany the written option extension notice; such payment shall not be applicable to the Purchase Price.

Option Exercise: The Option may be exercised by written notice accompanied by payment of the Purchase Price (or, if sooner, upon commencement of principal photography, in which event payment of the Purchase Price shall be made to Transferor within 5 business days thereafter).

Purchase Price: The amount of the Purchase Price shall equal 3% of 3 the final budget of the Picture (with exclusions for contingency, actual bond fees, finance charges and purchase price for screenplay), floor of $125,000, cap of $250,000. If the final budget has not been determined at the time of exercise of the Option, then the minimum amount shall be paid at that time, and the balance shall be paid within 30 days of commencement of principal photography of the Picture.

Box Office Bonus: Transferor will be paid $50,000 at $20 million U.S. theatrical box office as reported in Daily Variety or similar if Daily Variety not available with payment within 30 days of such determination.

Contingent Compensation: For sole writing credit, Transferor will receive 5% of contingent Net Proceeds (or Net Profits, as applicable) defined, accounting for and paid according to the same definition applicable to the Purchaser (or, if none, then on a favored nations basis with any other recipient of a participation in the revenues of the Picture); reducible to 2½% for shared writing credit by percentage paid to another credited writer.

Further Writing:  Transferor shall have the first opportunity to prepare one rewrite and one polish of the Property, fees at applicable WGA minimums + 10%, payable one-half upon start of writing and one-half upon delivery of each work.

Passive Payments for Sequels/Remakes/Spinoffs: These apply for payments to the Transferor for the particular form of work, if Transferor is not the writer and being compensated for writing the particular work. Below amounts reduced by one half if Transferor shares writing credit on the initial Picture.
(a)  Theatrical Sequels: ½ of the Purchase Price and ½ of contingent compensation percentage.
(b)  Theatrical Remakes: 1/3rd of Purchase Price and 1/3rd of contingent percentage.
(c)  Mini-series/MFT: $15,000 per hour for the first two hours, cap at $90K; proration for partial hours.
(d)  Episodic: $5,000/90 min; $3,500/hour; $2,500/half hour.
(e)  Spin-offs: one-half of applicable episodic amount for a generic spin-off, one-fourth of applicable episodic amount for a planted spin-off.

Re-runs: 20% of applicable episodic payment per re-run for first 6 re-runs.

Credit: Per WGA standards, as if applicable, and as otherwise set forth below.



Premiere: Invite for Kim + 1 to premiere with travel and accommodations provided.

6. REPRESENTATIONS AND WARRANTIES:

(a) Sole Proprietor:  the Transferor represents and warrants to Purchaser

5

that the Transferor is the sole and exclusive proprietor, throughout the universe, of that certain original literary material written by the Transferor entitled "Casanova Lost and Found."

(b) Facts:  the Transferor represents and warrants to Purchaser as follows:

(i) The Transferor is the sole author and creator of the Property.

(ii) The Property is unpublished and was registered for copyright in the name of "Casanova Lost and Found" written by Kim Boyle which work has been filed in the Office of the Writers Guild of America West, Los Angeles, California, USA, under Registration Number 919924.

(iii) No motion picture or dramatic version of the Property, or any part thereof, has been manufactured, produced, presented or authorized; no radio or television development, presentation, or program based on the Property, or any part thereof, has been manufactured, produced, presented, broadcast or authorized; and no written or oral agreements or commitments whatsoever with respect to the Property, or with respect to any rights therein, have been made or entered into by o on behalf of the Transferor.

(iv) None of the rights herein granted and assigned to Purchaser have been granted and/or assigned to any person, firm or corporation other than Purchaser herein upon exercise of the Option.

(c) No Infringement or Violation of Third Party Rights:  the Transferor represents and warrants to Purchaser that the Transferor has not adopted the Property from any other literary, dramatic or other material of any kind, nature or description, nor, except for material which is in the public domain, has the Transferor copied or used in the Property the characters, themes, plot, scenes, sequence or story of any other literary, dramatic or other material; that, according to the standard applicable under Article 28 of the WGA Basic Agreement, (i) the Property does not infringe upon any common law or statutory rights in any other literary, dramatic or other material; (ii) no material contained in the Property is libelous or violative of the right of privacy of any person; (iii) the full utilization of any and all rights in and to the Property granted by the Transferor pursuant to this Agreement will not violate the rights of any person, firm or corporation; and (iv) the Property is not in the public domain in any country in the world where copyright protection is available.

(d) No Impairment of Rights:  the Transferor represents and warrants to Purchaser that the Transferor is the exclusive proprietor, throughout the universe, of all rights in and to the Property granted herein to Purchaser; that the Transferor has not assigned, licensed or in any manner encumbered, diminished or impaired any such rights; that the Transferor has not committed or omitted to perform any act by which such rights could or will be encumbered, diminished or impaired; and that there is no outstanding claim or litigation pending against or involving the title, ownership and/or copyright in the Property, or in any part thereof, or in any rights granted herein to Purchaser.  The Transferor further represents and warrants that no attempt shall be made hereafter by the Transferor to challenge, encumber, diminish or impair any of the rights granted herein and that all appropriate protection of such rights will continue to be maintained by the Transferor.

7. INDEMNIFICATION:

(a) The Transferor agrees to indemnify Purchaser against all judgments, liability, damages, penalties, losses, costs, and expense (including reasonable attorneys' fees) which may be suffered or assumed by or obtained against Purchaser by reason of any breach or failure of any warranty or agreement herein made by the Transferor.

(b) Purchaser agrees to indemnify Transferor against all judgments,



6

liability, damages, penalties, losses, costs, and expense (including reasonable attorneys' fees and costs) which may be suffered or assumed by or obtained against Transferor by reason of any matter or things arising out of the development, production, distribution and exploitation of the Picture, the breach or failure of any warranty or agreement herein made by Purchaser and any material added to the Property by Purchaser, except to the extent that the foregoing covered by the Trnasferor's foregoing indemnity.

(c) Upon exercise of the Option and payment of the Purchase Price, all rights, licenses and privileges herein granted to Purchaser are irrevocable and not subject to rescission, restraint or injunction under any circumstances.

8. PROTECTION OF RIGHTS GRANTED: The Transferor hereby grants to Purchaser the free and unrestricted right, but at Purchaser's own cost and expense, to institute in the name and on behalf of the Transferor, or the Transferor and Purchaser jointly, any and all suits and proceedings at law or in equity, to enjoin and restrain any infringements of the rights herein granted, and hereby assigns and sets over to Purchaser any and all causes of action relative to or based upon any such infringement, as well as any and all recoveries obtained thereon. The Transferor will not compromise, settle or in any manner interfere with such litigation if brought; and Purchaser agrees to indemnify and hold the Transferor harmless from any costs, expenses, or damages which the Transferor may suffer as a result of any such suit or proceeding.

9. COPYRIGHT: Regarding the copyright (and/or any other intellectual property right) in and to the Property, the Transferor agrees that:

(a) The Transferor will prevent the Property and any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof whether published or unpublished and whether copyrighted or uncopyrighted, from vesting in the public domain, and will take or cause to be taken any and all steps and proceedings required for copyright or similar protection in any and all countries in which the same may be published or offered for sale, insofar as such countries now or hereafter provide for copyright or similar protection. Any contract or agreement entered into by the Transferor authorizing or permitting the publication of the Property or any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof in any country will contain appropriate provisions requiring such publisher to comply with all the provisions of this clause.

(b) Without limiting the generality of the foregoing, if the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof is published in the United States or in any other country in which registration is required for copyright or similar protection in accordance with the laws and regulations of such country, and the Transferor further agrees to affix or cause to be affixed to each copy of the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof which is published or offered for sale such notice or notices as may be required for copyright or similar protection in any country in which such publication or sale occurs.

(c) Intentionally omitted.



(d) If the Property, or any arrangement, revision, translation, novelization, dramatization or new version thereof, shall ever enter the public domain, then nothing contained in this agreement shall impair any rights or privileges that the Purchaser might be entitled to as a member of the public.

(e) Upon exercise of the Option and payment of the Purchase Price, all

7

rights granted or agreed to be granted to Purchaser under this Agreement shall be irrevocably vested in Purchaser and shall not be subject to rescission by the Transferor or any other party for any cause, nor shall said rights be subject to termination or reversion by operation of law or otherwise, except to the extent, if any, that the provisions of any copyright law or similar law relating to the right to terminate grants of, or recapture rights in, literary property may apply. If, pursuant to any such copyright law or similar law, the Transferor or any successor or any other legally designated party (all herein referred to as "the terminating party") becomes entitled to exercise any right to reversion, recapture or termination (the "termination right") with respect to all or any part of the rights granted or to be granted under this Agreement, and if the terminating party exercises said termination right with respect to all or part of said rights (the "recaptured rights"), then from and after the date on which the terminating party has the right to transfer to a third party all or part of the recaptured rights, Purchaser shall have the first right to purchase and acquire the recaptured rights from the terminating party. If the terminating party is prepared to accept a bona fide offer from a third party with respect to all or part of the recaptured rights, then in each such instance the terminating party shall notify Purchaser of such offer which the terminating party is prepared to accept and the name of the third party who made the offer to the terminating party, and the terminating party shall offer Purchaser the right to enter into an agreement with the terminating party with respect to the recaptured rights on the aforesaid terms and conditions. Purchaser shall have 30 days from the date of its receipt of such written offer within which to notify the terminating party of its acceptance of such offer (provided, however, the Purchaser shall not be required to meet any terms or conditions which cannot be easily met by one person as another, including, without limitation, the employment of a specified person, etc.) if Purchaser shall acquire from the terminating party all or part of the recaptured rights, then the terminating party agrees to enter into appropriate written agreements with Purchaser covering said acquisition. If Purchaser shall elect not to purchase the recaptured rights from the terminating party, then the terminating party may dispose of said recaptured rights, but only to the aforesaid third party and only upon the terms and conditions specified in the aforesaid written notice given by the terminating party to Purchaser, it being understood and agreed that the terminating party may not dispose of said recaptured rights either to: (a) any other proposed transferee; or (b) upon terms and conditions which are more favorable to any transferee than the terms and conditions previously offered to Purchaser hereunder, without again offering to enter into an agreement with Purchaser on: (i) the terms offered to such other transferee; or (ii) such more favorable terms and conditions offered to said proposed transferee, whichever of (a) or (b) shall apply. Any such required offer made to Purchaser by the terminating party shall be governed by the procedure set forth in the preceding four sentences of this Paragraph. The unenforceability of any portion of this Paragraph shall not invalidate or affect the remaining portions of this Paragraph of this Agreement.

10.  CREDIT OBLIGATIONS:  Purchaser shall have the right to publish, advertise, announce and use in any manner or medium, the name, approved biography and approved photographs or approved likenesses of the Transferor in connection with any exercise by Purchaser of its rights hereunder, provided such use shall not constitute an endorsement of any product or service.



The Transferor shall be accorded the following credit on a single card on screen in the main titles of the Picture and in the billing block portion of paid ads (subject to customary exceptions and exclusions), and in size of type (as to height, width, thickness and boldness) equal to the largest size of type of any other main title credit and otherwise subject to the credit requirements of the WGA Basic Agreement:

WRITTEN BY Kim Boyle

8

Additionally, if Purchaser shall exploit any other rights in and to the Property, then Purchaser agrees to give appropriate source material credit to the Property, to the extent that such source material credits are customarily given in connection with the exploitation of such rights.

Purchaser will notify third parties in writing of the foregoing credit requirements. No casual or inadvertent failure to comply with any of the provisions of this clause shall be deemed a breach of this agreement by the Purchaser. The Transferor hereby expressly acknowledges that in the event of a failure or omission constituting a breach of the provisions of this paragraph, the damage (if any) caused the Transferor thereby is not irreparable or sufficient to entitle the Transferor to injunctive or other equitable relief. Consequently, the Transferor's rights and remedies in the event of such breach shall be limited to the right to recover damages in an action at law; provided however, upon written notice by Transferor of a failure or omission regarding the foregoing credit requirements, Purchaser will make good faith efforts to promptly implement a cure.

11. RIGHT OF FIRST NEGOTIATION: Purchaser shall have a right of first negotiation on all Reserved Rights. The term "Right of First Negotiation" means that if the Transferor desires to dispose of or exercise a particular right reserved to the Transferor herein ("Reserved Right"), whether directly or indirectly, then the Transferor shall notify Purchaser in writing and immediately negotiate with Purchaser regarding such Reserved Right. If, after the expiration of thirty (30) days following the receipt of such notice, no agreement has been reached, then the Transferor may negotiate with third parties regarding such Reserved Right subject to Clause 12.

12. RIGHT OF LAST REFUSAL: The Purchaser shall have a right of last refusal on all Reserved Rights. The term "Right of Last Refusal" means that if Purchaser and the Transferor fail to reach an agreement pursuant to Purchaser's right of first negotiation, and the Transferor makes and/or receives any bona fide offer to transfer, sell, grant, convey, assign, license, and/or lease any Reserved Right or any interest therein ("Third Party Offer"), the Transferor shall notify Purchaser of such terms (the existence of which shall be fully disclosed) and Purchaser shall have the exclusive option for thirty (30) days to execute such proposed transaction upon the same terms and conditions as set forth in such notice. Purchaser's Right of Last Refusal shall continue in full force and effect, upon all of the terms and conditions of this paragraph, so long as the Transferor retains any rights, title or interests in or to the particular Reserved Right. Purchaser's Right of Last Refusal shall inure to the benefit of Purchaser, its successors and assigns, and shall bind the Transferor and the Transferor's heirs, successors and assigns.

13. NO OBLIGATION TO PRODUCE: Nothing herein shall be construed to obligate Purchaser to produce, distribute, release, perform or exhibit any motion picture, television, theatrical or other production based upon, adapted from or suggested by the Property, in whole or in part, or otherwise to exercise, exploit or make any use of any rights, licenses, privileges or property granted herein to Purchaser.

14. ASSIGNMENT: Purchaser may assign and transfer this agreement or all or any part of its rights hereunder to any studio, major production company, network, or similarly financially-capable person, firm or corporation without limitation, and this agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, representatives and assigns forever. Any other assignment and transfer of this Agreement shall require Transferor's written consent, not to be unreasonable withheld. 

15. NO PUBLICITY: The Transferor will not, without Purchaser's prior written consent, not to be unreasonably withheld, in each instance, issue or authorize the issuance or publication of any news story or publicity

9

(except non-derogatory remarks incidental to an interview of Transferor) relating to (i) this Agreement, (ii) the subject matter or terms hereof, or to any use by Purchaser, its successors, licensees and assigns, and (iii) any of the rights granted Purchaser hereunder.

16. AGENT COMMISSIONS:  Purchaser shall not be liable for any compensation or fee to any agent of the Transferor in connection with this Agreement.

17. ADDITIONAL DOCUMENTATION:  The Transferor agrees to execute and procure any other and further instruments necessary to transfer, convey, assign, protect, enforce, and copyright all rights in the Property granted herein by the Transferor to Purchaser in any country throughout the world.  If it shall be necessary under the laws of any country that copyright registration be acquired in the name of the Transferor, Purchaser is hereby authorized by the Transferor to apply for said copyright registration thereof; and, in such event, the Transferor shall and does hereby assign and transfer the same unto Purchaser, subject to the rights in the Property reserved hereunder by the Transferor.  The Transferor further agrees, upon request, to duly execute, acknowledge, procure and deliver to Purchaser such short form assignments as may be requested by Purchaser for the purpose of copyright recordation in any country, or otherwise.  If the Transferor shall fail to so execute and deliver, or cause to be executed and delivered, the assignments or other instruments herein referred to, Purchaser is hereby irrevocably granted the power coupled with an interest to execute such assignments and instruments in the name of the Transferor and as the Transferor's attorney-in-fact.  Purchaser agrees to cover any and all expense involved in obtaining compliance with the foregoing provisions of this paragraph.

18. NOTICES:  All notices to Purchaser under this agreement shall be sent by registered mail, postage prepaid, or by email (with a copy by regular mail) addressed to the Purchaser at:

Charis Feeney-Orchard
9 Haven Green
Ealing, London, W5 2UU
United Kingdom

And to:
charisorchard@gmail.com

All notices to the Transferor under this agreement shall be sent by registered mail, postage prepaid, or by email (with a copy by regular mail) to:

Kim Boyle
C/o- Jay S. Kenoff, ESQ.
Kenoff & Machtinger, LLP
1801 Century Park East, Suite 1520
Los Angeles, California 90067
United States of America

And to:
jay@km-entertainmentlaw.com

All payments to Transferor hereunder shall be made to Transferor c/o Jay S. Kenoff, Esq., at the address set forth above.



19. MISCELLANEOUS:

(a) Relationship:  This agreement between the parties does not constitute a joint venture or partnership of any kind.

(b) Cumulative Rights and Remedies:  All rights, remedies, licenses, undertakings, obligations, covenants, privileges and other property granted

10

herein shall be cumulative, and Purchaser may exercise or use any of them separately or in conjunction with any one or more of the others.

(c) Waiver: A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

(d) Severability: If any provision of this agreement as applied to either party or any circumstances shall be adjudged by a court to be void and unenforceable, such shall in no way affect any other provision of this agreement, the application of such provision in any other circumstance, or the validity or enforceability of this agreement.

(e) Governing Law: This agreement shall be construed in accordance with the laws of the State of California.

(f) Entire Understanding: This agreement contains the entire understanding of the parties relating to the subject matter, and this agreement cannot be changed except by written agreement executed by both parties.

(g) Arbitration: Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration using the rules and procedures of the International Film and Television Alliance using a single arbitrator. The parties agree that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable attorneys' fees and expenses. The arbitration will be held in Los Angeles and any award shall be final, binding and non-appealable.

(h) Electronic or Fax Execution: Counterparts: This Agreement may be executed by original, facsimile or electronic signatures and in counterparts, each of which will be deemed an original but all of which together will constitute a single instrument. Any signed copy of this Agreement delivered electronically or by facsimile transmission will for all purposes be treated as if it had been delivered containing an original signature of the party whose signature appears in the electronic or facsimile version and will be binding upon that party in the same manner as though an original signed copy had been delivered.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and year first above written.

------------------------------
Charis Feeney-Orchard     Date

------------------------------
Witness
(please sign and print name)

------------------------------ *Kim Boyle 11-4-14*
Kim Boyle                 Date

------------------------------
Witness  Dina Swann
(please sign and print name)

NOTARY PUBLIC
STATE OF ARIZONA
Maricopa County
DINA SWANN
My Commission Expires 07/28/15

11

EXHIBIT "B"

**Amy Lawrence**

| | |
|---|---|
| **From:** | Charis Orchard <charisorchard@gmail.com> |
| **Sent:** | Monday, May 20, 2019 5:08 PM |
| **To:** | Amy Lawrence; Charis Orchard |
| **Subject:** | Fwd: Lawsuit filed by Kimberly Boyle |
| **Attachments:** | Waiver of Service of Summons.pdf; Assignment to Judge Wu.pdf; Complaint Filed.pdf; Notice of Assignment to ADR.pdf; Notice of Interested Parties.pdf; Report on the Filing of a Copyright Filed.pdf; Standing Judges Order.pdf; Summons Issued.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

---------- Forwarded message ---------
From: **Larry Zerner** <Larry@zernerlaw.com>
Date: Wed, Mar 6, 2019 at 6:12 AM
Subject: Lawsuit filed by Kimberly Boyle
To: <charisorchard@gmail.com>
Cc: <Zernerlaw@gmail.com>

Dear Ms. Orchard,

I am the attorney for Kimberly Boyle. On February 7, 2019, I filed a copyright infringement lawsuit on Ms. Boyle's behalf against you, Adler & Associates Entertainment, LLC, Amazon.com, and Dreamscape Media.

The lawsuit arises out of the movie *Perfect Piece,* which you produced without ever securing rights in Ms. Boyle's screenplay. There was an attempt in 2016 to resolve this issue by you and Adler agreeing to pay Ms. Boyle $125,000 from the proceeds of the movie. However, as Adler never signed onto this deal, no agreement was reached. Ms. Boyle had me file the lawsuit after seeing that the movie was showing on Amazon Prime and was for sale on DVD.

Ms. Boyle is seeking payment of the $125,000 that you owe her under the terms of your option agreement.

1

I have enclosed copies of the pleadings filed in this case as well as a Waiver of Service of Summons form. If you sign and return the form, you will have 90 days to respond to the lawsuit. On the other hand, if you don't sign, and I have to hire a process server in Sydney to serve you, you will only have 21 days to respond to the complaint and you will be responsible for all of the costs of service.

Please let me know by the end of the week whether you will sign the waiver form.

Thank you for your prompt attention to this matter.

Larry Zerner

---

## ZERNERLAW
Copyright, Trademark, and Entertainment Law

1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Tel (310) 773-3623
Fax (310 634-1256
Url www.ZernerLaw.com

---

The information contained in this email and its attachments is confidential and may be the subject of legal, professional or other privilege. It is intended only for the named addressees and may not be disclosed to anyone else without consent from ZernerLaw. If you are not the named addressee you must not use, disclose, distribute, copy, print or rely on the contents of this email and should destroy it immediately. Whilst ZernerLaw takes care to protect its systems from electronic virus attack or other harmful element, the firm gives no warranty that this email message (including any attachments to it) is free of any virus or other harmful matter and accepts no responsibility for any loss or damage resulting from the recipient receiving, opening or using it. If you need further information, please contact the originator of this message on (310) 773-3623.

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is **2550 Hollywood Way, Suite 202, Burbank, California 91505.**

On May 22, 2019 I served the foregoing document described as **DECLARATION OF CHARIS FEENEY-ORCHARD IN SUPPORT OF DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S MOTION TO COMPEL ARBITRATION AND TO DISMISS AND/OR STAY THE LITIGATION** on the interested parties in this action by placing the original and/or a true copy thereof enclosed in (a) sealed envelope(s), addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **BY REGULAR MAIL:** I deposited such envelope in the mail at 2550 Hollywood Way, Suite 202, Burbank, California 91505. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☐ **BY FACSIMILE MACHINE:** I transmitted a true copy of said document(s) by facsimile machine, and no error was reported. Said fax transmission(s) were directed as indicated on the service list.

☐ **BY OVERNIGHT DELIVERY:** I caused such documents to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressees. The envelope or package was deposited with delivery fees thereon fully prepaid.

☐ **BY ELECTRONIC MAIL:** I transmitted a true copy of said document(s) via electronic mail, and no error was reported. Said email was directed as indicated on the service list.

☐ **BY PERSONAL SERVICE:** I caused such envelope(s) to be delivered by hand to the above addressee(s).

☑ **BY CM/ECF:** I electronically transmitted a true copy of said document(s) to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the aforementioned CM/ECF registrants.

I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 22, 2019, at Los Angeles, California.

Raisa Rosa

**PROOF OF SERVICE**

**SERVICE LIST**

| | |
|---|---|
| Larry Zerner<br>LAW OFFICES OF LARRY ZERNER<br>1801 Century Park East, Suite 2400<br> Los Angeles, CA 90067 | E: larry@zernerlaw.com<br><br>Tel: (310) 773-3623<br>Fax: (310) 388-5624<br><br>*Representing plaintiff Kimberly Boyle* |
| Gregory L. Doll<br>Jamie Olivia Kendall<br>Brett H. Oberst<br>Doll Amir & Eley LLP<br>725 South Figueroa Street, Suite 3275<br>Los Angeles, CA 90017 | E: boberst@dollamir.com<br>   gdoll@dollamir.com<br>   jkendall@dollamir.com<br><br>Tel: (213) 542-3380<br>Fax: (213) 542-3381<br><br>*Representing Defendant Amazon.com* |
| Marc Victor Allaria<br>Litchfield Caov LLP<br>251 South Lake Avenue Suite 750<br>Pasadena, CA 91101 | E: allaria@litchfieldcavo.com<br><br>Tel: (626) 683-1100<br>Fax: (626) 683-1113<br><br>*Representing Defendant Dreamscape* |

**PROOF OF SERVICE**

EXHIBIT "B"

Larry Zerner (SBN 155473)
Law Offices of Larry Zerner
1801 Century Park East, Ste. 2400
Los Angeles, CA 90067
(310) 773-3623
Email: Larry@ZernerLaw.com

Attorneys for Plaintiff KIMBERLY BOYLE

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY BOYLE | Case No.: 2:19-CV-893 |
| Plaintiff, | COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR COPYRIGHT INFRINGEMENT |
| vs. | |
| ADLER & ASSOCIATES ENTERTAINMENT, LLC, a California LLC; AMAZON.COM, INC., a Delaware corp.; DREAMSCAPE MEDIA, LLC., an Ohio LLC; CHARIS FEENEY-ORCHARD, an individual, and DOES 1-10, inclusive, | DEMAND FOR JURY TRIAL (F.R.C.P. Rule 38) |
| Defendants | |

## **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR**

## **COPYRIGHT INFRINGEMENT**

Complaint

Plaintiff KIM BOYLE, ("Plaintiff") alleges against ADLER &

ASSOCIATES ENTERTAINMENT, LLC, a California LLC; AMAZON.COM,

INC., a Delaware corporation; DREAMSCAPE MEDIA, LLC., an Ohio LLC;

CHARIS FEENEY-ORCHARD, an individual, INC.; and DOES 1-10

("Defendants") as follows:

## I.   THE PARTIES

1.   Plaintiff is a screenwriter, residing in the state of Arizona.

2.   Upon information and belief, Defendant Adler & Associates Entertainment,

LLC is a California LLC corporation with its principal place of business in

Burbank, CA.

3.   Upon information and belief, Defendant Amazon.com, Inc. is a Delaware

corporation with its principal place of business in Seattle, Washington.

4.   Upon information and belief, Defendant Dreamscape Media, LLC is an Ohio

LLC with its principal place of business in Holland, OH.

5.   Upon information and belief, Defendant Charis Feeney-Orchard is an

individual currently residing in London, England.

6.   Plaintiff does not presently know the true names and capacities of the

defendants named as Does 1 through 10 and therefore sues such defendants by

these fictitious names. Plaintiff believes that the Doe Defendants are persons or

Complaint

entities who are involved in the acts set forth below, either as independent
contractors, agents, or employees of the known defendants, or through entering
into a conspiracy and agreement with the known Defendants to perform these acts,
for financial gain and profit, in violation of Plaintiff's rights. Plaintiff will request
leave of Court to amend this Complaint to set forth their true names, identities and
capacities when Plaintiff ascertains them. The Doe defendants and the known
Defendants are referred to hereinafter collectively as "Defendants."

JURISDICTION AND VENUE

1. The present action arises under the Copyright Act, Title 17, Section 101, et seq.,
of the United States Code.

2. Jurisdiction is conferred on this Court by 28 U.S.C. Section 1338(a).

3. Venue lies in the Central District of California under 28 U.S.C § 1391(a) and
(b) and 28 U.S.C. Section 1400(a).

FACTS COMMON TO CLAIMS OF RELIEF

4.     In or about 2007, Plaintiff wrote a motion picture screenplay titled *Casanova
– Lost & Found* ("the Screenplay"). Boyle registered the Screenplay with the U.S.
Copyright Office on May 22, 2014 and received registration number
PAu003726542.

Page 3

**Complaint**

5. On or about November 4, 2014, Boyle entered into a Screenplay Option Purchase Agreement ("the Option Agreement") with Defendant Charis Feeney-Orchard ("Charis"). Under the terms of the Option Agreement, Charis paid Boyle $500 for a one-year option to purchase the Screenplay. In order to execute the option and purchase the Screenplay, the purchase price was set at an amount equal to 3% of the final budget of the picture, with a minimum payment of $125,000 and maximum payment of $250,000. Charis also could extend the option period for an additional year by giving Boyle written notice and paying her $1,000 prior to the expiration of the option period (i.e., November 4, 2015).

6. Charis did not pay the purchase price or pay the option extension fee by the due date. Therefore, under the terms of the Option Agreement, all the rights to the Screenplay reverted to Boyle on November 4, 2015.

7. However, Boyle learned that even though Charis had not paid the purchase price of $125,000 set forth in the Option Agreement, Charis had indeed produced a motion picture based on Boyle's screenplay without ever notifying her. The motion picture's title was changed to Perfect Piece but Boyle was credited as the screenwriter in the credits of the movie and on IMDB.com.

8. On or about January 5, 2016, Boyle's attorney, Jay Kenoff of Kenoff & Machtinger, LLP sent a letter to Charis demanding that she stop all further

Complaint

attempts to distribute the picture until the purchase price of $125,000 was paid in full. After receiving the letter, Charis refused to pay the purchase price.

9. Subsequently on August 8, 2016, Boyle attempted to resolve the dispute by having Charis instruct Defendant Adler & Associates Entertainment ("Adler") and any distributors, sub-licensees, agents, or representatives of the film to remit payment to Boyle until she received $125,000. A written agreement was prepared and sent to Charis and Adler on August 8, 2016.

10. However, this agreement was conditioned upon Adler and Charis agreeing to these terms and signing it by August 22, 2016. Adler never signed the agreement; accordingly no agreement was entered into.

11. Despite the fact that Charis and Adler never obtained any right to distribute a movie based on the Screenplay, Adler is actively distributing the picture and it is currently available for viewing on Amazon Prime.

12. Upon information and belief, Charis and Adler entered into a contract with Defendant Dreamscape Media to release the picture on DVD. Dreamscape is currently distributing the picture on DVD throughout the United States.

13. On or about October 30, 2018, Boyle notified Amazon.com by email that the picture was being streamed on Amazon Prime without her permission or any

Complaint

license from Boyle. Amazon acknowledged receipt of Boyle's email but has to date taken no steps to remove the picture from Amazon Prime.

FIRST CLAIM FOR RELIEF

(For Copyright Infringement Against All Defendants)

14.    Plaintiff re-alleges and incorporates by reference, as though set forth in full, paragraphs 1 through 13 above as though fully set forth herein.

15. Defendants, and each of them, have infringed Boyle's copyright in the Screenplay by producing, distributing and exhibiting a motion picture titled *Perfect Piece* based on Boyle's screenplay without Boyle's permission.

16. As a direct and proximate result of Defendants' infringement, Plaintiff is entitled to her actual damages in addition to Defendants' profits that are attributable to the copyrighted material; alternatively, Plaintiff is entitled to statutory damages for infringement in the maximum statutory amount allowed.

17. Furthermore, in acting as alleged above, Plaintiff is informed and believes, and on that basis allege, that when Defendants took the actions complained of above, they did so knowing that these acts infringed Plaintiff's copyright and therefore Plaintiff is entitled to additional damages in an amount to be proven at trial for willful and knowing infringement, but in no event less than $150,000.

Page 6

Complaint

18. Defendants threaten to continue to act as alleged above, and unless restrained and enjoined, will continue to do so, all to Plaintiff's irreparable injury. The amount of compensation which would afford adequate relief to Plaintiff for such injury will be difficult to ascertain. The wrongful acts of Defendants are of a continuing nature and will require a multiplicity of judicial proceedings. Accordingly, Plaintiff's remedy at law is inadequate, and Plaintiff is entitled to preliminary and permanent injunctive relief to enjoin the wrongful conduct of Defendants alleged above.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.      That Defendants be required to pay Plaintiff such damages as Plaintiff has sustained or will sustain by reason of Defendant's conduct, and to account for all gains, profits and advantages derived by Defendant from such conduct but in no event less than $150,000.

2.      That all items which infringe Plaintiff's copyright be impounded surrendered up and forfeited to Plaintiff for destruction or other disposition.

3.      That Defendants and Defendants' agents, servants, and employees, and each of them, and all persons acting in concert and participation with them, be enjoined and restrained during the pendency of this action and permanently

thereafter from infringing any and all of the copyrights in her screenplay, by, among other things, copying, distributing, and broadcasting the Picture; and

    4. That Defendants be required to pay to Plaintiff its attorneys' fees and costs incurred in connection with the prosecution of this action; and

    5. For such other and further relief as the Court deems appropriate.

DATED: February 6, 2019        LAW OFFICES OF LARRY ZERNER

By: /s/Larry Zerner
    Larry Zerner
    Attorney for Plaintiff Kimberly Boyle

## DEMAND FOR TRIAL BY JURY

Plaintiff Kimberly Boyle pursuant to Rule 38 of the Federal Rules of Civil Procedure hereby demands trial by jury of all issues so triable in the present action.

DATED: February 6, 2019        LAW OFFICES OF LARRY ZERNER

By: __/s/Larry Zerner_
    Larry Zerner
    Attorney for Plaintiff Kimberly Boyle

Page 8

Complaint

EXHIBIT "C"

FILED
CLERK, U.S. DISTRICT COURT

March 29, 2019

CENTRAL DISTRICT OF CALIFORNIA
BY: ___JG___ DEPUTY

Friday March 29th, 2019

REF : 2:19–cv–00893 GW (SKx)

ATTN: Judge George H. Wu

Charis Feeney-Orchard
9 Wirrilda Way,
Forestville, NSW, 2087
Australia
Email: charisfeeney77@gmail.com
Phone : +61 (0) 404870918

Hearing: April 29, 2019
Time: 8:30 a.m.
Courtroom: 9D

**Request for a motion to dismiss**

To the Honourable Judge George H. Wu,

Under Rule 12 of the Federal Rules of Criminal Procedure I hereby request for a motion to dismiss this case.

As the defendant on the above-mentioned court case, I formally request a motion to dismiss for the following reasons:

1. I was not served properly by the defendant (attachment a)

2. The signed Screenplay Option Purchase Agreement between the Plaintiff and Myself, which is the basis of this dispute, clearly states that all matters of dispute must be resolved by Arbitration using the rules of the International Film and Television Alliance (attachment b, item 19, clause g). Therefore, there is no jurisdiction for this matter to be resolved in the Federal Court of the United States as, in accordance with the contract in place, it should be resolved using a single arbitrator from the IFTA.

3. I paid the option for the screenplay (attachment c) and had the right to undertake principle photography before the payment of the writer's fee, as the fee was to be based on the final budget of the film.

4. When I went to pay the writer's fee, the dispute over the amount of payment arose due to a misunderstanding and misinterpretation of the writer's fee, where I believed the amount in question referred to the budget and not the writers fees (see attachment b, item 5: purchase price). I would be astonished to find if there was ever a payment of such a high writers fee in existence for a first-time producer screenplay, hence my shock and disbelief at finding that Ms. Boyle expected $125,000 for her first and only screenplay.

5. As I am not motivated by money and want the film to be available to the public, not only for myself but for all involved in its production, the dispute was promptly settled by an 'assignment of payment' agreement that was negotiated by the former Attorney of the Plaintiff in August 2016, over two years ago, and signed and accepted by Myself and the sales agent, Adler and Associates (See attachment d) where I accepted to allow the fee of $125,000 to be paid out of the receipts of the film, as per the sales agreement. If there was any issue why has it taken this long for the plaintiff to react and why wasn't there any attempt to seek out a resolution independent of a Federal Court?

6. I am a resident of Australia, not the United States and a single mother who is not affluent and earns a normal wage, therefore, I cannot defend myself properly in this case, which I feel is wasteful of Federal Court resources and stems from malicious intent.

Due to the above-mentioned reasons, I humbly request that Your Honour make a motion to dismiss the case and direct the Plaintiff towards Arbitration the IFTA.
at 9%

Signature of Charis Feeney-Orchard:

*Cheri Feeney-Orchard*

Name, email and signature of Witness:

Jason Hae   Jason.Hae@gmail.com

Motion to Dismiss

Attachment A

| | |
|---|---|
| **From:** | Charis Orchard |
| **To:** | Charis Feeney |
| **Subject:** | Fwd: Lawsuit filed by Kimberly Boyle |
| **Date:** | Tuesday, 19 March 2019 2:05:40 PM |
| **Attachments:** | Waiver of Service of Summons.pdf |
| | Assignment to Judge Wu.pdf |
| | Complaint Filed.pdf |
| | Notice of Assignment to ADR.pdf |
| | Notice of Interested Parties.pdf |
| | Report on the Filing of a Copyright Filed.pdf |
| | Standing Judges Order.pdf |
| | Summons Issued.pdf |

Sent from my iPhone

Begin forwarded message:

> **From:** "Larry Zerner" <Larry@Zernerlaw.com>
> **Date:** 6 March 2019 at 6:12:09 am AEDT
> **To:** <charisorchard@gmail.com>
> **Cc:** <Zernerlaw@gmail.com>
> **Subject:** Lawsuit filed by Kimberly Boyle
> **Reply-To:** <Larry@ZernerLaw.com>

Dear Ms. Orchard,

I am the attorney for Kimberly Boyle. On February 7, 2019, I filed a copyright infringement lawsuit on Ms. Boyle's behalf against you, Adler & Associates Entertainment, LLC, Amazon.com, and Dreamscape Media.

The lawsuit arises out of the movie *Perfect Piece,* which you produced without ever securing rights in Ms. Boyle's screenplay. There was an attempt in 2016 to resolve this issue by you and Adler agreeing to pay Ms. Boyle $125,000 from the proceeds of the movie. However, as Adler never signed onto this deal, no agreement was reached. Ms. Boyle had me file the lawsuit after seeing that the movie was showing on Amazon Prime and was for sale on DVD.

Ms. Boyle is seeking payment of the $125,000 that you owe her under the terms of your option agreement.

I have enclosed copies of the pleadings filed in this case as well as a Waiver of Service of Summons form. If you sign and return the

form, you will have 90 days to respond to the lawsuit.  On the other hand, if you don't sign, and I have to hire a process server in Sydney to serve you, you will only have 21 days to respond to the complaint and you will be responsible for all of the costs of service.

Please let me know by the end of the week whether you will sign the waiver form.

Thank you for your prompt attention to this matter.

Larry Zerner

ZERNERLAW
Copyright, Trademark, and Entertainment Law

1801 Century Park East, Suite 2400
Los Angeles, CA  90067
Tel (310) 773-3623
Fax (310 634-1256
Url www.ZernerLaw.com

The information contained in this email and its attachments is confidential and may be the subject of legal, professional or other privilege. It is intended only for the named addressees and may not be disclosed to anyone else without consent from ZernerLaw. If you are not the named addressee you must not use, disclose, distribute, copy, print or rely on the contents of this email and should destroy it immediately. Whilst ZernerLaw takes care to protect its systems from electronic virus attack or other harmful element, the firm gives no warranty that this email message (including any attachments to it) is free of any virus or other harmful matter and accepts no responsibility for any loss or damage resulting from the recipient receiving, opening or using it. If you need further information, please contact the originator of this message on (310) 773-3623.

*Motion's Attachment B*

Charis Feeney-Orchard
Purchaser/Director
8 Haven Green
Ealing, London, W5 2UU
United Kingdom
Email: charisorchard@gmail.com
Tel: +44 7455 309583

Kim Boyle
C/o Jay S. Kenoff, ESQ.
Kenoff & Machtinger, LLP
1801 Century Park East,
Suite 1520
Los Angeles, California 90067
United States of America
Email: Jay@km-
entertainmentlaw.com
Tel: +1 (310) 552 0808

### SCREENPLAY OPTION PURCHASE AGREEMENT

This Option Purchase Agreement made on 12 May 2014 by and between Kim Boyle, (hereinafter referred to as the "Transferor") and Charis Feeney-Orchard (hereinafter referred to as "Purchaser").

WHEREAS, the Transferor is the sole and exclusive owner throughout the world of all rights in and to the screenplay for a feature-length motion picture (the "Picture") presently-entitled: "Casanova Lost and Found" (formerly known as "This Albert DiGrazia") that was also written by the Transferor which work has been filed in the Office of the Writers Guild of America West, Los Angeles, California, USA, under Registration Number 818942 (a copy of which is attached as Appendix A to this Agreement), this work including all adaptations and/or versions, the titles, characters, plots, themes and story line is collectively referred to as the "Property"; and

WHEREAS, Purchaser wants to acquire certain rights of the Transferor in consideration for the purchase price provided herein and in reliance upon the Transferor's representations and warranties;

NOW, THEREFORE, the parties agree as follows:

1. RIGHTS: Upon exercise of the Option (as described below) and payment of the Purchase Price (as described herein), the Transferor will irrevocably transfer, sell, grant, convey and assign to the Purchaser, and the Purchaser's successors, licensees and assigns exclusively and forever, except for the reserved rights described below, all motion picture rights (including all silent, sound dialogue and musical motion picture rights), all television motion picture and other television rights, together with limited radio broadcasting rights and 7,500 word publication rights for advertisement, publicity and exploitation purposes, and certain incidental and allied rights, throughout the world, in and to the Property and in and to any intellectual property including the copyright thereof and all renewals and extensions of copyright. Included among the rights granted to Purchaser hereunder (without in any way limiting the grant of rights hereinabove made) are the following sole and exclusive rights throughout the world in perpetuity:

(a) To make, produce, adapt and copyright (or otherwise protect) one or more motion picture adaptations or versions (the initial one of which shall be the Picture), whether fixed on film, tape, disc, wire, audio-visual cartridge, cassette or through any other technical process whether now known or hereafter devised, based in whole or in part on the Property, of every size, gauge, colour, dimension or type, including, but not limited to, musical motion pictures and remakes of and sequels (or prequels) to any motion picture produced hereunder and motion pictures in series or serial form, and for such purposes to record and reproduce and license others to record and reproduce, in synchronization with such motion pictures, spoken words taken from or based upon the text or theme of the Property and any and all kinds of music, musical accompaniments and/or lyrics to be performed or sung by the performers in any such motion picture and any and all other kinds of sound and sound effects.

1

(b) To make, produce, distribute, sell, license, assign, transfer, exhibit, perform, rent, lease and generally deal in and with any of the foregoing:

(i) by all means or technical processes whatsoever, whether now known or hereafter devised including, by way of example only, film, tape, disc, wire, audio-visual cartridge, cassette or television (including commercially sponsored, sustaining and subscription or pay-per-view television, or any derivative thereof); and

(ii) in any place whatsoever, including, by way of example only and without limitation to, homes, theatres and elsewhere, and whether or not a fee is charged, directly or indirectly, for viewing any such motion picture.

(c) To broadcast, transmit or reproduce the Property or any adaptation or version thereof (including, by way of example only and without limitations to, any motion picture produced hereunder and/or any script or other material based on or utilizing the Property or any of the characters, themes or plots thereof), by means of television or any process analogous thereto whether now known or hereafter devised (including commercially sponsored, sustaining and subscription or pay-per-view television), through the use of motion pictures produced on films or by means of magnetic tape, wire, disc, audio-visual cartridge or any other device now known or hereafter devised and including such television productions presented in series or serial form, and the exclusive right generally to exercise for television purposes all the rights granted to Purchaser hereunder for motion picture purposes.

(d) Without limiting any other rights granted Purchaser, to broadcast and/or transmit by television or radio or any process analogous thereto whether now known or hereafter devised, all or any part of the Property or any adaptation or version thereof, including any motion picture or any other version or versions thereof, and announcements pertaining to said motion picture or other version or versions, for the purpose of advertising, publicizing or exploiting such motion picture or other version or versions, which broadcasts or transmissions may be accomplished through the use of living actors performing simultaneously with such broadcast or transmission or by any other method or means including the use of motion pictures (including trailers) reproduced on film or by means of magnetic tape or wire or through the use of other recordings or transcriptions.

(e) To publish, copyright and protect or cause to be published, copyrighted and protected in the name of Purchaser or its nominee in any and all languages throughout the world, in any form or media, synopses, novelizations, serializations, dramatizations, abridged and/or revised versions of the Property, not exceeding 75,000 words each, adapted from the Property or from any motion picture and/or other version of the Property for the purpose of advertising, publicizing and/or exploiting any such motion picture and/or other version.

(f) For the foregoing purposes to use all or any part of the Property and any of the characters, plots, themes and/or ideas contained therein, and the title of the Property and any title or subtitle of any component of the Property, and to use said titles or subtitles for any motion picture or other version of adaptation whether or not the same is based on or adapted from the Property and/or as the title of any musical composition contained in any such motion picture or other version or adaptation.

(g) To use and exploit commercial or merchandise licenses, tie-ups, promotions and recordings of any sort and nature arising out of or connected with the Property and/or its motion picture or other versions and/or the title or titles thereof and/or the characters thereof and/or their names or characteristics. 

All rights, licenses, privileges and property herein granted to Purchaser

2

shall be cumulative and Purchaser may exercise or use any or all said rights, licenses, privileges or property simultaneously with or in connection with or separately and apart from the exercise of any other of said rights, licenses, privileges and property; provided that Purchaser's initial production hereunder is the Picture. If the Transferor hereafter makes or publishes or permits to be made or published any revision, adaptation, sequel, prequel, translation or dramatization or other versions of the Property, then Purchaser shall have and the Transferor hereby grants to Purchaser, subject to the terms and conditions, including without limitation, the payment provisions set forth hereinbelow, all of the same rights therein as are herein granted Purchaser. The terms "Picture" and "Pictures" as used herein shall be deemed to mean or include any present or future kind of motion picture production based upon the Property, with or without sound recorded and reproduced synchronously therewith, whether the same is produced on film or by any other method or means now or hereafter used for the production, exhibition and/or transmission of any kind of motion picture productions.

2. RIGHTS RESERVED:  The following limited rights are reserved for the Transferor's continued and future use and disposition:

(a) Publication Rights:  The right to publish and distribute printed versions of the Property owned or controlled by the Transferor in written book form, whether hardcover or soft-cover, and in magazine or other similar periodicals (which may be published as a continuing series of instalments), subject to Purchaser's rights as provided for in Clause 1 above.

(b) Stage Rights:  The right to perform the Property or adaptations thereof on the spoken stage with actors appearing in person in the immediate presence of the audience, provided no broadcast, telecast, recording, photography or other reproduction of such performance is made.  The Transferor agrees not to exercise, or permit any other person to exercise, said stage rights earlier than five (5) years after the first general release or telecast, if earlier, of the first Picture produced hereunder, or seven (7) years after the date of exercise of the purchaser's option to acquire the property, whichever is earlier.

(c) Radio Rights:  The right to broadcast the Property by sound (as distinguished from visually) by radio, subject however to Purchaser's right at all times to: (i) exercise its radio rights provided in Clause 1 above for advertising and exploitation purposes by living actors or otherwise, by the use of excerpts from or condensations of the Property or any Picture produced hereunder; and (ii) in any event to broadcast any Picture produced hereunder by radio.  The Transferor agrees not to exercise, or permit any other person to exercise, the Transferor's radio rights earlier than five (5) years after the Purchaser first publishes the Property.

(d) Author-Written Sequel:  A literary property (story, novel, or drama), whether written by the Transferor or by a successor in interest of the Transferor, using one or more of the characters appearing in the Property, participating in substantially different events from those found in the Property, and whose plot is substantially different from that of the Property.  The Transferor shall have the right to exercise publication rights (i.e., in book or magazine form) at any time.  The Transferor agrees not to exercise, or permit any other person to exercise, any other rights (including but not limited to motion picture or allied rights) of any kind in or to any author-written sequel earlier than five (5) years after the Purchaser first publishes the Property, provided that such restriction on the Transferor's exercise of said author-written sequel rights shall be extended to any period during which there is in effect, in any particular country or territory, a network television broadcasting agreement for a television motion picture, (i) based upon the Property, or (ii) based upon any Picture produced in the exercise of rights assigned herein, or (iii) using a character or characters of the Property. 

3

(e) Inasmuch as the characters of the Property are included in the exclusive grant of motion picture rights to Purchaser, no sequel or prequel rights or television series rights may be granted to such other person or company, but such characters from the Property which are contained in the author-written sequel may be used in a motion picture and remakes thereof whose plot is based substantially on the plot of the respective author-written sequel.

It is expressly agreed that the Transferor's reserved rights under this subclause relate only to material written or authorized by the Transferor and not to any revision, adaptation, sequel, prequel, translation or dramatization written or authorized by Purchaser, even though the same may contain characters or other elements contained in the Property.

3. RIGHT TO MAKE CHANGES: the Transferor agrees that Purchaser shall have the unlimited right to vary, change, alter, modify, add to and/or delete from the Property, and to rearrange and/or transpose the Property and change the sequence thereof and the characters and descriptions of the characters contained in the Property, and to use a portion or portions of the Property or the characters, plots, or theme thereof in conjunction with any other literary, dramatic or other material of any kind. The Transferor hereby waives the benefits of any provisions of law known as the "droit moral" or any similar law in any country of the world and agrees not to permit or prosecute any action or lawsuit on the ground that any Picture or other version of the Property produced or exhibited by Purchaser, its assignees or licensees, in any way constitutes an infringement of any of the Transferor's droit moral or is in any way a defamation or mutilation of the Property or any part thereof or contains unauthorized variations, alterations, modifications, changes or translations.

4. DURATION AND EXTENT OF RIGHTS GRANTED: Upon exercise of the Option and payment of the Purchase Price, Purchaser shall enjoy, solely and exclusively, all the rights, licenses, privileges and property granted hereunder throughout the world, in perpetuity, as long as any rights in the Property are recognized in law or equity, except insofar as such period of perpetuity may be shortened due to any now existing or future copyright by the Transferor of the Property and/or any adaptations thereof, in which case Purchaser shall enjoy its sole and exclusive rights, licenses, privileges and property hereunder to the fullest extent permissible under and for the full duration of such copyright or copyrights, whether common law or statutory, and any and all renewals and/or extensions thereof, and shall thereafter enjoy all such rights, licenses, privileges and property non-exclusively in perpetuity throughout the world. The rights granted herein are in addition to and shall not be construed in derogation of any rights that Purchaser may have as a member of the public or pursuant to any other agreement. All rights, licenses, privileges and property granted herein to Purchaser are irrevocable and not subject to rescission, restraint or injunction under any circumstances. Notwithstanding the foregoing, if Purchaser exercises the Option and fails to produce the Picture within seven (7) years of the date of this Agreement or five (5) of the date of exerercise of the Option, all rights shall revert to Transferor with a lien in favour of Purchaser for Purchaser's actual out-of-pocket expenses incurred in connection with the acquisition of the Property, payable upon commencement of production of the Picture by a third party.

5. CONSIDERATION: The following terms shall apply to this Agreement:

Option: In consideration of the option payment specified below, Purchaser shall have an option (the "Option") to acquire the Rights described hereinabove on the terms and conditions specified in this Agreement.

Term: The initial option term shall be 12 months from the date of Transferor's execution of this Agreement; renewable for an additional period of 12 months upon written notice to Transferor and payment of the

4

option extension payment prior to the expiration of the initial option period.

Option Payments: Purchaser shall pay Transferor the sum of $500 upon execution of this Agreement for the initial period, with such payment applicable to the Purchase Price and $1,000 for the option extension payment, payment to accompany the written option extension notice; such payment shall not be applicable to the Purchase Price.

Option Exercise: The Option may be exercised by written notice accompanied by payment of the Purchase Price (or, if sooner, upon commencement of principal photography, in which event payment of the Purchase Price shall be made to Transferor within 5 business days thereafter).

Purchase Price: The amount of the Purchase Price shall equal 3% of the final budget of the Picture (with exclusions for contingency, actual bond fees, finance charges and purchase price for screenplay), floor of $125,000, cap of $250,000. If the final budget has not been determined at the time of exercise of the Option, then the minimum amount shall be paid at that time, and the balance shall be paid within 30 days of commencement of principal photography of the Picture.

Box Office Bonus: Transferor will be paid $50,000 at $20 million U.S. theatrical box office as reported in Daily Variety or similar if Daily Variety not available with payment within 30 days of such determination.

Contingent Compensation: For sole writing credit, Transferor will receive 5% of contingent Net Proceeds (or Net Profits, as applicable) defined, accounting for and paid according to the same definition applicable to the Purchaser (or, if none, then on a favored nations basis with any other recipient of a participation in the revenues of the Picture); reducible to 2½% for shared writing credit by percentage paid to another credited writer.

Further Writing: Transferor shall have the first opportunity to prepare one rewrite and one polish of the Property, fees at applicable WGA minimums + 10%, payable one-half upon start of writing and one-half upon delivery of each work.

Passive Payments for Sequels/Remakes/Spinoffs: These apply for payments to the Transferor for the particular form of work, if Transferor is not the writer and being compensated for writing the particular work. Below amounts reduced by one half if Transferor shares writing credit on the initial Picture.
(a)    Theatrical Sequels: ½ of the Purchase Price and ½ of contingent compensation percentage.
(b)    Theatrical Remakes: 1/3rd of Purchase Price and 1/3rd of contingent percentage.
(c)    Mini-series/MFT: $15,000 per hour for the first two hours, cap at $90K; proration for partial hours.
(d)    Episodic: $5,000/90 min; $3,500/hour; $2,500/half hour.
(e)    Spin-offs: one-half of applicable episodic amount for a generic spin-off, one-fourth of applicable episodic amount for a planted spin-off.

Re-runs: 20% of applicable episodic payment per re-run for first 5 re-runs.

Credit: Per WGA standards, as if applicable, and as otherwise set forth below.



Premiere: Invite for Kim + 1 to premiere with travel and accommodations provided.

6. REPRESENTATIONS AND WARRANTIES:

(a) Sole Proprietor: the Transferor represents and warrants to Purchaser

5

that the Transferor is the sole and exclusive proprietor, throughout the universe, of that certain original literary material written by the Transferor entitled "Casanova Lost and Found."

(b) Facts:  the Transferor represents and warrants to Purchaser as follows:

(i) The Transferor is the sole author and creator of the Property.

(ii) The Property is unpublished and was registered for copyright in the name of "Casanova Lost and Found" written by Kim Boyle which work has been filed in the Office of the Writers Guild of America West, Los Angeles, California, USA, under Registration Number 818524.

(iii) No motion picture or dramatic version of the Property, or any part thereof, has been manufactured, produced, presented or authorized; no radio or television development, presentation, or program based on the Property, or any part thereof, has been manufactured, produced, presented, broadcast or authorized; and no written or oral agreements or commitments whatsoever with respect to the Property, or with respect to any rights therein, have been made or entered into by o on behalf of the Transferor.

(iv) None of the rights herein granted and assigned to Purchaser have been granted and/or assigned to any person, firm or corporation other than Purchaser herein upon exercise of the Option.

(c) No Infringement or Violation of Third Party Rights:  the Transferor represents and warrants to Purchaser that the Transferor has not adapted the Property from any other literary, dramatic or other material of any kind, nature or description, nor, except for material which is in the public domain, has the Transferor copied or used in the Property the characters, themes, plot, scenes, sequence or story of any other literary, dramatic or other material; that, according to the standard applicable under Article 28 of the WGA Basic Agreement, (i) the Property does not infringe upon any common law or statutory rights in any other literary, dramatic or other material; (ii) no material contained in the Property is libelous or violative of the right of privacy of any person; (iii) the full utilization of any and all rights in and to the Property granted by the Transferor pursuant to this Agreement will not violate the rights of any person, firm or corporation; and (iv) the Property is not in the public domain in any country in the world where copyright protection is available.

(d) No Impairment of Rights:  the Transferor represents and warrants to Purchaser that the Transferor is the exclusive proprietor, throughout the universe, of all rights in and to the Property granted herein to Purchaser; that the Transferor has not assigned, licensed or in any manner encumbered, diminished or impaired any such rights; that the Transferor has not committed or omitted to perform any act by which such rights could or will be encumbered, diminished or impaired; and that there is no outstanding claim or litigation pending against or involving the title, ownership and/or copyright in the Property, or in any part thereof, or in any rights granted herein to Purchaser.  The Transferor further represents and warrants that no attempt shall be made hereafter by the Transferor to challenge, encumber, diminish or impair any of the rights granted herein and that all appropriate protection of such rights will continue to be maintained by the Transferor.

7. INDEMNIFICATION:

(a) The Transferor agrees to indemnify Purchaser against all judgments, liability, damages, penalties, losses, costs, and expense (including reasonable attorneys' fees) which may be suffered or assumed by or obtained against Purchaser by reason of any breach or failure of any warranty or agreement herein made by the Transferor.

(b) Purchaser agrees to indemnify Transferor against all judgments,

6

liability, damages, penalties, losses, costs, and expense (including reasonable attorneys' fees and costs) which may be suffered or assumed by or obtained against Transferor by reason of any matter or things arising out of the development, production, distribution and exploitation of the Picture, the breach or failure of any warranty or agreement herein made by Purchaser and any material added to the Property by Purchaser, except to the extent that the foregoing covered by the Trnasferor's foregoing indemnity.

(c) Upon exercise of the Option and payment of the Purchase Price, All rights, licenses and privileges herein granted to Purchaser are irrevocable and not subject to rescission, restraint or injunction under any circumstances.

8. PROTECTION OF RIGHTS GRANTED: the Transferor hereby grants to Purchaser the free and unrestricted right, but at Purchaser's own cost and expense, to institute in the name and on behalf of the Transferor, or the Transferor and Purchaser jointly, any and all suits and proceedings at law or in equity, to enjoin and restrain any infringements of the rights herein granted, and hereby assigns and sets over to Purchaser any and all causes of action relative to or based upon any such infringement, as well as any and all recoveries obtained thereon. The Transferor will not compromise, settle or in any manner interfere with such litigation if brought; and Purchaser agrees to indemnify and hold the Transferor harmless from any costs, expenses, or damages which the Transferor may suffer as a result of any such suit or proceeding.

9. COPYRIGHT:  Regarding the copyright (and/or any other intellectual property right) in and to the Property, the Transferor agrees that:

(a) The Transferor will prevent the Property and any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof whether published or unpublished and whether copyrighted or uncopyrighted, from vesting in the public domain, and will take or cause to be taken any and all steps and proceedings required for copyright or similar protection in any and all countries in which the same may be published or offered for sale, insofar as such countries now or hereafter provide for copyright or similar protection. Any contract or agreement entered into by the Transferor authorizing or permitting the publication of the Property or any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof in any country will contain appropriate provisions requiring such publisher to comply with all the provisions of this clause.

(b) Without limiting the generality of the foregoing, if the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof is published in the United States or in any other country in which registration is required for copyright or similar protection in accordance with the laws and regulations of such country, and the Transferor further agrees to affix or cause to be affixed to each copy of the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof which is published or offered for sale such notice or notices as may be required for copyright or similar protection in any country in which such publication or sale occurs.

(c) Intentionally omitted.

(d) If the Property, or any arrangement, revision, translation, novelization, dramatization or new version thereof, shall ever enter the public domain, then nothing contained in this agreement shall impair any rights or privileges that the Purchaser might be entitled to as a member of the public. 

(e) Upon exercise of the Option and payment of the Purchase Price, all

7

rights granted or agreed to be granted to Purchaser under this Agreement shall be irrevocably vested in Purchaser and shall not be subject to rescission by the Transferor or any other party for any cause, nor shall said rights be subject to termination or reversion by operation of law or otherwise, except to the extent, if any, that the provisions of any copyright law or similar law relating to the right to terminate grants of, or recapture rights in, literary property may apply.  If, pursuant to any such copyright law or similar law, the Transferor or any successor or any other legally designated party (all herein referred to as "the terminating party") becomes entitled to exercise any right to reversion, recapture or termination (the "termination right") with respect to all or any part of the rights granted or to be granted under this Agreement, and if the terminating party exercises said termination right with respect to all or part of said rights (the "recaptured rights"), then from and after the date on which the terminating party has the right to transfer to a third party all or part of the recaptured rights, Purchaser shall have the first right to purchase and acquire the recaptured rights from the terminating party. If the terminating party is prepared to accept a bona fide offer from a third party with respect to all or part of the recaptured rights, then in each such instance the terminating party shall notify Purchaser of such offer which the terminating party is prepared to accept and the name of the third party who made the offer to the terminating party, and the terminating party shall offer Purchaser the right to enter into an agreement with the terminating party with respect to the recaptured rights on the aforesaid terms and conditions.  Purchaser shall have 30 days from the date of its receipt of such written offer within which to notify the terminating party of its acceptance of such offer (provided, however, the Purchaser shall not be required to meet any terms or conditions which cannot be as easily met by one person as another, including, without limitation, the employment of a specified person, etc.)  If Purchaser shall acquire from the terminating party all or part of the recaptured rights, then the terminating party agrees to enter into appropriate written agreements with Purchaser covering said acquisition. If Purchaser shall elect not to purchase the recaptured rights from the terminating party, then the terminating party may dispose of said recaptured rights, but only to the aforesaid third party and only upon the terms and conditions specified in the aforesaid written notice given by the terminating party to Purchaser, it being understood and agreed that the terminating party may not dispose of said recaptured rights either to: (a) any other proposed transferee; or (b) upon terms and conditions which are more favorable to any transferee than the terms and conditions previously offered to Purchaser hereunder, without again offering to enter into an agreement with Purchaser on: (i) the terms offered to such other transferee; or (ii) such more favorable terms and conditions offered to said proposed transferee, whichever of (a) or (b) shall apply.  Any such required offer made to Purchaser by the terminating party shall be governed by the procedure set forth in the preceding four sentences of this Paragraph.  The unenforceability of any portion of this Paragraph shall not invalidate or affect the remaining portions of this Paragraph of this Agreement.

10.  CREDIT OBLIGATIONS:  Purchaser shall have the right to publish, advertise, announce and use in any manner or medium, the name, approved biography and approved photographs or approved likenesses of the Transferor in connection with any exercise by Purchaser of its rights hereunder, provided such use shall not constitute an endorsement of any product or service.



The Transferor shall be accorded the following credit on a single card on screen in the main titles of the Picture and in the billing block portion of paid ads (subject to customary exceptions and exclusions), and in size of type (as to height, width, thickness and boldness) equal to the largest size of type of any other main title credit and otherwise subject to the credit requirements of the WGA Basic Agreement:

WRITTEN BY Kim Boyle

8

Additionally, if Purchaser shall exploit any other rights in and to the Property, then Purchaser agrees to give appropriate source material credit to the Property, to the extent that such source material credits are customarily given in connection with the exploitation of such rights.

Purchaser will notify third parties in writing of the foregoing credit requirements. No casual or inadvertent failure to comply with any of the provisions of this clause shall be deemed a breach of this agreement by the Purchaser. The Transferor hereby expressly acknowledges that in the event of a failure or omission constituting a breach of the provisions of this paragraph, the damage (if any) caused the Transferor thereby is not irreparable or sufficient to entitle the Transferor to injunctive or other equitable relief. Consequently, the Transferor's rights and remedies in the event of such breach shall be limited to the right to recover damages in an action at law; provided however, upon written notice by Transferor of a failure or omission regarding the foregoing credit requirements, Purchaser will make good faith efforts to promptly implement a cure.

11. RIGHT OF FIRST NEGOTIATION:  Purchaser shall have a right of first negotiation on all Reserved Rights.  The term "Right of First Negotiation" means that if the Transferor desires to dispose of or exercise a particular right reserved to the Transferor herein ("Reserved Right"), whether directly or indirectly, then the Transferor shall notify Purchaser in writing and immediately negotiate with Purchaser regarding such Reserved Right.  If, after the expiration of thirty (30) days following the receipt of such notice, no agreement has been reached, then the Transferor may negotiate with third parties regarding such Reserved Right subject to Clause 12.

12. RIGHT OF LAST REFUSAL:  The Purchaser shall have a right of last refusal on all Reserved Rights. The term "Right of Last Refusal" means that if Purchaser and the Transferor fail to reach an agreement pursuant to Purchaser's right of first negotiation, and the Transferor makes and/or receives any bona fide offer to transfer, sell, grant, convey, assign, license, and/or lease any Reserved Right or any interest therein ("Third Party Offer"), the Transferor shall notify Purchaser of such terms (the existence of which shall be fully disclosed) and Purchaser shall have the exclusive option for thirty (30) days to execute such proposed transaction upon the same terms and conditions as set forth in such notice. Purchaser's Right of Last Refusal shall continue in full force and effect, upon all of the terms and conditions of this paragraph, so long as the Transferor retains any rights, title or interests in or to the particular Reserved Right.  Purchaser's Right of Last Refusal shall inure to the benefit of Purchaser, its successors and assigns, and shall bind the Transferor and the Transferor's heirs, successors and assigns.

13. NO OBLIGATION TO PRODUCE:  Nothing herein shall be construed to obligate Purchaser to produce, distribute, release, perform or exhibit any motion picture, television, theatrical or other production based upon, adapted from or suggested by the Property, in whole or in part, or otherwise to exercise, exploit or make any use of any rights, licenses, privileges or property granted herein to Purchaser.

14. ASSIGNMENT:  Purchaser may assign and transfer this agreement or all or any part of its rights hereunder to any studio, major production company, network, or similarly financially-capable person, firm or corporation without limitation, and this agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, representatives and assigns forever.  Any other assignment and transfer of this Agreement shall require Transferor's written consent, not to be unreasonable withheld. 

15. NO PUBLICITY:  The Transferor will not, without Purchaser's prior written consent, not to be unreasonably withheld, in each instance, issue or authorize the issuance or publication of any news story or publicity

9

(except non-derogatory remarks incidental to an interview of Transferor relating to (i) this Agreement, (ii) the subject matter of terms hereof, or to any use by Purchaser, its successors, licensees and assigns, and (iii) any of the rights granted Purchaser hereunder.

16. AGENT COMMISSIONS: Purchaser shall not be liable for any compensation or fee to any agent of the Transferor in connection with this Agreement.

17. ADDITIONAL DOCUMENTATION: The Transferor agrees to execute and procure any other and further instruments necessary to transfer, convey, assign, protect, enforce, and copyright all rights in the Property granted herein by the Transferor to Purchaser in any country throughout the world. If it shall be necessary under the laws of any country that copyright registration be acquired in the name of the Transferor, Purchaser is hereby authorized by the Transferor to apply for said copyright registration thereof; and, in such event, the Transferor shall and does hereby assign and transfer the same unto Purchaser, subject to the rights in the Property reserved hereunder by the Transferor. The Transferor further agrees, upon request, to duly execute, acknowledge, procure and deliver to Purchaser such short form assignments as may be requested by Purchaser for the purpose of copyright recordation in any country, or otherwise. If the Transferor shall fail to so execute and deliver, or cause to be executed and delivered, the assignments or other instruments herein referred to, Purchaser is hereby irrevocably granted the power coupled with an interest to execute such assignments and instruments in the name of the Transferor and as the Transferor's attorney-in-fact. Purchaser agrees to cover any and all expense involved in obtaining compliance with the foregoing provisions of this paragraph.

18. NOTICES: All notices to Purchaser under this agreement shall be sent by registered mail, postage prepaid, or by email (with a copy by regular mail) addressed to the Purchaser at:

Charis Feeney-Orchard
8 Haven Green
Ealing, London, W5 2UU
United Kingdom

And to:
charisorchard@gmail.com

All notices to the Transferor under this agreement shall be sent by registered mail, postage prepaid, or by email (with a copy by regular mail) to:

Kim Boyle
C/o- Jay S. Kenoff, ESQ.
Kenoff & Machtinger, LLP
1801 Century Park East, Suite 1520
Los Angeles, California 90067
United States of America

And to:
jay@km-entertainmentlaw.com

All payments to Transferor hereunder shall be made to Transferor c/o Jay S. Kenoff, Esq., at the address set forth above.



19. MISCELLANEOUS:

(a) Relationship: This agreement between the parties does not constitute a joint venture or partnership of any kind.

(b) Cumulative Rights and Remedies: All rights, remedies, licenses, undertakings, obligations, covenants, privileges and other property granted

herein shall be cumulative, and Purchaser may exercise or use any of them separately or in conjunction with any one or more of the others.

(c) Waiver: A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

(d) Severability: If any provision of this agreement as applied to either party or any circumstances shall be adjudged by a court to be void and unenforceable, such shall in no way affect any other provision of this agreement, the application of such provision in any other circumstance, or the validity or enforceability of this agreement.

(e) Governing Law: This agreement shall be construed in accordance with the laws of the State of California.

(f) Entire Understanding: This agreement contains the entire understanding of the parties relating to the subject matter, and this agreement cannot be changed except by written agreement executed by both parties.

(g) Arbitration: Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration using the rules and procedures of the International Film and Television Alliance using a single arbitrator. The parties agree that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable attorneys' fees and expenses. The arbitration will be held in Los Angeles and any award shall be final, binding and non-appealable.

(h) Electronic or Fax Execution; Counterparts: This Agreement may be executed by original, facsimile or electronic signatures and in counterparts, each of which will be deemed an original but all of which together will constitute a single instrument. Any signed copy of this Agreement delivered electronically or by facsimile transmission will for all purposes be treated as if it had been delivered containing an original signature of the party whose signature appears in the electronic or facsimile version and will be binding upon that party in the same manner as though an original signed copy had been delivered.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and year first above written.

```
--------------------------------          -------------------------------- 11-4-14
Charis Feeney-Orchard     Date            Kim Boyle                     Date


--------------------------------          --------------------------------
Witness                                   Witness Dina Swann
(please sign and print name)              (please sign and print name)
```

NOTARY PUBLIC
STATE OF ARIZONA
Maricopa County
DINA SWANN
My Commission Expires 07/28/15

11

*Motion to dismiss*

3/29/2019                                        Gmail - Proof of transfer

*Attachment C*

 Gmail                       **Charis Orchard <charisorchard@gmail.com>**

---

### Proof of transfer

---

**Charis Orchard** <charisorchard@gmail.com>                    Fri, Dec 19, 2014 at 11:32 PM
To: Jay Kenoff <jay@km-entertainmentlaw.com>, k boyle <kb2fo@yahoo.com>

Hi,

Attached is the proof of transfer for the option on the script. Could Kim please send 3 original signed copies to me at the address below:

Charis Orchard
Flat 4
56 Queens Gardens
W2 3AF
London
United Kingdom

This is rather urgent so I can get the BFI certification process complete.
Thank you very much.

Wish you both a very Merry Christmas!

Kind regards,
Charis

07455309583
www.charisorchard.com
imdb.com/name/nm2450532

LOVE ADDICT TRAILER:
http://bit.ly/1u0usVP
Love Addict received the award for
Best Comedy Film 2014
at the LA Comedy Awards on the 13th Nov

---------- Forwarded message ----------
From: **Charis Orchard** <charisorchard@gmail.com>
Date: Fri, Dec 19, 2014 at 1:30 PM
Subject:
To: Ms Me <charisorchard@gmail.com>

Envoyé de mon iPhone

---

 **FullSizeRender.jpg**
97K

Attachment C
page 2



*Motion to Dismiss
Attachment D*

## ASSIGNMENT OF PAYMENT RIGHTS

This agreement (the "Agreement") is made as of *04 May* , 2018, between **Charis Orchard**, an individual located at *9 Wirrilda Way, Forestville, NSW, 2087, Australia* (the "Producer") and Adler & Associates Entertainment, Inc., a California corporation whose principal offices are located at 3500 West Olive Avenue, Suite 300, Burbank, CA 91505, United States of America ("Adler & Associates Entertainment").

### RECITALS

A. Producer is the copyright owner of the motion picture **Perfect Piece**, which was formerly known under the titles of **This Albert DiGrazia, Casanova Lost & Found** and **Inner Peace** ("the Picture").

B. The Picture was based upon an original screenplay written by **Kim Boyle** (the "Screenwriter").

C. Adler & Associates Entertainment and Producer are both parties to a written agreement whereby Producer has granted Adler & Associates Entertainment the exclusive right to sell, distribute, license, exhibit and otherwise exploit the Picture throughout the world for a period of ten (10) years (the "Sales Agreement").

D. Under the terms of the Sales Agreement, Adler & Associates Entertainment shall be entitled to collect a one-time administration fee of four thousand five hundred dollars ($4500) and a one-time audit fee of three thousand five hundred dollars ($3500) from the monies received from the sale and distribution of the Picture and any and all ancillary products. Following the collection of these fees, Adler & Associates Entertainment shall also be entitled to reimburse itself for all "out of pocket" distribution expenses, the total of which shall not exceed sixty-five thousand dollars ($65,000) without the prior approval of the Producer.

E. Following the reimbursement of the administration fee, the audit fee and all "out of pocket" distribution expenses, Adler & Associates Entertainment shall be entitled to retain a sales commission of thirty-five percent (35%) of all monies received from the sale and distribution of the Picture, with the remaining sixty-five percent (65%) to be paid to the Producer (the "Producer's Share").

### AGREEMENT

Adler & Associates Entertainment and Producer hereby agree to following:

A. In accordance with section seventeen (17), sub-paragraph 'a' of the Sales Agreement, Producer hereby assigns the right to receive payments under the Sales Agreement to Screenwriter, pursuant to the following terms:

1. In accordance with the accounting schedule defined in section ten (10) of the Sales Agreement, Screenwriter shall hereby be paid one hundred percent (100%) of the Producer's Share until the amount paid to Screenwriter equals one hundred and twenty-five thousand United States dollars ($125,000).

PRODUCER INITIALS: _____

Page 1 of 2

## ASSIGNMENT OF PAYMENT RIGHTS

2. Producer hereby authorizes Adler & Associates Entertainment to provide Screenwriter and Screenwriter's attorney with copies of all financial statements and reports issued by Adler & Associates Entertainment with regards to the Picture. This permission shall terminate once the amount paid to Screenwriter equals one hundred and twenty-five thousand United States dollars ($125,000).

3. All monies owed to Screenwriter shall be paid by wire transfer into an account as directed by Screenwriter or Screenwriter's attorney.

4. Following the final and full payment of all monies owed to Screenwriter under this Agreement, Adler & Associates Entertainment shall pay all remaining monies owed as part of the Producer's Share to Producer in accordance with the terms of the Sales Agreement.

### ADDITIONAL TERMS

A. This Agreement shall be governed by the laws of the State of California.

B. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

C. Both parties represent and warrant to the other: that it has full right, power and authority to enter into and perform under this Agreement, and that it is under no obligation, contractual or otherwise, which might in any way interfere with its full and complete performance of this Agreement.

**AGREED TO AND ACCEPTED**

ADLER & ASSOCIATES ENTERTAINMENT

By: *Jeremy J. Lunt*       Date: 6 June, 2018
(Signature)

Name: Jeremy J. Lunt


PRODUCER

By: *Charis Feeney-Orchard*       Date: 04 May 2018
(Signature)

Name: Charis Feeney-Orchard

Page 2 of 2

"Casanova Lost & Found" aka "Perfect Piece"

Adler & Associates Entertainment, Inc., representatives sign to confirm their full knowledge of
this agreement.  Kim Boyle will provide them with a copy of the Screenplay Option Purchase
Agreement dated May 12, 2014 at the written request of Adler & Associates Entertainment, Inc.

Mark Belasco                    Date        Jeremy Lunt                      Date

Title                                       Title

Adler & Associates Entertainment, Inc.      Adler & Associates Entertainment, Inc.

3 of 5

Date:   27th March 2019

To:

Ms. Marie Adler
Adler & Associates Entertainment,
3500 West Olive Ave. Ste 300 Burbank, CA 91505
Telephone: (310) 684-3545
Email: info@adlersproductions.com

Re:    Kimberly Boyle v. Adler & Associates Entertainment, LLC et al Civil Action No. 2:19-CV-893 (C.D. Ca, filed February 6, 2019)

Dear Ms. Marie Adler,

I am writing this letter to confirm that I, Charis Feeney, indemnify and hold Alder and Associates harmless with respect to the claims made in the above-named lawsuit, pursuant to my obligations under Section 13 of the Agreement made between our parties.

Sincerely,

Charis Feeney-Orchard
Director and Producer of 'Perfect Piece'

EXHIBIT "D"

## NOTICE OF ARBITRATION

11th April 2019

**Attention: Kimberly Boyle and her Attorney's Jay Kenoff and Larry Zerner**

**Via email and/or postal mail**

**Re: Notice of Arbitration**

In accordance with the requirements of Rule 2 of the Independent Film & Television Alliance Rules for International Arbitration ("Rules"), Claimant hereby notifies Respondent and the Independent Film & Television Alliance ("IFTA") of the following:

Pursuant to Rule 2.4.1., demand is hereby made that the dispute between **Charis Feeney-Orchard** and **Kimberly Boyle** be referred to arbitration.

Pursuant to Rules 2.4.2. and 2.4.3., the names, addresses, telephone, and fax numbers, if available, of the parties to this dispute and the names, addresses, telephone and fax numbers, email addresses and, if available, of the respective legal counsel are as follows:

Claimant
**Charis Feeney-Orchard**
Producer and Director of 'Perfect Piece'
9 Wirrilda Way
Forestville, NSW, 2087, Australia
Email: charisorchard@gmail.com
Phone: +61 (0)404870918

Respondent
**Kimberly Boyle,**
Screenwriter of the film, 'Perfect Piece'
Email: kb2fo@yahoo.com

Claimant's Counsel
**Claimant is representing herself**

Respondent's counsel
**Larry Zerner and Jay Kernoff**

Larry Zerner
1801 Century Park East
Suite 2400
Los Angeles, CA 90067
Tel: (310) 773-3623
Larry@zernerlaw.com

Jay S. Kenoff
Attorney At Law
312 S. Beverly Dr. #6344
Beverly Hills, CA 90212
USA
Phone: (310) 552-0808
jay@km-entertainmentlaw.com

Pursuant to Rule 2.4.4., a copy of the arbitration clause contained in the attached contract, Paragraph 19 (g) on page 11, is referenced as follows:

**Paragraph 19 (g)        Arbitration:** Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration using the rules and procedures of the International Film and Television Alliance using a single arbitrator. The parties agree that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable attorneys' fees and expenses. The arbitration will be held in Los Angeles and any award shall be final, binding and non-appealable.

Pursuant to Rule 2.4.5., a copy of the relevant contract(s) is attached hereto.

Pursuant to Rule 2.4.6., **Charis Feeney-Orchard** sets forth a statement of the nature of the dispute and the amount involved, if any, as follows:

I hereby request that the arbitrator instate that the Writer's Fees for the rights to the screenplay be set at the

amount that I had understood and believed that I was going to pay, the amount of $3750 (Three Thousand Seven Hundred and Fifty United States Dollars), or otherwise 3% of the final Budget of $125,000, with a share of 5% of the net profit.

I believe that this is a fair, justifiable and industry-acceptable amount to be paid for the rights to the screenplay, which was viewed as being of a mediocre writing standard and which had sat on the shelf and remained un-optioned for a period of 5 years between when I first read the screenplay and when I considered using it for my university graduation assignment in 2014.

I feel that Kimberly Boyle and her Attorneys have acted on bad faith, have deliberately set out to commit fraud and extortion by wording the payment clause in such a confusing and vague way that it could be construed in the way I had, or in such a way that Kimberly Boyle would be able to demand the sum of $125,000.00 from me, post completion of the film, in exchange for the rights.

I believe that Kimberly Boyle and her Attorneys have seen me as a vulnerable university student and intentionally set up a trap so that I would be tricked into paying the amount of $125,000 for the rights to the script. Who has ever, in the history of cinema, received such as sum for their first-time produced screenplay that sat on a shelf for 5 years and has been reviewed by experts as a mediocre standard of writing? No one, except Kimberly Boyle and her Attorneys.

The value and worth of the screenplay that Kimberly Boyle wrote is not $125,000, it is not even close to the Writer's Guild recommended amount of $40,000 for a first-time produced screenplay. As such, I strongly believe that I am being extorted and deliberately conned Kimberly Boyle and her Attorneys through the way that Kimberly Boyle's attorney wrote 'Clause 5. Consideration - Purchase Price' in the Screenplay option agreement. I strong believe that this is a deliberate act of bad faith by Kimberly Boyle and her Attorneys, the justification for this is described in detail in the following document entitled 'Annex A - Background Story and Evidence'.

Pursuant to Rule 2.4.7., the relief or remedy sought by Charis Feeney-Orchard is as follows:
It is requested that the Arbitrator instate the amount of $3750.00 or the amount of 3% of a minimum budget of $125,000 plus 5% share of the net profit as the correct and legally binding payment of fees owed for the purchase of the rights to the screenplay entitled, 'Casanova Lost and Found', now a film entitled, 'Perfect Piece'.

The foregoing is not intended nor shall it be construed as a complete recitation of the facts and events concerning the above-referenced matter, nor shall it be construed as a waiver of any rights, remedies or claims, legal or equitable, which **Charis Feeney-Orchard** may have.

Sincerely,                                                                                     Notarized by:

Charis Feeney-Orchard

cc: IFTA Arbitral Agent

EXECUTED before me at Sydney, NSW, Australia
this  15th day of  April  2019.

MICHAELANGELO K. TWEMLOW
Public Notary ID No. 1660

Michaelangelo K Twemlow
Notary Public
Level 1, 299 Elizabeth Street
Sydney NSW 2000
Australia
Tel: +61 401 915 692
michael@solicitorsydney
W: www.solicitor.sydney

**Annex A - Background Story and Evidence**

As a young director and producer, I was connected via email to Kimberly Boyle via, 'Inktip Pro', which was a website that connected writers with producers. I requested the screenplay and read it. I thought it was fun and liked the fact it had a female lead role. *Attachment A – First email correspondence between Kim Boyle and I regarding the screenplay.*

Five years later, I was a Student at the University of Western London and the Met Film School, completing my master's degree London when I was trying to find a script for my thesis graduation project. I remembered Kim's script and reached out to her again. The script was still available and had not been optioned within the period of 6 years. *Attachment B – Email correspondence in 2014 between Kim Boyle and I regarding the option.*

Professional analyses of the script at the time found it to be of mediocre quality, heavily flawed story arcs and very talky and predictable. Even so, I felt that I could undertake a rewrite to correct many weaknesses in the story and make it affordable for me to shoot as a student. I was always honest and transparent with Kimberly and her Attorney Jay Kenoff that at that I was a university student on a tight, minimalist student budget and that the film would be made as a graduation project using other students. *Attachment C – Emails confirming my student and financial status to Kim and her Attorney during the option negotiation.*

I refused to pay the high option fee that Kim requested and after repeatedly explaining to Kim and her lawyer that I was a financially challenged master's degree student, I received a contract and believed in good faith Kim and her attorney understood my circumstances. That is why when I read the payment terms, although they were slightly confusing I 100% believed that the minimum floor of $125,000 referred to the budget and not Kim's writer's fee. I conferred with a lawyer at the time who also interpreted the payment clause in the same way that I had, and several other people have since, confirmed that my interpretation was correct. *Attachment D – Email from an Attorney friend, who was also a producer, that interpreted the payment clause as I had.* It seemed completely outrageous and bizarre to interpret the payment clause as the actual fee being $125,000 as the situation was such that I was a student and Kim was a never producer writer of a very basic script.

Due to my university assessment due dates I had significant time pressure on me at the time of negotiating with Kimberly and her Attorney, as well as financial pressures, and the writers contract stated that the amount of the writers fees would be based on the final budget so I pressed forward with producing and directing the film to meet my assessment criteria and due date for the university. *Attachment E – documents from the university.*

I was able to finance the film due to the fact I was a student, with the assistance of three private equity investors, two of whom were friends and the third and majority investor was my brother. I literally worked on the film every waking hour for a period of 12 Weeks for no income and invested my own time and money. I could have alternatively been working as an office worker during the same time and earning 1500 GBP a week but instead I chose to follow my passion and get a master's degree in film making. Shortly after I gained my master's degree, I was able to afford Kimberly's writer's fee and I reached out to her Attorney to organise the payment, with total conviction that I was completely just, honourable and honest in paying the fee of $3750 or 3% of a minimum budget of $125,000, which is how I had interpreted the payment clause. *Attachment F – Email to Jay Kenoff, Kim's attorney to make the payment of her writer's fee.*

I was completely astounded and shocked when Jay turned around and requested a fee of $125,000 for Kimberly, who had never had a screen play produced, but albeit had worked previously in the film industry as a computer-generated special effects technician on many big budget films. *Attachment G– my response to Jay's request for a writer's fee payment of $125,000.* I explained that even the Writer Guild of America recommends a payment of $40,000 as a fair amount for first time produced writers. *Attachment H – Writer's guild documentation regarding normal fees for the writer of a first-time produced screenplay at the time of the production.*

When the initial demand for payment of $125,000 occurred, I felt completely taken advantage of by Kimberly Boyle and Jay Kenoff. I felt that they had deliberately mislead me and acted in bad faith. I felt that they were scammers, fraudsters and completely removed from the reality of independent film making, especially young producers such as myself, who are at the front line of trying to break into the Hollywood industry.

I believe that Kimberly and Jay Kenoff deliberately and knowingly scammed me or attempted to extorted money from me because not only had I worked hard and given Kimberly her only credit as a feature film screen writer, after her script had sat on a shelf for 5 years but also because of the fact that Kimberly's 'Writer' credit on 'Perfect Piece' remains today as her only 'Writer' Credit on her IMDB profile (some 10 years on from when I first met her). This clearly demonstrates that Kimberly's writing ability is not on the level of a $125,000.00 screenplay and that this is a deliberate attempt to extort and fraud an innocent and well-intentioned young director-producer. Any person of sound mind and rational with even a small insight into the film industry would understand that Writers of Kimberly status and experience do not command $125,000 for a first-time produced screenplay. Therefore, demanding $125,000.00 is a blatant scam, an act of bad faith, and an act that deliberately and strategically disrespects and aims to injure and insult the work of myself and the 50 or so other young people who invested their time and energy into making the film.

On top of this, the fact is that Kimberly's original screenplay, 'Casanova Lost and Found' was the weakest part of the production from the get-go. The film is only viable to be sold to the wider public because I, as the producer and director, engaged and persuaded GreenPeace, a globally recognisable organisation, to let us use their name and likeness, their logo and global head office, to be a main part of the story. This was not in the original script. As well, the fact that it was set in London at Christmas time, another 'viable sale' aspect of the film, was not in the original script. The fact that I found a lead cast of amazingly talented actors who worked voluntarily made it a viable to be appreciated by audiences. None of this has to do with the mediocre script that I spend weeks re-writing that Kimberly Boyle is now demanding $125,000.00 in extortionate fees for. *Attachment I – Kimberly Boyle's current profile Internet Movie Database* (the industry standard for professional validation of credit) that shows only 'Perfect Piece' as her only, single credit as a writer).

I feel betrayed and scammed for myself and all the cast and crew, the editors, colour grader, VFX technicians, sound editors, the composer, the musicians and the sales agent who had all given their valuable time, energy and talents to making the movie a reality – many of whom have relied on this 'credit' to further build their careers in the film industry. *Attachment J – list of contributors to the film.*

When Kimberly and her attorney first demanded the extortionate fees, I spent some time reflecting on the situation and decided that the life of the film was worth more than to begin a legal battle for the correct fees and so initially, instead of engaging in arbitration earlier, I offered to Kimberly to take the extortionate sum of $125,000 through the revenue of the film over the duration of the sales agreement. Kimberly's Attorney was in favour of this resolution and drafted a settlement to allow the film to be sold and the revenues up to the amount of $125,000 to go to Kimberly. We all followed their demands and believed the issue was resolved. *Attachment K – The settlement agreement drafting by Kimberly's Attorney Jay Kenoff and Attachment L – emails from Jay Kenoff about the settlement.*

However, instead of signing the agreed settlement, Kimberly went into radio silence. No reply to any emails. No communication for almost 3 years. Until now when the film's Sales Agent, Adler and Associates, notified me of a demand for highly expensive and complicated Federal Court proceeding when there is a clause in the Writer's agreement specifying that any matter of dispute must be settled by arbitration, as per industry standards. *Attachment M – the original Screenplay Purchase Agreement signed by Kimberly Boyle*. This Federal Court action is another clear example of the intention to extort money for the script, which would never be considered by any normal, sound person of reasonable intelligence to be worth the amount of $125,000 United States Dollars.  If further evidence of this argument is needed, I would be happy to pay for 2 or 3 professional script analyses of the original screenplay to prove that its quality was well below industry standard. There is simply no logic or sense at all in what Kimberly Boyle and her Attorneys are continuing to demand, therefore, I have undertaken Arbitration in order to resolve this dispute once and for all.

My questions remain the same as when Kimberly and her Attorney first demanded $125, 000 for the payment of her very first, and only, produced screenplay;

1. Why was this amount not made clear to me during the negotiation of the contract when Kimberly and her Attorney both knew I was a struggling university student?
2. How can a woman who works in Hollywood not understand, or expect to be paid a normal amount, in line with industry standards for a first-time produced writer?
3. How could any artist deliberately try to derail and diminish the work of all the other artists and talents that came together to make this film?
4. How could a writer not appreciate that their only produced screenplay is now screening on Amazon and on other platforms all over the world thanks to the work of the dedicated sales agent?
5. How could someone who has been offered a fair and amicable resolution in an agreement drafted by her own attorney, then go silent for three years and then suddenly go to court with a new lawyer?
6. Do the behaviour and actions listed above demonstrate acts of bad faith, and attempts at extortion and fraud by Kimberly Boyle and her Attorneys?

Signed on the 11th April, 2019 in Sydney, Australia.

Signature of Charis Feeney-Orchard

Signature of Notary

Michaelangelo K Twemlow
Notary Public
Level 1, 299 Elizabeth Street
Sydney NSW 2000
Australia
Tel: +61 401 915 692
michael@solicitor.sydney
W: www.solicitor.sydney

**Annex B – List of Attachments**

Attachment A – First email correspondence between Kim Boyle and I regarding the screenplay.

Attachment B – Email correspondence in 2014 between Kim Boyle and I regarding the option.

Attachment C – Emails confirming my student and financial status to Kim and her Attorney during the option negotiation.

Attachment D – Email from an Attorney friend, who was also a producer, that interpreted the payment clause as I had.

Attachment E – Documents from the university assessment of 'Perfect Piece'.

Attachment F – Email to Jay Kenoff, Kim's attorney to make the payment of her writer's fee.

Attachment G– my response to Jay's request for a writer's fee payment of $125,000.

Attachment H – Writer's guild documentation regarding normal fees for the writer of a first-time produced screenplay at the time of the production.

Attachment I – Kimberly Boyle's current profile Internet Movie Database.

Attachment J – list of contributors to the film.

Attachment K – The settlement agreement drafting by Kimberly's Attorney Jay Kenoff

Attachment L – Emails from Jay Kenoff about the settlement.

Attachment M – The original Screenplay Purchase Agreement signed by Kimberly Boyle

Signed on the 11th April, 2019 in Sydney, Australia.

Signature of Charis Feeney-Orchard                  Signature of Notary

EXECUTED before me at Sydney, NSW, Australia
this ___ day of _____ 20___

MICHAELANGELO K. TWEMLOW
Public Notary iD No. 1660

Michaelangelo K Twemlow
Notary Public
Level 1, 299 Elizabeth Street
Sydney NSW 2000
Australia
Tel: +61 401 915 692
michael@solicitor.sydney
W: www.solicitor.sydney

**AFFIDAVIT**

I, the undersigned Charis Dwyer Feeney (hereinafter the "Affiant"), currently residing at 9 Wirrilda Way,

Forestville, NSW, 2087, Australia, do hereby solemnly swear, declare and state as follows:

i)    Affiant is competent to state the matters set forth herewith.
ii)   Affiant has personal knowledge of the facts stated herein.
iii)  All the facts stated herein are true, correct, and complete in accordance with the Affiant's best firsthand knowledge and understanding, and if called upon to testify as a witness Affiant shall so state.
iv)   Affiant is the director and producer of the motion picture currently known as 'Perfect Piece' (the "Picture"), which was previously a screenplay known under the titles of 'Casanova Lost and Found'.

**Statement of Facts**

1. I was approached by Adler and Associates Entertainment's Marketing Department via email after they saw my film 'Perfect Piece' on Vimeo on Demand in June 2015. I believe they had found my contact details via the IMDB website, where I kept my professional contact information up to date.
2. I agreed that Adler and Associates represent the film as the sales agent.

This Affidavit of Fact is dated the 15th day of the April month of the year 2019.

By: _Charisfeeney (Orchard)_
(Signature)

Name: _Charis Feeney-Orchard_
(Please print)

**Verification**

On _April 15, 2019_ in the State/Province of _NSW_, ~~County of~~ _Australia_
(date)

_Sydney_, Country of _Australia_,

_Charis Feeney-Orchard_ personally appeared before me,
(applicant name)

_Michaelangelo Twemlow_, and proved to me on the basis of satisfactory evidence
(Notary Public name)

to be the person whose name is subscribed to the above Affidavit of Fact and acknowledged to me that ~~he~~/she executed the same in ~~his~~/her authorized capacity, and who, being first duly sworn on oath according to law, deposes and says that ~~he~~/she has read the foregoing Affidavit of Fact subscribed by ~~him~~/her, and that the matters stated herein are true to the best of his/her information, knowledge and belief.

I certify under PENALTY OF PERJURY that the foregoing paragraph is true and correct.

_____
Signature and seal of Notary Public

Michaelangelo K Twemlow
Notary Public
Level 1, 299 Elizabeth Street
Sydney NSW 2000
Australia
Tel: +61 401 915 692
michael@solicitor.sydney
W: www.solicitor.sydney

EXHIBIT "E"



## ANSWER AND COUNTER-CLAIM

<u>Via U.S. Mail and Email</u>

Charis Feeney-Orchard
9 Wirrilda Way
Forestville, NSW, 2087, Australia
Email: Charisorchard@gmail.com

Re: <u>Arbitration #19-18 – Charis Feeney-Orchard v. Kim Boyle</u>

In accordance with the requirements of Rule 8.5 of the Independent Film & Television Alliance Rules for International Arbitration ("Rules"), Kim Boyle hereby provides its statement setting forth the facts and other contentions of law on which Boyle's defense is based, as well as a counterclaim for intentional copyright infringement.

## STATEMENT OF FACTS

1. In or about 2007, Boyle wrote a motion picture screenplay titled *Casanova – Lost & Found* ("the Screenplay"). Boyle registered the Screenplay with the U.S. Copyright Office on May 22, 2014 and received registration number PAu003726542.

2. In April 2014, Feeney-Orchard approached Boyle about optioning the Screenplay for a motion picture. Feeney-Orchard initially offered Boyle $500 and 15% of the "net profits" of the movie as a purchase price. This offer was rejected by Boyle as too low. Boyle sent Feeney-Orchard a counterproposal (dated April 14, 2014) with a purchase price of "3% of the final budget . . ., floor of $125,000, cap of $250,000."

3. Feeney-Orchard did not accept this deal and then it appeared as if she had given up on optioning the Screenplay. Then, on September 1, 2014, Feeney-Orchard sent Boyle an email asking if Boyle would "reduce the fees by a third." On September 2, 2014, Boyle replied to this email, stating in pertinent part, "For clarification, when you say 'reduce the fees by a third,' are

you asking to reduce the purchase price from $125,000 to $41,700," making it expressly clear to Feeney-Orchard that the purchase price was $125,000.

4.   In response, on September 4, 2014, Feeney-Orchard offered Boyle $1,650 for the script and on September 4, 2015, Boyle emailed Feeney-Orchard, "I'm sorry it's not an acceptable offer. I'm looking for a different deal structure and terms for this screenplay."

5.   Thereafter, on or about November 4, 2014, Boyle entered into a Screenplay Option Purchase Agreement ("the Option Agreement") with Feeney-Orchard. Under the terms of the Option Agreement, Feeney-Orchard paid Boyle $500 for a one-year option to purchase the Screenplay. In order to execute the option and purchase the Screenplay, the purchase price was set at "3% of the final budget . . ., floor of $125,000, cap of $250,000." This is standard language in every screenplay option agreement in which the purchase price is tied to the budget of the picture and the floor amount always refers to the purchase price, never to the budget of the picture.

6.   The Option Agreement provided Feeney-Orchard also could extend the option period for an additional year by giving Boyle written notice and paying her $1,000 prior to the expiration of the option period (i.e., November 4, 2015).

7.   The Option Agreement provided that the Option could be exercised "by written notice accompanied by payment of the Purchase Price (or, if sooner, upon commencement of principal photography, in which event payment of the Purchase Price shall be made to [Boyle] within 5 business days thereafter.)"

8.   Sometime in 2015, Feeney-Orchard apparently shot the film.  In August 2015, Boyle reached out to Feeney-Orchard asking about the status of the film.  Feeney-Orchard then notified Boyle that she had already shot the film and admitted that she had never notified or paid Boyle for the rights.  Feeney-Orchard then offered to pay Boyle $1000 for the film.

9.   At this point, Boyle's attorney, Jay Kenoff, explained to Feeney-Orchard that the minimum purchase price set forth in the Option Agreement was $125,000.  Feeney-Orchard refused to pay Boyle the agreed upon price and made up a story that the $125,000 amount set forth in the Option Agreement referred to the budget, not the purchase price.

10.   Feeney-Orchard did not pay the purchase price or pay the option extension fee by the end of the one-year option term (November 4, 2015).  Therefore, under the terms of the Option Agreement, all the rights to the Screenplay reverted to Boyle on that date.

11.  On or about January 5, 2016, Boyle's attorney, Jay Kenoff sent a letter to Feeney-Orchard demanding that she stop all further attempts to distribute the picture until the purchase price of $125,000 was paid in full.  After receiving the letter, Feeney-Orchard refused to pay the purchase price.

12. Subsequently on August 8, 2016, Boyle attempted to resolve the dispute by having Feeney-Orchard instruct Adler & Associates Entertainment ("Adler"), who Feeney-Orchard had licensed to distribute the film to remit payment to Boyle until she received $125,000.  A written agreement was prepared and sent to Feeney-Orchard and Adler on August 8, 2016.

13.  However, this agreement was conditioned upon Adler and Feeney-Orchard agreeing to these terms and signing it by August 22, 2016.  Adler never signed the agreement; accordingly, no agreement was entered into.

14.  At this point, Feeney-Orchard should have told Adler that it could no longer distribute the film as Feeney-Orchard never obtained any right to the underlying screenplay.  Instead, Feeney-Orchard allowed Adler to distribute the motion picture despite not having the right to do so.

15. In late 2018, Boyle discovered that the film was playing on Amazon Prime and had been licensed to Dreamscape Media, LLC to distribute on DVD.  All without Boyle's knowledge or permission.

16. To sum up, Boyle and Feeney-Orchard entered into a written option agreement, by which Feeney-Orchard agreed to pay Boyle a minimum of $125,000 for her screenplay.  Feeney-Orchard produced a motion picture but has not paid Boyle any money for the Screenplay.

<u>Counterclaim for Copyright Infringement</u>

1.  Boyle re-alleges and incorporates by reference, as though set forth in full, paragraphs 1 through 16 above as though fully set forth herein.

2.  Feeney-Orchard has infringed Boyle's copyright in the Screenplay by producing a motion picture titled *Perfect Piece* based on Boyle's screenplay without Boyle's permission, and without paying Boyle

3.  As a direct and proximate result of Feeney-Orchard's infringement, Boyle is entitled to her actual damages in addition to Feeney-Orchard's profits that are attributable to the

copyrighted material; alternatively, Boyle is entitled to statutory damages for infringement in the maximum statutory amount allowed.

4.     Furthermore, in acting as alleged above, Boyle is informed and believes, and on that basis allege, that when Feeney-Orchard took the actions complained of above, she did so knowing that these acts infringed Boyle copyright and therefore Boyle is entitled to additional damages in an amount to be proven at trial for willful and knowing infringement, but in no event less than $150,000.

5.     Feeney-Orchard threatens to continue to act as alleged above, and unless restrained and enjoined, will continue to do so, all to Boyle's irreparable injury.  The amount of compensation which would afford adequate relief to Boyle for such injury will be difficult to ascertain.  The wrongful acts of Feeney-Orchard are of a continuing nature and will require a multiplicity of judicial proceedings.  Accordingly, Boyle's remedy at law is inadequate, and Boyle is entitled to preliminary and permanent injunctive relief to enjoin the wrongful conduct of Feeney-Orchard alleged above.

<u>Counterclaim for Breach of Contract</u>

6.   Boyle re-alleges and incorporates by reference, as though set forth in full, paragraphs 1 through 16 above as though fully set forth herein.

7.   Although, Boyle's position is that Feeney-Orchard's failure to pay the Purchase Price of $125,000 within five days of the commencement of principal photograph (or by November 4, 2015 at the latest) voids the Option Agreement, in the event that the Arbitrator rules that the Option Agreement is still valid, Feeney-Orchard has breached the terms of the Option Agreement by failing to pay the $125,000 minimum Purchase Price.

8.   Therefore, Boyle asks in the alternative that Feeney-Orchard be ordered to pay Boyle $125,000 for breach of contract.

9.   Additionally, pursuant to the Option Agreement, Boyle is entitled to her attorney's fees and expenses, in an amount to be proved at the arbitration.

Pursuant to Rule 2.4.7., the relief or remedy sought by Kim Boyle is an amount of no less than $150,000, or in the alternative, $125,000.

The foregoing is not intended nor shall it be construed as a complete recitation of the facts and events concerning the above-referenced matter, nor shall it be construed as a waiver of any rights, remedies or claims, legal or equitable, which Kim Boyle may have.

Sincerely,

Larry Zerner
Attorney for Kim Boyle

CC: The Arbitral Tribunal
c/o The Arbitral Agent
10850 Wilshire Blvd., 9th Floor
Los Angeles, CA 90024

EXHIBIT "F"

**_Boyle v. Adler & Assocs. Entm't, LLC, et al._**; Case No. 2:19-cv-00893-GW-(SKx)
Tentative Ruling on Motion to Compel Arbitration and/or Stay

## I. Background

### A. Factual Background

Kimberly Boyle ("Plaintiff") sues Adler & Associates Entertainment, LLC ("Adler"), Amazon.com, Inc. ("Amazon"), Dreamscape Media, LLC ("Dreamscape"), and Does 1-10 (collectively, "Defendants") for copyright infringement under 17 U.S.C. §§ 101 *et seq. See* First Amended Complaint ("FAC"), Docket No. 15. Charis Feeney-Orchard ("Feeney-Orchard"), a defendant in the original complaint, was terminated after the filing of the FAC. *See* FAC; Apr. 11, 2019 Civil Minutes, Docket No. 16. This case arises out of Defendants' distribution of a film based on Plaintiff's screenplay allegedly without Plaintiff's permission. *See* FAC ¶¶ 4-18.[1]

#### 1. Allegations in the FAC

In or about 2007, Plaintiff wrote a motion picture screenplay titled "Casanova – Lost and Found" ("the Screenplay"). *See id.* ¶ 4. She registered the Screenplay with the U.S. Copyright Office on May 22, 2014 and received registration number PAu003726542. *See id.*

On or about November 4, 2014, Plaintiff entered into a Screenplay Option Purchase Agreement ("the Option Agreement") with Feeney-Orchard. *See id.* ¶ 5. Under the terms of the Option Agreement, Feeney-Orchard paid Plaintiff $500 for a one-year option to purchase the Screenplay. *See id.* To execute the option and purchase the Screenplay, Feeney-Orchard would pay 3% of the final budget of the motion picture, with a minimum payment of $125,000 and a maximum payment of $250,000. *See id.* Alternatively, Feeney-Orchard could extend the option period for an additional year by giving Plaintiff written notice and $1000 prior to the expiration of the option period on November 4, 2015. *See id.*

Feeney-Orchard did not pay the purchase price or pay the option extension fee before the expiration of the option period. *See id.* ¶ 6. On November 4, 2015, the rights to the Screenplay reverted to Plaintiff. *See id.* Later, she learned that Feeney-Orchard had produced a motion picture titled "Perfect Piece" ("the Motion Picture") based on the Screenplay without notifying Plaintiff. *See id.* ¶ 7. Plaintiff was credited as the screenwriter in the credits of the movie and on

---

[1] The FAC restarts paragraph numbering on page 3, under "Jurisdiction and Venue." The paragraphs cited here correspond with the numbering that begins on page 3, unless stated otherwise.

IMDB.com. *See id.*

On or about January 5, 2016, Plaintiff's attorney sent a letter to Feeney-Orchard demanding that she stop all further attempts to distribute the Motion Picture until the purchase price of $125,000 was paid in full. *See id.* ¶ 8. Feeney-Orchard refused to pay the purchase price. *See id.* On August 8, 2016, Plaintiff sent a written agreement to Feeney-Orchard and Adler, Feeney-Orchard's agent, having Feeney-Orchard instruct Adler and any distributors, sub-licensees, agents, or representatives of the film to remit payment to Plaintiff until she received $125,000. *See id.* ¶ 9. The written agreement was conditioned upon Feeney-Orchard and Adler agreeing to the terms by August 22, 2016, but Adler never signed the agreement. *See id.* ¶ 10.

Adler is actively distributing the Motion Picture, which is available for streaming on Amazon Prime. *See id.* ¶ 11. Feeney-Orchard and Adler entered into a contract with Dreamscape, which is currently distributing the Motion Picture on DVD throughout the United States. *See id.* ¶ 12. On or about October 30, 2018, Plaintiff emailed Amazon saying Amazon Prime was streaming the Motion Picture without her permission or a license. *See id.* ¶ 13. Amazon acknowledged receipt of her email but has taken no steps to remove the Motion Picture from its website. *See id.*

### 2. Additional Evidence in Exhibits

Under the terms of the Option Agreement between Plaintiff and Feeney-Orchard, the purchase price is described as "3% of the final budget of the Picture (with exclusions for contingency, actual bond fees, finance charges and purchase price for screenplay), floor of $125,000, cap of $250,000." Feeney-Orchard Decl. ¶ 3, Ex. A at 5, Docket No. 25. Additionally, the Option Agreement has an arbitration provision providing the following:

> (g) Arbitration: Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration using the rules and procedures of the International Film and Television Alliance[2] using a single arbitrator. The parties agree that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to

---

[2] The rules of the International Film and Television Alliance are available at www.ifta-online.org/rules-international-arbitration.

> recover its reasonable attorneys' fees and expenses. The arbitration will be held in Los Angeles and any award shall be final, binding and non-appealable.

*Id.* at 11.

Plaintiff interpreted the purchase price language to mean that the stated floor and cap refer to the final purchase price itself, so that Feeney-Orchard would pay at minimum $125,000. *See* FAC ¶¶ 5, 7-9. Feeney-Orchard and Defendants contend that the purchase price language means that the stated floor and cap are of the budget, so that Feeney-Orchard would pay at minimum $3750.[3] *See* Defendant Adler's Notice of Motion and Motion to Compel Arbitration ("Motion") at 10, Docket No. 25.

On August 2, 2015, Feeney-Orchard entered into a Sales Agency Agreement with Adler ("Sales Agreement") containing an arbitration clause.[4] *See* Lunt Decl. ¶ 3, Ex. A, Docket No. 25. The Sales Agreement designated Adler as the exclusive sales agent for the Motion Picture. *See id.* On December 8, 2017, Adler entered into a distribution agreement with Dreamscape containing an arbitration clause.[5] *See id.* ¶ 4, Ex. B. The license terms included exclusive video rights and non-exclusive internet rights. *See id.* Adler also entered into a digital license agreement with Amazon containing an arbitration clause.[6] *See id.* ¶ 5, Ex. C. The license

---

[3] 3% x $125,000 minimum = $3750.

[4] Adler's Sales Agreement with Feeney-Orchard contains the following arbitration clause:

> Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by final, binding and non-appealable arbitration under the Rules for International Arbitration of the International Film and Television Alliance (I.F.T.A.) in effect when the arbitration is filed (the "I.F.T.A. Rules"). Each party waives any right to adjudicate any dispute in any other court of forum, except that a Party may seek interim relief before the start of arbitration as allowed by the I.F.T.A. Rules . . . .

Lunt Decl. ¶ 3, Ex. A at 15.

[5] Adler's "IFTA INTERNATIONAL MULTIPLE RIGHTS DISTRIBUTION AGREEMENT" with Dreamscape contains an arbitration clause stating:

> Dispute Resolution: Any dispute arising under this Agreement, including with respect to any right or obligation that survives termination or cancellation of this Agreement, will be administered and resolved by binding arbitration under the IFTA Rules for International Arbitration ("IFTA Rules") in effect as of the Effective Date and in accordance with Paragraph 16.12 of the IFTA International Standard Terms . . . .

*Id.* ¶ 4, Ex. B at DT-6.

[6] Adler's "PRIME VIDEO DIRECT DIGITAL LICENSE AGREEMENT" with Amazon includes the following arbitration clause:

> Any dispute or claim arising from or relating to this Agreement or the Program is subject to the binding arbitration, governing law, disclaimer of warranties and limitation of liability and all other

3

agreement was an online form through Amazon's digital self-publication and distribution program. *See id.*

Two arbitrations are already pending before the International Film and Television Alliance ("IFTA"). *See* Motion at 8. The first, filed on or about April 11, 2019, involves Feeney-Orchard against Plaintiff, based on the arbitration agreement in the Option Agreement. *See* Lawrence Decl. ¶ 2, Ex. A, Docket No. 25. The second, filed on or about April 25, 2019, involves Adler against Feeney-Orchard, based on the arbitration agreement in the Sales Agreement. *See id.* ¶ 3, Ex. B.

### B. Procedural History

Previously, Feeney-Orchard was a defendant in the original complaint and filed a request for a motion to dismiss. *See* Request to Dismiss Case, Docket No. 14. Plaintiff filed the FAC dropping Feeney-Orchard as a defendant, so the Court terminated Feeney-Orchard and vacated her motion. *See* Apr. 11, 2019 Civil Minutes; *see generally* FAC. Before the Court is Adler's Motion to Compel Arbitration and Dismiss and/or Stay the Litigation.[7] *See* Motion. Plaintiff filed an opposition to the Motion. *See* Plaintiff's Opposition to Motion ("Opp'n"), Docket No. 28. Adler replied. *See* Reply, Docket No. 31.

## II. Legal Standard

The Federal Arbitration Act ("FAA"), at 9 U.S.C. § 2, reflects a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2010) (citation omitted). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). A party aggrieved by the refusal of another party to arbitrate under a written arbitration agreement may petition the court for an order compelling arbitration as provided for in the parties' agreement. *See* 9 U.S.C. § 4. "By its terms, the [FAA] leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean*

---

terms in the Amazon.com Conditions of Use. You agree to those terms by entering into this Agreement or using the Program. The United States Federal Arbitration Act, applicable United States federal law, and the laws of the State of Washington, without regard to principles of conflict of laws, will govern this Agreement and any dispute of any sort that might arise between you and Amazon relating to this Agreement or the Program.

*Id.* ¶ 5, Ex. C at 15.

[7] This motion is joined by Defendants Dreamscape and Amazon. *See* Docket Nos. 26, 27.

*Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213 (1985) (emphasis in original); *see also* 9 U.S.C. § 4. "The court's role under the Act is therefore limited to determining: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Daugherty v. Experian Info. Sols., Inc.*, 847 F. Supp. 2d 1189, 1193 (N.D. Cal. 2012) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). "While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.'" *Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 540 (E.D. Pa. 2006)).

On a motion to compel arbitration, courts apply a standard similar to the summary judgment standard applied under Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"). *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (citing *McCarthy v. Providential Corp.*, No. C 94-0627, 1994 WL 387852, at *2 (N.D. Cal. July 19, 1994)). Under Rule 56, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "[T]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (quoting *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)) (internal quotation marks omitted). Similarly, at the summary judgment stage, courts do not "focus on the admissibility of the evidence's form," but rather "on the admissibility of its contents." *Fraser*, 342 F.3d at 1036. Objections based on a failure to comply with the technicalities of authentication requirements or the best evidence rule are, therefore, inappropriate. *See Adams v. Kraft*, No. 5:10-CV-00602-LHK, 2011 WL 5079528, at *25 n. 5 (N.D. Cal. Oct. 25, 2011) ("On summary judgment, unauthenticated documents may be considered where it is apparent that they are capable of being reduced to admissible evidence at trial"); *Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992) (holding that even if declaration violated best evidence rule, court was not precluded from considering declaration in awarding summary judgment).

Additionally, the FAA allows the Court to stay an action "upon being satisfied that the

issue involved in such suit or proceeding is referable to arbitration under [a written] agreement." 9 U.S.C. § 3.

## III. Analysis

### A. Validity of the Arbitration Agreement

"[T]he federal policy favoring arbitration is inapplicable to the determination of whether a valid agreement to arbitrate between the parties exists." *Campos v. Campos Family Farms, LLC*, No. 12-598-LJO, 2012 WL 2090303, at *8 (E.D. Cal. June 8, 2012) (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006)). Rather, that determination is made by reference to ordinary state law contract principles. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). As the party moving to compel arbitration, Adler bears the burden of proving by a preponderance of the evidence the existence of a valid arbitration agreement. *See Lucas v. Hertz Corp.*, 875 F.Supp.2d 991, 998 (N.D. Cal. 2012) (citing *Olvera v. El Pollo Loco*, 173 Cal. App. 4th 447, 453 (2009)); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

Here, the Option Agreement contains a choice-of-law provision that requires application of California law. *See* Feeney-Orchard Decl. ¶ 3, Ex. A at 11 ("This agreement shall be construed in accordance with the laws of the State of California."). Neither Plaintiff nor Adler dispute the validity of the choice-of-law provision, so the Court will honor the choice of law provision and apply California law to this dispute. *See* Motion at 9; *see generally* Opp'n. Under California law, "a written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." Cal. Civ. Proc. Code § 1281 (West 2019). Reasons under California law include fraud, duress, and unconscionability. *See Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 239 (2014). Both Plaintiff and Defendants agree that Plaintiff entered into the Option Agreement with Feeney-Orchard on or about November 4, 2014. *See* FAC ¶ 5; Motion at 9. The pending arbitration between Plaintiff and Feeney-Orchard will decide the application of the disputed terms of the contract, including the purchase price.[8] Plaintiff has

---

[8] Plaintiff filed an evidentiary objection to Paragraph 2 of Exhibit A of the Lawrence Declaration. *See* Opp'n, Attachment 2. Paragraph 2 of Exhibit A of the Lawrence Declaration reads, "On or about April 11, 2019, Director/Producer Charis Feeney-Orchard filed an arbitration claim against Plaintiff Kimberly Boyle with the IFTA. A true and correct copy of said arbitration claim is attached as Exhibit A." Plaintiff asserts that the paragraph is inadmissible because there is no showing of personal knowledge, a lack of foundation, and that the statement is hearsay. *Id.* Plaintiff does not appear to object to "Exhibit A" itself. *Id.* Exhibit A is the Notice of Arbitration from

6

not opposed Adler's assertion that the *arbitration* clause is valid and enforceable, nor has she raised fraud, duress, or unconscionability grounds.

Instead, reading Plaintiff's Opposition liberally, it seems she argues that the arbitration clause is unenforceable because the Option Agreement expired without Feeney-Orchard exercising the option. *See* Opp'n at 2. Adler seemingly responds that any dispute about whether the Option Agreement was in effect does not defeat the arbitration clause therein. *See* Reply at 2 (citing *St. Agnes Med. Ctr. v. PacifiCare of California*, 31 Cal. 4th 1187, 1199 (2003)). The Court agrees that, in general, an attack on the validity of the underlying contract as a whole is a question for the arbitrator. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006) ("First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."). Additionally, there is a more relevant line of precedent that holds that arbitration clauses may survive the expiration of the underlying contract when the disputed right or obligation arose under the contract. *See, e.g., Brachfeld v. Hopkins*, No. CV 17-01443 SJO (SSx), 2017 WL 10436075, at *5 (C.D. Cal. Dec. 11, 2017) ("Absent an express agreement to the contrary, however, arbitration agreements 'survive[ ] contract termination when the dispute [is] over an obligation arguably created by the expired agreement.'") (quoting *Nolde Bros. v. Local No. 358, Bakery & Confectionery Workers Union, AFL-CIO*, 430 U.S. 243, 252 (1977) (alterations in original)). Here, whether Feeney-Orchard validly exercised the Option Agreement is a dispute that arises under that contract, such that Feeney-Orchard and Plaintiff would be required to arbitrate that dispute.

Thus, the Court is inclined to find the arbitration provision valid but based on the somewhat cursory briefing on the issue, would ask the parties to clarify some points during this hearing. Namely, it may be helpful to the Court to hear an explanation of the nature of the dispute between Feeney-Orchard and Plaintiff. For example, does Feeney-Orchard dispute that she failed to exercise the Option Agreement? Does Feeney-Orchard admit a breach, but argue about the price owed to Plaintiff? The parties should clarify the point during the hearing.

---

Feeney-Orchard to Boyle. The Court would overrule the objection. The facts underlying the affidavit could be admitted into evidence at trial. The Court focuses on the admissibility of the contents, not the form, of the evidence in considering a motion to compel arbitration. *See Fraser*, 342 F.3d at 1036; *Macias*, 767 F. Supp. 2d at 1007; *Concat LP*, 350 F. Supp. 2d at 804.

## B. Whether the Arbitration Agreement Encompasses the Dispute

Second, the Court determines whether the arbitration agreement encompasses the dispute at issue. When determining the scope, the factual allegations of the party resisting the motion to compel only need to "touch matters" in the contract and "all doubts are to be resolved in favor of arbitrability." *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n. 13 (1985). Here, Plaintiff sues Defendants for copyright infringement. *See* FAC ¶¶ 4-18. While copyright issues between Plaintiff and Feeney-Orchard are clearly covered by the Option Agreement terms, the dispute involves whether the arbitration clause in the Option Agreement encompasses copyright claims involving nonsignatories.

Adler argues that Plaintiff has no claim for copyright infringement here because, if the Option Agreement, Sales Agreement, and distribution agreements are valid and enforceable, Plaintiff transferred any rights to the Screenplay to Feeney-Orchard. *See* Motion at 19. Adler argues that Defendants would not have agreed to use and distribute the Motion Picture *but for* the fact that they believed Feeney-Orchard had acquired rights under contract. *See id.* (emphasis original). Thus, they claim that Plaintiff's copyright claim is "inextricably intertwined" with the Option Agreement. *See id.* at 18. Plaintiff argues that the current case is a copyright dispute and not a breach of contract action. *See* Opp'n at 2. She contends that Feeney-Orchard had not acquired any rights to the Screenplay under the Option Agreement because she failed to pay the purchase price, and thus Defendants violated her copyright when they distributed the Motion Picture. *See id.*

The Court would find that the copyright claims fall within the sort of "controversy or claim" encompassed by the arbitration provision in the Option Agreement. If exercised, the Option Agreement transfers "all motion picture rights" for the Screenplay from Plaintiff to Feeney-Orchard including "the copyright thereof." *See* Feeney-Orchard Decl. ¶ 1, Ex. A at 1. The Option Agreement also contains a section on copyright.[9] *See id.* ¶ 3. The rights under the

---

[9] Paragraph 9 states:

> (e) Upon exercise of the Option and payment of the Purchase Price, all rights granted or agreed to be granted to Purchaser under this Agreement shall be irrevocably vested in Purchaser and shall not be subject to rescission by the Transferor or any other party for any cause, nor shall said rights be subject to termination or reversion by operation of law or otherwise, except to the extent, if any, that the provisions of any copyright law or similar law relating to the right to terminate grants of, or recapture rights in, literary property may apply . . . .

8

Option Agreement are dependent on "exercise of the Option and payment of the Purchase Price." *See id.* ¶ 1. Plaintiff's allegations need only "touch matters" in the contract, and copyright issues are related enough to the Option Agreement terms that the arbitration provision encompasses the issue of Adler's infringement of the distribution rights. *See Simula*, 175 F.3d at 721; *see also Packeteer, Inc. v. Valencia Sys., Inc.*, No. C-06-07342, 2007 WL 707501, at *3 (N.D. Cal. Mar. 6, 2007) (finding that copyright issues and validity are subject to arbitration if within scope of arbitration agreement). In short, the question of whether Feeney-Orchard obtained rights to the Screenplay pursuant to the Option Agreement is fundamental to the question of whether Defendants infringed on Plaintiff's copyright. Therefore, the arbitration provision encompasses the instant dispute.

While the FAA requires courts to enforce arbitration if both a valid agreement and applicable scope are found, here the issue involves a third factor: Adler was not a party to the Option Agreement, and the Court must determine whether Adler may enforce an arbitration as a nonsignatory.

### C. Adler's Enforcement of the Arbitration Agreement Against Plaintiff

There are five theories under which a nonsignatory can enforce an arbitration agreement against a signatory: "(1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel." *See Boucher v. All. Title Co., Inc.*, 127 Cal. App. 4th 262, 268 (2005) (citing *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)). Adler relies on equitable estoppel to support its theory that it, as a nonsignatory to the Option Agreement, may force Plaintiff to arbitrate. *See* Motion at 16-20. Equitable estoppel may be applied in arbitration in two circumstances:

> As to the first circumstance . . . [e]quitable estoppel applies "when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory." *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999).
>
> As to the second circumstance . . . [i]n *any* case applying equitable estoppel to compel arbitration despite the lack of an agreement to arbitrate, a nonsignatory may compel arbitration only when the claims against the nonsignatory are founded in and inextricably bound up with *the obligations imposed by the agreement*

---

Feeney-Orchard Decl. ¶ 3, Ex. A at 7-8.

> *containing the arbitration clause.* In other words, allegations of substantially interdependent and concerted misconduct by signatories and nonsignatories, standing alone, are not enough: the allegations of interdependent misconduct must be founded in or intimately connected with the obligations of the underlying agreement.

*Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 218-19 (2009) (emphasis original).

Adler's motion relies on the second application of equitable estoppel. Adler argues that Plaintiff's copyright claim is "inextricably intertwined" with the Option Agreement, the Sales Agreement, and the distribution agreements, all containing arbitration clauses. *See* Motion at 18. It claims that Plaintiff signed the Option Agreement with the expectation that it would form the basis for additional contracts involving distribution. *See id.* Adler cites *Goldman*, 173 Cal. App. 4th at 219, to support its arguments of the validity of a nonsignatory defendant enforcing an arbitration clause and a nonsignatory plaintiff being required to arbitrate.[10] From *Goldman*, the principal concern in applying equitable estoppel is fairness. *See id.* at 220. A "signatory 'cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory.'" *Id.* (quoting *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 528 (5th Cir. 2000). Plaintiff's Opposition cites *Boucher*, which states the same reasoning that equitable estoppel applies when the signatory relies on the terms of a written agreement in asserting claims against a nonsignatory. 127 Cal. App. 4th at 269-72 (finding that claims that "make reference to and presume the existence of the validity" of the original contract are intimately founded in and intertwined with the original contract, and thus equitable estoppel applies).

Generally, the Ninth Circuit has resisted extending equitable estoppel to allow a nonsignatory defendant to invoke equitable estoppel against a signatory plaintiff. *See Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) ("We have never previously

---

[10] Adler argues, as additional support, that arbitration applies to Plaintiff as a nonsignatory to the Sales Agreement and distribution agreements. *See* Motion at 17-18. Adler does not develop its argument as to the Sales Agreement or distribution agreements. The Court suspects that the analysis may be different because Adler would be a signatory to an arbitration agreement trying to compel a nonsignatory to arbitrate. *Amisil Holdings Ltd. v. Clarium Capital Mgmt.*, 622 F. Supp. 2d 825, 831 (N.D. Cal. 2007) ("Arbitration is more likely to be attained when the party resisting arbitration is a signatory."). Because the Court is inclined to find that the arbitration provision in the Option Agreement encompasses the copyright claims, the Court need not reach the question of the arbitrability of the claims under the Sales and distribution agreements.

allowed a non-signatory defendant to invoke equitable estoppel against a signatory plaintiff, and we decline to expand the doctrine here."); *see also Mundi v. Union Sec. Life Ins. Co*, 555 F.3d 1042, 1046 (9th Cir. 2009) ("In light of the general principle that only those who have agreed to arbitrate are obliged to do so, we see no basis for extending the concept of equitable estoppel of third parties in an arbitration context beyond the very narrow confines delineated [previously]."). However, *Mundi* does not foreclose the possibility of a nonsignatory defendant compelling arbitration against a signatory plaintiff and notes that other Circuits have allowed such situations. *See Mundi*, 718 F.3d at 1047. Further, district courts within the Ninth Circuit have permitted nonsignatory defendants to compel arbitration against signatory plaintiffs. *See ValueSelling Assocs., LLC v. Temple*, No. 09 CV 1493 JM, 2009 WL 3736264, at *6-7 (S.D. Cal. Nov. 5, 2009) (holding that a nonsignatory could compel arbitration based on equitable estoppel when a signatory bringing a claim relies on the contract with the arbitration clause and alleges concerted misconduct); *Amisil Holdings Ltd. v. Clarium Capital Mgmt.*, 622 F. Supp. 2d 825, 841 (N.D. Cal. 2007) (finding that a nonsignatory enforcing arbitration permitted when signatory's claims referred to or presumed the existence of an operating agreement and absent the agreement, none of the claims would lie).

Here, Plaintiff is claiming that Defendants infringed her copyright in the Screenplay by distributing the Motion Picture without authorization. *See FAC ¶ 15*. Plaintiff's claims against nonsignatory Adler arise from Plaintiff's dealings with Feeney-Orchard, as dictated by the Option Agreement. *See id. ¶¶ 4-18*. In the FAC, Plaintiff discusses the terms of the Option Agreement as a basis as to why Defendants violated and continue to violate her copyright. *See id.* For example, she states that "under the terms of the Option Agreement, all the rights to the Screenplay reverted to [Plaintiff]" after Feeney-Orchard did not pay the purchase price, and the subsequent distributions directly violate Plaintiff's rights returned under the Option Agreement. *See id. ¶¶ 6-15*. If Plaintiff is wrong that Feeney-Orchard failed to pay the purchase price, then Feeney-Orchard would have had the right to distribute the Motion Picture to parties such as Defendants. Defendants' allegedly wrongful distribution of the Motion Picture is therefore dependent upon Feeney-Orchard's actions. Thus, Plaintiff relies on the terms of the Option Agreement in asserting her claims against Defendants while trying to avoid arbitration. *See FAC ¶¶ 4-18*. As such, the Court would find that the copyright claim is inextricably bound up in the obligations and terms of the Option Agreement. Thus, the third consideration in the

determination to enforce arbitration falls in favor of arbitration.[11] *See e.g., ValueSelling Assocs.*, 2009 WL 3736264, at *8-*10 (S.D. Cal. Nov. 5, 2009) (holding that nonsignatory defendant could compel arbitration against signatory plaintiff alleging a copyright infringement claim).

### D. Stay of Litigation

Adler moves to dismiss or stay the litigation if the Court compels arbitration. *See* Motion at 20. Adler also argues that even if the Court does not compel arbitration, the Court should stay the litigation pending resolution of the other IFTA arbitrations, including the arbitration between Feeney-Orchard and Plaintiff. *See id.* Plaintiff opposes the Motion, but she provides arguments for only if the Court does not compel arbitration. *See* Opp'n at 5. Under California law, the Court should stay the proceeding until the application for an order to arbitrate is determined, and if arbitrated, until then or an earlier time specified by the Court. Cal. Code Civ. Pro. § 1281.4. The FAA also allows the Court to stay the trial on a party's motion after an issue is referred to arbitration. 9 U.S.C. § 3. The Ninth Circuit has expressed a preference for staying an action pending arbitration rather than dismissing it, especially since an arbitrator can determine questions of arbitrability that may require a return to federal court. *See MediVas, LLC v. Marubeni Corp.*, 741 F.3d 4, 9 (9th Cir. 2014). Therefore, the Court will stay the action pursuant to 9 U.S.C. § 3.[12]

## IV. Conclusion

Based on the foregoing discussion, the Court is inclined to **GRANT** Adler's Motion to Compel Arbitration but would like clarification as specified above about whether the expiration of the Option Agreement affects the analysis herein. If the Court grants the Motion to Compel Arbitration, it would stay the litigation.

---

[11] Regarding Adler's application of *NORCAL Mutual Insurance Co. v. Newton,* 84 Cal. App. 4th 64, 71-72, 76, 84 (2000), to enforce a nonsignatory to an arbitration when there is an agency or similar relationship, Adler positions Plaintiff as the nonsignatory to the Sales Agreement with an agency relationship to Feeney-Orchard. *See* Motion at 17, 19. However, the agency-type relationships detailed in *Norcal* include a party's "partners, associates, association, corporation or partnership, and the employees, agents and estates of any of them," and do not include individuals engaged in a one-time business deal, as is the case here. *See Norcal,* 84 Cal. App. 4th at 76 (quoting *Michaelis v. Schori,* 20 Cal. App. 4th 133, 139 (1993)). The agency argument is inapplicable in this instance.

[12] Even if the Court were inclined to deny Adler's Motion to Compel, the Court would strongly consider staying the action considering the overlap with issues currently pending in the separate arbitration between Plaintiff and Feeney-Orchard.

EXHIBIT "G"

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 19-893-GW(SKx) | Date | July 15, 2019 |
| Title | *Kimberly Boyle v. Adler and Associates Entertainment, LLC, et al.* | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie E. Thibodeaux | Tape No. |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Lawrence J. Zerner | Amy B. Lawrence |
| | Brett H. Oberst |
| | Marc Allaria |

PROCEEDINGS:    **DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S MOTION TO COMPEL ARBITRATION AND TO DISMISS AND/OR STAY THE LITIGATION [25]**

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, the Court will stay this action pending the consolidation of arbitration matters. The Motion is continued to September 12, 2019 at 8:30 a.m., with a joint status report to be filed by September 10, 2019.

|  |  | : | 17 |
|---|---|---|---|
| | Initials of Preparer | JG | |

EXHIBIT "H"

Amy B. Lawrence, Esq. - Bar # 115874
LAWRENCE & ASSOCIATES
Attorneys at Law
2550 N. Hollywood Way, Suite 202
Burbank, CA 91505
Telephone: (818) 843-6442
Facsimile: (818) 566-7875
Email: ablawrence@lawandassoc.com

Attorneys for Defendant
ADLER & ASSOCIATES ENTERTAINMENT, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY BOYLE<br><br>Plaintiff,<br><br>vs.<br><br>ADLER & ASSOCIATES ENTERTAINMENT, LLC, a California LLC; AMAZON.COM, INC., a Delaware corp.; DREAMSCAPE MEDIA, LLC, an Ohio LLC; and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. 2:19CV00893-GW(SKx)<br><br>**JOINT STATUS REPORT BY ALL PARTIES FOLLOWING DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S MOTION TO COMPEL ARBITRATION AND TO DISMISS AND/OR STAY THE LITIGATION**<br><br>Continued Hearing Date: 9/12/19<br>Time: 8:30 a.,.<br>Courtroom: 9D<br><br>Trial Date:<br><br>Judge: Hon. George H. Wu |

THE PARTIES HEREBY SUBMIT THEIR JOINT STATUS REPORT PURSUANT TO THE COURT'S MINUTE ORDER DATED 7/15/19

### I.  BACKGROUND FACTS.

On July 15, 2019, the Court commenced the hearing on the Motion to Compel Arbitration and to Dismiss and/or Stay the Litigation ("Motion") filed by Defendant Adler & Associates Entertainment, LLC and joined in by

---

**DEFENDANT ADLER'S MOTION TO COMPEL ARBITRATION**

1  Defendants Dreamscape and Amazon.

2      As described in the Motion, two separate arbitrations were previously filed
3  by certain defendants before the Independent Film & Television Alliance
4  ("IFTA"). At the hearing, the Court again reiterated its inclination to grant the
5  Motion and suggested that **(1)** the parties determine "which" of the two pending
6  IFTA arbitrations he should "refer" Plaintiff's Federal Case to as part of his
7  order granting the Motion, and **(2)** perhaps the arbitrator could order both of the
8  pending arbitrations consolidated.

9      The Court continued the hearing to September 12, 2019 and ordered the
10 parties to submit this joint status report to report on the progress finding answers
11 to these questions. In summary, as further described below, the arbitrator
12 appointed to date has pointed out that, if the Court is inclined to grant the
13 Motion, the Motion should simply be granted without addressing either point.

14 **II.  POINTS MADE BY ARBITRATOR AT CONFERENCE.**

15     Attorney Roy G. Rifkin, Esq., of Wolf, Rifkin, Shapiro, Schulman &
16 Rabkin, LLP ("Arbitrator Rifkin") is the assigned arbitrator for the earliest IFTA
17 arbitration, Arb. 19-18 (the "First Arbitration"). No arbitrator has been assigned
18 to the second IFTA arbitration, Arb. No. 19-19 (the "Second Arbitration").

19     On September 4, 2019, Arbitrator Rifkin held a one-hour telephone
20 conference regarding the Court's two questions described above concerning the
21 Motion to Compel Arbitration.

22     As to "which" pending arbitration the Court should "refer" Plaintiff to,
23 Arbitrator Rifkin pointed out that:

24     (1) Plaintiff's recourse if the Motion is granted is to file her own
25 arbitration including all parties;

26     (2) Neither arbitration appropriately supports a "referral" because neither
27 arbitration contains all of Plaintiff's actual copyright claims;

28     (3) Arbitrator Rifkin does not have all parties to the Federal Case before

1   him in the First Arbitration; and

2       (4) The arbitrator appointed to Plaintiff's arbitration must successfully
3   review and clear any conflicts, which is premature at this time because all the
4   parties are not before Arbitrator Rifkin at this time.

5       As to the Court's suggestion that the arbitrator consolidate the already
6   pending arbitrations, Arbitrator Rifkin pointed out:

7       (1) Consolidation of the First and Second Arbitrations is not a critical
8   concern because the Second Arbitration is one for indemnity which, as a
9   practical matter, is premature because it can be resolved only after a hearing on
10   the First Arbitration in any event.

11       (2) Arbitrator Rifkin is appointed for only the First Arbitration and thus
12   has no power over the Second Arbitration, and no authority or ability at this time
13   to order that second arbitration consolidated with the first

14              **III. THE PARTIES SUGGESTIONS.**

15   **A. Plaintiff's Suggestion.**

16       The court should allow the September 25th hearing between Plaintiff and
17       Charis Feeney-Orchard to go forward and the motion to send this case to
18       arbitration should be denied. This is in keeping with IFTA rules, which
19       require a hearing within 120 days, and which do not provide for
20       consolidation of cases. Also, as Arbitrator Rifkin has pointed out,
21       Defendant's claim for indemnity is premature. None of the Defendants
22       in the Federal Case have been ordered to pay any money to Plaintiff.
23       Therefore, the whole basis for Defendants motion to send the present
24       case to arbitration is wrong. As there is no active indemnification claim
25       against any of the Defendants, there is no need to consolidate anything
26       and the Federal Case should continue.

27   **B. Defendant Adler's Suggestion.**

28   **As** Arbitrator Rifkin respectfully suggested, the proper procedure for ruling

on the Motion would be for the Court to simply grant the Motion using the standard form of order whereby the court stays or dismisses the action. Plaintiff will then either file her copyright claims against all parties in arbitration or abandon her case.  If Plaintiff does choose to file an arbitration to adjudicate the copyright claims against all parties, then Plaintiff remains subject to the IFTA arbitration clause and must proceed through an IFTA arbitration.  Arbitrator Rifkin will, in the interest of justice, enter an order staying the hearing on the First Arbitration as needed while all pending arbitrations are procedurally addressed.  If needed, the parties, or some of them, may seek to have Arbitrator Rifkin appointed as arbitrator in Plaintiff's newly filed copyright infringement arbitration against all parties (after clearance of any conflicts), after which point he would be able to consolidate the arbitrations in the interest of justice and proceed in one venue.

## IV.  NEXT ARBITRATION HEARING

Arbitrator Rifkin has set another telephonic hearing in the First Arbitration for September 16, 2019, with the expectation that he will be apprised of the outcome of the Court's September 12, 2019 hearing in the Federal Case.


Respectfully submitted:


DATED:  September  10, 2019          LAWRENCE & ASSOCIATES
                                     Attorneys at Law


                                     By:  /s/ Amy B. Lawrence
                                         Amy B. Lawrence
                                         Attorneys for Defendant
                                         ADLER & ASSOCIATES
                                         ENTERTAINMENT, LLC

1

2   DATED:  September 10, 2019          LITCHFIELD CAVO LLP

3

4

5

6                                      By:  /s/ Marc V. Allaria
                                           Marc V. Allaria
7                                          Attorneys for Defendant
                                           DREAMSCAPE MEDIA LLC
8

9

10  DATED:  September 10, 2019          DOLL AMIR & ELEY LLP

11

12

13                                     By:  /s/ Brett H. Oberst
                                           Brett H. Oberst
14                                         Attorneys for Defendant
                                           AMAZON.COM, INC.
15

16  DATED:  September 10, 2019          LAW OFFICES OF LARRY ZERNER

17

18

19                                     By:   /s/ Larry Zerner
                                           Larry Zerner
20                                         Attorneys for Plaintiff
                                           Kimberly Boyle
21

22

23

24

25

26

27

28

**JOINT STATUS REPORT**

EXHIBIT "I"

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 19-893-GW(SKx) | Date | September 12, 2019 |
| Title | *Kimberly Boyle v. Adler and Associates Entertainment, LLC, et al.* | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Anne Kielwasser | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Lawrence J. Zerner | Amy B. Lawrence |
| | Brett H. Oberst |

PROCEEDINGS:   **DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S MOTION TO COMPEL ARBITRATION AND TO DISMISS AND/OR STAY THE LITIGATION [25]**

Court hears further argument. Based on the Tentative issued on July 15, 2019, and for reasons stated on the record, Defendant's Motion to Compel is GRANTED. The Court stays this matter and sets a status conference for June 15, 2020 at 8:30 a.m., with a joint status report to be filed by noon on June 10, 2020.

                                                                    :        11

                                        Initials of Preparer   JG

EXHIBIT "J"



**Independent** 🖼️
**Film & Television**
🖼️ 🖼️ 🖼️ **Alliance**
**Arbitration®**

10850 Wilshire Boulevard / 9th Floor
Los Angeles, CA 90024-4321
310-446-1000 TEL / 310-446-1600 FAX
www.ifta-online.org / info@ifta-online.org

October 17, 2019

Charis Feeney-Orchard
9, Wirrilda Way
Forestville, NSW
2087 Australia
        Via email: charisorchard@gmail.com and registered mail

Larry Zerner, Esq.
Law Offices of Larry Zerner
1801 Century Park East, Suite 2400
Los Angeles, CA  90067
        Via email: larry@zernerlaw.com and certified mail

Re:   Arbitration #19-18 – Charis Feeney-Orchard v. Kim Boyle

Gentlepersons:

In accordance with Paragraph 12.3 of the applicable IFTA Rules for International Arbitration, enclosed is a fully executed Final Award, and the arbitrator's final invoice for services rendered in this matter.  Please remit your party's share of the outstanding balance within ten (10) days of receipt of this invoice.

This Award is being forwarded to the Parties via email, with an original to follow via USPS certified and registered mail.  If you would like to receive the Award via courier, please provide IFTA with your courier account number no later than close of business day from the date of this letter.

Sincerely,
IFTA

Richonda Starkey
Arbitral Agent

enclosures by certified and registered mail

cc:     Roy G. Rifkin, Esq., Arbitrator – rrifkin@wrslawyers.com w/o attachments
        Susan Cleary, Vice President & General Counsel, IFTA

# DECLARATION OF SERVICE

I, Richonda Starkey, declare as follows:

I act as Arbitral Agent for IFTA Arbitration in Los Angeles, California. I am over the age of eighteen years of age and am not a party to this action. IFTA's address is 10850 Wilshire Boulevard, 9th Floor, Los Angeles, CA 90024. On October 17, 2019, I served the **Final Award** on the interested parties as follows:

☒      **BY REGISTERED AND/OR CERTIFIED MAIL:** I placed a true copy in a sealed envelope addressed the party/ies indicated at the address(es) below. The envelope was deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party serviced, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day after date of deposit for mailing in affidavit.

☐      **BY COURIER/OVERNIGHT SERVICE:** I caused DHL Express or Federal Express to deliver a true copy of the aforementioned document(s) in a sealed envelope with airbill addressed to the party/ies indicated at the address(es) shown below.

☐      **BY FACSIMILE:** I caused the aforementioned document to be transmitted by facsimile machine to the parties and numbers indicated below. The transmissions were reported as complete, and no errors were reported by the facsimile machine. Copies of the transmission records are maintained by our office.

☐      **BY PERSONAL SERVICE:** I caused Express Group, Inc. to hand deliver a true copy of the aforementioned document(s) in a sealed envelope addressed to each person(s) named at the address(es) shown below.

☒      **BY ELECTRONIC MAIL (.PDF FORMAT):** I caused a true copy of the aforementioned document(s) to be sent via e-mail (.pdf format) to the interested party/ies at the e-mail address/es indicated below.

Executed on October 17, 2019 at Los Angeles, California.

☒      **I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

**RICHONDA STARKEY**
**Arbitral Agent**
**IFTA Arbitration**

## SERVICE LIST

**IFTA Arbitration #19-18**
**Charis Feeney-Orchard v. Kim Boyle**

Charis Feeney-Orchard
9, Wirrilda Way
Forestville, NSW
2087 Australia
charisorchard@gmail.com

Larry Zerner, Esq.
Law Offices of Larry Zerner
1801 Century Park East, Suite 2400
Los Angeles, CA  90067

larry@zernerlaw.com

.

INDEPENDENT FILM & TELEVISION ALLIANCE

INTERNATIONAL ARBITRATION TRIBUNAL

CHARIS FEENEY-ORCHARD,

      Claimant / Counter-Respondent,

           v.

KIM BOYLE,

      Respondent / Counter-Claimant.


Arbitration No. 19-18

_____


FINAL AWARD


      This Arbitration was commenced by Claimant Charis Feeney-Orchard ("Claimant" or "Orchard")
by Notice of Arbitration dated April 11, 2019, under the Screenplay Option Purchase Agreement
("Agreement") dated May 12, 2014, providing for the binding arbitration of any disputes under the IFTA
Rules of International Arbitration.  The claim is essentially one for declaratory relief seeking a
declaration that the purchase price for the rights to the subject screenplay was $3,750.00.  Respondent
Kim Boyle ("Respondent" or "Boyle") counterclaimed for the amount of $125,000.00, which she
contends is the purchase price provided for in the Agreement.

      All claims and counterclaims have been properly served in accordance with the IFTA Rules.
Roy G. Rifkin was duly appointed as Arbitrator, and the arbitration proceeded under the jurisdiction of
IFTA and the Arbitrator.  The matter came on for hearing September 25, 2019.  Claimant appeared *pro
se*; Respondent was represented at the hearing by Larry J. Zerner, Esq.


1

FACTS

Respondent is the writer of a motion picture screenplay entitled *Casanova -- Lost and Found* (the "Screenplay"). Beginning in April 2014 and continuing into November 2014 Orchard, a budding motion picture producer, negotiated with Boyle directly and with Boyle's attorney Jay Kenoff ("Kenoff") in an attempt to acquire the rights to the Screenplay in order to produce a feature length motion picture based thereon. The negotiations were conducted primarily, if not exclusively, by email. Throughout the negotiations Orchard indicated that she was a film student and that the picture she contemplated making would have a very low budget. Boyle and Kenoff, on the other hand, made equally clear that the minimal offers being made by Orchard for the rights to the Screenplay would not be accepted.

Ultimately, on or about November 4, 2014, both Orchard and Boyle signed the Agreement. The final document was based on a draft provided by Orchard with various provisions incorporated into that draft by Kenoff. Of primary importance are the provisions relating to the option period, the exercise of the option, and the purchase price. The Agreement provides for an option price of $500.00 for a one year option on the Screenplay, with the option exercisable by written notice and payment of the purchase price no later than five business days after commencement of principal photography. The Agreement provides as to the purchase price (apart from provisions for contingent compensation, sequels, remakes, etc.) as follows:

> "The amount of the Purchase Price shall equal 3% of the final budget of the Picture (with exclusions for contingency, actual bond fees, finance charges and purchase price for screenplay), floor of $125,000, cap of $250,000."

Additionally, the Agreement provides, at paragraph 1, that the transfer of rights to the Screenplay takes place "[u]pon exercise of the Option . . . and payment of the Purchase Price . . . ."

Orchard paid the $500.00 option fee. Then in January 2015 she began principal photography on a motion picture (the "Picture") entitled *Perfect Piece*. It is not disputed that the Picture is based on

2

Boyle's Screenplay.  Orchard did not notify Boyle that she was shooting the Picture, did not provide written notice of exercise of the option, and did not pay or tender to Boyle the purchase price under the Agreement.  In August 2015 Orchard entered into a contract with a sales agent for the distribution of the Picture but still did not notify Boyle (or Kenoff) that the Picture was being completed and placed in distribution.  Neither did she pay the purchase price.  Boyle was informed by a third party later in August 2015 that the Picture was on IMDB (with Boyle credited as writer) whereupon Boyle contacted Orchard.  Only then did Orchard acknowledge that she was obligated to pay Boyle the purchase price under the Agreement.  Orchard then tendered to Boyle the sum of $3,750.00, contending that this amount is 3% of $125,000.00, and thus the correct calculation of the purchase price.  Boyle did not accept such tender, contending that under the Agreement $125,000.00 constitutes the minimum purchase price, not the minimum budget for purposes of the purchase price formula.

Efforts to resolve the matter, including apparently some involvement on the part of the sales agent for the Picture, were unsuccessful; and this Arbitration ensued.

ISSUES

The issues presented are:

1. What does the Agreement provide as to the purchase price?

2. Is Orchard liable for either breach of contract or copyright infringement?

ANALYSIS

1. The rules for contract interpretation in California are well-established and set forth fundamentally in Civil Code sections 1635, *et seq*.  The contract is to be viewed as a whole (Civil Code section 1641) with the language in question to be interpreted in the context of the entire instrument. *See Haering v. Topa Insurance Co.*, 244 Cal.App.4th 725,733 (2016).

3

The interpretation of the purchase price provision proposed by Claimant is not a reasonable one either based on the language of the provision itself or in the context of other provisions of the Agreement. The purchase price theory proffered by Claimant, for example, defies logic in the context of other provisions in the Agreement regarding compensation for television productions, sequels, and the like. It must be found, therefore, that the Agreement provides for a minimum purchase price of $125,000.00.

Even assuming that Orchard signed the Agreement with the mistaken belief that the purchase price was to be $3,750.00 (something which Orchard credibly asserts), this does not avail her. A contract properly may be rescinded, under appropriate circumstances, on the ground of unilateral mistake of fact. *Donovan v. Rrl Corp.,* 26 Cal. 4th 261, 281-2 (2001). Such a unilateral mistake might have given her an ability to rescind the contract had she timely tendered what she believed was owing at the commencement of principal photography. She forfeited that right, however, when she surreptitiously completed the Picture and commenced distribution thereof. She is barred from the equitable remedy of rescission by virtue of her unclean hands. *See Kendall-Jackson Winery, Ltd. v. Superior Court,* 76 Cal. App. 4th 970, 978 (1999).

2. The precise nature of the relief to which Respondent may be entitled is driven by a determination of whether the payment of the purchase price for the Screenplay is an independent covenant or is a condition of the transfer of rights to the Screenplay. *Wu v. Pearson Educ., Inc.,* 277 F.R.D 255, 267 (SDNY 20110. If the payment obligation is an independent covenant, Orchard is in breach of the Agreement by having failed to pay the amount called for therein. On the other hand, if the payment obligation is a condition precedent to the transfer of rights to the Screenplay the failure to pay means that the rights never transferred, the result being that Orchard has engaged in copyright infringement as a result of her producing the Picture and placing it in distribution. In California, and apparently most other jurisdictions, conditions precedent are not favored in the law. Absent clear indications that a contract term is a condition, it is to be viewed as a covenant. *Rubin v. Fuchs,* 1 Cal. 3d 50, 53 (1969). In this case such indications exist. As noted above, the Agreement clearly provides that the transfer of rights takes place "upon exercise of the Option . . . and payment of the Purchase Price." That phrase is repeated elsewhere in the Agreement (see paragraphs 4 and 9(e)), making it abundantly clear that the rights to produce a motion picture based on the Screenplay do not pass absent the proper exercise of the option and payment of the purchase price. Those obligations are conditions precedent

which Claimant did not meet.  Since she never acquired the rights to the Screenplay, Claimant's production and distribution of the Picture are acts of copyright infringement for which she is liable. Under the Copyright Act Respondent is entitled to recover from Claimant her actual damages, as prayed for, in the amount of $125,000.00.

<u>AWARD</u>

Based on the foregoing, the Arbitrator hereby makes the following Award:

1.      The claim for declaratory relief set forth in Claimant Charis Feeney Orchard's Notice of Arbitration is denied.

2.      Respondent Kim Boyle's counterclaim is granted in the amount of $125,000.00 US.

3.      Respondent is the prevailing party and therefore entitled to recover attorney's fees. Accordingly, Claimant shall pay to Respondent the sum of $10,000.00 US for attorney's fees.

4.      In accordance with IFTA Rule 14, all administrative fees of the Independent Film & Television Alliance, fees of the Arbitrator, and other costs shall be borne as incurred by the parties.

DATED:  October 11, 2019

Roy G. Rifkin

Arbitrator

**ROY G. RIFKIN, ESQ.**
**11400 West Olympic Boulevard, Ninth Floor**
**Los Angeles, California 90064**
**310-478-4100**

October 11, 2019

STATEMENT FOR ARBITRATOR'S SERVICES

Re: <u>Feeney-Orchard v. Boyle</u>
IFTA Arbitration No. 19-18

| | | |
|---|---|---|
| 6/14/19 | Review Pleadings | 1.00 |
| 6/17/19 | Review Response to Proposed Cross-Claim | 0.30 |
| 6/17/19 | Telephonic Preliminary Hearing / Prepare Report and Order | 0.90 |
| 7/19/19 | Review Motion to Add Respondent | 0.50 |
| 7/31/19 | Review Opposition Papers | 0.40 |
| 8/1/19 | Prepare Order | 0.40 |
| 8/23/19 | Telephone Conference w/Parties, Counsel | 1.00 |
| 8/25/19 | Prepare Report of Status Conference | 0.20 |
| 9/16/19 | Telephone Conference w/Parties, Counsel | 0.50 |
| 9/17/19 | Telephone Conference w/Parties, Counsel | 0.20 |
| 9/24/19 | Review Briefing, Witness and Exhibit Lists | 0.80 |
| 9/25/19 | Hearing | 6.00 |
| 10/2/19 | Review Record / Prepare Award | <u>3.00</u> |

Total      15.20
@$350 / hour

| | |
|---|---|
| TOTAL ARBITRATOR FEE | $5,320 |
| LESS DEPOSIT | ($3,000) |
| BALANCE DUE | $2,320 |

Payable one-half ($1,160) each by Claimant and Respondent per payment directions in May 9, 2019, letter from IFTA Arbitral Agent

EXHIBIT "K"

**Amy Lawrence**

| | |
|---|---|
| **From:** | Larry Zerner <Larry@zernerlaw.com> |
| **Sent:** | Tuesday, October 22, 2019 12:14 PM |
| **To:** | Amy Lawrence; 'Marc Allaria'; Brett Oberst |
| **Subject:** | Boyle v. Adler, et al. |
| **Attachments:** | Stipulation for IFTA Arbitration.docx |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Counsel,

As we have obtained the ruling from the arbitrator in the action against Charis Feeney-Orchard, I am proceeding with the copyright infringement claim against Adler, Amazon and Dreamscape. Because there is no contract between Boyle and the Defendants, I spoke to the IFTA administrator and she informed me that in order for IFTA to accept the arbitration, it would need a stipulation filed by the parties agreeing to the IFTA arbitration.  To that end, I have prepared a short stipulation whereby the parties agree to have the copyright infringement claim heard by IFTA arbitration.  Please sign and get it back to me no later than Friday, October 25, 2019.  If you have any issues with the stipulation, please let me know what they are.

Thank you for your prompt attention to this matter.

Larry

---

<u>ZERNERLAW</u>
Copyright, Trademark, and Entertainment Law

1801 Century Park East, Suite 2400
Los Angeles, CA  90067
Tel (310) 773-3623
Fax (310 634-1256
Url <u>www.ZernerLaw.com</u>

---

The information contained in this email and its attachments is confidential and may be the subject of legal, professional or other privilege. It is intended only for the named addressees and may not be disclosed to anyone else without consent from ZernerLaw. If you are not the named addressee you must not use, disclose, distribute, copy, print or rely on the contents of this email and should destroy it immediately. Whilst ZernerLaw takes care to protect its systems from electronic virus attack or other harmful element, the firm gives no warranty that this email message (including any attachments to it) is free of any virus or other harmful matter and accepts no responsibility for any loss or damage resulting from the recipient receiving, opening or using it. If you need further information, please contact the originator of this message on (310) 773-3623.

## STIPULATION FOR IFTA ARBITRATION

WHEREAS, on February 6, 2019, Kimberly Boyle filed a lawsuit in the United States District Court, Central District of California, Case No. 2:19CV00893 for damages for copyright infringement against Defendants Adler & Associates Entertainment, LLC, Amazon.Com, Inc., and Dreamscape Media, LLC; and

WHEREAS, on May 22, 2019, Defendant Adler & Associates Entertainment, LLC filed a motion to compel arbitration and stay the litigation; and

WHEREAS, Defendants Amazon.com, Inc., and Dreamscape Media, LLC joined in the motion filed by Adler; and

WHEREAS, on September 12, 2019, the Court granted Defendants motion and ordered the case to arbitration;

THEREFORE, Plaintiff and Defendants hereby stipulate, by and through their attorneys of record, that the copyright infringement dispute be administered and resolved by final and binding arbitration under the IFTA Rules for International Arbitration, the arbitration shall be heard in Los Angeles, California. The Parties agree to accept service of process in accordance with the IFTA® Rules and agree that such service satisfies all requirements to establish personal jurisdiction over the Parties.

**IT IS SO STIPULATED:**

DATED: October ___, 2019                    LAWRENCE & ASSOCIATES
                                            Attorneys at Law


                                            By:_____
                                            Amy B. Lawrence
                                            Attorneys for Defendant
                                            Adler & Associates Entertainment, LLC


DATED: October ___, 2019                    LITCHFIELD CAVO LLP


                                            By:_____
                                            Marc V. Allaria
                                            Attorneys for Defendant
                                            DREAMSCAPE MEDIA LLC

DATED: October ___, 2019    DOLL AMIR & ELEY LLP


By:_____
Brett H. Oberst
Attorneys for Defendant
AMAZON.COM, INC.

DATED: October 22, 2019    LAW OFFICES OF LARRY ZERNER

By:_____
Larry Zerner
Attorneys for Plaintiff Kimberly Boyle

EXHIBIT "L"

**Amy Lawrence**

| | |
|---|---|
| **From:** | Larry Zerner <Larry@zernerlaw.com> |
| **Sent:** | Friday, November 1, 2019 2:04 PM |
| **To:** | Amy Lawrence; 'Brett Oberst'; 'Marc Allaria' |
| **Subject:** | RE: Adler adv. Boyle |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Counsel,

As none of you have so far agreed to sign the stipulation to have the case arbitrated by IFTA, I have no choice but to file a motion with the court to either 1) order you to participate in an IFTA arbitration, or 2) send the case back to the Federal Court since you don't want to participate in an arbitration.

You can't have it both ways.  You can't file a motion asking to have the case sent to IFTA for arbitration and then refuse to sign a stipulation agreeing to the IFTA arbitration.  As you made clear in your earlier motion that there were three pending cases in IFTA, I don't think the court is going to agree with Ms. Lawrence's contention that really this should be heard by AAA or JAMS.

Pursuant to Local Rule 7-3, this email shall constitute a request for a meet and confer to discuss the motion.  I am available on November 5-7 anytime between 9-5 to conduct a meet and confer.  Please confer among yourselves and let me know a date and time that works for you.

Thank you,

Larry

---

**ZERNERLAW**
Copyright, Trademark, and Entertainment Law

1801 Century Park East, Suite 2400
Los Angeles, CA  90067
Tel (310) 773-3623
Fax (310 634-1256
Url www.ZernerLaw.com

---

The information contained in this email and its attachments is confidential and may be the subject of legal, professional or other privilege. It is intended only for the named addressees and may not be disclosed to anyone else without consent from ZernerLaw. If you are not the named addressee you must not use, disclose, distribute, copy, print or rely on the contents of this email and should destroy it immediately. Whilst ZernerLaw takes care to protect its systems from electronic virus attack or other harmful element, the firm gives no warranty that this email message (including any attachments to it) is free of any virus or other harmful matter and accepts no responsibility for any loss or damage resulting from the recipient receiving, opening or using it. If you need further information, please contact the originator of this message on (310) 773-3623.

**Amy Lawrence**

| | |
|---|---|
| **From:** | Amy Lawrence |
| **Sent:** | Friday, November 1, 2019 3:19 PM |
| **To:** | Larry Zerner |
| **Cc:** | Brett Oberst; Marc Allaria |
| **Subject:** | Re: Adler adv. Boyle |

Larry-

You are misrepresenting the facts.  Adler had moved to compel Plaintiff to arbitrate with all parties in one arbitration, and even specifically discussed your option to file a single arbitration with all parties.  Ms. Orchard was willing to do that.  You refused, insisting on arbitrating only with the one unrepresented party, Ms. Orchard.

Nevertheless, we are mindful of the requirement to meet and confer.  I am available November 7th anytime between 10:00 a.m. and 2:00 p.m.

Regards,

Amy B. Lawrence
LAWRENCE & ASSOCIATES
Attorneys at Law
2550 Hollywood Way, Suite 202
Burbank, California 91505
(818) 843-6442 * (818) 566-7875 fax
Email to: ablawrence@lawandassoc.com
Website: www.lawandassoc.com

NOTICE
This e-mail message is confidential, intended only for the
named recipient(s) above and may contain information that
is privileged, attorney work product or exempt from disclosure
under applicable law. If you have received this message in
error, or are not the named recipient(s), please immediately notify
the sender at (818) 843-6442, permanently delete this e-mail message
from your computer, and destroy any printed or other copy.
Thank you.

On Nov 1, 2019, at 2:04 PM, Larry Zerner <Larry@Zernerlaw.com> wrote:

Counsel,

As none of you have so far agreed to sign the stipulation to have the case arbitrated by IFTA, I have no choice but to file a motion with the court to either 1) order you to participate in an IFTA arbitration, or 2) send the case back to the Federal Court since you don't want to participate in an arbitration.

You can't have it both ways.  You can't file a motion asking to have the case sent to IFTA for arbitration and then refuse to sign a stipulation agreeing to the IFTA arbitration.  As you made clear in your earlier motion that there were three pending

**Amy Lawrence**

| | |
|---|---|
| **From:** | Larry Zerner <Larry@zernerlaw.com> |
| **Sent:** | Monday, November 4, 2019 10:38 AM |
| **To:** | Amy Lawrence |
| **Cc:** | Brett Oberst; Marc Allaria |
| **Subject:** | RE: Adler adv. Boyle |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Amy,

I am not misrepresenting any facts.  Your motion to compel arbitration was based on the premise that the factual allegations in the lawsuit "touch matters" covered by the contract containing the arbitration clause.  As you said in the motion, "Boyle bears the burden of proof as to whether its copyright claim is outside the scope of the arbitration clause."  (Motion p.15:26-27).  As the judge held that Boyle did not meet its burden, the ruling is that the copyright claim is within the scope of the arbitration clause.  As the arbitration clause in the Boyle-Orchard agreement calls for IFTA arbitration (as does the Orchard-Adler contract and the Adler-Dreamscape contract), the matter is to heard before IFTA.

But if you want to just increase the attorney's fees by arguing about this, I will call you on November 7 at 10:30 to conduct our meet and confer.

Larry

---

**ZERNERLAW**
Copyright, Trademark, and Entertainment Law

1801 Century Park East, Suite 2400
Los Angeles, CA  90067
Tel (310) 773-3623
Fax (310) 634-1256
Url www.ZernerLaw.com

---

The information contained in this email and its attachments is confidential and may be the subject of legal, professional or other privilege. It is intended only for the named addressees and may not be disclosed to anyone else without consent from ZernerLaw. If you are not the named addressee you must not use, disclose, distribute, copy, print or rely on the contents of this email and should destroy it immediately. Whilst ZernerLaw takes care to protect its systems from electronic virus attack or other harmful element, the firm gives no warranty that this email message (including any attachments to it) is free of any virus or other harmful matter and accepts no responsibility for any loss or damage resulting from the recipient receiving, opening or using it. If you need further information, please contact the originator of this message on (310) 773-3623.

**From:** Amy Lawrence <ablawrence@lawandassoc.com>
**Sent:** Friday, November 1, 2019 3:19 PM
**To:** Larry Zerner <Larry@zernerlaw.com>

## Amy Lawrence

| | |
|---|---|
| **From:** | Amy Lawrence |
| **Sent:** | Tuesday, November 12, 2019 11:04 AM |
| **To:** | Larry Zerner |
| **Cc:** | Brett Oberst; Marc Allaria |
| **Subject:** | Adler adv. Boyle |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Dear Mr. Zerner:

So there is no misinterpreptation, I will simply memorialize our position after our failed attempt to resolve issues prior to motions.

You believe all parties agreed to an IFTA Arbitration, so despite your choice to proceed with a single IFTA Arbitration with only one unrepresented party, Charis Orchard, the remaining parties must sign a Stipulation to proceed with another IFTA Arbitration.

We believe that you unreasonably insisted on moving forward with the single party arbitration, despite Judge Rifkin's suggestion that he would hold it in abeyance until you filed a proper single arbitration of your client's copyright infringement claims against all parties. We believe that, once ordered to arbitrate, you cannot unreasonably move forward with separate arbitrations. We believe you have waived and/or abandoned your right to arbitrate against the remaining parties.

We have agreed to disagree and file our respective motions.

Regards,

Amy B. Lawrence
LAWRENCE & ASSOCIATES
Attorneys at Law
2550 Hollywood Way, Suite 202
Burbank, California 91505
(818) 843-6442 * (818) 566-7875 fax
Email to: ablawrence@lawandassoc.com
Website: www.lawandassoc.com

NOTICE
This e-mail message is confidential, intended only for the
named recipient(s) above and may contain information that
is privileged, attorney work product or exempt from disclosure
under applicable law. If you have received this message in
error, or are not the named recipient(s), please immediately notify
the sender at (818) 843-6442, permanently delete this e-mail message
from your computer, and destroy any printed or other copy.
Thank you.

| | |
|---|---|
| **From:** | Larry Zerner |
| **To:** | Amy Lawrence |
| **Cc:** | Brett Oberst; Marc Allaria |
| **Subject:** | RE: Adler adv. Boyle |
| **Date:** | Tuesday, November 12, 2019 11:31:50 AM |

Ms. Lawrence,

Let me clear. My client did not agree to arbitration with any of you. But the court ordered this matter to arbitration based on my client's contract with Charis, and Adler's contracts with Charis and Dreamscape, all of which called for IFTA arbitration.

You have refused to agree to now arbitrate the matter except through AAA arbitration, despite the fact that none of the parties in this case is party to a AAA arbitration clause.

I will move the court to order the matter to IFTA. In terms of your purported motion to dismiss the case based on waiver, that would be a matter for an arbitrator to decide, not the judge, as you have already told the judge that this case must be arbitrated. Accordingly, Judge Wu would have no authority to rule on whether the matter should be dismissed.



Larry

ZERNERLAW

Copyright, Trademark, and Entertainment Law

**Amy Lawrence**

| | |
|---|---|
| **From:** | Amy Lawrence |
| **Sent:** | Tuesday, November 12, 2019 3:50 PM |
| **To:** | Larry Zerner |
| **Cc:** | Brett Oberst; Marc Allaria |
| **Subject:** | Re: Adler adv. Boyle |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Mr. Zerner:

For clarity, we believe you have waived all right to arbitrate further.  We have not agreed to arbitrate at AAA, but do believe Amazon does have a AAA clause.Regarding our prior Motion to Compel Arbitration, I do believe we reconfirmed that it was based upon equitable estoppel, and further believe Judge Wu does indeed have the authority to decide.

Regards,

Amy B. Lawrence
LAWRENCE & ASSOCIATES
Attorneys at Law
2550 Hollywood Way, Suite 202
Burbank, California 91505
(818) 843-6442 * (818) 566-7875 fax
Email to: ablawrence@lawandassoc.com
Website: www.lawandassoc.com

NOTICE
This e-mail message is confidential, intended only for the
named recipient(s) above and may contain information that
is privileged, attorney work product or exempt from disclosure
under applicable law. If you have received this message in
error, or are not the named recipient(s), please immediately notify
the sender at (818) 843-6442, permanently delete this e-mail message
from your computer, and destroy any printed or other copy.
Thank you.

On Nov 12, 2019, at 11:31 AM, Larry Zerner <Larry@Zernerlaw.com> wrote:

Ms. Lawrence,

Let me clear.  My client did not agree to arbitration with any of you.  But the court ordered this matter to arbitration based on my client's contract with Charis, and Adler's contracts with Charis and Dreamscape, all of which called for IFTA arbitration.

You have refused to agree to now arbitrate the matter except through AAA arbitration, despite the fact that none of the parties in this case is party to a AAA arbitration clause.

1

## Amy Lawrence

| | |
|---|---|
| **From:** | Larry Zerner <Larry@zernerlaw.com> |
| **Sent:** | Wednesday, November 13, 2019 10:22 AM |
| **To:** | Amy Lawrence |
| **Cc:** | Brett Oberst; Marc Allaria |
| **Subject:** | RE: Adler adv. Boyle |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Just to be clear.  You filed a motion saying that this matter has to be arbitrated and can't be heard by the court.  The court agrees with you and orders the matters to arbitration.  I ask you to sign a stipulation so that the arbitration can move forward and you now say that the matter can't be arbitrated and Judge Wu has to dismiss the case (that you told him has to be arbitrated).

Good luck with that.

Larry

## ZERNERLAW
Copyright, Trademark, and Entertainment Law

1801 Century Park East, Suite 2400
Los Angeles, CA  90067
Tel (310) 773-3623
Fax (310 634-1256
Url www.ZernerLaw.com

The information contained in this email and its attachments is confidential and may be the subject of legal, professional or other privilege. It is intended only for the named addressees and may not be disclosed to anyone else without consent from ZernerLaw. If you are not the named addressee you must not use, disclose, distribute, copy, print or rely on the contents of this email and should destroy it immediately. Whilst ZernerLaw takes care to protect its systems from electronic virus attack or other harmful element, the firm gives no warranty that this email message (including any attachments to it) is free of any virus or other harmful matter and accepts no responsibility for any loss or damage resulting from the recipient receiving, opening or using it. If you need further information, please contact the originator of this message on (310) 773-3623.

**From:** Amy Lawrence <ablawrence@lawandassoc.com>
**Sent:** Tuesday, November 12, 2019 3:50 PM
**To:** Larry Zerner <Larry@zernerlaw.com>
**Cc:** Brett Oberst <boberst@dollamir.com>; Marc Allaria <allaria@litchfieldcavo.com>
**Subject:** Re: Adler adv. Boyle

Mr. Zerner:

For clarity, we believe you have waived all right to arbitrate further.  We have not agreed to arbitrate at AAA, but do believe Amazon does have a AAA clause.Regarding our prior Motion to Compel Arbitration, I do believe we reconfirmed that it was based upon equitable estoppel, and further believe Judge Wu does indeed have the authority to decide.

Regards,

## Amy Lawrence

| | |
|---|---|
| **From:** | Amy Lawrence |
| **Sent:** | Wednesday, November 13, 2019 10:28 AM |
| **To:** | Larry Zerner |
| **Cc:** | Brett Oberst; Marc Allaria |
| **Subject:** | Re: Adler adv. Boyle |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Larry-

That is your take. Ours is that we filed a Motion to Arbitrate with all parties. We proposed stipulating to have that done. You refused and instead chose to arbitrate with only one party in pro per.

Regards,

Amy B. Lawrence
LAWRENCE & ASSOCIATES
Attorneys at Law
2550 Hollywood Way, Suite 202
Burbank, California 91505
(818) 843-6442 * (818) 566-7875 fax
Email to: ablawrence@lawandassoc.com
Website: www.lawandassoc.com

NOTICE
This e-mail message is confidential, intended only for the
named recipient(s) above and may contain information that
is privileged, attorney work product or exempt from disclosure
under applicable law. If you have received this message in
error, or are not the named recipient(s), please immediately notify
the sender at (818) 843-6442, permanently delete this e-mail message
from your computer, and destroy any printed or other copy.
Thank you.

> On Nov 13, 2019, at 10:22 AM, Larry Zerner <Larry@Zernerlaw.com> wrote:
>
> Just to be clear. You filed a motion saying that this matter has to be arbitrated and can't be heard by the court. The court agrees with you and orders the matters to arbitration. I ask you to sign a stipulation so that the arbitration can move forward and you now say that the matter can't be arbitrated and Judge Wu has to dismiss the case (that you told him has to be arbitrated).
>
> Good luck with that.
>
> Larry

1

**Amy Lawrence**

| | |
|---|---|
| **From:** | Larry Zerner <Larry@zernerlaw.com> |
| **Sent:** | Wednesday, November 13, 2019 10:50 AM |
| **To:** | Amy Lawrence |
| **Cc:** | Brett Oberst; Marc Allaria |
| **Subject:** | RE: Adler adv. Boyle |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Ms. Lawrence,

The court did not order that there be an arbitration with all parties. I specifically asked Judge Wu about that in the hearing and he said he was not. There is nothing in the judge's order which requires the arbitration with Adler, Amazon and Dreamscape to be consolidated with Charis' arbitration, and indeed, you could not do so under IFTA rules.

Further, this idea that you filed a motion seeking to compel arbitration with all the parties (including Charis) is patently not true. Your motion simply requests an "order to compel Boyle to submit all of her claims in this case to arbitration pursuant to the terms of the agreements." (Motion P. 8 and 22). In fact, nowhere in your motion did you ever ask the court to order consolidation of the arbitration with Charis case. I would further note that your request in the motion that Boyle submit her claims to arbitration "pursuant to the terms of the agreements" (all of which call for IFTA arbitration), makes your refusal to sign the stipulation for IFTA arbitration all the more incredible.

Boyle is willing to submit all of her claims to arbitration. You are defying the court's order. But the fact that your client is willing to pay you to stall and delay this case further tells me that it will have the money to pay my client and there would be no reason to settle for less than my client is entitled to. All you are doing is ensuring that this will cost your client more in the long run, both in additional legal fees it pays you, and in additional legal fees it will owe to me and my client when the case is over.

Larry

---

**ZERNERLAW**
Copyright, Trademark, and Entertainment Law

1801 Century Park East, Suite 2400
Los Angeles, CA  90067
Tel (310) 773-3623
Fax (310 634-1256
Url www.ZernerLaw.com

1

**Amy Lawrence**

| | |
|---|---|
| **From:** | Amy Lawrence |
| **Sent:** | Wednesday, November 13, 2019 11:00 AM |
| **To:** | Larry Zerner |
| **Cc:** | Brett Oberst; Marc Allaria |
| **Subject:** | Re: Adler adv. Boyle |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Mr. Zerner:

It is obvious that you believe in your erroneous position and mistaken recollections, and I acknowledge your need to get in the last word. However, your erroneous assumption that minor delays have everything to do with you and your client is specifically noted.

Regards,

Amy B. Lawrence
LAWRENCE & ASSOCIATES
Attorneys at Law
2550 Hollywood Way, Suite 202
Burbank, California 91505
(818) 843-6442 * (818) 566-7875 fax
Email to: ablawrence@lawandassoc.com
Website: www.lawandassoc.com

NOTICE
This e-mail message is confidential, intended only for the
named recipient(s) above and may contain information that
is privileged, attorney work product or exempt from disclosure
under applicable law. If you have received this message in
error, or are not the named recipient(s), please immediately notify
the sender at (818) 843-6442, permanently delete this e-mail message
from your computer, and destroy any printed or other copy.
Thank you.

On Nov 13, 2019, at 10:49 AM, Larry Zerner <Larry@Zernerlaw.com> wrote:

Ms. Lawrence,

The court did not order that there be an arbitration with all parties. I specifically asked Judge Wu about that in the hearing and he said he was not. There is nothing in the judge's order which requires the arbitration with Adler, Amazon and Dreamscape to be consolidated with Charis' arbitration, and indeed, you could not do so under IFTA rules.

Further, this idea that you filed a motion seeking to compel arbitration with all the parties (including Charis) is patently not true. Your motion simply requests an "order to compel Boyle to submit all of her claims in this case to arbitration

1

EXHIBIT "M"

**CRÉDIT AGRICOLE**
**ILE DE FRANCE**

Payer contre ce chèque non endossable, sauf au profit d'une banque ou d'un établissement assimilé

Trente Mille Sept Cent Cinquante euros

A Jay Kenoff

€ 3750,00€

Payable en France
33 BD DE GRENELL
75015 PARIS 15
TEL  01 44 37 29 75

MME FEENEY CHARIS
54 RUE ROUELLE
75015 PARIS

N° de compte 60250691987

5972856
▽ N° du chèque ▽

(44)

Fait à Londres
Le  21 08 15

△ Signature △

⑈5972856 ⑈075008206908⑈ 060250691987⑈

EXHIBIT "N"

**Amy Lawrence**

| | |
|---|---|
| **From:** | Charis Orchard <charisorchard@gmail.com> |
| **Sent:** | Sunday, October 20, 2019 7:35 PM |
| **To:** | Amy Lawrence; Marie Adler; Jeremy Lunt; Richonda Starkey |
| **Subject:** | Fwd: IFTA Arbitration #19-18 |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Dear Ms. Lawrence,

Please see below and note that I have no intention of further dealing with IFTA and as such I will not be participating in your arbitration. If you seek further indemnification, please contact me through an Australian lawyer and the Australian courts.

Sincerely,
Charis

---------- Forwarded message ---------
From: **Charis Orchard** <charisorchard@gmail.com>
Date: Mon, Oct 21, 2019 at 1:14 PM
Subject: Re: IFTA Arbitration #19-18
To: Richonda Starkey <rstarkey@ifta-online.org>, Roy Rifkin <rrifkin@wrslawyers.com>, k boyle <kb2fo@yahoo.com>
Cc: Larry Zerner <Larry@zernerlaw.com>

Thank you Ms. Starkey,

I have to say I am extremely disappointed with this decision by Arbitrator Rifkin and feel it disregards the evidence that clearly demonstrated my own misunderstanding as well as the blatant fraud that was carried out by Ms. Boyle and Mr. Kenoff. On top of this, it encourages further scamming and fraud by Ms. Boyle and Mr. Zerner. What a shameful system exists in the United States. Thankfully I live in Australia thus I will require that this is pursued in the Australian Courts  in order for any further payments to be made.

After such as disgraceful outcome, I have no further interest in defending my honor with the IFTA, and will not be responding to further correspondence unless it comes from within the Australian judicial system.

Sincerely,
Charis

On Fri, Oct 18, 2019 at 6:51 AM Richonda Starkey <rstarkey@ifta-online.org> wrote:

Gentlepersons:

In accordance with Paragraph 12.3 of the applicable IFTA Rules for International Arbitration, enclosed is a fully executed Final Award, and the arbitrator's final invoice for services rendered in this matter.

Sincerely,

**Richonda Starkey | Arbitral Agent**

**Independent Film & Television Alliance®**

10850 Wilshire Blvd., 9th Floor | Los Angeles | CA USA 90024

rstarkey@IFTA-online.org | 1.310.446.1047 (p) | 1.310.446.1600 (f)

www.IFTA-online.org | IFTA on Facebook

EXHIBIT "O"

## Amy Lawrence

**From:** Amy Lawrence
**Sent:** Tuesday, November 12, 2019 11:04 AM
**To:** Larry Zerner
**Cc:** Brett Oberst; Marc Allaria
**Subject:** Adler adv. Boyle

Dear Mr. Zerner:

So there is no misinterpretation, I will simply memorialize our position after our failed attempt to resolve issues prior to motions.

You believe all parties agreed to an IFTA Arbitration, so despite your choice to proceed with a single IFTA Arbitration with only one unrepresented party, Charis Orchard, the remaining parties must sign a Stipulation to proceed with another IFTA Arbitration.

We believe that you unreasonably insisted on moving forward with the single party arbitration, despite Judge Rifkin's suggestion that he would hold it in abeyance until you filed a proper single arbitration of your client's copyright infringement claims against all parties. We believe that, once ordered to arbitrate, you cannot unreasonably move forward with separate arbitrations. We believe you have waived and/or abandoned your right to arbitrate against the remaining parties.

We have agreed to disagree and file our respective motions.

Regards,

Amy B. Lawrence
LAWRENCE & ASSOCIATES
Attorneys at Law
2550 Hollywood Way, Suite 202
Burbank, California 91505
(818) 843-6442 * (818) 566-7875 fax
Email to: ablawrence@lawandassoc.com
Website: www.lawandassoc.com

NOTICE
This e-mail message is confidential, intended only for the
named recipient(s) above and may contain information that
is privileged, attorney work product or exempt from disclosure
under applicable law. If you have received this message in
error, or are not the named recipient(s), please immediately notify
the sender at (818) 843-6442, permanently delete this e-mail message
from your computer, and destroy any printed or other copy.
Thank you.

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action. My business address is **2550 Hollywood Way, Suite 202, Burbank, California 91505.**

On December ꝫ , 2019 I served the foregoing document described as **DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S MOTION TO DISMISS BASED UPON PLAINTIFF KIMBERLY BOYLE'S FAILURE TO INCLUDE DEFENDANT IN ARBITRATION PROCEEDINGS IN CONTRAVENTION OF PRIOR COURT ORDER COMPELLING PLAINTIFF TO ARBITRATE** on the interested parties in this action by placing the original and/or a true copy thereof enclosed in (a) sealed envelope(s), addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **BY REGULAR MAIL:** I deposited such envelope in the mail 2550 Hollywood Way, Suite 202, Burbank, California 91505. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☐ **BY FACSIMILE MACHINE:** I transmitted a true copy of said document(s) by facsimile machine, and no error was reported. Said fax transmission(s) were directed as indicated on the service list.

☐ **BY OVERNIGHT DELIVERY:** I caused such documents to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressees. The envelope or package was deposited with delivery fees thereon fully prepaid.

☐ **BY ELECTRONIC MAIL:** I transmitted a true copy of said document(s) via electronic mail, and no error was reported. Said email was directed as indicated on the service list.

☐ **BY PERSONAL SERVICE:** I caused such envelope(s) to be delivered by hand to the above addressee(s).

☑ **BY CM/ECF:** I electronically transmitted a true copy of said document(s) to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the aforementioned CM/ECF registrants.

I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December ꝫ , 2019, at Los Angeles, California.

_____
Raisa Rosa

18

**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF**
**MOTION TO DISMISS**

1

**SERVICE LIST**

| | |
|---|---|
| Larry Zerner<br>LAW OFFICES OF LARRY ZERNER<br>1801 Century Park East, Suite 2400<br>Los Angeles, CA 90067 | E: larry@zernerlaw.com<br><br>Tel: (310) 773-3623<br>Fax: (310) 388-5624<br><br>*Representing plaintiff Kimberly Boyle* |
| Gregory L. Doll<br>Jamie Olivia Kendall<br>Brett H. Oberst<br>Doll Amir & Eley LLP<br>725 South Figueroa Street, Suite 3275<br>Los Angeles, CA 90017 | E: boberst@dollamir.com<br>  gdoll@dollamir.com<br>  jkendall@dollamir.com<br><br>Tel: (213) 542-3380<br>Fax: (213) 542-3381<br><br>*Representing Defendant Amazon.com* |
| Marc Victor Allaria<br>Litchfield Caov LLP<br>251 South Lake Avenue Suite 750<br>Pasadena, CA 91101 | E: allaria@litchfieldcavo.com<br><br>Tel: (626) 683-1100<br>Fax: (626) 683-1113<br><br>*Representing Defendant Dreamscape* |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

19

**DECLARATION OF AMY B. LAWRENCE IN SUPPORT OF
MOTION TO DISMISS**

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

11

KIMBERLY BOYLE

12
                                    Plaintiff,

13
        vs.

14

15
ADLER & ASSOCIATES
ENTERTAINMENT, LLC, a California
16
LLC; AMAZON.COM, INC., a
Delaware corp.; DREAMSCAPE
17
MEDIA, LLC, an Ohio LLC; and
DOES 1 through 10, inclusive,

18

19
                                    Defendants.

| |
|---|

**CASE NO. 2:19CV00893-GW(SKx)**

**[PROPOSED] ORDER ON DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S MOTION TO DISMISS BASED UPON PLAINTIFF KIMBERLY BOYLE'S FAILURE TO INCLUDE DEFENDANT IN ARBITRATION PROCEEDINGS IN CONTRAVENTION OF PRIOR COURT ORDER COMPELLING PLAINTIFF TO ARBITRATE**

*[Filed Concurrently with Motion to Compel Arbitration and to Dismiss and/or Stay the Litigation; and Declaration of Amy B. Lawrence]*

20

21
Date: January 2, 2020
Time: 8:30 am
22
Courtroom: 9D

23
Judge: Hon. George H. Wu

24

25
        The Court having considered Defendant Adler & Associates

26
Entertainment, LLC's Motion to Dismiss Based Upon Plaintiff Kimberly

27
Boyle's Failure to Include Defendant in Arbitration Proceedings in

28

---

1   Contravention of Prior Court Order Compelling Plaintiff To Arbitrate ("Motion

2   to Dismiss"), and having considered any and all other documents filed in relation

3   to the Motion to Dismiss, the Motion to Dismiss is granted pursuant to Federal

4   Rules of Civil Procedure, Rule 41(b).

5

6       Plaintiff Kimberly Boyle's complaint in the above entitled action is

7   ordered dismissed with prejudice.

8

9

10      Dated: _____, 2020

11

12

13                                  _____

14                                      Hon. George H. Wu

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] ORDER ON
MOTION TO COMPEL ARBITRATION**

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action. My business address is **2550 Hollywood Way, Suite 202, Burbank, California 91505.**

On December ⌐2⌐, 2019 I served the foregoing document described as **[PROPOSED] ORDER ON DEFENDANT ADLER & ASSOCIATES ENTERTAINMENT, LLC'S MOTION TO DISMISS BASED UPON PLAINTIFF KIMBERLY BOYLE'S FAILURE TO INCLUDE DEFENDANT IN ARBITRATION PROCEEDINGS IN CONTRAVENTION OF PRIOR COURT ORDER COMPELLING PLAINTIFF TO ARBITRATE** on the interested parties in this action by placing the original and/or a true copy thereof enclosed in (a) sealed envelope(s), addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **BY REGULAR MAIL:** I deposited such envelope in the mail 2550 Hollywood Way, Suite 202, Burbank, California 91505. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☐ **BY FACSIMILE MACHINE:** I transmitted a true copy of said document(s) by facsimile machine, and no error was reported. Said fax transmission(s) were directed as indicated on the service list.

☐ **BY OVERNIGHT DELIVERY:** I caused such documents to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressees. The envelope or package was deposited with delivery fees thereon fully prepaid.

☐ **BY ELECTRONIC MAIL:** I transmitted a true copy of said document(s) via electronic mail, and no error was reported. Said email was directed as indicated on the service list.

☐ **BY PERSONAL SERVICE:** I caused such envelope(s) to be delivered by hand to the above addressee(s).

☑ **BY CM/ECF:** I electronically transmitted a true copy of said document(s) to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the aforementioned CM/ECF registrants.

I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December ⌐2⌐, 2019, at Los Angeles, California.

_Raisa Rosa_
Raisa Rosa

---

**[PROPOSED] ORDER ON**
**MOTION TO COMPEL ARBITRATION**

1

## SERVICE LIST

| | |
|---|---|
| Larry Zerner<br>LAW OFFICES OF LARRY ZERNER<br>1801 Century Park East, Suite 2400<br> Los Angeles, CA 90067 | E: larry@zernerlaw.com<br><br>Tel: (310) 773-3623<br>Fax: (310) 388-5624<br><br>*Representing plaintiff Kimberly Boyle* |
| Gregory L. Doll<br>Jamie Olivia Kendall<br>Brett H. Oberst<br>Doll Amir & Eley LLP<br>725 South Figueroa Street, Suite 3275<br>Los Angeles, CA 90017 | E: boberst@dollamir.com<br> gdoll@dollamir.com<br> jkendall@dollamir.com<br><br>Tel: (213) 542-3380<br>Fax: (213) 542-3381<br><br>*Representing Defendant Amazon.com* |
| Marc Victor Allaria<br>Litchfield Caov LLP<br>251 South Lake Avenue Suite 750<br>Pasadena, CA 91101 | E: allaria@litchfieldcavo.com<br><br>Tel: (626) 683-1100<br>Fax: (626) 683-1113<br><br>*Representing Defendant Dreamscape* |

**[PROPOSED] ORDER ON
MOTION TO COMPEL ARBITRATION**

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is **2550 Hollywood Way, Suite 202, Burbank, California 91505.**

On December 2, 2019 I served the foregoing document described as **DEFENDANT ADLER'S OPPOSITION TO MOTION TO COMPLY WITH 9/12/19 ORDER** on the interested parties in this action by placing the original and/or a true copy thereof enclosed in (a) sealed envelope(s), addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ **BY REGULAR MAIL:** I deposited such envelope in the mail 2550 Hollywood Way, Suite 202, Burbank, California 91505. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☐ **BY FACSIMILE MACHINE:** I transmitted a true copy of said document(s) by facsimile machine, and no error was reported. Said fax transmission(s) were directed as indicated on the service list.

☐ **BY OVERNIGHT DELIVERY:** I caused such documents to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressees. The envelope or package was deposited with delivery fees thereon fully prepaid.

☐ **BY ELECTRONIC MAIL:** I transmitted a true copy of said document(s) via electronic mail, and no error was reported. Said email was directed as indicated on the service list.

☐ **BY PERSONAL SERVICE:** I caused such envelope(s) to be delivered by hand to the above addressee(s).

☑ **BY CM/ECF:** I electronically transmitted a true copy of said document(s) to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the aforementioned CM/ECF registrants.

I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 2, 2019, at Los Angeles, California.

Raisa Rosa

Raisa Rosa

11

**DEFENDANT ADLER'S OPPOSITION TO**
**MOTION TO COMPLY WITH 9/12/19 ORDER**

1

## SERVICE LIST

| Larry Zerner<br>LAW OFFICES OF LARRY ZERNER<br>1801 Century Park East, Suite 2400<br> Los Angeles, CA 90067 | E: larry@zernerlaw.com<br><br>Tel: (310) 773-3623<br>Fax: (310) 388-5624<br><br>*Representing plaintiff Kimberly Boyle* |
|---|---|
| Gregory L. Doll<br>Jamie Olivia Kendall<br>Brett H. Oberst<br>Doll Amir & Eley LLP<br>725 South Figueroa Street, Suite 3275<br>Los Angeles, CA 90017 | E: boberst@dollamir.com<br>  gdoll@dollamir.com<br>  jkendall@dollamir.com<br><br>Tel: (213) 542-3380<br>Fax: (213) 542-3381<br><br>*Representing Defendant Amazon.com* |
| Marc Victor Allaria<br>Litchfield Caov LLP<br>251 South Lake Avenue Suite 750<br>Pasadena, CA 91101 | E: allaria@litchfieldcavo.com<br><br>Tel: (626) 683-1100<br>Fax: (626) 683-1113<br><br>*Representing Defendant Dreamscape* |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DEFENDANT ADLER'S OPPOSITION TO MOTION TO COMPLY WITH 9/12/19 ORDER**